**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| THE PENNSYLVANIA STATE | : | |
| UNIVERSITY, | : | No. 1:19-cv-02039 |
|     **Plaintiff** | : | |
| | : | **(Judge Kane)** |
|     v. | : | |
| | : | |
| KEYSTONE ALTERNATIVES LLC | : | |
| d/b/a GOPSURV.COM and | : | |
| MARK LAUER, | : | |
|     **Defendants** | : | |

## <u>MEMORANDUM</u>

Before the Court is Plaintiff The Pennsylvania State University ("Plaintiff")'s fully

briefed Motion to Exclude the Opinions of Jeffrey J. Neuman Under Rule 702 and <u>Daubert</u> (Doc.

No. 140).  Neither Plaintiff nor Defendants Keystone Alternatives LLC d/b/a GOPSURV.COM

("Keystone") and Mark Lauer ("Lauer," and with Keystone, "Defendants") requested a hearing

on the pending motion.  Upon careful consideration of the briefing and exhibits associated with

the motion, and the applicable law, and for the reasons provided herein, the Court will grant

Plaintiff's Motion to Exclude the Opinions of Jeffrey J. Neuman.

## I.     BACKGROUND

This is a trademark infringement action arising out of Defendant Keystone's alleged

infringing use of Plaintiff's registered trademark "PSU" and two internet domain names that

incorporate the PSU mark, as well as the "PENN STATE" mark and the "Nittany Lion Logo."

(Doc. No. 1 ¶¶ 1-4, 18-21, 26-31.)  In a May 3, 2021 Memorandum addressing discovery

disputes between the parties, Magistrate Judge Saporito succinctly summarized the factual

background of this case:

> [Plaintiff] has alleged that the defendants have infringed its trademarks by
> incorporating the PSU mark into their internet domain registered as

&lt;goPSUrv.com&gt; (the "Disputed Domain") and almost exclusively use the brand GoPSU rv.com rather than Keystone Alternatives to promote their goods and services.  ([Doc. No. 1] ¶ 43.)  [Plaintiff] alleges that the defendants attempt to suggest a connection, sponsorship, or affiliation with it where no such affiliation exists.  (Id. ¶ 45.)  It has further alleged that the defendants advertise in other media using the PSU mark, and they use other [Plaintiff] owned trademarks on their webpage and in advertising which has caused or is likely to cause irreparable injury to [Plaintiff].  (Id. ¶¶ 49, 52, 54-58, 66.)  The defendants contend that they have used the Disputed Domain for ten years with [Plaintiff's] knowledge and acquiescence.  Further, the defendants maintain that [Plaintiff] initiated a Uniform Domain Name Dispute Resolution Proceeding against them to deprive them of their rights causing a loss of revenue.

(Doc. No. 99 at 2-3.)

Based on the above facts, Plaintiff asserts the following claims against Defendants: trademark infringement (Count I), unfair competition (Count II), cybersquatting (Count III), and trademark dilution (Count IV), all in violation of the Lanham Act, 15 U.S.C. § 1051 et seq. (Doc. No. 1.)  The complaint also asserts a claim for trademark dilution (Count V) under Pennsylvania law and a claim for common law trademark infringement and unfair competition (Count VI).  (Id.)  Defendants filed a motion to dismiss the complaint, which the Court denied, and subsequently filed an answer to the complaint (Doc. No. 32), asserting counterclaims for cyberpiracy (Counterclaim Count I), reverse domain name hijacking (Counterclaim Count II), and tortious interference with contractual relations (Counterclaim Count IV), and seeking a declaratory judgment that Defendants' domain name GoPSUrv.com does not violate the Lanham Act (Counterclaim Count III).  Plaintiff filed a motion to dismiss Counterclaim Count IV (Doc. No. 33), which the Court granted (Doc. Nos. 39-40).

The Court conducted a case management conference and set a close of fact discovery date of December 31, 2020.  (Doc. No. 46.)  Thereafter, the case was referred to Magistrate Judge Saporito for purposes of conducting a settlement conference (Doc. Nos. 47, 49), and, by

agreement of the parties, the fact discovery deadline was extended to March 31, 2021 (Doc. No. 77).  After the undersigned handled an initial discovery-related motion (Doc. Nos. 54-56, 63-64, 67-68), the Court referred additional discovery-related disputes to Magistrate Judge Saporito for resolution in light of his familiarity with the case (Doc. Nos. 85, 102).  The Court then extended the close of fact deadline again—to April 30, 2021—upon the parties' joint request.  (Doc. No. 90.)

On May 4, 2021, Defendants filed another motion (Doc. No. 101), which Plaintiff opposed (Doc. No. 103), requesting an extension of the discovery deadline.  On June 7, 2021, acknowledging the May 2021 Orders of Magistrate Judge Saporito (Doc. Nos. 100, 107), which resolved the discovery disputes referred to him, the Court granted Defendants' motion only insofar as necessary to comply with Magistrate Judge Saporito's Orders (Doc. No. 109).   The Court conducted a post-discovery status conference with the parties on July 15, 2021, and issued a case management order setting a potential trial date for March 2022.  (Doc. No. 112.) Defendants subsequently filed a motion to compel deposition testimony and supporting memorandum (Doc. Nos. 114-15), and the Court, noting that the motion to compel related to one of the discovery disputes previously resolved by Magistrate Judge Saporito,[1] referred the dispute to him for resolution by Order dated September 29, 2021 (Doc. No. 118).  After the motion to compel was briefed, Defendants filed a motion to stay case deadlines based on Defendants' counsel's COVID-19 illness (Doc. No. 125), and the Court thereafter granted the motion to stay and continued all case management deadlines (Doc. No. 128).   The Court held a status

---

[1]  The motion to compel sought to compel the deposition testimony of James Franklin ("Coach Franklin"), the head coach of Plaintiff's football team.

conference with the parties on December 1, 2021,[2] after which the Court issued an Order lifting

the stay of case deadlines and ordering that any Daubert motions or motions to dismiss be filed

by December 13, 2021.  (Doc. No. 131.)

On that date, Plaintiff filed two Daubert motions (Doc. Nos. 135, 140) with supporting

briefs (Doc. Nos. 136, 141), and Defendants filed a motion to dismiss for failure to join an

indispensable party (Doc. No. 142), along with a supporting brief (Doc. No. 143).   Three days

before the parties filed those motions, Magistrate Judge Saporito issued a Memorandum and

Order (Doc. Nos. 133-34) denying Defendants' motion to compel the deposition testimony of

Coach Franklin.   On December 20, 2021, Defendants filed an appeal of Magistrate Judge

Saporito's Memorandum and Order denying their motion to compel (Doc. No. 148), along with a

brief in support of the appeal (Doc. No. 149).  Plaintiff filed a brief in opposition to Plaintiff's

appeal.  (Doc. No. 152.)  The parties agreed to extend the deadlines to oppose the pending

motions (Doc. No. 144), and, after briefs in opposition to the Daubert motions and the motion to

dismiss were filed (Doc. Nos. 153-55), the parties filed reply briefs to the briefs in opposition to

the pending motions (Doc. Nos. 156-58), making the motions ripe for resolution.

In September 2022 the Court denied Defendants' appeal of Magistrate Judge Saporito's

Order and also denied Defendants' motion to dismiss for failure to join an indispensable party.

(Doc. Nos. 161-64.)  Accordingly, at this juncture only Plaintiff's Daubert motions remain

pending for the Court's resolution.[3]

---

[2] At the status conference, Defendants' counsel indicated his plan to file a motion to dismiss for failure to join an indispensable party, and the parties agreed that Daubert motions must be resolved prior to the Court's issuance of a dispositive motion deadline.

[3] The Court will address Plaintiff's Motion to Partially Exclude the Opinions of Steven B. Boyles Under Rule 702 and Daubert (Doc. No. 135) by separate Order.

## II.    LEGAL STANDARD

Federal Rule of Evidence 702 governs the admissibility of expert testimony.  See Fed. R.

Evid. 702.  Rule 702 states, in relevant part:

> If scientific, technical, or other specialized knowledge will assist the trier of fact
> to understand the evidence or to determine a fact in issue, a witness qualified as
> an expert by knowledge, skill, experience, training, or education, may testify
> thereto in the form of an opinion or otherwise, if (1) the testimony is based upon
> sufficient facts or data, (2) the testimony is the product of reliable principles and
> methods, and (3) the witness has applied the principles and methods reliably to
> the facts of the case.

See id.

As the United States Court of Appeals for the Third Circuit has explained, "Rule 702

embodies a trilogy of restrictions on expert testimony: qualification, reliability and fit."  See

Schneider v. Fried, 320 F.3d 396, 404 (3d Cir. 2003).  The rule imposes an obligation on district

court judges to act as "gatekeepers" to ensure that an expert witness's testimony meets those

three threshold requirements before consideration by a jury.  See Kumho Tire Co. v. Carmichael,

526 U.S. 137, 147 (1999); Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579, 597 (1993).  In

fulfilling its obligation as a gatekeeper, a court exercises discretion when deciding whether to

admit or deny expert testimony.  See Gen. Elec. Co. v. Joiner, 522 U.S. 136, 146-47 (1997).

When considering the qualification requirement, a court must discern whether a

purported expert has specialized knowledge in a given field.  See Pineda v. Ford Motor Co., 520

F.3d 237, 244 (3d Cir. 2008).  No particular background or credentials are necessary to establish

the requisite specialized knowledge, as "a broad range of knowledge, skills, and training qualify

an expert."  See In re Paoli R.R. Yard PCB Litig., 35 F.3d 717, 741 (3d Cir. 1994); accord

Waldorf v. Shuta, 142 F.3d 601, 627 (3d Cir. 1998) (noting that a proposed expert witness's

generalized knowledge or practical experience may be sufficient to qualify him as an expert). While the Third Circuit has instructed that a court must "eschew[] imposing overly vigorous requirements of expertise," the determination of whether an expert is qualified to testify about a particular topic is not one that has been reduced to a mere formality, as the Court's assessment of a proposed expert's qualifications is predominantly a fact-specific endeavor that is governed by the unique circumstances in each case.  See Voilas v. Gen. Motors Corp., 73 F. Supp. 2d 452, 456 (D.N.J. 1999) (quoting United States v. Velasquez, 64 F.3d 844, 849 (3d Cir. 1995)).

As for the reliability requirement, the United States Supreme Court has held that the gatekeeping function requires the trial court to "make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field."  See Kumho Tire, 526 U.S at 152.  To meet this requirement, "a litigant has to make more than a prima facie showing that his expert's methodology is reliable," but the "evidentiary requirement of reliability is lower than the merits standard of correctness."  See Pineda, 520 F.3d at 244 (quoting In re Paoli, 35 F.3d at 744).  The expert's opinion "must be based on the methods and procedures rather than on subjective belief or unsupported speculation."  See In re TMI Litig., 193 F.3d 613, 664 (3d Cir. 1999).  "The focus is not upon the expert's conclusions, but rather upon his methodology; the issue is whether the evidence should be excluded because the flaw is large enough that the expert lacks good grounds for his or her conclusions."  Burke v. TransAm Trucking, Inc., 617 F. Supp. 2d 327, 331 (M.D. Pa. 2009) (citing In re Paoli, 35 F.3d at 746). When evaluating the reliability of a witness's methodology, a court is guided by several familiar factors drawn from Daubert:

6

> (1) whether a method consists of a testable hypothesis; (2) whether the method has been subject to peer review; (3) the known or potential rate of error; (4) the existence and maintenance of standards controlling the technique's operation; (5) whether the method is generally accepted; (6) the relationship of the technique to methods which have been established to be reliable; (7) the qualifications of the expert witness testifying based on the methodology; and (8) the non-judicial uses to which the method has been put.

See In re Paoli, 35 F.3d at 742 n.8. These factors "may or may not be pertinent in assessing reliability, depending on the nature of the issue, the expert's particular expertise, and the subject of his testimony." See Kumho Tire, 526 U.S. at 150. Accordingly, the Rule 702 inquiry is a flexible one, and the court should also take into account any other relevant factors. See Calhoun v. Yamaha Motor Corp., 350 F.3d 316, 321 (3d Cir. 2003).

Under the third requirement—fit—"the expert's testimony must be relevant for the purposes of the case and must assist the trier of fact." See Schneider, 320 F.3d at 404. "Rule 702's helpfulness standard requires a valid scientific connection to the pertinent inquiry as a precondition to admissibility." Daubert, 509 U.S. at 591-92. Indeed, an expert who renders an opinion based on factual assumptions not present in the case or opines on a matter that does not relate to a disputed issue is not relevant and, thus, will not assist the trier of fact, as required by Rule 702. See id. For example:

> The study of the phases of the moon . . . may provide valid scientific "knowledge" about whether a certain night was dark, and if darkness is a fact in issue, the knowledge will assist the trier of fact. However (absent creditable grounds supporting such a link), evidence that the moon was full on a certain night will not assist the trier of fact in determining whether an individual was unusually likely to have behaved irrationally on that night.

See id. Like the typical relevance inquiry, "the standard for analyzing the fit of an expert's analysis to the case at hand is 'not that high.'" See United States v. Ford, 481 F.3d 215, 219 n. 6 (3d Cir. 2007) (quoting In re Paoli, 35 F.3d at 745). However, expert testimony can be powerful

and misleading because of the difficulty in evaluating it, and the Third Circuit has cautioned that "district courts should tread carefully when evaluating proffered expert testimony, paying special attention to the relevance prong of <u>Daubert</u>." <u>See id.</u> at 219 n.6.

## III.   DISCUSSION

As an initial matter, in order to provide context to the opinion of Mr. Neuman proffered by Defendants and challenged by Plaintiff, and noting that the opinion relates to Plaintiff's Lanham Act claim of trademark infringement and/or Defendants' affirmative defense of nominative fair use, the Court briefly reviews the relevant law before specifically addressing Plaintiff's motion.

### A.   Relevant Law

Proof of trademark infringement under the Lanham Act requires a plaintiff's demonstration "that (1) it has a valid and legally protectable mark; (2) it owns the mark; and (3) the defendant's use of the mark to identify goods and services causes a likelihood of confusion." <u>See</u> <u>A&H Sportswear, Inc. v. Victoria's Secret Stores, Inc.</u>, 237 F.3d 198, 210 (3d Cir. 2000). The Third Circuit has set forth a non-exhaustive list of factors considered by courts when determining whether a "likelihood of confusion" exists, as follows:

> (1) the degree of similarity between the owner's mark and the alleged infringing mark; (2) the strength of the owner's mark; (3) the price of the goods and other factors indicative of the care and attention expected of consumers when making a purchase; (4) the length of time the defendant has used the mark without evidence of actual confusion arising; (5) the intent of the defendant in adopting the mark; (6) the evidence of actual confusion; (7) whether the goods, though not competing, are marketed through the same channels of trade and advertised through the same media; (8) the extent to which the targets of the parties' sales efforts are the same; (9) the relationship of the goods in the minds of the consumers because of the similarity of function; (10) other facts suggesting that the consuming public might expect the prior owner to manufacture a product in the defendant's market, or that he is likely to expand into that market.

See Interpace Corp. v. Lapp, Inc., 721 F.2d 460, 463 (3d Cir. 1983).

Nominative fair use is an affirmative defense to claims of trademark infringement.  See Century 21 Real Estate Corp. v. Lendingtree, Inc., 425 F.3d 211, 228 (3d Cir. 2005).  Within the Third Circuit, courts apply a two-step approach when evaluating a nominative fair use defense. See Commerce Bancorp, LLC v. Hill, No. 08-cv-05628, 2010 WL 2545166, at *14 (D.N.J. June 18, 2010) (citing Century 21, 425 F.3d at 222).  At the first step, "the primary inquiry is whether the defendant's use of the mark is likely to cause confusion."  See Pierre & Carlo, Inc. v. Premier Salons, Inc., 713 F. Supp. 2d 471, 483 (E.D. Pa. 2010) (citing Century 21, 425 F.3d at 222). "[T]he burden then shifts to defendant to show that its nominative use of plaintiff's mark is nonetheless fair."  Century 21, 421 F.3d at 222.  At the second step, a court considers:

> (1)  Is the use of the plaintiff's mark necessary to describe both plaintiff's product or service and defendant's product or service? (2) Is only so much of the plaintiff's mark used as is necessary to describe plaintiff's products or services? (3) Does the defendant's conduct or language reflect the true and accurate relationship between plaintiff and defendant's products or services?

See id. at 232.  "If each of these questions can be answered in the affirmative, the use will be considered a fair one, regardless of whether likelihood of confusion exists."  Id.

### B.    Motion to Exclude the Opinions of Jeffrey J. Neuman

#### 1.    The Proposed Expert Report and Testimony of Jeffrey J. Neuman

Defendants have tendered Jeffrey J. Neuman ("Mr. Neuman") as an expert to "discuss gTLD[4] registrations and the genericness of using the word 'go' as a prefix in gTLDs," both historically and in the time period between 1995 and 2012.  (Doc. No. 141-1 at 3 ¶ 1.)  The Report proffered by Mr. Neuman ("Mr. Neuman's Report") also states that Defendants asked

---

[4] "gTLD" is an abbreviation for "generic top-level domain."  (Doc. No. 141-1 at 4 ¶ 15.)

him to "research the use of the terms 'PSU' and/or 'Penn State' in domain names owned by third parties other than the Pennsylvania State University." (<u>Id.</u>)

As to the first issue, Mr. Neuman's Report concludes as follows:

100. It is my opinion, with a reasonable degree of certainty, as a domain name expert and a[] domain name attorney, that the term "GO" has been an incredibly valuable prefix used in domain names since the mid to late 1990s. It has been used in domain names associated with some of the world's leading companies, and has also been frequently used in connection with the RV industry[.]

(<u>Id.</u> at 28 ¶ 100.) With regard to the second issue, Mr. Neuman's Report opines that "the terms 'PSU' and 'Penn State' have been used by a number of individuals and organizations in domain names to describe the products and/or services they provide despite the fact that those organizations do not appear to be affiliated with the Pennsylvania State University." (<u>Id.</u> at 28-29 ¶ 101.)

In challenging both opinions proffered by Mr. Neuman's Report, Plaintiff argues that the opinions are unreliable and irrelevant to the issues in this case. (Doc. No. 141 at 5.) As to the first opinion, Plaintiff maintains that "Mr. Neuman provides no discernable—let alone reliable—methodology to support his conclusion that the prefix 'go' is valuable to domain names," arguing that, while his Report "recites alleged facts on the popularity of the prefix 'go' and the valuations of companies that use 'go' in their own domain names," it "fails to articulate any reliable methodology showing a causal relationship between using 'go' as a prefix in a domain name and value of the companies using those domains, or how that value equates to 'genericness.'" (<u>Id.</u> at 5-6.) In addition, Plaintiff argues that, even if Mr. Neuman employed a reliable methodology in developing his opinion regarding the use of the prefix "go," that opinion is irrelevant to the issues in the case because "Penn State does not assert that Defendants' use of 'go' in their

10

domain names infringes Penn State's Asserted Marks in this case"—"[n]or does the value of 'go'
have any apparent relevance to damages in this matter, as Penn State seeks only statutory
damages and transfer of Defendants' domain, not the domain's purported value, as relief for its
cybersquatting claim."  (Id. at 6.)  Further, Plaintiff asserts that Mr. Neuman offers no opinion on
the monetary value of 'go' in any case," and does not "offer an actual conclusion of whether 'go'
is generic."  (Id.)  Accordingly, Plaintiff argues that "whether the prefix 'go' is valuable or
generic is immaterial to this matter and will not assist the trier of fact," and therefore, that Mr.
Neuman's opinion does not "fit" the facts of this case.  (Id.)

Similarly, Plaintiff argues that Mr. Neuman's second opinion regarding the use of "Penn
State" or "PSU" in domain names of entities apparently unaffiliated with Penn State is
unreliable, as "he concedes that he only speculates that those domains are, in fact, unaffiliated
with Penn State."  (Id. at 6.)  Plaintiff maintains that this opinion is also irrelevant to the claims
at issue in this case because "Mr. Neuman provides no explanation as to why the use of Penn
State and PSU by entities he speculates are unaffiliated with Penn State is relevant to whether
Defendants' use of PSU in its own domain name infringes Penn State's PSU mark."  (Id. at 6-7.)
Accordingly, Plaintiff maintains that this opinion also does not "fit" the facts of this case.  (Id.)

The Court addresses the reliability and "fit" of each of Mr. Neuman's challenged two
opinions in turn below, after initially assessing his qualifications to offer expert testimony in this
proceeding.

## 2.    Qualification

Although Plaintiff does not directly challenge Mr. Neuman's qualification to offer expert testimony in this case,[5] because "the qualifications of the expert witness testifying based on the methodology" is one factor to be considered by the Court in evaluating the reliability of a witness's methodology, see In re Paoli, 35 F.3d at 742 n.8, the Court briefly reviews Mr. Neuman's qualifications before addressing the reliability of his methodology and the "fit" of his opinions to the facts of this case.

The Court notes that Mr. Neuman's Report reflects that he received two Bachelor of Arts degrees from the Pennsylvania State University, one in Labor & Industrial Relations and one in Political Science.  (Doc. No. 141-1 at 3 ¶ 8.)  Mr. Neuman then attended the George Washington University Law School in Washington, DC, and, while there, was a member and editor of the American Intellectual Property Law Association Law Journal before receiving his degree in 1997.  (Id. at ¶ 9.)  Mr. Neuman first practiced with the law firm of Arter & Hadden, LLP in Washington, DC, and later joined the firm of Greenberg Traurig in 1999, having been barred in both the Commonwealth of Virginia and the District of Columbia.  (Id. at 3 ¶ 10, 4 ¶ 11.)  Mr. Neuman's early legal practice focused on domain name enforcement issues; he joined the American Intellectual Property Association and became a co-chair of their "cyberlaw" committee.  (Id. at 4 ¶¶ 12-13.)  On behalf of that organization, and in connection with his legal practice, Mr. Neuman participated in Internet Governance discussions in 1997 and 1998 with the United States Department of Commerce and various members of the Internet community.  (Id. ¶ 13.)  In connection with that role, Mr. Neuman assisted in the formation of the Internet

---

[5]  In its reply brief, Plaintiff asserts that it "could not adequately challenge Mr. Neuman's qualifications, as without any explanation as to the meaning Mr. Neuman ascribed to 'value,' it is impossible to determine if Mr. Neuman's experience qualifies him to offer his opinion that 'go' is a 'valuable' domain prefix."  (Doc. No. 158 at 8 n.1.)

Corporation of Names and Numbers ("ICANN")[6] in 1998 and was one of the first members of the Intellectual Property Constituency ("IPC") of ICANN.  (Id.)  In connection with his practice with Greenberg Traurig's Intellectual Property and Information Technology transaction groups, Mr. Neuman represented various clients participating in ICANN's IPC and was appointed to a working group responsible for the development of the Uniform Dispute Resolution Policy ("UDRP").  (Id. ¶ 14.)  The UDRP, which went into effect in 1999, operates as an alternative dispute resolution forum to handle disputes arising from domain names registered and used in bad faith.  (Id.)

Mr. Neuman began working for a client of Greenberg Traurig, Neustar, Inc., as its Director of Law and Policy and was involved in the process of applying for a gTLD.  (Id. at 4-5 ¶¶ 15-16.)  Mr. Neuman continued his work at Neustar for approximately ten years, when he was asked to serve as Neustar's Vice President of Registry Services.  (Id. at 5 ¶¶ 19-20.)  In that capacity, he "led the acquisition of .co Internet S.A.S. (owners of the .co ccTLD), as well as 350 new gTLD applications for which Neustar served as the back-end technical registry services provider," and "was responsible for the acquisition, development and launch of the .nyc new gTLD on behalf of the City of New York, which launched in 2014."  (Id. ¶ 20.)  Mr. Neuman's next position was with Com Laude, USA, the North American arm of Nom-1Q Ltd., d/b/a Com Laude, a corporate domain name registrar and consultancy service located in the United

---

[6] As described by Mr. Neuman, "ICANN is a not-for-profit, public-benefit organization formed in 1998.  Its staff operates the Internet's Domain Name System, coordinates allocation and assignment of the Internet's unique identifiers, such as Internet Protocol addresses, accredits generic top-level domain (gTLD) name registrars, and helps facilitate the voices of volunteers worldwide who are dedicated to keeping the Internet secure, stable and interoperable."  (Doc. No. 141-1 at 4 n.1).

Kingdom, where he was hired to oversee all business development efforts in the United States.

(Id. ¶ 21.)  His Report describes his work with Com Laude in the following way:

> Com Laude maintained domain name portfolios for some of the largest global companies including Amazon, Microsoft, Twitter, HSBC, Nestle, Formula 1, Hard Rock, and Caterpillar.  In this role, we audited domain name portfolios and made recommendations on which of the thousands of names they registered needed to be kept, which could be deleted, and which domain names globally they should be registering.  In addition, we would assist our clients in acquiring domain names owned by other third parties, file domain name disputes where those third parties abusively registered the domain names, and engaged in other online brand enforcement activities.

(Id.)

In 2020, Mr. Neuman founded a consulting company called JJN Solutions, LLC, which "specializes in providing legal and policy services involving intellectual property, information technology transactions, Internet governance, domain name disputes, and Entertainment Law." (Id. at 5-6 ¶ 23.)  Mr. Neuman's Report lists a number of leadership positions that he has held within the "Internet, Intellectual Property and ICANN communities," including a panelist presiding on UDRP cases.  (Id. at 6 ¶ 24.)  Mr. Neuman's Report also represents that he has been a member of the International Trademark Association for a number of years and is "a frequent speaker on issues involving intellectual property, domain names, online dispute resolution, and the introduction of new gTLDs," as well as an author of "numerous articles on the domain name industry that have been featured on jjnsolutions.com and CircleID" and a interviewee of "several worldwide publications including the New York Times, Wired Magazine, IP Asia and the World Trademark Review."  (Id. at 6-7 ¶ 25.)

Upon consideration of all of the above, the Court concludes preliminarily that Mr. Neuman appears qualified to offer testimony as an expert on the general subject of domain

names and, accordingly, turns to an assessment of the reliability and fit of the two specific

opinions proffered by him in this case.

### 3.      Mr. Neuman's Proffered Opinion Regarding the Prefix "Go"

In the section of his Report entitled "The use of the word 'Go' in Domain Names," Mr.

Neuman states as follows:

> 53. One of the words that has been used in a variety of ways since the late 1990s in domain names were being offered for sale to commercial enterprises, is the word "Go."  As a short action word meaning "to move on a course: Proceed." It also is a term used in connection with sports to connote success or the drive for success (e.g., "Let's go Penn State.")

> 54. The Computer/Networking world has used the term "Go" in connection with computer programming language since at least as early as the development of the "BASIC" programming language.  More specifically, the "goto" or "Go To" command is often found in computer programming languages to denote a one-way transfer of control to another line of code.  Also called a "jump statement", it implies that if a condition is met, then the computer is told to "go to" another line of code in the program. (e.g. "IF X>100, Goto [Line] 50).

> 55. According to Y Combinator, a company that has funded over 3000 companies and worked with over 6000 founders, the keyword "GO" is the 2nd most preferred keyword used in the domain names owned by their companies.  In their portfolio of companies, 110 of them are valued over $100M and more than 25 companies are valued over $1B. The list of companies include GoCardless, Go1, go Billion, goDutch, GoTrade, GoGo Grandparent, GoLinks, GoLorry, GoComm, GoScale, and BeGo.

> 56. According to a complete analysis of the .com zone file, "Go" is ranked 4th in terms of Prefixes most commonly used in domain names, and 9th overall in the "Top 5000 Most Common Domain Prefix/Suffix List" in the .com zone file. As a suffix, "Go" ranks 234th overall.

(Doc. No. 141-1 at 12 ¶¶ 53-56) (footnotes omitted).  As to this issue, Mr. Neuman's Report

concludes as follows:

> 100. It is my opinion, with a reasonable degree of certainty, as a domain name expert and a[] domain name attorney, that the term "GO" has been an incredibly valuable prefix used in domain names since the mid to late 1990s.  It has been

used in domain names associated with some of the world's leading companies, and has also been frequently used in connection with the RV industry[.]

(Id. at 28 ¶ 100.)

### a.   Reliability

As set forth more fully above, the reliability inquiry focuses on an expert's methodology and whether he or she has good grounds for the opinion offered.  See In re Paoli, 35 F.3d at 746.

In re Paoli sets forth numerous factors to guide the Court in evaluating the reliability of a witness's methodology, as follows:

(1) whether a method consists of a testable hypothesis; (2) whether the method has been subject to peer review; (3) the known or potential rate of error; (4) the existence and maintenance of standards controlling the technique's operation; (5) whether the method is generally accepted; (6) the relationship of the technique to methods which have been established to be reliable; (7) the qualifications of the expert witness testifying based on the methodology; and (8) the non-judicial uses to which the method has been put.

See id. at 742 n.8.  As noted by Plaintiff, Mr. Neuman's Report does not explicitly set forth a methodology.  In Defendants' brief in opposition to Plaintiff's motion, Defendants represent that "Mr. Neuman's methodology is clear in paragraphs 53 – 85 of his Expert Report."  (Doc. No. 153 at 11.)  Defendants state that:

His methodology included referencing publicly-available registration records (WHOIS records) and information compiled therefrom showing how many domain names are using the prefix "go."  He then determined what industries these domains were operating in through examination of historical website screenshots information.  He made use of expert resources in conducting this analysis, including Y Combinator.  He determined from searchable information compiled from millions of WHOIS records how common the prefix "go" is in domain names relative to all other prefixes, concluding it is the fourth most commonly-used prefix in .com domain names on the Internet.  This issue is of central importance in assessing the degree to which the domain name as a whole is generic or descriptive under a nominative fair use analysis.

16

(Id.)  Defendants maintain that "[t]his is sound methodology with respect to Mr. Neuman's opinions on the prefix 'go'" and argue that "[i]nstead of attacking the soundness of this methodology, Plaintiff simply asserts that Neuman had no methodology."  (Id.)  Defendants assert that "[i]f the Plaintiff wants to question whether the research was extensive enough for the expert to conclude what he did, that is an acceptable cross examination factual dispute, but it is not a standard of review for whether an expert opinion is reliable."  (Id. at 19-20.)

Upon careful review of Mr. Neuman's Report, the briefs of the parties, and the relevant authorities, the Court concludes that Defendants have failed to meet their burden to demonstrate that Mr. Neuman's opinion that "the term GO has been an incredibly valuable prefix used in domain names since the mid to late 1990s," and has "been used in domain names associated with some of the world's leading companies, and has also been frequently used in connection with the RV industry" is based on a reliable methodology.   First, as noted by Plaintiff, Mr. Neuman's Report fails to provide discernable criteria for what makes a domain name "valuable," instead asserting that the prefix "go" is "incredibly valuable" apparently because it has been used in many domain names since the mid to late 1990s, including "domain names associated with some of the world's leading companies."  (Doc. No. 141-1 at 28 ¶ 100.)   The Court agrees with Plaintiff that Mr. Neuman's opinion assumes that the apparent popularity of the prefix "go" in domain names and its use by "some of the world's leading companies" equates to value of the prefix "go" without demonstrating or explaining how or why that is so.   As noted by Plaintiff, Mr. Neuman's analysis relies on domain names of valuable companies and appears to simply assume that the companies are valuable at least in part because of the use of the word "go" in their domain names "without taking into account that many of those companies are valuable for

17

reasons completely independent of their domain names."  (Doc. No. 141 at 12.)   In addition, Mr.

Neuman's Report does not consider domains of "leading companies" that do not use the prefix

"go" in an effort to assess the value added to domains by the use of the prefix "go."  Without

providing criteria by which to assess "value," Mr. Neuman's Report fails to provide "a logical

bridge" between the data he assesses and his conclusion that the prefix "go" is "valuable."  (Doc.

No. 158 at 11); see Joiner, 522 U.S. at 146 (stating that "nothing in either Daubert or the Federal

Rules of Evidence requires a district court to admit opinion evidence that is connected to existing

data only by the ipse dixit of the expert"); see also Oddi v. Ford Motor Co., 234 F.3d 136, 156

(3d Cir. 2000) (excluding expert testimony where expert opinion did not satisfy any of the

considerations governing a reliability inquiry); Fedor v. Frieghtliner, Inc., 193 F. Supp. 2d 820,

829 (E.D. Pa. 2002) (excluding expert testimony given lack of discernable methodology);

Hamilton v. Emerson Elec. Co., 133 F. Supp.2d 360, 371 (M.D. Pa. 2001) (same).

     Further, the Court finds Defendants' effort in their briefing to point to a definition of the

"value" of a domain name in Mr. Neuman's Report unavailing.  They describe Mr. Neuman's

view of "value" as "based upon numerous characterizations," including:

> value based on the way a business views a given domain name, value based upon
> non-trademarked or non-associational names creating value in a domain, common
> terms or phrases deemed valuable assets by investors in domains; investors
> recognizing that ". . . certain linguistic terms may, and sometimes by
> happenstance, correspond to distinctive marks. . ."; advertising based and
> keyword registration valuations; short and easy to remember, descriptive and
> generic domain names became valuable due to the rise in popularity of search
> engines; secondary markets selling domains for premium amounts due to the
> popularity of the internet and its domains.

 (Doc. No. 153 at 13-14.)  The Court agrees with Plaintiff that Defendants' explanation of Mr.

Neuman's view of "value to be projected on domain names . . . based upon numerous

characterizations" only underscores the necessity for Mr. Neuman to explain which of these "numerous characterizations" he relied on in determining the value of the prefix "go."  His Report does not do so and therefore fails to demonstrate "good grounds" for his opinion as to the value of the prefix "go."  See In re Zoloft Prods. Liab. Litig., 858 F.3d 787, 796-97 (3d Cir. 2017) (affirming exclusion of an expert who failed to explain how he reached his conclusions based on multiple criteria).

Moreover, even assuming that Mr. Neuman's Report defined "value" in connection with his opinion, his Report fails to explain how "value" equates to "genericness" for purposes of assessing the "genericness" of the prefix "go," which is the issue upon which he purports to opine.  See (Doc. No. 141-1 at 3 ¶ 1) (stating, "I have been retained on behalf of Keystone Alternatives, LLC d/b/a GoPSUrv.com and Mark Lauer . . . to discuss gTLD registrations and the genericness of using the word "go" as a prefix in gTLDs historically, and especially between the 1995-2012 timeframe"); (Doc. No. 153 at 11) (stating that the frequency of use of the prefix "go" in domain names "is of central importance in assessing the degree to which the domain name as a whole is generic or descriptive under a nominative fair use analysis").  However, despite stating in his Report that he was retained to discuss "the genericness of using the word 'go' as a prefix in gTLDs," nowhere in the "Summary of Findings" or "Conclusion" sections of his Report does Mr. Neuman actually opine on the issue of the "genericness" of the prefix "go." Rather, he limits his opinion to the "value" of the prefix "go," e.g., "'GO' is a valuable prefix that has been used in domain names since the mid to late 1990s."  See (Doc. No. 141-1 at 7 ¶ 28); (id. at 28 ¶ 100) (stating that "'GO' has been an incredibly valuable prefix used in domain names since the mid to late 1990s").

Finally, the Court notes that, in opposing Plaintiff's motion, Defendants' briefing focuses largely on reiterating Mr. Neuman's qualifications and expertise on the subject of domain names. That focus, however, is no answer to Mr. Neuman's failure to set forth a methodology by which he assessed and measured the "value" of the prefix "go" and how any such "value" equates to "genericness" of the prefix.  The Court agrees with Plaintiff that "Mr. Neuman could be the most qualified expert in the world on domain names but his failure to employ a reliable methodology nonetheless requires exclusion" of his opinion relating to the prefix "go."  (Doc. No. 158 at 9); see Whyte v. Stanley Black & Decker, Inc., 514 F. Supp. 3d 684, 694 (W.D. Pa. 2021) (finding expert qualified but nevertheless excluding his opinion as unreliable).  Although Mr. Neuman's opinion relating to the prefix "go" is subject to exclusion for failure to satisfy Daubert's reliability requirement, in the interest of completeness, the Court also assesses the "fit" of the proffered opinion to the facts of this case.

### b.    Fit

Even assuming arguendo that the Court concluded that Defendants met their burden to establish that Mr. Neuman's opinion regarding the value of prefix "go" was based on a reliable methodology, it would still find that his opinion is subject to exclusion because it does not "fit" the facts of this case.  Defendants argue that Mr. Neuman's opinion regarding the prefix "go" is relevant to Plaintiff's cybersquatting claim, as follows:

> Under the [Anti-Cybersquatting Consumer Protection Act], 15 U.S.C. § 1125(d), this Court must consider whether "the domain name" as a whole is "confusingly similar" to Plaintiff's PSU mark, not individual words in the domain.  The Court must also determine whether the domain name as a whole is being used descriptively under nominative fair use (e.g., to describe Defendants' services).  Thus, Mr. Neuman's opinion that "go" is commonly used in a generic sense to describe products or services in the athletic and RV sectors is extremely relevant

> to the legal question for the trier of fact of whether the domain in question in this
> case is also being generically or descriptively for that purpose.

(Doc. No. 153 at 9-10.)  However, the problem with Defendants' argument, as noted, <u>supra</u>, is that, while above Defendants characterize Mr. Neuman's opinion as that "'go' is commonly used in a generic sense," Mr. Neuman's Report concludes only that "the term 'GO' has been an incredibly valuable prefix used in domain names since the mid to late 1990s" and "has been used in domain names associated with some of the world's leading companies, and has also been frequently used in connection with the RV industry."  (Doc. No. 141-1 at 28 ¶ 100.)  The Report simply lacks any opinion about the genericness of "go" or whether it might lessen any confusion resulting from the similarity of Defendants' <GoPSUrv.com> domain name and Plaintiff's PSU mark.  As discussed more fully above, "value" does not automatically equate to "genericness," and Mr. Neuman's Report fails to address how the value of the prefix "go" renders it "commonly used in a generic sense."  Therefore, Defendants' argument that Mr. Neuman's opinion regarding the prefix "go" relates to Plaintiff's cybersquatting claim is unavailing.  Lacking any reference to "genericness," Mr. Neuman's opinion would not assist the trier of fact in determining a disputed issue in this case.

Accordingly, for all of the foregoing reasons, the Court will grant Plaintiff's motion to exclude Mr. Neuman's first opinion regarding the prefix "go."  The Court turns to Mr. Neuman's second proffered opinion regarding the use of PSU and PENN STATE marks in domain names apparently unaffiliated with Plaintiff.

**4.      Mr. Neuman's Proffered Opinion Regarding the use of Plaintiff's "PENN STATE" and "PSU" Marks in Domain Names**

In the section of his Report entitled "Domain Names with 'PSU' or 'Penn State'" Mr.

Neuman states as follows:

86. In conducting research on the use of the term "PSU" or "Penn State" within the domain name system, there were a number of such domain names that appear on its face not to be affiliated with the Pennsylvania State University.  Please note, however, that the sources used to determine ownership include WHOIS records and/or information provided directly on the applicable websites.  Although these domain names may appear to not be affiliated with the Pennsylvania State University, it may be that they are affiliated and/or there may be written license agreements or other forms of consent that exist between the University and such third parties.

87. A "WHOIS" record contains all of the contact information associated with the person, group, or company that registers a particular domain name. Typically, each Whois record will contain information such as the name and contact information of the owner of a domain name ("Registrant"), the name and contact information of the registrar used by the Registrant to register the domain name ("Registrar"), the registration dates, the name servers, the most recent update, and the expiration date.

88. Below are just some of the "Penn State" and "PSU" domain names that were found through public searches on the Internet.

89. PennStateClothes.com: PennStateClothes.com was registered in November 2001 and is currently owned by The Family Clothesline.  The business sells official Penn State merchandise and is located on College Avenue in State College, Pennsylvania directly across from the Penn State University.  It is owned and operated by "a Penn State alum and his Penn State alumni family since 1985."  According to the website, "our Internet business, located above our retail store, was established in the early 1990's and was the first website to sell retail Penn State clothing in Pennsylvania.  According to the Internet Archive, the Family Clothesline began using PennStateClothes.com as its primary website around December 2004.  Prior to that, PennStateClothes.com redirected to FamilyClothesline.com.  Today, FamilyClothesline.com redirects traffic to PennStateClothes.com

90. PennStateRoom.com: PennStateRoom is owned and operated by McLanahan's which got its start in 1903 in Tyrone, Pennsylvania.  The founder opened a drug store just off the Pennsylvania State University campus and sold Penn State memorabilia and apparel in "The Penn State Room."  In 1983, after Penn State's first Football National Championship, The Penn State Room published its first mail order catalog, which in 1997 was published on the web.

22

According to historical WHOIS date, the domain name PennStateRoom.com was registered on September 25, 1998 by McLanahan Drug Store Management Co, Inc.

91. PSUMoms.com:  PSUMoms.com claims to be the "Official Penn State Moms Website."  It claims to be a place for Moms and parents of Penn State students to connect, learn and explore college life.  According to WHOIS information, the domain name was registered on August 21, 2007 and launched shortly thereafter. The website has links to different university resources, academics, sports, and reviews.  It also is an Amazon Associate, meaning that it earns advertising fees from Amazon.com and commissions off of products sold through the website. Finally, by subscribing to PSUMoms, you are able to obtain an email address [yourchoice@PSUMoms.com].

92. PSUHouses.com:  PSUHouses.com is owned by Prime Property Group, located in State College, Pennsylvania.  According to WHOIS information, the domain name was registered on April 23, 2007.  The WHOIS information shows that the domain name was registered under a privacy service which does not reveal the name of the true owner of the domain name.  There is a disclaimer at the top of the website that state it "is not associated with any college or university."  The website offers listings for houses and apartments for rent in and around Penn State University.

93. PSURentals.com:  PSURentals.com was registered on January 4, 2022 by Pork Chop Productions, Inc. located in New York, NY.  At some point between 2006-2008, the domain name was transferred to McWhirter Property Management, located in Dobbs Ferry, New York.  Although still owned by McWhirter Property Management, the domain name now lists its address in Boalsburg, Pennsylvania.  The website advertises undergraduate, graduate and professional houses and apartments close to the campus of Penn State University.

94. ValleyMagazinePSU.com: ValleyMagazinePSU was founded in 2007 and "is Penn State's premier student-run life and style magazine. According to the WHOIS records the domain name ValleyMagazinePSU.com was registered on January 21, 2010 by "A Happy Dreamhost Customer" located in California.  The first screenshot of ValleyMagazinePSU according to the Internet Archive was on January 25, 2010.  "Valley" is name[d] after "Happy Valley" and was founded in September 2007 by former students to serve as a resource for female undergraduate students to lea[r]n about life and style on and around the University Park campus.

95. PennStateTool.com: PennStateTool is currently owned and operated by Penn State Tool & Die Corporation located in Mount Pleasant, Pennsylvania.  They

have been providing these services since 1954.  The domain name was registered on October 9, 2000 and has been in use since at least 2001.

96. PennStateRV.com: This domain name redirects traffic to JustgoRV.com described in Paragraph 85 above.  According to WHOIS records, the PennStateRV.com domain name was registered on December 20, 2017, under a privacy service.

97. PennStateRV.Net and PennStateMotorHome.com:  These two sites are grouped together because the[y] both redirect traffic to an RV Rental listing on Outdoorsy.com.  According to the specific listing, the host of the content is "Carefree Coach Rentals", the same owner/operator of JustgoRV.com.

98. PennStateDJ.com:  This domain name redirects to Nittany Entertainment located in State College Pennsylvania.  Nittany Entertainment provides event planning and entertainment for weddings and other celebrations.  This domain name was registered in August 2009.

(Doc. No. 141-1 at 23-28 ¶¶ 86-98) (footnote omitted).  As noted above, as to this issue, Mr. Neuman's Report offers the following conclusion: "the terms 'PSU' and 'Penn State' have been used by a number of individuals and organizations in domain names to describe the products and/or services they provide despite the fact that those organizations do not appear to be affiliated with the Pennsylvania State University."  (Id. at 28-29 ¶ 101.)

a.    **Reliability**

Plaintiff argues that this opinion "relies on speculation and is unreliable for that reason." (Doc. No. 141 at 14.)  Plaintiff notes that Mr. Neuman concedes in his Report that "[a]lthough the[] domains appear to not be affiliated with the Pennsylvania State University, it may be that they are affiliated and/or there may be written license agreements or other forms of consent that exist between the University and such third parties."  (Id.) (quoting Doc. No. 141-1 at 23 ¶ 86). Plaintiff maintains that "[o]ther than checking WHOIS information and the face of each website for an indication of any relationship between the domain owners and Penn State, Mr. Neuman

24

conducted no investigation to confirm that the data supporting his conclusions was accurate."
(Id.)  Plaintiff points to Mr. Neuman's deposition testimony wherein he testified that he did not
contact the owners of the identified domains.  (Id.) (citing Doc. No. 141-2 at 28).  Plaintiff
argues that Mr. Neuman has acknowledged that he relied on assumptions in making his
conclusions regarding the use of PSU and PENN STATE marks in other domain names, and that
such an approach is inherently unreliable, citing UGI Sunbury LLC v. A Perm. Easement for
1.7575 Acres, 949 F.3d 825, 833-34 (3d Cir. 2020).  (Id. at 15.)

In response, Defendants maintain that Mr. Neuman's opinion is reliable and that he
testified that, in reaching his conclusion, he "carefully scrutinize[ed] historical records for each
of the websites and relevant domains as well as the ownership and registration records," and
noted "that none of the websites contained the expected expressions of affiliation or licensing
you would normally expect to see included on the websites."  (Doc. No. 153 at 12.)   Defendants
argue that "[t]he fact Mr. Neuman acknowledges that there may be an affiliation which is not
apparent from his methodology does not change his opinion that 'those organizations' using the
identified domain names 'do not appear to be affiliated with the Pennsylvania State University,'"
maintaining that "opining that 'they do not appear' to be affiliated during the 2010 timeframe is
much different from opining they are not."  (Id.)

Upon careful review of Mr. Neuman's Report, the briefs of the parties, and the relevant
authorities, the Court concludes that Defendants have failed to meet their burden to demonstrate
the Mr. Neuman's opinion that "the terms 'PSU' and 'Penn State' have been used by a number
of individuals and organizations in domain names to describe the products and services they
provide despite the fact that those organizations do not appear to be affiliated with the

25

Pennsylvania State University" is based on a reliable methodology and should be admitted as

expert testimony in this matter.  (Id. at 28-29 ¶ 101.)  First, to the extent that Mr. Neuman's

opinion is offered to show that the relevant domain names/websites are not in fact affiliated with

Plaintiff, the opinion is based on an unreliable methodology given Mr. Neuman's admission at

his deposition that the information reviewed by him was incomplete—he did not contact the

domain owners to confirm a lack of affiliation with Plaintiff—leading to the possibility that the

domains could in fact be affiliated with Plaintiff.[7]  See (Doc. No. 141-2 at 29).  This failure to

employ a method of confirming his opinion regarding the relevant domains renders his opinion

in this regard speculative and inherently unreliable.  See UGI Sunbury LLC, 949 F.3d at 833-34

(emphasizing that Rule 702's reliability threshold requires "rigor" in the methods of an expert

and must be "based on the methods and procedures of science, not on subjective belief and

unsupported speculation").

Second, to the extent that Mr. Neuman's opinion can be characterized as an assertion that

the websites identified above "do not appear to be affiliated with [Penn State]," the Court agrees

with Plaintiff that the factfinder here is equally able to review the ownership information of the

identified domains and the websites associated with those domains and to determine if, based on

that review, they appear to be affiliated with Plaintiff.  Such an opinion is not based on

specialized knowledge beyond the common understanding of laypersons and therefore not a

proper subject of expert testimony.  See Salem v. United States Lines Co., 370 U.S. 31, 35

(1962) (holding that "expert testimony not only is unnecessary but indeed may be properly

---

[7] In Plaintiff's opening brief, it asserts that it has in fact licensed its marks to be utilized in at
least two of the domains reviewed by Mr. Neuman.  (Doc. No. 141 at 15.)

excluded" where a factfinder is "as capable of comprehending the primary facts . . . as are

[expert] witnesses . . . .").

Having concluded that the opinion sought to be offered by Mr. Neuman with regard to

other domains including "PSU" or "Penn State" is either unreliable or else not a proper subject of

expert testimony, the Court need not assess the "fit" of the opinion to the facts of this case.[8]

## IV.     CONCLUSION

For all of the foregoing reasons, the Court will grant Plaintiff's motion to exclude the

opinions of Jeffrey J. Neuman in its entirety.  An appropriate Order follows.

---

[8]  In any event, a cursory assessment of this opinion and the issues in this case reveals that this opinion does not "fit" the facts of this case.  Defendants assert that Mr. Neuman's opinion regarding the use of "PSU" and "Penn State" in domain names is relevant to "Defendants' affirmative defense of third-party use, as well as nominative fair use," arguing that "[t]he entire case may turn on the issue of whether the Defendants are using the mark PSU descriptively (to describe Defendants' products or services at PSU events) under a nominative fair use analysis, especially in light of the fact that PSU does not itself rent or s[ell] recreational vehicles."  (Doc. No. 153 at 16.)  However, as an initial matter, the Court notes that expert opinion based on speculation will not assist the trier of fact.  See In re TMI Litig., 193 F.3d at 670 (concluding that expert opinion based on speculation would not assist the trier of fact).  Even if the Court were to assume arguendo that Mr. Neuman's opinion was the product of a reliable methodology, the Court is unpersuaded that this opinion's focus on other domain names and their use of the "PSU" or "Penn State" marks is relevant to the issue of nominative fair use upon which Defendants believe "the entire case may turn."  The elements of such a claim focus on Defendants' and Plaintiff's use of the marks, as opposed to the use of marks by others.  See Century 21, 425 F.3d at 222 (setting forth the elements of a nominative fair use claim).