# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| THE PENNSYLVANIA STATE UNIVERSITY, | : | |
| Plaintiff | : | No. 1:19-cv-02039 |
| | : | |
| v. | : | (Judge Kane) |
| | : | |
| KEYSTONE ALTERNATIVES LLC d/b/a GOPSURV.COM and MARK LAUER, | : | |
| Defendants | : | |

## MEMORANDUM

This is a trademark infringement action arising out of Defendants Keystone Alternatives, LLC d/b/a GoPSUrv.com ("Keystone") and Mark Lauer (collectively, "Defendants")' alleged use of Plaintiff The Pennsylvania State University ("Plaintiff or "Penn State")'s registered trademark "PSU" as well as the "PENN STATE" mark and the "Nittany Lion Logo." (Doc. No. 1 ¶¶ 1–4, 18–21, 26–31.) Before the Court are cross-motions for summary judgment filed by Plaintiff and Defendants (Doc. Nos. 176, 173), which the Court will resolve by separate opinions on the respective motions.[1] The Court addresses Plaintiff's motion by way of this Memorandum

---

[1] "Concurrent resolution of cross-motions for summary judgment can present a formidable task." Interbusiness Bank, N.A. v. First Nat'l Bank of Mifflintown, 318 F. Supp. 2d 230, 235 (M.D. Pa. 2004) (Conner, J.) (citing 10A Charles Alan Wright et al., Federal Practice and Procedure § 2720 (3d ed. 1998)). Federal Rule of Civil Procedure 56 requires that the court view all facts in the light most favorable to the non-moving party, drawing all reasonable inferences in favor of the non-moving party. See Fed. R. Civ. P. 56. However, in the circumstances of cross-motions for summary judgment, where both parties are moving and non-moving parties, "[i]nferences to which a party is entitled with respect to the opponent's motion may not be granted with respect to its own" and accordingly, "[i]n such circumstances, Rule 56 requires two statements of the 'facts' of the same case, a proposition that may counsel separate opinions on the respective motions." See Interbusiness Bank, N.A., 318 F. Supp. 2d at 235–36 (first citing United States v. Hall, 730 F. Supp. 646, 648 (M.D. Pa. 1990) and then citing Rains v. Cascade Indus., Inc., 402 F. 2d 241, 245 (3d Cir. 1968)). Given the voluminous record in this case, the lengthy statements of facts filed by the parties, the factual disputes reflected in those statements of facts and responses thereto, and mindful of the Court's obligation to view the evidence in the light most favorable to the non-moving party with respect to each motion, the Court concludes that separate opinions on

and accompanying Order and, for the following reasons, the Court will grant Plaintiff's motion

as to Defendants' counterclaim count two but deny the motion in all other respects.

## I.      PROCEDURAL HISTORY AND FACTUAL BACKGROUND

The Court first describes the extensive procedural history of this case before setting forth

the factual background relevant to Plaintiff's motion.

### A.      Procedural History

In connection with the resolution of discovery disputes between the parties, then-

Magistrate Judge Saporito in a May 3, 2021 Memorandum succinctly summarized the facts

giving rise to Plaintiff's complaint in the instant action:

> [Plaintiff] has alleged that the defendants have infringed its trademarks by
> incorporating the PSU mark into their internet domain registered as <goPSUrv.com>
> (the "Disputed Domain") and almost exclusively use the brand GoPSUrv.com rather
> than Keystone Alternatives to promote their goods and services. ([Doc. No. 1] ¶ 43.)
> Plaintiff alleges that the defendants attempt to suggest a connection, sponsorship, or
> affiliation with it where no such affiliation exists. (Id. ¶ 45.) It has further alleged
> that the defendants advertise in other media using the PSU mark, and they use other
> [Plaintiff] owned trademarks on their webpage and in advertising which has caused
> or is likely to cause irreparable injury to [Plaintiff]. (Id. ¶¶ 49, 52, 54–58, 66.) The
> defendants contend that they have used the Disputed Domain for ten years with
> [Plaintiff's] knowledge and acquiescence.

(Doc. No. 99 at 2–3.)

Plaintiff's complaint asserts the following claims against Defendants: trademark

infringement (Count I), unfair competition (Count II), cybersquatting (Count III), and trademark

dilution (Count IV), all in violation of the Lanham Act, 15 U.S.C. § 1051 et seq. (Doc. No. 1.)

Plaintiff also asserts a claim for trademark dilution (Count V) under Pennsylvania law and a

claim for common law trademark infringement and unfair competition (Count VI). (Id.)

Defendants filed a motion to dismiss the complaint (Doc. No. 14), which the Court denied (Doc.

---

the respective motions are appropriate.

Nos. 28–29), and Defendants subsequently filed an answer to the complaint (Doc. No. 32), asserting counterclaims for cyberpiracy (Counterclaim Count I), reverse domain name hijacking (Counterclaim Count II) and tortious interference with contractual relations (Counterclaim Count IV), and seeking a declaratory judgment that Defendants' domain name GoPSUrv.com does not violate the Lanham Act (Counterclaim Count III).  Plaintiff filed a motion to dismiss Counterclaim Count IV (Doc. No. 33), which the Court granted (Doc. Nos. 39–40).

The Court conducted a case management conference and set a close of fact discovery date of December 31, 2020. (Doc. No. 46.)  Thereafter, the case was referred to then-Magistrate Judge Saporito for purposes of conducting a settlement conference (Doc. Nos. 47, 49), and, by agreement of the parties, the fact discovery deadline was extended to March 31, 2021 (Doc. No. 77).  After the undersigned initially handled a discovery-related motion (Doc. Nos. 54–56, 64–64, 67–68), the Court referred additional discovery-related disputes to then-Magistrate Judge Saporito for resolution given his familiarity with the case (Doc. Nos. 85, 102).  The Court then extended the fact discovery deadline again—to April 30, 2021—upon the parties' joint request. (Doc. No. 90.)

On May 4, 2021, Defendants filed another motion (Doc. No. 101), which Plaintiff opposed (Doc. No. 103), requesting an extension of the discovery deadline.  On June 7, 2021, acknowledging the May 2021 Orders of then-Magistrate Judge Saporito (Doc. Nos. 100, 107), which resolved the discovery disputes referred to him, the Court granted Defendants' motion only insofar as necessary to comply with then-Magistrate Judge Saporito's Orders (Doc. No. 109).  The Court conducted a post-discovery status conference with the parties on July 15, 2021, and issued a case management order setting a potential trial date for March 2022.  (Doc. No. 112.)  Defendants subsequently filed a motion to compel deposition testimony and supporting

memorandum (Doc. Nos. 114–15), and the Court, noting that the motion to compel related to one of the discovery disputes previously resolved by then-Magistrate Judge Saporito,[2] referred the dispute to him for resolution by Order dated September 29, 2021 (Doc. No. 118).  After the motion to compel was briefed, Defendants filed a motion to stay case deadlines based on Defendants' counsel's COVID-19 illness (Doc. No. 125), and the Court thereafter granted the motion to stay and continued all case management deadlines (Doc. No. 128).

The Court held a status conference with the parties on December 1, 2021,[3] after which the Court issued an Order lifting the stay of case deadlines and ordering that any Daubert motions or motions to dismiss be filed by December 13, 2021.  (Doc. No. 131.)  Plaintiff thereafter filed two Daubert motions (Doc. Nos. 135, 140) with supporting briefs (Doc. Nos. 136, 141), and Defendants filed a motion to dismiss for failure to join an indispensable party (Doc. No. 142), along with a supporting brief (Doc. No. 143).  Three days before the parties filed those motions, then-Magistrate Judge Saporito issued a Memorandum and Order (Doc. Nos. 133–34) denying Defendants' motion to compel the deposition testimony of Coach Franklin.  On December 20, 2021, Defendants filed an appeal of then-Magistrate Judge Saporito's Memorandum and Order denying their motion to compel (Doc. No. 148), along with a brief in support of the appeal (Doc. No. 149).  Plaintiff filed a brief in opposition to Defendants' appeal. (Doc. No. 152.)  The parties agreed to extend the deadlines to oppose the pending motions (Doc. No. 144), and, after briefs in opposition to the Daubert motions and the motion to dismiss were filed (Doc. Nos. 153–55), the parties filed reply briefs in opposition to the pending motions

---

[2]   The motion to compel sought to compel the deposition testimony of James Franklin ("Coach Franklin"), the head coach of Plaintiff's football team.

[3]   At the status conference, Defendants' counsel indicated his plan to file a motion to dismiss for failure to join an indispensable party, and the parties agreed that Daubert motions must be resolved prior to the Court's issuance of a dispositive motion deadline.

4

(Doc. Nos. 156–58).

In September 2022, the Court denied Defendants' appeal of then-Magistrate Judge Saporito's Order and Defendants' motion to dismiss for failure to join an indispensable party. (Doc. Nos. 161–64.)  In March 2023, the Court issued a Memorandum and Order granting Plaintiff's Daubert motion to exclude the opinions of Jeffrey J. Neuman in its entirety (Doc. Nos. 165–66) and an Order denying Plaintiff's Daubert motion to partially exclude the opinions of Steven B. Boyles without prejudice to Plaintiff's right to refile the motion after the Court's resolution of any dispositive motions (Doc. No. 167).  The Court's Order also set a dispositive motions deadline of April 14, 2023.  (Id.)

On April 14, 2023, both Plaintiff and Defendants filed motions for summary judgment (Doc. Nos. 173, 176), briefs in support of those motions (Doc. Nos. 175, 179), and respective statements of facts in support of those motions (Doc. Nos. 174, 178).  Both statements of facts attached numerous exhibits.  (Id.)  After the Court granted the parties an extension of time (Doc. No. 183), on May 12, 2023, Defendants filed five sealed documents on the docket of this matter in connection with their response to Plaintiff's motion for summary judgment.  (Doc. Nos. 184-88.)  On that date, Defendants also filed their answer to Plaintiff's statement of material facts (Doc. No. 189), with numerous attached exhibits (Doc. Nos. 189-1 through 189-13), several of which Defendants also sought to file under seal,[4] as well as a brief in opposition to Plaintiff's motion for summary judgment (Doc. No. 190).

Also on May 12, 2023, Plaintiff filed its "Unopposed Motion for Leave to File Under Seal Exhibits in Support of Plaintiff's Opposition to Defendants' Motion for Summary

---

[4]  The exhibits sought to be sealed by Defendants—Docket Numbers 189-1 through 189-5, 189-7 through 189-9, and 189-11 through 189-12—were transmitted to the Court by way of a letter filed June 7, 2023 (Doc. No. 204) and subsequently filed provisionally under seal on the Court's docket at Docket Numbers 209-1 through 209-10.

Judgment" (Doc. No. 191), with a proposed order (Doc. No. 191-1) and supporting brief (Doc. No. 192). By way of that motion, Plaintiff originally sought to file under seal Exhibits 45, 54, 56, 58, and 60 (Doc. Nos. 194-14, 194-25, 194-27, 194-29, and 194-31) to its response in opposition to Defendants' statement of undisputed material facts in support of their summary judgment motion. On that date, Plaintiff filed its brief in opposition to Defendants' motion for summary judgment (Doc. No. 193), as well as an answer to statement of facts (Doc. No. 194), with numerous attached exhibits (Doc. Nos. 194-1 through 194-34). Subsequently, on May 17, 2023, Plaintiff filed the exhibits to Docket Number 194 sought to be filed under seal (Doc. Nos. 194-14, 194-25, 194-27, 194-29, and 194-31) provisionally under seal on the Court's docket at Docket Numbers 196-1 through 196-5. On May 26, 2023, both parties filed reply briefs in further support of their motions for summary judgment. (Doc. Nos. 198–99.)

Also on May 26, 2023, the Court issued an Order (Doc. No. 197) directing the parties to show cause why the exhibits submitted provisionally under seal should not be made a part of the publicly available docket in this matter under the standards applicable to judicial records articulated by the United States Court of Appeals for the Third Circuit in In re Avandia Marketing, Sales Practices and Products Liability Litigation, 924 F.3d 662 (3d Cir. 2019) ("Avandia"). (Id.) In its May 26 2023 Order, the Court referenced Avandia's discussion of the common law right of access to judicial records as well as the First Amendment right of access, which "requires a much higher showing than the common law right of access before a judicial proceeding can be sealed." See Avandia, 924 F.3d at 673 (quoting In re Cendant Corp., 260 F.3d 183, 198 n.13 (3d Cir. 2001)). That Order directed the Clerk of Court to maintain the documents filed by Defendants (Doc. Nos. 184–88, representing exhibits contained at Doc. Nos. 174-2; 174-4 through 174-9; 174-11; and 174-12) and documents filed by Plaintiff (Doc. Nos. 196-1 through

196-5, representing exhibits contained at Doc. Nos. 194-14; 194-25; 194-27; 194-29; and 194-31) provisionally under seal until further Order of Court.  (Doc. No. 197 at 6–7.)  On June 5, 2023, Plaintiff and Defendants filed their respective responses to the Court's May 26 2023 Order.  (Doc. Nos. 201–02.)[5]

On October 27, 2023, the Court issued a Memorandum (Doc. No. 212) and corresponding Order (Doc. No. 213) largely denying Plaintiff's motion for leave to file exhibits under seal but granting the motion insofar as it permitted Plaintiff to file a redacted version of its Exhibit 60.  In addition, the Court's Order temporarily retained under seal Defendants' Exhibit E pending the parties' clarification of the nature of the exhibit.  The Court's Order also permitted Plaintiff to file appropriately excerpted (but unredacted) versions of two of Defendants' exhibits (Exhibit B and Exhibit D), afforded third-party Christopher Longo the opportunity to be heard before unsealing his deposition and its exhibits, and directed the Clerk of Court to unseal certain exhibits provisionally filed under seal by both parties and to strike certain exhibits from the docket of this matter.

On November 9, 2023, Plaintiff filed a "Notice of Filing Exhibits and Response to the Court's Request for Clarification" (Doc. No. 214) which attached a redacted version of Plaintiff's Exhibit 60 (Doc. No. 214-1) and excerpted versions of Defendants' Exhibit B (Doc. No. 214-2) and Exhibit D (Doc. No. 214-3).  Although the Court's Order directed Plaintiff to provide the Order to third-party Christopher Longo or his counsel and permitted Christopher

---

[5]  As noted supra at note 4, on June 7, 2023, Defendants filed under seal on the Court's docket a letter (Doc. No. 204) which resubmitted certain documents originally intended to be filed under seal by way of its May 12, 2023 letter (Doc. Nos. 174-8, 174-11, and 174-12), filed provisionally under seal on the Court's docket at Docket Numbers 204-1 and 205 through 208, in addition to submitting the exhibits located at Docket Numbers 189-1 through 189-5, 189-7 through 189-9, 189-11, and 189-12, for filing under seal on the Court's docket.  As noted above, the exhibits to Docket Number 189 sought to be filed under seal were filed provisionally under seal on the Court's docket at Docket Numbers 209-1 through 209-10.

Longo time within which to show cause why his deposition and accompanying exhibits (located at Docket Numbers 207 and parts of Docket Numbers 186 and 209-8) should remain sealed, Christopher Longo did not respond to the Court's Order.  As to Defendants' Exhibit E (Doc. Nos. 189-5 and 209-5), Plaintiff's filing stated that "[t]he parties have conferred regarding this document" and "Defendants indicated that the document filed with the Court was corrupted, and that the filed document is not the exhibit Defendants intended to submit"; accordingly, Plaintiff stated its understanding that "Defendants will be requesting that this document be withdrawn from the record, rendering the issue of sealing the document moot."  (Doc. No. 214 at 2.)

The next day, Defendants submitted a letter to the Court (Doc. No. 215) requesting to withdraw Docket Numbers 209-5 and 189-5 from the Court's docket and "replace those filings with the redacted version of the Contract attached hereto as Exhibit A."  (Doc. No. 215-1.) Defendants stated that "[b]ecause Plaintiff concurs that the redactions in this replacement attachment obviate the need for confidentiality, Defendants submit that the question of whether Docks. 209-5 and 189-5 should remain sealed is rendered moot by this replacement."  (Doc. No. 215.)

In an Order dated April 1, 2024, the Court, in accordance with its October 27, 2023 Order, and in light of the parties' filings: (1) directed the Clerk of Court to strike from the docket Plaintiff's original Exhibit 60 (Doc. No. 196-5), given Plaintiff's filing of a redacted version of its Exhibit 60 (Doc. No. 214-1); (2) directed the Clerk of Court to strike from the docket the original versions of Defendants' Exhibit B (Doc. Nos. 288 and 209-3) and Defendants' Exhibit D (Doc. Nos. 187 and 209-3), given Plaintiff's filing of appropriately excerpted versions of Defendants' Exhibit B (Doc. No. 214-2) and Defendants' Exhibit D (Doc. No. 214-3); and (3) directed the Clerk of Court to unseal Christopher Longo's deposition (Doc. No. 207) and

8

documents containing exhibits to his deposition (Doc. Nos. 186 and 209-8), given his lack of response to the Court's October 27, 2023 Order.  (Doc. No. 218 at 2.)  In addition, noting Defendants' clarification that they previously filed the wrong Exhibit E and request that Exhibit E (Doc. Nos. 189-5 and 209-5) be removed from the Court's docket, the Court directed the Clerk of Court to strike from the docket Docket Numbers 189-5 and 209-5.  (Id.)  However, noting the Court's prior statement to the effect that it would address whether Plaintiff met its burden to demonstrate that its interest in secrecy in Defendants' Exhibit E outweighed the presumption of public access under Avandia after the parties clarified whether the Exhibit E filed on the Court's docket was the "SideARM Sports" contract referenced by the parties in their summary judgment briefing, and the fact that the replacement Exhibit E (Doc. No. 215-1) was heavily redacted, with minimal text visible, and the fact that, absent an ability to review an unredacted copy of the SideARM Sports contract, as well as a statement from Plaintiff justifying the redactions made to that contract under the Avandia standard, the Court could not address whether Plaintiff met its Avandia burden as to the entirety of Exhibit E such that filing a redacted version is permissible, the Court directed the parties to file an unredacted version of Exhibit E (Doc. No. 215-1) provisionally under seal along with a statement from Plaintiff justifying the redactions under Avandia.  (Doc. No. 218 at 1–3.)

On April 11, 2024, Plaintiff filed a "Statement Concerning Docket No. 215-1 in Response to the Court's April 1, 2024 Order" (Doc. No. 219), in which Plaintiff stated that "the redactions here [in Doc. No. 215-1] are part of the Exhibit itself, and do not denote material that either party is requesting the Court to review under seal."  (Doc. No. 219 at 1.)  Plaintiff further stated as follows:

> By way of background, prior to the Defendants' submission of this Exhibit on November 10, 2023, counsel for the parties conferred on this Exhibit with the goal of

avoiding complications related to sealing.  Because the parties' relevant summary judgment briefing referenced only a few provisions of the SideARM Sports contract, the parties agreed to jointly create a redacted exhibit, essentially paring down the exhibit to show only the portions of the contract that are relevant to the pending motions.  With those redactions in place, the final exhibit—which Defendants submitted at Docket Number 215-1—obviated the need for the Court to consider any portions of this contract under seal.

(Doc. No. 219 at 2.)  Plaintiff also stated that "[b]ecause the parties are not requesting that the

Court consider any portions of this contract under seal, the Court need not apply Avandia here or

consider whether the redactions included in Docket Number 215-1 should remain in place."

(Doc. No. 219 at 2.)  Finally, Plaintiff concluded:

> Accordingly, in response to the Court's directive that the parties "file an unredacted version of Defendants' Exhibit E (Doc. No. 215-1) provisionally under seal on the Court's docket", Penn State respectfully submits that the document filed at Docket Number 215-1 is the full and complete copy of Defendants' Exhibit E.  There is not an alternate version of this Exhibit to be filed here, as the redactions are part of the Exhibit itself.

(Doc. No. 219 at 3.)  Upon consideration of Plaintiff's April 11 filing, the Court will accept the

filing of Docket Number 215-1 (Defendants' Exhibit E) in its current form.

Plaintiff's motion for summary judgment is ripe for disposition.  The Court turns to a

recitation of the relevant facts of record.

## B.     Factual Background[6]

Penn State is a state-related institution of higher education and instrumentality of the

Commonwealth of Pennsylvania that educates nearly 100,000 students each year.  (Doc. No. 178

¶ 1.)  Penn State is the flagship university in the Commonwealth of Pennsylvania and is famous

throughout the United States and the world for, among other things, its educational programs,

---

[6] The following relevant facts of record are taken from Plaintiff's Statement of Undisputed Material Facts ("PSUMF") (Doc. No. 178) and Defendants' Response to Plaintiff's Statement of Undisputed Material Facts ("DRSUMF") (Doc. No. 189) and are undisputed unless otherwise noted.  In general, both the PSUMF and DRSUMF contain citations to the record at each numbered paragraph.

athletics programs and services, and other goods and services.  (Id. ¶ 2.)  Penn State consistently

ranks as one of the top research universities in the United States as well as one of the top schools

in terms of training its students to be prepared for success in the workplace.  (Id. ¶ 3.)  The

University was founded in 1855, and in 1953, the University began operating under the name

"The Pennsylvania State University."  (Id. ¶ 4.)  The University has grown to over 30,000 faculty

and staff across 24 campuses.  (Id.)  Penn State has one of the largest living alumni bases—

approximately 700,000—among all U.S.-based universities.  (Id. ¶ 5.)   Almost one percent of all

college graduates in the United States are Penn State alumni.  (Id.)  Penn State's educational

programs have also obtained nationwide and worldwide recognition, including in the U.S. News

& World Report rankings for the best undergraduate business and engineering programs and the

best graduate programs in business, engineering, education, nursing, health disciplines,

humanities, sciences, and law.  (Id. ¶ 6.)

Penn State promotes its goods and services through a variety of valuable trademarks.  (Id.

¶ 7.)  Penn State has used PSU as a word and design mark (the "PSU Mark") continuously for

more than four decades, throughout Pennsylvania and the United States.  (Id. ¶ 8.)  The

University is often referred to by the abbreviation "PSU"; this abbreviation is commonly used by

both the University and the public, and the public has come to associate "PSU" with the

University.  (Id. ¶ 9.)  Penn State has promoted the PSU Mark extensively throughout its decades

of using the Mark.  (Id. ¶ 10.)  Penn State owns multiple federal registrations covering the PSU

Mark in a wide range of goods and services.  (Id. ¶ 11.)  Penn State's registrations with the

United States Patent and Trademark Office ("USPTO") covering the PSU Mark include

Registrations Nos. 1,276,801 and 5,544,312.  (Id.)  The table below summarizes these

registrations, including the marks, dates of registration, incontestable status, goods/services

covered, and dates of first use in commerce:

| MARKS & REGISTRATION STATUS | GOODS/SERVICES & DATES OF FIRST USE IN COMMERCE |
|---|---|
| **PSU**<br><br>U.S. Registration No. 1,276,801<br><br>Registration Date: May 8, 1984<br><br>**Incontestable** | **Int'l Class 9:** Decorative Magnetic Stickers (First use: 1979)<br>**Int'l Class 14:** Gold Charms, Silver Charms, Necklaces, Gold Stick Pins, and Silver Stick Pins (First use: 1979)<br>**Int'l Class 16:** Notebooks, Looseleaf Binders, Notepads, Pad Holders, Writing Paper and Envelopes, Clipboards, and Decals (First use: 1973)<br>**Int'l Class 18:** General Purpose Gym Bag (First use: 1973)<br>**Int'l Class 24:** Washcloths and Blankets (First use: 1973)<br>**Int'l Class 25:** Shirts, T-Shirts, Jerseys, Sweat Shirts, Jackets, Shorts, One Piece Little Girls' Cheerleader Outfits, Baby Rompers, and Hats (First use: 1973) |
| **PSU**<br><br>U.S. Registration No. 5,544,312<br><br>Registration Date: August 21, 2018 | **Int'l Class 6:** Metal novelty license plates (First use: 9/30/1982)<br>**Int'l Class 12:** License plate frames (First use: 9/30/1982)<br>**Int'l Class 14:** Earrings, metal key chains (First use: 9/30/1982)<br>**Int'l Class 18:** Umbrellas, backpacks (First use: 9/30/1982)<br>**Int'l Class 21:** Ceramic mugs, drinking glasses (First use: 9/30/1982) |
|  | Int'l Class 25: Bras, sweaters, cardigans, tennis shirts, ponchos, raincoats, hooded sweatshirts (First use: 9/30/1982)<br>Int'l Class 26: Hair bows (First use: 9/30/1982) Int'l Class 28:Toy stuffed animals (First use: 9/30/1982) |

(Id.)  The parties dispute whether Penn State's sales and licensing of goods and services bearing its marks is so widespread and well known that consumers who see the PSU Mark on goods and services naturally assume that the goods and service emanate from Penn State or are sold pursuant to an official license.  Compare (Id. ¶ 12 with Doc. No. 189 ¶ 12).[7]

In addition to the mark PSU, Penn State frequently uses other word marks and logos in connection with its goods and services—including the mark PENN STATE and the Lionhead Logo shown below.

_____

[7] Plaintiff maintains that consumers who see the PSU Mark on goods and services naturally assume that the goods and services emanate from Penn State or are sold pursuant to an official license, while Defendants deny this assertion, challenging Plaintiff's characterization of the testimony upon which the statement is based.  In support of its assertion, Plaintiff relies on the deposition testimony of Mark Lauer, the Declaration of Thomas McGrath ("McGrath Declaration"), Defendants' responses to discovery requests, and the deposition testimony of Maureen Riedel.  (Doc. No. 178 ¶ 12) (citing Doc. No. 178-23 (Lauer deposition testimony) at 15–17; Doc. No. 178-2 (McGrath Declaration) at 12, 15; Doc. No. 178-19 (Defendants' discovery responses) at 16; and Doc. No. 178-20 (Riedel deposition testimony) at 9).

In denying this assertion, Defendants contend that "[t]his paragraph misstates the testimony of Lauer and Riedel."  (Doc. No. 189 ¶ 12.)  Defendants assert that Lauer does not contest the general notoriety of the PSU Mark, but while affirming that "PSU" generally refers to Penn State, "he says nothing of sales and licensing or the natural assumptions of consumers when seeing 'PSU'" and testified that "he believed PSU was a name, not a trademark."  (Id.) (citing Doc. No. 209-1 (Lauer deposition testimony) at 77 ("Q. So the PSU is supposed to stand for Penn State? A. Well, PSU is PSU."), 227 ("Q. Were you aware that Penn State had a trademark in PSU? A. No.").

Defendants further contend that "Riedel also says nothing of the assumptions of consumers in the references cited; while the statement of McGrath—who was Penn State's corporate designee in this case—amounts to no more than Penn State supporting its own allegations with its own unsupported statements speculating about the belief of others, and not amounting to undisputed fact."  (Id.) (citing Doc. No. 178-2 (McGrath Declaration) at 12, 15; Doc. No. 214-2 (Riedel deposition testimony) at 10).  Defendants also assert that they "put up a disclaimer on their website disclaiming any affiliation with Plaintiff immediately after receiving Plaintiff's cease and desist letter."  (Id.) (citing Doc. No. 189-9 (Lauer Declaration) at 12; Doc. No. 209-1 (Lauer deposition testimony) at 63, 67).  Defendants contend that "[w]ithout evidentiary support, this allegation of Plaintiff that it has made an allegation has no relevance in the adjudication of this case."  (Id.)



(Id. ¶ 13.)  Penn State has used PENN STATE as a word and design mark continuously since

1908, throughout Pennsylvania and the United States, as well as internationally.  (Id. ¶ 14.)  Penn

State has developed a family of PENN STATE-formative word and design marks that it uses in

connection with its goods and services (collectively, the "PENN STATE Mark").  (Id. ¶ 15.)

Penn State has extensively promoted the PENN STATE Mark for over a century.  (Id. ¶ 16.)

Penn State's registrations with the USPTO covering the PENN STATE Mark include

Registration Nos. 1,308,610; 1,732,445; 1,870,005; 4,439,041; 4,561,709; 4,811,121; 5,052, 191;

5,393,863; 5,441,650; 5,766,698; 5,854,383; 6,089,756; and 6,208,399.  (Id. ¶ 17.)  Five of those

registrations are incontestable.  (Id.)  Penn State adopted a mascot called the "Nittany Lion" at

least as early as 1984 for many purposes, including related to Penn State's many sports teams

and sporting events, as well as goods and services related to those events.  (Id. ¶ 18.)  Penn State

has used the Lionhead Logo since the 1980s in connection with its goods and services.  (Id. ¶

19.)  The Lionhead Logo is often used in connection with Penn State's athletics programs and is

frequently used on goods and services related to Penn State's sports.  (Id.)  Penn State has

extensively promoted the Lionhead Logo throughout the United States and internationally for

nearly four decades.  (Id. ¶ 20.)  The following are representative examples of Penn State's use

of the PENN STATE Mark and the Lionhead Logo.

14







(Id. ¶ 21.)  Penn State's U.S. registrations covering the Lionhead Logo include Registration Nos.

1370866, 4406486, 5204747, 5323000, 5323786, and 5548988.  (Id. ¶ 22.)  Several of Penn

State's registrations for the word mark PENN STATE and for the Lionhead Logo have achieved

incontestable status under the Lanham Act.  (Id. ¶ 23.)  Each of these Marks has been registered

and used continuously for more than five consecutive years.  (Id.)  The USPTO has recognized

these registrations as incontestable.  (Id.)

The parties dispute whether Penn State itself and through authorized licensees owns and

controls two domain names that incorporate the PSU Mark: <psu.edu> and <goPSUsports.com>.

Compare (Id. ¶ 24 with Doc. No. 189 ¶ 24).[8]   Penn State uses the PSU Mark on several of its

---

[8]  As support for its assertion of ownership and control of the two domain names, Plaintiff relies
on the McGrath Declaration and several exhibits to it.  (Doc. No. 178 ¶ 24) (citing Doc. No. 178-
2 (McGrath Declaration) at 4–6, 11; Doc. Nos. 178-4 through 178-6 (Exhs. A–C to the McGrath
Declaration)).  Defendants deny this assertion with regard to the ownership and control of
<gopsusports.com>, contending that "[w]hether Plaintiff owns and controls <goPSUsports.com>
is disputed," maintaining that "[a]ccording to historical public records, the domain
<goPSUsports.com> is owned by SideARM Sports (a subsidiary of PSSP [Penn State Sports
Properties], not Plaintiff."  (Doc. No. 189 ¶ 24.)  In support of this assertion, Defendants cite the
deposition testimony of Timothy Bordner, the deposition testimony of Thomas McGrath,
Plaintiff's contract with SideARM Sports, and the declaration of Steven Rinehart ("Rinehart
Declaration").  (Id.) (citing Doc. No. 209-3 (Bordner deposition testimony) at 22–24; Doc. No.
214-3 (McGrath deposition testimony); Doc. No. 215-1 (SideARM Sports contract); and Doc.
No. 189-6 (Rinehart Declaration) at 2–3).  Defendants further state that:

> Plaintiff never asserted any cause of action in this matter for infringement of
> GOPSUSPORTS as such a claim would have been contested on standing.  Plaintiff
> cannot now interpose nonexistent claims using its [PSUMF].  Additionally, Plaintiff
> has never filed any trademark application for GOPSUSPORTS—giving rise to a
> factual question of whether Plaintiff can legally assert ownership and control of, or
> claim any trademark rights arising from, the use of the domain <gopsusports.com>.
> Plaintiff has made no claim to trademark rights in GOPSUSPORTS in the present
> action, only to PSU.  Additionally, Penn State admitted that it has not marked
> references to its own website goPSUsports nor gopsurv.com with any trademark
> identifiers, either the ® or ™ symbols.  Plaintiff offered various contradictory
> explanations for this, including that references to URLs should not be marked with
> trademark identifiers because they are "associated with a web page."  Penn State also
> testified that it was not necessary to mark goPSUsports as a trademark because any
> person who has come to the website has already gotten there and knows what it is.
> When presented with evidence that Penn State is marking references to the domain
> name of their credit union PSECU with trademark identifiers, Penn State simply said
> [sic] testified that "some people use it [trademark identifiers], some people do not."

(Doc. No. 189 ¶ 24) (citations to the record omitted).

primary websites, including <psu.edu> and <goPSUsports.com> websites.  (Id. ¶ 25.)[9]

These domains (<psu.edu> and <goPSUsports.com>) are Penn State's primary domains for the University and its athletic programs.  (Id. ¶ 26.)  The website at <goPSUsports.com> is the primary website for Penn State athletics.  (Id. ¶ 27.)  Exemplary screenshots of the University's website at <psu.edu> and the University's athletics website at <goPSsports.com> are shown below.



(psu.edu)

---

[9]  Defendants also deny this assertion "for the same reasons as paragraph 24."  (Doc. No. 189 ¶ 25.)  Defendants further assert that "[t]he evidence establishes that Plaintiff does not own <gopsusports.com> or rights to the content at the website to which <gopsusports.com> resolves" and that "[w]ith Plaintiff's assertion that it controls the entity which does own <gospusports.com> (SideARM Sports, a subsidiary of PSSP), Plaintiff is forced into contradiction of its denial that PSSP is Plaintiff's agent, which it is."  (Id.)



(goPSUsports.com)



(gopsusports.com/sports/2018/8/8/tickets-m-footbl-parking-html.aspx)

(Id. ¶ 28.)

The PSU Mark has been famous for many years and is generally associated with Penn

State.  (Id. ¶¶ 29–30.)  The PSU Mark is highly valuable to Penn State.  (Id. ¶ 31.)  The general

consuming public in Pennsylvania and throughout the United States recognize the PSU Mark and

associate this Mark with Penn State.  (Id. ¶ 32.)  Timothy Lauer, one of Keystone Alternatives'

founders and its Vice President, acknowledged the fame of the PSU Mark, stating "all over the

country, all over the world, PSU is known."  (Id. ¶ 33.)

Penn State uses and licenses the PSU Mark and its other trademarks in relation to goods

and services specifically related to college athletics gameday festivities—particularly related to

its college football games.  (Id. ¶ 34.)  Penn State operates a large and widespread licensing

program.  (Id. ¶ 35.)[10]  The parties dispute whether, because Penn State's licensing program is so

widespread and well-known, consumers who see the PSU Mark on goods and services will

naturally assume that those goods and service emanate from Penn State or are sold pursuant to an

official license.  Compare (Id. ¶ 36 with Doc. No. 189 ¶ 36).[11]  The parties also dispute whether

Penn State has engaged an exclusive licensing agent to assist in all facets (from marketing to

---

[10]  Defendants clarify that while they "admit that the Plaintiff operates a large and widespread licensing program" they "assert [that the program] is fueled in part by Plaintiff's agent PSSP." (Doc. No. 189 ¶ 35.)

[11]  In support of this assertion, Plaintiff cites to the McGrath Declaration.  (Doc. No. 178 ¶ 36) (citing Doc. No. 178-2 at 15).  Defendants deny this assertion, stating that "[t]he conclusory statement of McGrath—who was Penn State's corporate designee in this case—amounts to no more than Penn State supporting its own facts with its own unsupported statements which merely speculate about the personal knowledge and assumptions of others while making legal conclusions, and thus does not amount to undisputed fact" and that "Plaintiff has cited no evidence supporting the factual nature of this allegation," so that "this allegation that an allegation was made has no relevance in the adjudication of this case."  (Doc. No. 189 ¶ 36.)

enforcement) of its licensing program.  Compare (Id. ¶ 37 with Doc. No. 189 ¶ 37).[12]  The

parties dispute whether, as part of ensuring the high quality of the goods and services licensed to

use the PSU Mark, Penn State exercises care when making decisions about the entities to whom

it grants licenses as well as the types of goods and services it licenses, employing quality control

measures (including sourcing, quality control, financial and contract compliance audits), and

does not enter into licenses with companies it believes will tarnish the reputation of the PSU

Mark or sell goods or services or license the PSU Mark for goods and services that will tarnish

the PSU Mark.  Compare (Id. ¶ 38 with Doc. No. 189 ¶ 38).[13]  The parties further dispute

whether Penn State authorizes only a limited number of employees to enter into trademark

licenses on its behalf and whether Penn State's athletic coaching staffs are not and do not purport

to be authorized to grant trademark licenses on behalf of Penn State.  Compare (Id. ¶ 39 with

Doc. No. 189 ¶ 39).[14]  The parties dispute whether Penn State's Licensing Committee has

---

[12]  Plaintiff again cites to the McGrath Declaration in support of its assertion.  (Doc. No. 178 ¶ 37) (citing Doc. No. 178-2 at 15).  Defendants deny this assertion, contending that "[m]any different agents act for Penn State in marketing and enforcement, including SideARM Sports (which runs <gopsurv.com> [sic]), Intercollegiate Athletics, and PSSP."  (Doc. No. 189 ¶ 37.) The Court notes that it appears that Defendants inadvertently refer to <gopsurv.com> when they intend to refer to <gopsusports.com>.  In support, Defendants cite deposition testimony of Mark Bodenschatz and David Baker.  (Id.) (citing Doc. Nos. 209-6 (Bodenschatz deposition testimony) at 21–26; 209-7 (Baker deposition testimony) at 31–33, 41).

[13]  Plaintiff cites the McGrath Declaration in support of its assertions.  (Doc. No. 178 ¶ 38) (citing Doc. No. 178-2 at 15).  Defendants deny the assertions of paragraph 38, stating that "[e]vidence indicates that Plaintiff does not exercise the care it alleges in enforcing its Marks," citing multiple sources of record evidence that they maintain demonstrate Plaintiff's lack of care in this regard. (Doc. No. 189 ¶ 38) (citing Doc. No. 189-9 (Lauer Declaration) at 5–6, 14–16, 19–20; Doc. No. 207 (Longo deposition testimony); Doc. No. 209-9 (Conlon deposition testimony) at 16–17, 77–78; Doc. No. 214-2 (Riedel deposition testimony) at 11–12; Doc. No. 214-3 (McGrath deposition testimony) at 13–14).

[14]  In support of its assertion that it authorizes only a limited number of employees to enter into trademark licenses on its behalf and that those employees do not include members of its athletic coaching staffs, Plaintiff relies on the McGrath Declaration, deposition testimony of McGrath,

responsibility for overseeing and enforcing the University's trademarks and licensing and whether the Office of Licensing Programs makes decisions about trademark licensing.  Compare (Id. ¶ 40 with Doc. No. 189 ¶ 40).[15]  The parties dispute whether any use of Penn State's trademarks through sponsorship arrangements ultimately also had to be approved by the Penn State Office of Licensing Programs.  Compare (Id. ¶ 41 with Doc. No. 189 ¶ 41).[16]

Penn State also promotes its trademarks and brand using sponsorship agreements.  (Id. ¶ 42.)  Penn State partners with a separate entity, Penn States Sports Properties (or "PSSP"), to control activities including distributing marketing and promotional materials around intercollegiate athletics facilities and events.  (Id. ¶ 43.)  These sponsorship agreements provide

---

and deposition testimony of Chris Longo.  (Doc. No. 178 ¶ 39) (citing Doc. Nos. 178-2 (McGrath Declaration) at 15–16; 178-25 (McGrath deposition testimony) at 4; and 178-27 (Longo deposition testimony) at 3–5).

Defendants deny the assertions of paragraph 39, stating that "Plaintiff itself has admitted that Penn State or PSSP can authorize use of Plaintiff's Marks" (Doc. No. 189 ¶ 39) (citing Doc. No. 178 ¶ 139), and that "Plaintiff's head football coach, James Franklin, represented to Defendants that he had authority to permit Defendants to use the PSU mark and that he had done so."  (Doc. No. 189 ¶ 39) (citing Doc. No. 207 (Longo deposition testimony)).  Further, Defendants state that "[b]oth David Baker and Mark Bodenschatz, senior employees of Plaintiff, have testified under oath that they were responsible for enforcing university policies, including various forms on intellectual property rights (including trademarks in the case of Bodenschatz)."  (Id.) (citing Doc. Nos. 209-6 (Bodenschatz deposition testimony) at 21–26; 209-7 (Baker deposition testimony) at 31–34, 41).

[15]  In support, Plaintiff cites the McGrath Declaration and its deposition testimony.  (Doc. No. 189 ¶ 40) (citing Doc. No. 178-2 (McGrath Declaration) at 20–21; Doc. No. 178-24 (Plaintiff 30(b)(6) deposition testimony) at 19).  Defendants deny that Penn State's Licensing Committee has responsibility for overseeing and enforcing the University's trademarks and licensing, referring to their response to paragraph 39 that "Plaintiff itself has admitted that Penn State or PSSP can authorize use of Plaintiff's marks."  (Doc. No. 189 ¶ 40).

[16]  In support, Plaintiff cites the McGrath Declaration and its deposition testimony.  (Doc. No. 189 ¶ 41) (citing Doc. No. 178-2 (McGrath Declaration) at 20–21; Doc. No. 178-24 (Plaintiff 30(b)(6) deposition testimony) at 19).  Defendants deny that trademark use through sponsorship arrangements had to be approved by the Penn State Office of Licensing Programs, referring to their response to paragraph 39 that "Plaintiff itself has admitted that Penn State or PSSP can authorize use of Plaintiff's marks."  (Doc. No. 189 ¶ 41.)

another avenue by which Penn State's marks are promoted.  (Id.)  Penn State's authorized

sponsors offer a wide variety of goods and services, including apparel and beverages.  (Id. ¶ 44.)

 Recognizing the value of the University's intellectual property, sponsors pay for the right to use

Penn State's trademarks in association with their brands.  (Id. ¶ 45.)  The University's

sponsorship agent, Penn State Sports Properties, offers and sells rights to advertise at Penn State

athletic events, such as on signage, radio commercials, print advertisements, or internet

advertising as just some examples.  (Id. ¶ 46.)

     The parties dispute whether Penn State Sports Properties has the authority to license or

authorize the use of Penn State's trademarks and whether, for any sponsor to obtain a license to

use Penn State's trademarks, permission must be separately obtained from Penn State.  Compare

(Id. ¶ 47 with Doc. No. 189 ¶ 47).[17]  The parties also dispute whether Penn State's athletic

coaching staff are authorized or purport to be authorized to endorse vendors on behalf of the

University or to enter into sponsorship agreements on behalf of the University.  Compare (Id. ¶

---

[17]  In support of its position that PSSP does not have authority to license or authorize the use of
Penn State trademarks, Plaintiff relies on Bordner deposition testimony and the McGrath
Declaration.  (Doc. No. 178 ¶ 47) (citing Doc. No. 178-28 (Bordner deposition testimony) at 3;
Doc. No. 178-2 (McGrath Declaration) at 20–21.  In support of its position that, for any sponsor
to obtain a license to use Penn State's trademarks, permission must be separately obtained from
Penn State, Plaintiff relies on Bordner and Riedel deposition testimony, the McGrath
Declaration, and the Rule 30(b)(6) deposition testimony of Plaintiff.  (Doc. No. 178 ¶ 47) (citing
Doc. Nos. 178-28 (Bordner deposition testimony) at 3; 178-20 (Riedel deposition testimony) at
16–18; 178-2 (McGrath Declaration) at 20–21; and 178-24 (Plaintiff 30(b)(6) deposition
testimony) at 19).

Defendants deny the assertions of paragraph 47, stating that "[i]t is difficult to understand how
this allegation can be made in good faith by Plaintiff when letters from Plaintiff to Defendants,
Plaintiff's own evidence and testimony, and even Plaintiff's own undisputed fact 139 in this case
expressly assert that PSSP—and not Plaintiff alone—can authorize use of Plaintiff's Marks."
(Doc. No. 189 ¶ 47) (citing Doc. No. 178 ¶ 139).

48 with Doc. No. 189 ¶ 48).[18]    The parties dispute whether Penn State invests significant

resources in promoting, advertising, and protecting the PSU Mark and its other trademarks.

Compare (Id. ¶ 49 with Doc. No. 189 ¶ 49).[19]

Penn State frequently displays the PSU Mark and its other trademarks in a navy blue and

white color scheme.  (Id. ¶ 50.)  Examples of Penn State merchandise using the PSU Mark in a

navy blue and white color scheme are shown here:



---

[18]  Plaintiff asserts that Penn State's athletic coaching staff are not, and do not purport to be, authorized to enter into sponsorship agreements on behalf of the University.  (Doc. No. 174 ¶ 48) (citing Doc. Nos. 178-2 (McGrath Declaration) at 16; 178-20 (Riedel deposition testimony) at 16; and 178-24 (Plaintiff 30(b)(6) deposition testimony) at 19).  Defendants deny this assertion, stating that "Plaintiff's head football coach, James Franklin, represented to Defendants that he had authority to permit Defendants to use the PSU mark and that he had done so" and that "Plaintiff's Athletic Director, Sandy Barbour, also represented through Chris Longo that she had authorized Defendants' use of the PSU Mark."  (Doc. No. 189 ¶ 48) (citing Doc. No. 207 (Longo deposition testimony); Doc. No. 189-9 (Lauer Declaration) at 19–20).

[19]  In support. Plaintiff cites the McGrath Declaration and Riedel deposition testimony.  (Doc. No. 174 ¶ 49) (citing Doc. No. 178-2 (McGrath Declaration) at 14 and 178-20 (Riedel deposition testimony) at 3–4, 9).  Defendants deny this assertion, citing to Riedel and Plaintiff deposition testimony.  (Doc. No. 189 ¶ 49) (citing Doc. Nos. 214-2 (Riedel) at 15–19; and 203-7 (Plaintiff 30(b)(6) deposition testimony) at 47–50).























(<u>Id.</u> ¶ 51.)

       To further the University's efforts to promote the University's educational, research, and

athletic programs and services and protect the PSU Mark, Penn State employs several hundred

27

communications and marketing professionals across administrative units, colleges, and campuses.  (Id. ¶ 52.)  The University uses paid, earned, owned, and shared media channels as well as events, sponsorships, and other platforms to advance the University's priorities, from promoting research, community initiatives, and the University's positive impact on the Pennsylvania community and beyond, to recruitment of prospective students and ticket sales for athletics and the arts, to summer camps and enrichment activities.  (Id. ¶ 53.)

Penn State, either directly or through its agents and licensees, has consistently promoted goods and services featuring the PSU Mark across the United States.  (Id. ¶ 54.)  Penn State promotes its brand through an array of marketing channels, including online and social media advertising.  (Id. ¶ 55.)  Due to Penn State's significant investments in the PSU Mark and the fame of that Mark, Penn State has strong sales of goods and services branded with the PSU Mark, whether those sales come from Penn State directly or from those officially licensing the PSU Mark.  (Id. ¶ 56.)  The revenues from these sales, as well as the revenues from licenses with hundreds of license partners, are in the millions of dollars.  (Id.)

Penn State actively polices for infringing and dilutive uses of the PSU Mark to protect its important investments in this asset.  (Id. ¶ 57.)  To enforce its rights in the PSU Mark, Penn State monitors trademark applications and filings, issues cease and desist letters, acts against pending trademark applications at the USPTO, and brings federal lawsuits, among other efforts.  (Id.)  Penn State also undertakes enforcement efforts in the online space.  (Id. ¶ 58.)  Penn State has filed numerous "UDRP" domain name actions and has had significant success in getting infringing domain names transferred to Penn State.  (Id.)  Specifically with respect to the PSU Mark, Penn State has enforced its rights in this Mark for nearly forty years.  (Id. ¶ 59.)

Penn State's athletic programs are generally televised or streamed to national and

sometimes international audiences, and Penn State enjoys a large fan base throughout the country.  (Id. ¶ 60.)  Penn State fans are loyal to the University and its brand.  (Id. ¶ 61.)  Many of Penn State's fans travel to Penn State's campus prior to scheduled sporting events and tailgate before the event.  (Id. ¶ 62.)  Penn State's football program is one of the most successful sporting programs of all time, with its games seen worldwide.  (Id. ¶ 63.)  Substantially all, if not all, of the games of Penn State's team are nationally televised and watched in areas outside of the United States as well, leading to widespread recognition of Penn State's trademarks.  (Id.)  Penn State's football stadium is one of the largest stadiums in college football.  (Id. ¶ 64.)  With a seating capacity of 106,572, well over 100,000 people travel to and park near Penn State's football stadium for football games.  (Id.)

Penn State has been using the PSU Mark for decades in connection with a wide variety of goods and services.  (Id. ¶ 65.)  Penn State's target consumers for goods and services bearing the PSU Mark are not only students, alumni, and faculty and staff of Penn State, but also fans and supporters of Penn State throughout Pennsylvania and the entire United States, as well as internationally.  (Id. ¶ 66.)

The parties dispute whether Penn State has sold goods or services bearing its marks or licensed its marks to be on goods and services that are either the same as or are closely related to the services that Defendants offer.  Compare (Id. ¶ 67 with Doc. No. 189 ¶ 67.)[20]  The parties

---

[20]  While Plaintiff maintains that it has sold goods or services bearing its marks or licensed its marks to be on goods and services that are closely related to services offered by Defendants, relying on the McGrath Declaration (Doc. No. 178 ¶ 67) (citing Doc. No. 178-2 at 16), Defendants deny this assertion, and "object and move to strike paragraph 67" (Doc. No. 189 ¶ 67) (citing Doc. No. 203-7 (Plaintiff 30(b)(6) deposition testimony) at 15–16, 18–19). Defendants assert that "Penn State's registered PSU Mark is not registered in any classes for any hospitality- or transportation-related services" and that "Plaintiff has failed to assert any common law trademark rights in any class, much less hospitality- or transportation- related industries." (Id.)  Defendants further contend that "Penn State admitted that it has never rented RVs"; "Penn

also dispute whether Penn State promotes lodging and hospitality services, including multiple hotels in State College.  (Id. ¶ 68.)[21]

Penn State licenses its marks to the Penn Stater Hotel & Conference Center, located in State College, Pennsylvania.  (Id. ¶ 69.)  The Penn Stater is marketed online specifically to Penn State football fans, given the hotel's proximity to Beaver Stadium.  (Id.)  The webpage advertising the Penn Stater Hotel uses the PSU Mark to signify the hotel's connection to the University.  (Id. ¶ 70.)  For instance, the domain name is through the University's official <psu.edu> domain.  Similarly, the hotel instructs potential customers to reach out to the hotel by contacting the email address reservations@psu.edu.  (Id.)

Penn State licenses its trademarks to certain hotels, such as the Penn Stater and the Nittany Lion Inn.  (Id. ¶ 71.)  Penn State also partners with hotels which have secured sponsorship or promotional rights allowing them to use Penn State's trademarks related to Penn

---

State testified it does not rent vehicles either"; and "Penn State testified it owns a trolley and some shuttles which are not rented as vehicles, but which Penn State uses to offer transportation services."  (Id.) (citing Doc. No. 203-7 (Plaintiff 30(b)(6) deposition testimony)).  Defendants maintain that "Plaintiff's assertions to the contrary should be stricken as pos[t] hoc assertions which have no relevance to the claims at bar and are therefore irrelevant to the adjudication of, and outside the scope of, any claims pending in this case."  (Id.)

[21]  Plaintiff cites its deposition testimony in support of this assertion (Doc. No. 178 ¶ 68) (citing Doc. No. 178-24 at 4, 8–9), while Defendants deny this assertion and "object and move to strike paragraph 68" (Doc. No. 189 ¶ 68).  Defendants state that "Penn State's registered PSU Mark is not registered in any classes for any hospitality- or transportation-related services" and that "Plaintiff has failed to assert any common law trademark rights in any class, much less hospitality- or transportation-related industries."  (Id.)  Defendants further contend that "Penn State admitted that it has never rented RVs"; "Penn State testified it does not rent vehicles either"; and "Penn State testified it owns a trolley and some shuttles which are not rented as vehicles, which but Penn State uses to offer transportation services."  (Id.) (citing Doc. No. 203-7 (Plaintiff 30(b)(6) deposition testimony)).  Defendants maintain that "Plaintiff's assertions to the contrary should be stricken as post hoc assertions which have no relevance to the claims at bar and are therefore irrelevant to the adjudication of, and outside the scope of, any claims pending in this case."  (Id.)

State Athletics, such as Lion Country Lodging.  (Id.)  Penn State advertises this lodging through its athletics website <goPSUsports.com> and on advertisements, including marketing materials sent to Penn State fans.  (Id.)

The parties dispute whether, as part of its services, Penn State offers overnight and day of game recreational vehicle (RV) parking under the PSU Mark, the Penn State Mark, and the Nittany Lion Logo.  Compare (Id. ¶ 72 with Doc. No. 189 ¶ 72).[22]  Penn State offers attendees the opportunity to purchase a parking pass for its overnight RV lot, allowing fans to travel from out of town and tailgate.  (Id. ¶ 73.)  In addition, Penn State works with third parties to provide overflow capacity when Penn State's RV lot reaches capacity.  (Id.)

Penn State, either directly or through authorized third parties, provides through the <goPSUsports.com> website branded tailgate related merchandise such as coolers and cornhole sets that bear its trademarks.  (Id. ¶ 74.)[23]  Penn State fans can also secure tables, chairs, tents,

---

[22]  In support of this assertion, Plaintiff cites the McGrath Declaration and Exhibit B to the Declaration.  (Doc. No. 178 ¶ 72) (citing Doc. No. 178-2 (McGrath Declaration) at 17; Doc. No. 178-5 (Exh. B to McGrath Declaration) at 2–6).  Defendants dispute this assertion, stating that "[w]hi[l]e it is admitted that Plaintiff offers overnight and day of game parking, Defendants deny it did so using the marks in 2010" and that "[t]he cited references do not show use during the relevant time periods" because "[t]he screenshots attached appear to show use in 2018."  (Doc. No. 189 ¶ 72.)  Defendants also state that they "object to, and move to strike, paragraph 72 as irrelevant and outside the scope of Plaintiff's claims at bar" because "Penn State's registered PSU Mark is not registered in any class for any parking-related services."  (Id.)

[23]  In support of this assertion, Plaintiff cites the McGrath Declaration and Exhibit B to the Declaration.  (Doc. No. 178 ¶ 74) (citing Doc. No. 178-2 (McGrath Declaration) at 17; Doc. No. 178-5 (Exh. B to McGrath Declaration) at 12–31).  Defendants purport to deny this assertion, referencing their response to paragraph 37, which asserts that "[m]any different agents act for Penn State in marketing and enforcement, including SideARM Sports (which runs <gopsurv.com> [sic]), Intercollegiate Athletics, and PSSP."  (Doc. No. 189 ¶ 74.)  The Court notes that it appears that Defendants inadvertently refer to <gopsurv.com> when they intend to refer to <gopsusports.com>.  In any event, the Court notes that is unclear how the assertion that "many different agents act for Penn State in marketing and enforcement" suffices to deny the assertion that Penn State acts "either directly or through authorized third parties" to provide various merchandise bearing its trademarks; accordingly, the Court deems this fact admitted.

and catering through the <goPSUsports.com website>, or through partners that are linked

through the <goPSUsports.com> website.  (Id. ¶ 75.)[24]  The parties dispute whether Penn State

provides reserved, preferred, and general parking spaces.  Compare (Id. ¶ 76 with Doc. No. 189 ¶

76).[25]  Since 2017, Penn State has partnered with Tailgate Guys to "bring turnkey and hassle-free

tailgating to State College" by providing packages including "tents, table, chairs, coolers with

ice, TV and media service, food and beverage options and their own bellhop service."  (Id. ¶

77.)[26]

Penn State runs a Transportation Services division.  (Id. ¶ 78.)  Information about these

Services is set out online through the domain <transportation.psu.edu>.  (Id.)  Among the many

goods and services that Penn State offers, the University offers transportation services both on

and off-campus.  (Id. ¶ 79.)   Some of the off-campus transportation provided by Penn State's

Transportation Services is conducted through a partnership between Penn State and the Centre

Area Transportation Authority (CATA") which offers free transportation along several routes in

---

[24]  In support of this assertion, Plaintiff cites the McGrath Declaration and Exhibit B to the
Declaration.  (Doc. No. 178 ¶ 75) (citing Doc. No. 178-2 at 17; Doc. No. 178-5 at 12–31).
Defendants dispute this assertion, stating that "[w]hile it is admitted that tables and chairs can be
secured through the website, it is denied that Plaintiff did so using the Marks in 2010,"
maintaining that "[t]he cited references do not show use during the relevant time periods and as
such are irrelevant as they have no semblance to the claims at bar."  (Doc. No. 189 ¶ 75.)

[25]  In support of this assertion, Plaintiff cites the McGrath Declaration and Exhibit B to it.  (Doc.
No. 178 ¶ 76) (citing Doc. No. 178-2 at 17; Doc. No. 178-5 at 12–31).  Defendants dispute this
assertion, stating that they "object to, and move to strike, paragraph 72  [sic] as irrelevant as post
hoc assertions which were not pled in Plaintiff's Complaint" because "Penn State's registered
PSU Mark is not registered in any class for any parking-related services and no common law
rights are asserted."  (Doc. No. 189 ¶ 76.)  The Court notes that it appears that Defendants
inadvertently refer to paragraph 72 when they intend to refer to paragraph 76.

[26]  Defendants purport to deny this assertion in part, stating that "the cited evidence shows
Tailgate Guys do not offer lodging or RV rentals."  (Doc. No. 189 ¶ 77.)  However, the Court
notes that Penn State's assertion in paragraph 77 does not state that Tailgate Guys offer lodging
or RV rentals.  Accordingly, the Court deems this fact admitted.

State College, PA—including routes that cover Beaver Stadium during home football weekends. (Id. ¶ 80.)[27]  For instance, Penn State runs a campus shuttle that provides "transportation across campus for faculty, staff, students, and visitors."  (Id. ¶ 81.)[28]  The parties dispute whether the University owns a fleet of vehicles that can be rented out to the general public through the University's director of transportation.  Compare (Id. ¶ 82 with Doc. No. 189 ¶ 82).[29]

Defendants Keystone Alternatives and Mark Lauer operate a business offering and providing recreational vehicle ("RV") rental services and turn-key tailgating services at Penn State football games.  (Id. ¶ 83.)[30]  Keystone Alternatives was formed in 2008 by Mark Lauer and his brother, Timothy Lauer.  (Id. ¶ 84.)  Defendant Mark Lauer is the president of Keystone Alternatives.  (Id. ¶ 85.)  The parties dispute whether Mark Lauer manages Keystone Alternatives.  Compare (Id. ¶ 86 with Doc. No. 189 ¶ 86).[31]  Timothy Lauer is the Vice President

---

[27]  Defendants deny the assertions in paragraph 80 in part, based on its objection "that the cited references do not show use during the relevant time periods before this action was commenced." (Doc. No. 189 ¶ 80.)

[28]  Defendants again deny this assertion in part, based on its objection "that the cited references do not show use during the relevant time periods before this action was commenced."  (Doc. No. 189 ¶ 81.)

[29]  In support of its assertion that it owns vehicles that can be rented out to the public, Plaintiff relies on its deposition testimony and screenshots of the Penn State Transportation Services webpage.  (Doc. No. 174 ¶ 82) (citing Doc. Nos. 178-24 (Plaintiff 30(b)(6) deposition testimony) at 24–25, 30–33; 178-35 (webpage) at 2–5).   Defendants deny the assertions in paragraph 82, objecting that "the cited references do not show use during the relevant time periods before this action was commenced" and to "Plaintiff's characterization of the cited references and exhibits, which do not show vehicles can be rented" but "show only that 'trained drivers are available at reasonable rates.'"  (Doc. No. 189 ¶ 82.)  Citing Plaintiff's deposition testimony, Defendants also assert that "Penn State previously testified that it does not rent vehicles."  (Id.) (citing Doc. No. 203-7 at 18).

[30]  Defendants deny this assertion "as stated," admitting it as to Keystone Alternatives but denying it as to Mark Lauer.  (Doc. No. 189 ¶ 83.)

[31]  Plaintiff asserts that he does, citing Defendants' answer and Tim Lauer's testimony.  (Doc. No. 178 ¶ 86) (citing Doc. No. 32 (answer) and Doc. No. 178-26 (Tim Lauer deposition

of Keystone Alternatives.  (Id. ¶ 87.)  Keystone Alternatives owns and maintains a website at the

domain <goPSUrv.com> ("the Domain") advertising RV rentals and related services.  (Id. ¶ 88.)

 The parties dispute whether Keystone Alternatives controls the content of the Domain.  (Id. ¶

89.)[32]  The parties dispute whether Defendant Mark Lauer makes all branding and marketing

decisions on behalf of Keystone Alternatives.  (Id. ¶ 90.)[33]  The parties dispute whether, since at

least 2010, Defendants have in connection with their business used the brand goPSUrv and the

domain name goPSUrv.com, as shown below:

---

testimony) at 3–4).  Defendants deny this assertion, stating that they "object to, and move to
strike, paragraph 86" because "[t]he Complaint does not allege at paragraph 6 that Mark Lauer
manages Keystone Alternatives, nor was the same averred" and because "Mark Lauer testified
that he and Tim Lauer divide management of Keystone Alternatives 50/50."  (Doc. No. 189 ¶ 86)
(citing Doc. No. 209-1 (Lauer deposition testimony) at 51–53).

[32]  Plaintiff relies on Mark Lauer's deposition testimony and Defendants' responses to discovery
in support of its assertion that Keystone Alternatives controls the Domain content.  (Doc. No.
178 ¶ 89) (citing Doc. No. 178-23 (Lauer deposition testimony) at 48–49 and Doc. No. 178-19
(responses to discovery) at 12).  Defendants deny this assertion, stating that "[a] website designer
hired by Defendant Keystone Alternative[s] put the content up on the website at <gopsurv.com>
in 2010 and thereafter" and "Mark Lauer personally did not know how to change 'one thing' on
the website and never did access it"; further, "[t]his same website designer created the logo on
the website."  (Doc. No. 189 ¶ 89) (citing Doc. No. 209-1 (Lauer deposition testimony) at 74–
76).

[33]  In support of the assertion that he does, Plaintiff relies on Defendants' responses to
discovery.  (Doc. No. 178 ¶ 90) (citing Doc. Nos. 178-37 at 3 and 178-19 at 13).  Defendants
deny this assertion, stating that they "object and deny that Defendants admission that Mark Lauer
makes marketing and branding decisions implies he controlled the website or selected the
domain <gopsurv.com>, which Lauer has always maintained was done by a third-party web
designer" and that "Mark Lauer testified that he and Tim divide management of Keystone
Alternatives 50/50."  (Doc. No. 189 ¶ 90) (citing Doc. No. 189-9 (Lauer Declaration) at 7 and
Doc. No. 209-1 (Lauer deposition testimony) at 51–53, 78, 80).  Defendants also "object that this
paragraph misstates the evidence in that [Doc. No. 178-37] does not support paragraph 90."  (Id.)



(screenshot taken August 12, 2019)



(screenshot taken November 21, 2019)



(Id. ¶ 91.)[34]

---

[34]  In support of this assertion, Plaintiff relies on screenshots of the website taken on dates in 2019, Defendants' answer, and Mark Lauer's deposition testimony.  (Doc. No. 178 ¶ 91) (citing Doc. Nos. 178-38 (screenshot of website taken on August 19, 2019); 178-39 (screenshot of website taken November 2019); 32 (answer); and 178-23 (Lauer deposition testimony) at 3–4, 12–15).

Defendants deny this assertion, admitting that "they have used the tradename GOPSURV and the domain <gopsurv.com> since April 19, 2010, but deny the exhibited photographs show use since 2010," asserting that "[t]he first exhibited photograph shows use in 2019 by its own timestamp" and that "[f]rom 2010 to at least 2015, Defendants' use of GOPSURV, and the website at <gopsurv.com>, did not look as shown."  (Doc. No. 189 ¶ 91) (citing Doc. No. 189-9 (Lauer Declaration) at 5–6, 21 and Doc. No. 178-40 (screenshot of prior version of Defendants' website) at 2).  Defendants additionally assert that "all items shown inside of the RVs bearing Plaintiff's Marks, including stickers and garbage cans, were purchased from the Penn State bookstore or licensed merchandisers" (id.), and that "[b]eginning in 2010, Defendants' website looked as follows:"

Defendants use goPSUrv.com to offer and sell RV rentals and related services.  (Id. ¶ 92.)
Defendants own approximately 15–20 RVs that they rent out.  (Id. ¶ 93.)  Nearly all of
Defendants' RVs have goPSUrv.com painted on the vehicles.  (Id. ¶ 94.)  Defendants' branding
and advertising includes the following uses of goPSUrv and goPSUrv.com:



(Id.)  In addition, Defendants state that, "[f]rom 2010 to 2015, the Nittany Lion, mascot of Penn
State University, was shown in the header of Defendants' website stepping out of Defendants'
RV (shown above)" and that "[t]his photograph of the Nittany Lion exiting on the website was
taken by a photography team of the Penn State Athletics Department in 2010."  (Id.)
Defendants maintain that "[t]he mascot was instructed by the photography team to enter
Defendants' RV on Penn State property at a home football game, then exit for the photograph,
then the photograph was given to Defendants by Penn State for marketing purposes."  (Id.)
(citing Doc. No. 189-9 (Lauer Declaration) at 5–6).



(Id. ¶ 95.)[35]  Defendants use the goPSUrv Mark to promote and offer for rent RVs to Penn State

students, alumni, and fans who are traveling to State College at Penn State football games for

both tailgating and lodging.  (Id. ¶ 96.)  Although Defendants rent RVs for uses other than

lodging and tailgating at Penn State football games, Defendants do not offer RV rentals through

any domain names other than goPSUrv.com.  (Id. ¶ 97.)  The name goPSUrv.com is also

attached to Defendants' RVs regardless of whether the RVs are rented for a Penn State game or a

non-Penn State event.  (Id. ¶ 98.)  Defendants use the stylized treatment of goPSUrv.com shown

below to emphasize "PSU" and this stylized logo appears prominently on Defendants' webpage,

as well as on other advertising:

---

[35]  Defendants admit this assertion only in part, admitting distributing the voucher shown in
paragraph 95 but asserting that "the wording on the voucher actually distributed was changed to
read 'OFFICIAL PSU RV RENTAL OF COACH FRANKLIN.'"  (Doc. No. 189 ¶ 95) (citing
Doc. No. 189-9 (Lauer Declaration) at 19–20 and Doc. No. 207 (Longo deposition testimony)).



(Id. ¶ 99.)  The term "PSU" in goPSUrv and goPSUrv.com refers to Penn State.  (Id. ¶ 100.)

Beyond using the PSU Mark, Defendants' website at the domain goPSUrv.com also uses images

showing the PENN STATE Mark and images of the Lionhead Logo, as shown below:



(Id. ¶ 101.)

The parties dispute whether Defendants adopted and use "PSU" in goPSUrv and

goPSUrv.com in order to create an association in the minds of consumers between Defendants'

services and the University.  Compare (Id. ¶ 102 with Doc. No. 189 ¶ 102).[36]  The parties dispute

whether Defendants have called themselves the "OFFICIAL" company for "PSU RV RENTAL

& TAILGATINGS".  Compare (Id. ¶ 103 with Doc. No. 189 ¶ 103).[37]  The parties dispute

---

[36] Plaintiff relies on Mark Lauer's testimony in support of this assertion.  (Doc. No. 178 ¶ 102)
(citing Doc. No. 178-23 at 15–17).  Defendants deny this assertion, stating that it "misstates prior
testimony" in that "Lauer did not testify Keystone's use of PSU was meant to 'create an
association in the mind of consumers between Defendants' services and the University' but
rather that PSU simply was adopted because it refers to the name of the University and location
where Defendants' services were being offered."  (Doc. No. 189 ¶ 102) (citing Doc. No. 178-23
at 15–16).

[37] In support of this assertion, Plaintiff relies on Defendants' responses to discovery wherein
they admit that Defendants distributed coupons using this language.  (Doc. No. 178 ¶ 103)
(citing Doc. No. 178-19 at 14).  Defendants deny this assertion, referring to their response to
paragraph 95, wherein they state that "the wording on the voucher actually distributed was
changed to read 'OFFICIAL PSU RV RENTAL OF COACH FRANKLIN.'"  (Doc. No. 189 ¶
103) (citing Doc. No. 189-9 (Lauer Declaration) at 19–20).

whether Defendants chose the domain <goPSUrv.com> because of the similarities between this

domain and the Penn State Athletics website domain <goPSUsports.com>.  Compare (Id. ¶ 104

with Doc. No. 189 ¶ 104).[38]

Mark Lauer testified in his deposition that when Defendants were selecting their branding

and domain name, the "PSU" portion was meant to refer to Penn State, noting that: "PSU is

PSU." (Id. ¶ 105.)  Mark Lauer admitted that by using this mark, he "took it that [consumers]

_____

[38] In support of this assertion, Plaintiff relies on Defendants' responses to discovery.  (Doc. No.
178 ¶ 104) (citing Doc. No. 178-19 at 14).  Defendants deny this assertion, stating that they
"object to, and move to strike, paragraph 104 which presumes facts not in evidence, including
that Penn State Athletics owns the domain name <goPSUsports.com>, which is owned by
SideARM Sports." (Doc. No. 189 ¶ 104) (citing Doc. No. 178 ¶ 37).  Defendants also assert that
they object because this assertion "misstates the request for admission, which called only for
Defendant to admit the domain was chosen 'at least in part.'" (Id.)  Defendants further state that
they "also registered the domain name <gopsurv.com> after it was recommended by their
marketing consultant and did not select the name themselves." (Id.) (citing Doc. No. 189-9
(Lauer Declaration) at 7–8 and Doc. No. 209-1 (Lauer deposition testimony) at 78, 80).
Defendants contend that they "recognized that 'go' was a common prefix in domains in 2010 to
indicate a 'call to action'" and "incorporated 'PSU' into the domain because '[i]t's where we
were offering our services.'" (Id.) (citing Doc. No. 189-9 (Lauer Declaration) at 7–8; Doc. No.
209-1 (Lauer deposition testimony) at 77).  Defendants also state that they "liked the name
because it was reminiscent of two other domain names having the prefix go relating to RVs,
<gorving.com> and <gooutdoors.com>" and that "[t]he name of Defendant's internet hosting
company, where Keystone registered the Disputed Domain itself, was also called GoDaddy and
used the domain <godaddy.com>." (Id.) (citing Doc. No. 209-1 (Lauer deposition testimony) at
78; Doc. No. 189-9 (Lauer Declaration) at 7–8).  Defendants additionally state that:

> The Disputed Domain <gopsurv.com> is the only domain which Defendants own
> that incorporates the character string "psu."  Lauer never marked references to
> GOPSURV as a tradename, or <gopsurv.com> with any trademark identifiers.
> Defendants have never before in their history have been the target of a
> "cybersquatting" case and have never registered any other domain name containing
> "psu" or any other of Plaintiff's trademarks.  Defendants have never tried to sell the
> Disputed Domain.  Lauer did not know what the USPTO was (U.S. Patent and
> Trademark Office), nor how to search for trademarks there.  Lauer also did not know
> Plaintiff had a trademark for PSU, but believed it was simply the name of the
> Plaintiff.

(Id.) (citing Doc. No. 189-9 (Lauer Declaration) at 8, 20; Doc. No. 209-1 (Lauer deposition
testimony) at 77, 226–27).

would assume we offered RV rentals at Penn State." (Id. ¶ 106.)  Timothy Lauer similarly

testified that in choosing the brand name: "We definitely wanted—Penn State fans are going to

be drawn to Penn State—and that's going to get them to think." (Id. ¶ 107.)  The parties dispute

whether Defendants primarily use the brands goPSUrv and goPSUrv.com to conduct business

and promote their goods and services despite their use of the entity name Keystone Alternatives

as their legal name.  Compare (Id. ¶ 108 with Doc. No. 189 ¶ 108).[39]

Defendants' website does not mention "Keystone Alternatives." (Id. ¶ 109.)  The

branding that appears on the Defendants' website prominently uses goPSUrv and goPSUrv.com

rather than "Keystone Alternatives." (Id. ¶ 110.)  Defendants' advertising includes social media

advertisements published through the Facebook pages at both

https://www.facebook.com/goPSUrv and

http://www.facebook.com/keystonealternativesRVrentals. (Id. ¶ 111.)  Defendants' Facebook

advertisements prominently feature the branding goPSUrv and goPSUrv.com. (Id. ¶ 112.)  In

addition to their @goPSUrv Facebook page, Defendants have used a separate Facebook page

under the handle @keystonealternativesRVrentals to advertise their RV services. (Id. ¶ 113.)

This page also features many ads using the goPSUrv Mark. (Id.)  Defendants also operate a

social media page on Twitter under the handle @goPSUrv. (Id. ¶ 114.)  The Twitter profile uses

an image that features the goPSUrv Mark, as seen below:

---

[39]  Plaintiff relies on Defendants' answer in support of this assertion.  (Doc. No. 178 ¶ 108)
(citing Doc. No. 32 (answer) ¶ 43).  Defendants deny this assertion, maintaining that "[a]ll
paperwork which Defendants exchanged with other parties, including distributed football
schedules and the voucher, contained the name Keystone Alternatives" and that such paperwork
"included invoices, contracts, insurance certificates, football schedules, mail from Plaintiff and
other parties, social media posting, [and] the voucher authorized by James Franklin."  (Doc. No.
189 ¶ 108) (citing Doc. No. 186 (Exhibits to Lauer Declaration) at 11–38 (Exhs. B–E), 69–71
(Exh. I), 76–77 (Exh. L), 82–87 (Exh. N), 107–08 (Exh. V), and 215–17 (Exh. Z)).  Defendants
further state that "Plaintiff's own evidence shows use of Keystone Alternatives on Defendants
marketing materials." (Id.) (citing Doc. No. 178 ¶ 95).



(Id.)  In addition, since 2010, Defendants have promoted the goPSUrv Mark through the acquisition of 20,000 to 40,000 business cards each year, raffles at events attended by Penn State alumni and fans, and the production of apparel bearing the goPSUrv Mark, at an estimated average cost of at least $10,000 a year.  (Id. ¶ 115.)  Defendants advertise their business through their RVs, most of which have been painted to include the goPSUrv.com Domain and advertise that Defendants offer RV rentals.  (Id. ¶ 116.)    Representative images of Defendants' RVs are set forth below, showing this branding:





(Id.)  Defendants have distributed hard copy football schedules and flyers that feature the

goPSUrv Mark to attendees at Penn State football games.  (Id. ¶ 117.)  Representative examples

of these advertising materials that have been created and distributed by Defendants on Penn State

property include the following:





(Id. ¶ 118.)  The parties dispute whether Keystone Alternatives distributed the following coupon

advertising its services, including at tailgating areas around Beaver Stadium:



(Id. ¶ 119.)[40]  Defendants have also advertised their services through billboards and other

signage, as well as radio and TV advertising and sponsorships.  (Id. ¶ 120.)[41]  On November 15,

2019, Defendants ran an advertisement in the Centre Daily Times for a tailgate party, as shown

below:



---

[40]  Defendants deny this statement, stating that, while they admitted distributing the voucher shown in this paragraph, they have always asserted that "the wording on the voucher actually distributed was changed to read 'OFFICIAL PSU RV RENTAL OF COACH FRANKLIN.'" (Doc. No. 189 ¶ 119) (citing Doc. No. 189-9 (Lauer Declaration) at 19–20 and Doc. No. 207 (Longo deposition testimony)).

[41]  Defendants deny this assertion, maintaining that they "have never run television ads."  (Doc. No. 189 ¶ 120) (citing Doc. No. 189-9 (Lauer Declaration) at 21).

(Id. ¶ 121.)[42]

Since 2019, Defendants have displayed a large billboard near State College, Pennsylvania using the goPSUrv mark.  (Id. ¶ 122.)  A photo of this billboard shows that Defendants prominently feature the stylized Mark emphasizing the "PSU" element:



(Id.)  The newspaper advertisement and roadside billboard make no reference to Keystone Alternatives.  (Id. ¶ 123.)  Defendants' website at goPSUrv.com links to a video advertisement. (Id. ¶ 124.)  The following images are still frames taken from this advertisement:

---

[42]   Defendants deny this assertion in part, denying that Defendant Lauer ran this ad, and stating that, in admitting it ran the ad, Defendant Keystone Alternatives intended to admit the ad was run for its benefit, but it was a local television station that instructed the paper to run the ad.  (Doc. No. 189 ¶ 121) (citing Doc. No. 32 (answer) ¶ 57 and Doc. No. 189-9 (Lauer Declaration) at 21–22).







(Id. ¶ 125.)  The video advertisement linked on Defendants' website does not reference or

mention Keystone Alternatives.  (Id. ¶ 126.)  Defendants also rely on "word of mouth" spreading

about their business to potential customers.  (Id. ¶ 127.)[43]

Defendants' target customers for their RV-related goods and services include people

attending Penn State football games.  (Id. ¶ 128.)  Defendants market their goods and services

specifically at Penn State sports fans.  (Id. ¶ 129.)  Defendants' customers generally comprise

ordinary purchasers who do not need to have any prior experience owning or operating RVs.  (Id.

---

[43]  Defendants admit this assertion only in part, stating that Defendants' main form of advertising
is stenciling on the RVs and word-of-mouth.  (Doc. No. 189 ¶ 127) (citing Doc. No. 189-9
(Lauer Declaration) at 22).

¶ 130.)  The rental process can be completed in a matter of minutes over the phone.  (Id.)

Customers can simply call to request for an RV with a certain number of beds and any other

desired accommodations such as a bathroom or air conditioning.  (Id.)

The parties dispute whether Penn State authorized Defendants' use of goPSUrv,

goPSUrv.com, or any of Penn State's other marks.  Compare (Id. ¶ 131 with Doc. No. 189 ¶

131).[44]  The parties further dispute whether Penn State's authorized sponsorship agent, Penn

---

[44] Plaintiff asserts that it never authorized Defendants' use of any of its marks, relying on its
deposition testimony, the McGrath Declaration, and McGrath's deposition testimony.  (Doc. No.
178 ¶ 131) (citing Doc. Nos. 178-24 (Plaintiff 30(b)(6) deposition testimony) at 12–13; 178-2
(McGrath Declaration) at 6, 22; and 178-25 (McGrath deposition testimony) at 3).  Defendants
deny this assertion, relying on the Lauer Declaration, Baker's deposition testimony,
Bodenschatz's deposition testimony, Riedel's deposition testimony, Conlon's deposition
testimony, Longo's deposition testimony, and McGrath's deposition testimony.  Defendants
state:

> From 2010 to 2015, the Nittany Lion, mascot of Penn State, was shown in the header
> of Defendants' website stepping out of Defendants' RV (shown above).  This
> photograph of the Nittany Lion exiting on the website was taken by a photography
> team of the Penn State Athletics Department in 2010.  The mascot was instructed by
> the photography team to enter Defendants' RV on Penn State property at a home
> football game, then exit for the photograph, then the photograph was given to
> Defendants by Penn State for marketing purposes.  Numerous Penn State employees
> attended, including head football coach Joe Paterno in 2010, head coach James
> Franklin in 2017, Mark Bodenschatz (associate director of Penn State Intercollegiate
> Athletics), and Dave Baker (associate director of Penn State Intercollegiate
> Athletics), attended events at Defendants' RVs on campus.  Penn State's Ticket
> Department sold passes to GOPSURV each year from 2010 to 2017 and sent mail to
> Defendants identifying them as GOPSURV.  Each year from 2010–2017, Defendants
> paid to sponsor Penn State athletics, signing a Marketing and Sports Contract with
> Penn State Sports Properties (PSSP)—an agent of Plaintiff handling the sale of Penn
> State sports sponsorships.  Copies of Marketing and Sponsorship Contracts which
> Defendants executed with PSSP, beginning in 2010, are annexed to Lauer's
> deposition.  Defendants sent insurance certificates directly to Penn State's Risk
> Management Department every year as requested.  Defendants were allowed to park
> RVs covered with references to GOPSURV in highly trafficked grassy areas on
> campus and in front of Beaver Stadium as shown below.  From 2010 to 2017,
> Defendants brought their RVs upon invitation of Plaintiff's Alumni Coordination
> Director, to Penn State events which Ms. Conlon had organized, including clay
> pigeon shoots at which Penn State used Defendants' RVs as scoring stations and

manned them with Penn State employees. An attorney who Defendants believed was handling legal matters involving donations for Penn State signed forms using GOPSURV. Plaintiff ran advertisements for Defendants in Penn State Alumni Association newsletters and invited Defendants to distribute marketing materials at Penn State events and actively participated in marketing Defendants' services at these events, distributing business cards for Defendants, notifying Defendants of potential customers, and allowing Defendants to park RVs bearing the GOPSURV name on campus—as well as notifying other departments that Defendants were authorized to do so. Plaintiff asked Lauer to arrange for guest speakers to speak at these events. Defendants would park caravans of RVs, sometimes as many as 20, at the ORV lot on Thursdays then remove these RVs on Sundays. Defendants paid Penn State for entry of each RV into the ORV lot and rented the RVs to Penn State fans for the weekends of Penn State home football games. Penn State began reserving approximately a dozen spaces for GOPSURV's use in the ORV lot during each home football game weekend, permitting only Defendants to use these spaces with RV marks with GOPSURV and excluding all others. Baker never asked Defendants to take down their signage. Baker testified that he knew Defendants operation went back to "2010, 2011" and later that he became aware of Defendants "about that time, 2011, 2012, somewhere in that period." Head football coach James Franklin was given a free RV rental in exchange for endorsing GOPSURV and authorizing GOPSURV to advertise that it as the "Official PSU RV Rental of Coach Franklin." According to James Franklin's agent, both James Franklin and Athletic Director Sandy Barbour then authorized Defendants to distribute marketing materials saying GOPSURV was the "Official PSU RV Rental of Coach Franklin" at official Penn State events in Beaver stadium in 2017, including dinners with large Penn State benefactors. Bodenschatz admitted he was aware of Defendants' activities "before 2012" and exchanged emails with Defendants before 2012. Plaintiff's fan zone maps showed Defendants from 2010 onward. Plaintiff had no objection to Defendants' use of GOPSURV. Plaintiff's Licensing Director may have known of Defendants' use of GOPSURV before 2012. Plaintiff saw Penn State marks on Defendants' RVs in 2010. Plaintiff used Defendants' RVs as scoring stations of official fundraising events. Plaintiff distributed marketing materials for Defendants on campus, including business cards, and ran advertisements for Defendants in the Penn State Alumni Association newsletter. Plaintiff allowed Defendants RVs to be parked at prominent locations on campus and asked Defendants for donations of free RV services. Plaintiff asked Defendants to arrange speakers for Plaintiff at fundraising events. Plaintiff sent emails in 2010 referring to Defendants as "gopsurv.com". Plaintiff informed Campus Security that Defendants' RV was authorized to be on display on campus on April 7, 2017, as it had been the year before. Plaintiff's head football coach authorized use of PSU on Defendants' vouchers and represented Plaintiff's Athletic Director had done the same. James Franklin attempted to use Defendants' services at away football games. McGrath testified that it is possible other individuals at Penn State before he was hired in 2014 may have given permission to Defendants to use the <gopsurv.com> domain name.

State Sports Properties, granted Defendants permission to use Penn State's trademarks in their

business names.  Compare (Id. ¶ 132 with Doc. No. 189 ¶ 132).[45]  The parties also dispute

whether Mr. Lauer or anyone else at Keystone Alternatives ever asked Penn State to use, or

received permission from Penn State to use, goPSUrv.com as a domain or brand.  Compare (Id. ¶

133 with Doc. No. 189 ¶ 133.)[46]  The parties dispute whether, since at least 2013, Mr. Lauer was

aware that he could not use the Lionhead Logo on apparel promoting his business.  Compare (Id.

---

(Doc. No. 189 ¶ 131) (citations to the record omitted).

[45]  Plaintiff relies on the deposition testimony of Tim Bordner in support of this assertion.  (Doc.
No. 178 ¶ 132) (citing Doc. No. 178-28 at 4).  Defendants deny this assertion, stating that they
"object to, and move to strike, paragraph 132 which intentionally misstates the evidence" in that
"[t]he citation of Bordner's deposition transcript cited by Plaintiff reads as follows:
Q. Did you ever tell Keystone Alternatives that they had permission to use Penn State's
trademarks in their business name?
A. I did not.  Not that I could ever recall.  I wouldn't have a reason to because I didn't really call
on them as a client.
Bordner Dep. 72:10–15."  (Doc. No. 189 ¶ 132.)  Defendants further assert that:

> Bordner was not testifying in a 30(b)(6) deposition for PSSP, nor did he testify as
> Plaintiff alleges.  He specifically says that he cannot recall granting Defendants
> permission, never testifies that PSSP did not, and answers that he would not have
> granted permission merely because Defendants were not his client at PSSP.
> Bordner's testimony, in fact, is void of any mention of PSSP alleged inability to
> grant permission—giving rise to a question of why Bordner did not assert PSSP
> could not.  The Marketing and Sponsorship Contracts signed by Defendants and
> PSSP expressly provide that Defendants are authorized to set up displays, "including
> tables, chairs, tents, staffing . . . and other materials."

(Id.) (citing Doc. No. 189-9 (Lauer Declaration) at 2–4; Doc. No. 186 (Exh. C. to Lauer
Declaration) at 13–27).  Defendants maintain that Bordner testified that PSSP needed Plaintiff's
permission before allowing Defendants to set up displays.  (Id.) (citing Doc. No. 209-3 at 26).

[46]  Plaintiff cites Mark Lauer's deposition testimony in support of this assertion.  (Doc. No. 178 ¶
133) (citing Doc. No. 178-23 at 31–32).  Defendants deny this assertion, stating that they "object
to, and move to strike, paragraph 133 which intentionally misstates the evidence" in that "Lauer
testified in the cited reference that he never asked for permission to use PSU, not that he never
received it."  (Doc. No. 189 ¶ 133) (citing Doc. No. 178-23 (Lauer deposition testimony) at 31–
32).

¶ 134.)[47]

The parties dispute whether, in April 2015, Penn State's Licensing Committee became aware that Defendants were using the goPSUrv Mark and were operating through the website <goPSUrv.com>.  Compare (Id. ¶ 135 with Doc. No. 189 ¶ 135).[48]  Upon learning of Defendants' use, Maureen Riedel—who was at the time the Director of Licensing—contacted Mark Lauer by telephone.  (Id. ¶ 136.)  Upon receiving the call from Penn State Licensing, Mark Lauer discussed the call with his brother and business partner, Timothy Lauer.  (Id. ¶ 137.)  Timothy Lauer testified that Mark told him that Penn State Licensing had said "you can't use GoPSUrv as your business name."  (Id.)

Penn State reached out to Defendants again by letter dated May 12, 2017.  (Id. ¶ 138.)  This 2017 letter reviewed Penn State's intellectual property policies and specifically stated: "the use of University intellectual property, including the University name, its trademark and associated imagery, and promotional use of tickets to University Intercollegiate Athletics events is also restricted"; "[s]uch use may not occur without a grant of specific rights by the University or its licensed designated, Penn State Sports Properties"; and that Defendants were not permitted

---

[47]  Plaintiff cites Mark Lauer's deposition testimony in support of this assertion.  (Doc. No. 178 ¶ 134) (citing Doc. No. 178-23 at 35–38).  Defendants deny this assertion, stating that they "object that paragraph 134 misstates the evidence" in that "Lauer did not testify in the cited reference that he was instructed not to wear the clothing nor that the clothing had the Lionhead Logo on it."  (Doc. No. 189 ¶ 134) (citing Doc. No. 178-23 at 35–38).

[48]  In support of this assertion, Plaintiff cites its deposition testimony and that of Maureen Riedel.  (Doc. No. 178 ¶ 135) (citing Doc. No. 178-24 (Plaintiff 30(b)(6) deposition testimony) at 16–17 and Doc. No. 178-20 (Riedel deposition testimony) at 6–8).  Defendants deny that Penn State's Licensing Committee became aware of their use of the goPSUrv Mark and website <gospurv.com> in April 2015, stating that "Penn State's licensing director testified, in fact, she may have been aware of Defendants' use of GOPSURV before 2012."  (Doc. No. 189 ¶ 135) (citing Doc. No. 214-2 (Riedel deposition testimony) at 7–8).

to conduct commercial activities on Penn State's property.  (Id. ¶ 139.)[49]

Penn State then issued an additional letter to Defendants a year later, on June 19, 2018. (Id. ¶ 140.)  The June 2018 cease and desist letter to Keystone Alternatives identified that Penn State owns rights in the marks PSU, PENN STATE, and the Lionhead Logo, citing to federal registrations of those marks.  (Id. ¶ 141.)  In this letter Penn State demanded that Keystone Alternatives immediately and permanently cease all use of Penn State's trademarks, remove all indicia that Keystone Alternatives was affiliated with or connected to Penn State, and that Keystone Alternatives transfer the domain <goPSUrv.com> to Penn State.  (Id. ¶ 142.)  In June 2019, Penn State initiated a Uniform Dispute Resolution Proceeding ("UDRP") against the Domain <goPSUrv.com>.  (Id. ¶ 143.)[50]

The parties dispute whether, in or around April 2016, a Penn State season ticketholder contacted James Grecco of Penn State's Athletics Department regarding Defendants' business. Compare (Id. ¶ 144 with Doc. No. 189 ¶ 144).[51]  The parties dispute whether the individual had

---

[49]  Plaintiff cites the letter, an exhibit to the McGrath Declaration in support of this assertion. (Doc. No. 178 ¶ 139) (citing Doc. No. 178-15 (Exh. L to McGrath Declaration) at 2). Defendants admit this assertion only in part, denying that the letter informed them that their actions were prohibited, instead asserting that this was a form letter sent to all parties using the ORV lot and that they believed that they already had permission to use the PSU Mark.  (Doc. No. 189 ¶ 139) (citing Doc. No. 189-9 (Lauer Declaration) at 21).

[50]  Defendants deny this assertion as stated, admitting that "Plaintiff initiated the UDRP action upon which this litigation seeks review; however, Defendants seek judicial notice that this arbitration was lost by the Plaintiff in a decision dated July 29, 2019."  (Doc. No. 189 ¶ 143) (citing Doc. No. 189-6 (Rinehart Declaration) at 1–2).

[51]  Plaintiff cites its Exhibit 35, which is an email from one of Plaintiff's employees (Lowell Berg) to another Penn State employee, Tom McGrath, forwarding an April 28, 2016 email from Penn State employee James Grecco to Lowell Berg (the "Grecco email").  (Doc. No. 178 ¶ 144) (citing Doc. No. 178-36).  Defendants dispute this assertion, stating that they "object to, and move to strike, paragraph 144 as it is inadmissible hearsay and misstates the evidence" as Defendants maintain that:

received a copy of the Penn State football schedules that Defendants were handing out in Penn State's RV lot, which also included the goPSUrv.com domain name.  Compare (Id. ¶ 145 with Doc. No. 189 ¶ 145).[52]  The parties also dispute whether, upon looking at the football schedule on this card, the individual noted that the schedule listed an incorrect date for one of the games.  Compare (Id. ¶ 146 with Doc. No. 189 ¶ 146).[53]  Further, the parties dispute whether the customer saw the goPSUrv.com domain on the schedule, believed that the website was

> Plaintiff has not included testimony from alleged the season ticket holder, nor from the alleged Penn State employee who spoke to the season ticket holder, but rather from a third party who heard from Grecco that he had heard from a season ticket holder that there was an error on one of Defendants' football schedules.  Plaintiff testified that it produced these football schedules being distributed by Defendants; "[t]here has not been confusion between Penn State and Defendants"; "[n]obody has ever asked Defendants if they work for Penn State, are part of Penn State, have a contract with Penn State, or are sponsored by Penn State" and "[w]hen questioned in its 30(b)(6) [deposition], Penn State could not identify any instances of actual confusion."

(Doc. No. 189 ¶ 144) (citing Doc. No. 209-6 (Bodenschatz deposition testimony) at 52–53; Doc. No. 209-1 (Lauer deposition testimony) at 202–03; Doc. No. 203-7 (Plaintiff 30(b)(6) deposition testimony) at 102–03).

[52]  Plaintiff again cites the Grecco email in support of its assertion.  (Doc. No. 178 ¶ 145) (citing Doc. No. 178-36).  Defendants dispute this assertion, stating that they "object to, and move to strike, paragraph 145 which is inadmissible hearsay and misstates the evidence" in that "Plaintiff has not included testimony from the alleged season ticket holder, nor from the alleged Penn State employee who spoke to the season ticket holder, but rather from a party who heard from Grecco that he had heard from a season ticket holder that there was an error on one of Defendants' football schedules." (Doc. No. 189 ¶ 145.) Defendants further state that "Plaintiff testified that it produced the football schedules being distributed by Defendants."  (Id.) (citing Doc. No. 209-6 (Bodenschatz deposition testimony) at 52–53).

[53]  Plaintiff cites the Grecco email.  (Doc. No. 178 ¶ 146) (citing Doc. No. 178-36).  Defendants dispute this assertion, stating that they "object to, and move to strike, paragraph 146 which is inadmissible hearsay and misstates the evidence" in that "Plaintiff has not included testimony from the alleged season ticket holder, nor from the alleged Penn State employee who spoke to the season ticket holder, but rather from a party who heard from Grecco that he had heard from a season ticket holder there was an error on one of Defendants' football schedules." (Doc. No. 189 ¶ 146.)  Defendants further state that "Plaintiff testified that it produced the football schedules being distributed by Defendants."  (Id.) (citing Doc. No. 209-6 (Bodenschatz deposition testimony) at 52–53).

associated with Penn State because of the "GOPSU-" element, and contacted the Athletic

Department to discuss the schedule issue.  Compare (Id. ¶ 147 with Doc. No. 189 ¶ 147).[54]

Defendants continue using the goPSUrv Mark to offer and advertise RVs and related

goods and services.  (Id. ¶ 148.)  Defendants' website at goPSUrv.com remains active.  (Id. ¶

149.)  Defendants have updated their advertisements to solicit customers for the Blue White

Game being held at Penn State in April 2023.  (Id. ¶ 150.)  For instance, Defendants published

on Facebook the advertisement shown here:

---

[54]  Plaintiff cites the Grecco email.  (Doc. No. 178 ¶ 147) (citing Doc. No. 178-36).  Defendants
dispute this assertion, stating that they "object to, and move to strike, paragraph 147 which is
inadmissible hearsay, misstates the evidence, lacks foundation, and calls for speculation" in that
"Plaintiff has not included testimony from the season ticket holder, nor from the alleged Penn
State employee who spoke to the alleged season ticket holder, but rather from a party who heard
from Grecco that he had heard from a season ticket holder there was an error on one of
Defendant' football schedules"  (Doc. No. 189 ¶ 147.)  Defendants state that "Plaintiff testified
that it produced the football schedules being distributed by Defendants"; and that "[t]he alleged
customer, and the alleged customer's summary, never indicate that the customer was contacting
Penn State because of what he believed about the GOPSU-element of the football schedule."
(Doc. No. 189 ¶ 147) (citing Doc. No. 209-6 (Bodenschatz deposition testimony) at 52–53).



(Id.)

The parties dispute whether Defendants' ongoing use of the goPSUrv Mark harms Penn

State in that the University is harmed by the confusion caused by their use of the goPSUrv Mark

as well as the dilution of the PSU Mark.  Compare (Id. ¶ 151 with Doc. No. 189 ¶ 151).[55]

---

[55]  Plaintiff cites to the McGrath Declaration in support of its assertion.  (Doc. No. 189 ¶ 151)
(citing Doc. No. 178-2 at 9).  Defendants deny this assertion, stating that "Plaintiff has testified it
was benefitting from Defendants' use of GOPSURV, not being harmed."  (Doc. No. 189 ¶ 151)
(citing Doc. No. 209-6 (Bodenschatz deposition testimony) at 47; Doc. No. 209-9 (Conlon

The Domain (<goPSUrv.com>) is registered through the Registrar GoDaddy.  (Id. ¶ 152.)

The parties dispute whether Defendants own and control the website at the Domain

<goPSUrv.com>.  Compare (Id. ¶ 153 with Doc. No. 189 ¶ 153).[56]  The website at the Domain

<goPSUrv.com> is used to advertise Keystone Alternatives' RV goods and services to the

public.  (Id. ¶ 154.)   The parties dispute whether GoDaddy has prevented Keystone Alternatives

from advertising RV rental services through the <goPSUrv.com> Domain.  Compare (Id. ¶ 155

with Doc. No. 189 ¶ 155).[57]

## II.   LEGAL STANDARD

Rule 56(a) of the Federal Rules of Civil Procedure provides that summary judgment is

warranted "if the movant shows that there is no genuine dispute as to any material fact and the

movant is entitled to judgment as a matter of law."  See Fed. R. Civ. P. 56(a).  A factual dispute

is material if it might affect the outcome of the suit under the applicable law, and it is genuine

only if there is a sufficient evidentiary basis that would allow a reasonable factfinder to return a

verdict for the non-moving party.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248–49

---

deposition testimony) at 18).

[56]  Plaintiff cites Defendants' response to discovery in support of its assertion.  (Doc. No. 178 ¶ 153) (citing Doc. No. 178-19 at 12).  Defendants deny this assertion, clarifying that they have not testified that "they" own the website but rather that Keystone Alternatives alone owns the website.  (Doc. No. 189 ¶ 153) (citing Doc. No. 189-9 (Lauer Declaration) at 1–2).

[57]  Plaintiff cites Defendants' discovery responses and Mark Lauer's deposition testimony in support of its assertion that "at no time" has GoDaddy prevented Keystone Alternatives from advertising RV rental services through the <goPSUrv.com> domain.  (Doc. No. 178 ¶ 155) (citing Doc. No. 178-19) (discovery responses) at 9 and Doc. No. 178-23 (Lauer deposition testimony) at 48–49).  Defendants deny this assertion, stating that "[a]s a result of the UDRP complaint, GoDaddy LLC disabled Defendants' access to and control of the Disputed Domain" and therefore "[w]ithin approximately 48 hours of filing the UDRP case, Defendant lost the ability to control the Disputed Domain, including redirecting the nameservers and emails, as well as eliminating Defendant's ability to sell, transfer, or license the website."  (Doc. No. 189 ¶ 155) (citing Doc. No. 189-9 (Lauer Declaration) at 5).

(1986).  At summary judgment, the inquiry is whether the evidence presents a sufficient disagreement to require submission to the jury or whether it is so one-sided that one party must prevail as a matter of law.  See id. at 251–52.  In making this determination, the Court must "consider all evidence in the light most favorable to the party opposing the motion."  See A.W. v. Jersey City Pub. Schs., 486 F.3d 791, 794 (3d Cir. 2007).

The moving party has the initial burden of identifying evidence that it believes shows an absence of a genuine issue of material fact.  See Conoshenti v. Pub. Serv. Elec. & Gas Co., 364 F.3d 135, 145–46 (3d Cir. 2004).  Once the moving party has shown that there is an absence of evidence to support the non-moving party's claims, "the non-moving party must rebut the motion with facts in the record and cannot rest solely on assertions made in the pleadings, legal memoranda, or oral argument."  See Berckeley Inv. Grp. Ltd. v. Colkitt, 455 F.3d 195, 201 (3d Cir. 2006); accord Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986).  If the non-moving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden at trial," summary judgment is warranted.  See Celotex, 477 U.S. at 322.  With respect to the sufficiency of the evidence that the non-moving party must provide, a court should grant a motion for summary judgment when the non-movant's evidence is merely colorable, conclusory, or speculative.  See Anderson, 477 U.S. at 249–50.  There must be more than a scintilla of evidence supporting the non-moving party and more than some metaphysical doubt as to the material facts.  See id. at 252; see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  Further, a party may not defeat a motion for summary judgment with evidence that would not be admissible at trial.  See Pamintuan v. Nanticoke Mem'l Hosp., 192 F.3d 378, 387 (3d Cir. 1999).

III.    DISCUSSION

As noted <u>supra</u>, Plaintiff's complaint asserts the following causes of action: (1) trademark infringement (Lanham Act); (2) unfair competition (Lanham Act); (3) cybersquatting (Lanham Act); (4) trademark dilution (Lanham Act); (5) trademark dilution (Pennsylvania law); and (6) common law trademark infringement and unfair competition.  Defendants' counterclaims for (1) cyberpiracy; (2) reverse domain name hijacking; and (3) declaratory judgment as to non-violation of the Lanham Act remain pending.  Plaintiff has moved for summary judgment on all six counts of its complaint, as well as Defendants' three counterclaims, arguing that no disputes of material fact exist and that Plaintiff is entitled to judgment as a matter of law on each of its claims and Defendants' counterclaims.

As an initial matter, the Court notes that, although Plaintiff's complaint purports to assert claims of trademark infringement and unfair competition (counts one, two and six) based on Defendants' use of the "PSU" mark, the "PENN STATE" mark, and the Lionhead Logo, see (Doc. No. 1 at 1, 20, 22, and 26), the focus of Plaintiff's briefing in support of its motion for summary judgment as to those claims is on Defendants' allegedly infringing use of the "PSU" mark.  For example, Plaintiff characterizes its claims of trademark infringement and unfair competition (counts one, two and six of its complaint) as alleging "that Defendants infringed on [Plaintiff's] trademark rights in the PSU Mark," (Doc. No. 179 at 17), and its briefing on the issue of trademark infringement addresses only the "PSU Mark" (id. at 17–41).[58]  Based on Plaintiff's characterization of its trademark infringement and unfair competition claims and the focus of its briefing, the Court's discussion infra as to Plaintiff's trademark infringement and

---

[58]  The Court notes that Plaintiff briefly addresses the "PENN STATE" mark and Lionhead Logo in connection with its discussion of its entitlement to relief on its unfair competition claims (counts two and six), arguing that it is entitled to relief on these claims for the same reasons that pertain to Defendants' use of the PSU mark.  (Doc. No. 179 at 41–43.)

unfair competition claims (counts one, two, and six) is limited to the PSU mark.[59]

The Court considers Plaintiff's motion as to its trademark infringement and unfair competition claims (counts one, two and six) together as those claims all turn on the common question of likelihood of confusion.  The Court will then consider Plaintiff's motion as to each of its remaining claims and as to Defendants' counterclaims.

### A.   Trademark Infringement and Unfair Competition Under the Lanham Act and Pennsylvania Law (Plaintiff's counts one, two, and six)

#### 1.   Legal Standard

Trademark infringement and unfair competition claims share essentially the same elements under both the Lanham Act and Pennsylvania law.  See A&H Sportswear, Inc. v. Victoria's Secret Stores, Inc., 237 F.3d 198, 210 (3d Cir. 2000); UHS of Delaware, Inc. v. United Health Services, Inc., 227 F. Supp. 3d 381, 390 (M.D. Pa. 2016).[60]  "To prove either form of Lanham Act violation, a plaintiff must demonstrate that (1) it has a valid and legally protectable mark; (2) it owns the mark; and (3) the defendant's use of the mark to identify goods or services causes a likelihood of confusion."  See A&H Sportswear, Inc., 237 F.3d at 210 (citation omitted); see also Giannone v. Giannone, 429 F. Supp. 3d 34, 39 (E.D. Pa. 2019) (applying the same standard to Pennsylvania common law trademark infringement and unfair competition claims).

As to the first two elements, "[a] certificate of registration of a mark upon the principal register . . . shall be prima facie evidence of the validity of the registered mark and of the

---

[59]  Plaintiff's cybersquatting and trademark dilution claims (counts three, four, and five) are also based on the PSU mark.  See (Doc. No. 1 at 23–25).

[60]  The only difference between the Lanham Act and the Pennsylvania claims is that federal unfair competition claims contain an interstate commerce requirement.  See Pennzoil-Quaker State Co. v. Smith, No. 2:05-cv-01505, 2008 WL 4107159, at *9 n.12 (W.D. Pa. Sept. 2, 2008) (noting this sole difference in the infringement inquiry).

registration of the mark, of the owner's ownership of the mark, and of the owner's exclusive

right to use the registered mark in commerce of in connection with the goods or services

specified in the certificate." 15 U.S.C. § 1057(b).   Further, "[i]f the mark at issue is federally

registered and has become incontestable, then validity, legal protectability, and ownership are

proved."  See Commerce Nat. Ins. Services, Inc. v. Commerce Ins. Agency, Inc. 214 F.3d 432,

438 (3d Cir. 2000).  However, "[i]f the owner of an incontestable mark brings an infringement

action, the defendant still has a number of statutorily provided defenses available to it, including

laches, estoppel and acquiescence."  See Keystone Federal Sav. Bank v. First Keystone Mortg.,

Inc., 923 F. Supp. 693, 701 (E.D. Pa. 1996) (citing 15 U.S.C. § 1115(b)).  Further, "[i]f the

defendant prevails on one of the permitted defenses, then the plaintiff loses the presumption of

validity, ownership and right to protection."  See id. (citing Ford Motor Co. v. Summit Motor

Prods., 930 F.2d 277, 291 (3d Cir.), cert. denied, 502 U.S. 939 (1991)).  The Lanham Act

includes the following defenses:

> (1) That the registration or the incontestable right to use the mark was obtained
> fraudulently; or
> (2) That the mark has been abandoned by the registrant; or
> (3) That the registered mark is being used by or with the permission of the registrant
> or a person in privity with the registrant, so as to misrepresent the source of the
> goods or services on or in connection with which the mark is used; or
> (4) That the use of the name, term, or device charged to be an infringement is a use,
> otherwise than as a mark, of the party's individual name in his own business, or of
> the individual name of anyone in privity with such party, or of a term or device
> which is descriptive of and used fairly and in good faith only to describe the goods or
> services of such party, or their geographic origin; or
> (5) That the mark whose use by a party is charged as an infringement was adopted
> without knowledge of the registrant's prior use and has been continuously used by
> such party or those in privity with him from a date prior to (A) the date of
> constructive use of the mark established pursuant to section 1057(c) of this title, (B)
> the registration of the mark under this chapter if the application for registration is
> filed before the effective date of the Trademark Law Review Act of 1988, or (C)
> publication of the registered mark under subsection (c) of section 1062 of this title.
> Provided, however, That this defense or defect shall apply only for the area in which
> such continuous prior use is proved; or

(6) That the mark whose use is charged as an infringement was registered and used prior to the registration under the chapter or publication under subsection (c) of section 1062 of this title of the registered mark of the registrant, and not abandoned: <u>Provided, however,</u> That this defense or defect shall apply only for the area in which the mark was used prior to such registration or such publication of the registrant's mark; or

(7) That the mark has been or is being used to violate the antitrust laws of the United States; or

(8) That the mark is functional; or

(9) That equitable principles, including laches, estoppel, and acquiescence, are applicable.

<u>See</u> 15 U.S.C. § 1115(b).

As to the third element of a trademark infringement claim, a plaintiff must prove that a defendant's "use of the mark to identify goods or services causes a likelihood of confusion."  <u>See</u> <u>A&H Sportswear</u>, 237 F.3d at 210.  The Third Circuit has set forth a non-exhaustive list of factors (the "<u>Lapp</u> factors") to be considered by courts when determining whether a likelihood of confusion exists, as follows:

(1) the degree of similarity between the owner's mark and the alleged infringing mark; (2) the strength of the owner's mark; (3) the price of the goods and other factors indicative of the care and attention expected of consumers when making a purchase; (4) the length of time the defendant has used the mark without evidence of actual confusion; (5) the intent of the defendant in adopting the mark; (6) the evidence of actual confusion; (7) whether the goods, though not competing, are marketed through the same channels of trade and advertised through the same media; (8) the extent to which the targets of the parties' sales efforts are the same; (9) the relationship of the goods in the minds of the consumers because of the similarity of function; (10) other facts suggesting that the consuming public might expect the prior owner to manufacture a product in the defendant's market, or that he is likely to expand into that market.

<u>See</u> <u>Interpace Corp. v. Lapp</u>, 721 F.2d 460, 463 (3d Cir. 1983) (citation omitted).   "None of these factors is determinative in the likelihood of confusion analysis and each factor must be weighed and balanced one against the other."  <u>Checkpoint Systems, Inc. v. Check Point Software</u> <u>Technologies, Inc.</u>, 269 F.3d 270, 280 (3d Cir. 2001) (citing <u>Fisons Horticulture, Inc. v. Vigoro</u> <u>Industries, Inc.</u>, 30 F.3d 466, 473 (3d Cir. 1994)).

Determining whether a likelihood of confusion exists is a "decidedly fact-intensive issue" and "[c]ourts have thus cautioned that 'summary judgment for either party is unlikely, absent a particularly one-sided factual record.'"  See UHS of Delaware, Inc., 227 F. Supp.3d at 391 (quoting 800-JR Cigar, Inc. v. GoTo.com, Inc., 437 F. Supp. 2d 273, 285 (D.N.J. 2006)); see also Country Floors, Inc. v. P'ship Composed of Gepner & Ford, 930 F.2d 1056, 1062–63 (3d Cir. 1991) (noting that "summary judgments are the exception" in a trademark action).  Only if "the record clearly shows no viable evidence rebutting a showing of a likelihood of confusion and no viable evidence of an affirmative defense" is summary judgment for a trademark owner appropriate.  See J. Thomas McCarthy, 6 McCarthy on Trademarks § 32:121 (5th ed. 2023).

## 2.  Analysis

Plaintiff maintains that it is undisputed that it owns valid trademark registrations for the PSU mark, one of which it asserts is incontestable; therefore, it argues that "the first two elements of trademark infringement are satisfied as a matter of law."  (Doc. No. 179 at 18.) Plaintiff also argues that it is undisputed that "Defendants have been using the mark goPSUrv in commerce and that the goPSUrv Mark is confusingly similar to the PSU Mark," which satisfies the third element of a trademark infringement claim, maintaining that an application of the Lapp factors weighs strongly in favor of a finding of likelihood of confusion "such that a reasonable jury could not disagree" and therefore it is entitled to summary judgment on its trademark infringement claims as to the PSU Mark.  (Id. at 19–20.)

In response to Plaintiff's arguments regarding the PSU Mark, Defendants concede that they do not contest "the validity of Plaintiff's registered marks, in the recited classes" (Doc. No. 190 at 8);[61] however, Defendants assert that Plaintiff's claims are barred by "other

---

[61]  Defendants state that they "are contesting the validity of Plaintiff's marks in any unregistered

considerations," specifically, the fact that:

> Plaintiff has had actual knowledge of Defendants' use of the domain name <gopsurv.com> since 2010; allowed Defendant to sponsor PSU sports since 2010; accepted money and consideration from Defendants for sponsorship; and allowed Defendants to market themselves on campus and at official PSU sporting events; Plaintiff was [sic] required insurance certificates from Defendant for RVs since 2010; Plaintiff's head football coach James Franklin has rented RVs from Defendants during home football games and PSU's former head football coach, Joe Paterno, also visited Defendants' tailing [sic] gating parties held on Plaintiff's ORV lot.

(Doc. No. 190 at 8–9.)  Accordingly, Defendants maintain that "Plaintiff has acquiesced to Defendants' use of PSU, and Plaintiff's claims are barred in their entirety by laches and fair use." (Doc. No. 190 at 9.)

Defendants also maintain that, as to the likelihood of confusion element, "a reasonable jury could find the Lapp factors favor Defendants."  (Id. at 11.)  Defendants note that whether a likelihood of confusion exists is a question of fact to be determined by reference to the Lapp factors and that "there are material disputes of fact on each factor" such that "a reasonable jury could find the factors as a whole weigh in Defendants' favor and that likelihood of confusion does not exist."  (Id.)  The Court addresses the evidence of record as to each of the Lapp factors in turn.

### a.    Similarity of Marks – Lapp Factor 1

The Third Circuit has recognized that similarity of marks is the "single most important factor" in the likelihood of confusion analysis.  See A&H Sportswear, 237 F.3d at 216 (citing Fisons, 30 F.3d at 476).  "In applying this test, courts attempt to 'move into the mind of the roving consumer,' and determine 'whether the labels create the same overall impression when viewed separately.'"  Checkpoint Sys., 269 F.3d at 281 (first quoting A&H Sportswear, 237 F.3d

---

classes, such as transportation."  (Doc. No. 190 at 8 n.2.)

at 216, then quoting <u>Fisons</u>, 30 F.3d at 476).  In doing so, "[c]ourts must compare the appearance, sound and meaning of the marks" so as to "determine whether the average consumer, on encountering one mark in isolated circumstances of marketplace and having only [a] general recollection of the other, would likely confuse or associate the two."  <u>See</u> <u>Checkpoint Sys.</u>, 269 F.3d at 281 (citations and internal quotation marks omitted).  In considering the appearance of the marks, courts look to "visual characteristics such as the layout and format of lettering."  <u>See</u> <u>Harp v. Rahme</u>, 984 F. Supp. 2d 398, 411–12 (E.D. Pa. 2013) (citing <u>A&H Sportswear</u>, 237 F.3d at 217).  As to the "sound" of the marks, "courts have looked at the number of words and syllables, as well as the use of different words or syllables, in each mark."  <u>See</u> <u>Harp</u>, 984 F. Supp. 2d at 412.  The "meaning" of the marks requires an assessment of "whether the words included in each mark, viewed as a whole, gave the mark a different denotative or connotative meaning."  <u>See</u> <u>id.</u> at 413.

As an initial matter, Plaintiff argues that Defendants' use of the "goPSUrv" and "goPSUrv.com" marks incorporates the "PSU" mark completely, and that "portion of the marks is dominant in sound, appearance, and meaning."  (Doc. No. 179 at 20–21.)  Plaintiff also notes that the "PSU" is depicted in a larger font and in blue coloring, rendering the "PSU" dominant. (<u>Id.</u> at 21.)  In addition, Plaintiff argues that Defendants' inclusion of the terms "go" and "rv" do not change the analysis, as "[t]he dominant portions of both the PSU Mark and the goPSUrv Mark is PSU" and "because these dominant portions are identical, the overall impression of the marks is to be confusingly similar."  (<u>Id.</u>)  Further, Plaintiff asserts that the additions of "go" and "rv" to the PSU Mark "actually <u>increase</u> the risk of confusion here" because "[Plaintiff's] athletics website is located at the URL <goPSUsports.com>" and Penn State fans who are "Defendants' target customers—will be familiar with Penn State's sports website and would

recognize this domain-name pattern, thereby likely assuming that Defendants' website is affiliated with the University" and therefore goPSUrv.com "creates the same commercial impression as Penn State's official mark."  (Id. at 22.)  In response, Defendants maintain that "[t]he relevant inquiry for this factor is whether the parties' marks create the same overall impression when viewed separately" and that "[i]t is indisputable that Defendants' GOPSURV expression is not identical to PSU and they share no prefixes"; further, Defendants state that "[c]onsumers are generally more likely to focus on the first word, prefix, or syllable in a trademark which in this case is 'go' not 'psu.'"  (Doc. No. 190 at 12.)

Here, as to the appearance of the marks, while it is clear that "PSU" is not identical to "goPSUrv" or "goPSUrv.com," the dominant portion of Defendants' marks—depicted in larger font and blue coloring—is Plaintiff's "PSU" mark, supporting a finding that an average consumer might associate the marks.  As to the "sound" of the marks, requiring an examination of the "number of words and syllables, as well as the use of different words or syllables, in each mark," see Harp, 984 F. Supp. 2d at 412, the Court agrees with Plaintiff that Defendants' inclusion of the terms "go" and "rv" before and after the "PSU" mark does not alter the analysis as to the similarity between the dominant portion of the marks because they are generic or descriptive terms, the addition of which to the dominant portion "PSU" would not cause the average consumer to conclude that there was no association between the marks.  See Checkpoint Sys., 269 F.3d at 281–82 (affirming district court's finding of likelihood of confusion where the dominant portions of marks overlapped and only generic or descriptive terms were added); 4 McCarthy, supra, § 23:50 (stating that "[i]f a junior user takes the entire mark of another and adds a generic, descriptive or highly suggestive term, it is generally not sufficient to avoid confusion").  Further, as to the "meaning" of the marks, the words of each mark, viewed as a

whole, give the impression of an association between the two marks. Accordingly, construing the undisputed facts of record in the light most favorable to Defendants, the similarities in appearance, sound, and meaning between the parties' marks weigh in favor of a likelihood of confusion.

      **b.**        **Strength of the Owner's Mark – <u>Lapp</u> Factor 2**

As stated by the Third Circuit, "[t]he strength of a mark is determined by (1) the distinctiveness or conceptual strength of the mark and (2) its commercial strength or marketplace recognition." See <u>Checkpoint Sys.</u>, 269 F.3d at 282 (citing <u>Fisons</u>, 340 F.3d at 478–79).

As to the first prong of this test—distinctiveness or conceptual strength—courts evaluate the "inherent features of the mark." See <u>id.</u> As stated by the Third Circuit, "[t]rademarks protected under the Lanham Act are divided into four categories," see <u>id.</u>, as follows:

> [1] arbitrary or fanciful marks use terms that neither describe nor suggest anything about the product; they "bear no logical or suggestive relation to the actual characteristics of the goods." [2] Suggestive marks require consumer "imagination, thought or perception" to determine what the product is. [3] Descriptive terms "forthwith convey[] an immediate idea of the ingredients, qualities or characteristics of the goods" [and] [4] Generic marks are those that "function as the common descriptive name of a product class."

See <u>A&H Sportswear</u>, 237 F.3d at 221–22 (quoting <u>A.J. Canfield Co.v. Honickman</u>, 808 F.2d 291, 296–97 (3d Cir. 1986)). Arbitrary or fanciful marks generally do not describe or suggest anything about the product and are "virtually indistinguishable" from suggestive marks except that suggestive marks may "suggest a quality or ingredient of goods." See <u>Checkpoint Sys.</u>, 269 F.3d at 282 (quoting <u>Ford Motor Co.</u>, 930 F.2d at 292 n.18). "A mark is descriptive with a secondary meaning when the mark is interpreted by the consuming public to be not only an identification of the product or services, but also a representation of the origin of those products of services." <u>Checkpoint Sys.</u>, 269 F.3d at 283 n.10 (citations and internal quotation marks

omitted).  Generic marks "function as the common descriptive name of a product class."  See

A&H Sportswear, 237 F.3d at 221–22 (citation omitted).

As to the second prong of the test—commercial strength—courts measuring commercial

strength consider "advertising expenditures, sales volume, and purchasing trends."  See UHS of

Delaware, Inc., 227 F. Supp. 3d at 394 (citing Harp, 984 F. Supp. at 415).  "These factual

indicators serve as proxies to test the likelihood and extent of marketplace recognition."  Id.

(citations omitted).  Therefore, courts consider a registrant's "efforts to promote and fortify the

mark's 'commercial presence' through the prism of this evidence."  See id. (citing Checkpoint

Sys., 104 F. Supp. 2d at 458).

Plaintiff asserts that the PSU Mark is "distinctive," noting that "Penn State owns two

registrations for the PSU Mark, one of which is incontestable."  (Doc. No. 179 at 23.)  Plaintiff

points out that "Defendants do not contest that the PSU Mark is well known and was in use when

they [] adopted the goPSUrv Mark and related domain."  (Id.)  Plaintiff also maintains that the

PSU Mark is "strong commercially," pointing to what it maintains is undisputed evidence of

record that it has promoted the PSU Mark for decades and that it is recognized by consumers

nationwide.  (Id.) (citing Doc. No. 178 ¶¶ 8–10, 12, 25, 29–30, 32, 52–53, 55, 56).  Plaintiff

argues that Defendants know this, pointing to testimony of Mark Lauer that it characterizes as

stating that "Defendants decided to incorporate 'PSU' within the goPSUrv Mark specifically

because 'PSU' will resonate with consumers, particularly Penn State fans."  (Doc. No. 179 at 23)

(citing Doc. No. 174 ¶¶ 100, 102, and 104–06).[62]  Plaintiff argues that "[o]verall, given that the

---

[62]  The Court notes that Defendants dispute the record evidence cited by Plaintiff in this regard
inasmuch as they maintain that Lauer did not testify that Defendants chose "PSU" to create as
association between it and PSU but rather because "it refers to the name of the University and
location where Defendants' services were being offered." (Doc. No. 189 ¶ 102.)  Defendants also
dispute Plaintiff's statement that they chose the domain <goPSUrv.com> because of the

PSU Mark is distinctive and commercially strong, the second <u>Lapp</u> factor weighs heavily towards a likelihood of confusion." (<u>Id.</u> at 24.)

In response, Defendants cite an Eastern District of Pennsylvania case for the proposition that "the ultimate strength of [a] mark—particularly the commercial strength—must be decided by a factfinder." (Doc. No. 190 at 12–13) (quoting <u>Vynamic, LLC v. Diebold Nixdorf, Inc.</u>, No. 18-cv-00577, 2019 WL 193660, at *7 (E.D. Pa. Jan. 15, 2019)). Defendants assert that although they do not "contest[] the validity of Plaintiff's PSU Mark, [they] do argue that PSU is an abbreviation which is inherently subject to descriptive use by others—meaning it describes a place or location (a university in Pennsylvania)." (<u>Id.</u> at 13.) While Defendants "concede this abbreviation has come to be associated with the Plaintiff, the PSU Mark, as an abbreviation of a location, may be used by others to describe products, services or events taking place at Plaintiff's university location and not necessary [sic] originating with the Plaintiff." (<u>Id.</u>) Accordingly, Defendants maintain that "summary judgment is inappropriate given the descriptive purposes of Defendants[] in using PSU in the domain and tradename." (<u>Id.</u>)

The Court recognizes that Plaintiff owns two registrations for the PSU Mark, one of which is incontestable, <u>see</u> (Doc. No. 178 ¶ 11), and that marks that are both registered and incontestable are "presumptively distinctive," <u>see</u> <u>UHS of Delaware, Inc.</u>, 227 F. Supp. 3d at 393. As noted by Plaintiff, Defendants do not dispute that the PSU Mark is well known and has been for many years. <u>See</u> (Doc. No. 178 ¶¶ 30, 33; Doc. No. 189 ¶¶ 30, 33). Viewed in the light most favorable to Defendants, the Court concludes that the undisputed evidence supports a

---

similarities between that domain and <goPSUsports.com>, asserting that they only admitted that they chose the domain "at least in part" for that reason, but also chose it after it was recommended by their marketing consultant and in recognition of the fact that "go" was a common prefix in domains in 2010, particularly two domains relating to RVs—<gorving.com> and <gooutdoors.com>. (Doc. No. 189 ¶ 104.)

finding that Plaintiff's mark is conceptually strong.

As to the commercial strength of the mark, Defendants do not dispute that: Penn State has used PSU as a word and design mark continuously for more than four decades throughout Pennsylvania and the United States; the public has come to associate "PSU" with the university; Penn State has promoted the PSU mark extensively; the PSU Mark has been famous for many years and is generally associated with Penn State; the general consuming public recognizes the PSU Mark and associates it with Penn State; and Penn State's revenues from goods and services branded with the PSU Mark—whether from Penn State directly or from official licensees—are in the millions of dollars.  (Doc. No. 178 ¶¶ 8–10, 29–30, 32, 56; Doc. No. 189 ¶¶ 8–10, 29–30, 32, 56.)  Accordingly, viewed in the light most favorable to Defendants, the cited undisputed evidence of record supports a finding that Plaintiff's PSU mark is also commercially strong, and therefore, this Lapp factor weighs in favor of a likelihood of confusion.

### c.        Care and Sophistication of Purchasers – Lapp Factor 3

The third Lapp factor assesses the expected care and sophistication of consumers when purchasing a product containing the mark at issue and acknowledges that likelihood of confusion decreases when consumers exercise greater care in purchasing decisions.  See Checkpoint Sys., 269 F.3d at 284.  If the product is expensive, "or the buyer class consists of sophisticated or professional purchasers, courts have generally not found Lanham Act violations."  See id. (citing Versa Prods. Co., Inc. v. Bifold Co. (Mfg.) Ltd., 50 F.3d 189, 204 (3d Cir. 1995)).  However, "[w]hen the purchasing class is mixed, courts normally do not hold the general class to a high standard of care."  See id. at 285 (citing Ford Motor Co., 930 F.2d at 293).

Plaintiff argues that this factor—price/care and attention expected by consumers—weighs in favor of likelihood of confusion, noting that "[t]o find that this factor weighs against

likelihood of confusion, Defendants would have to show that 'the products or services at issue are complex and expensive, the purchasers highly sophisticated, and the purchase process one that is lengthy and requires close attention and analysis by the purchasers'" but they "cannot prove any of these factors here."  (Doc. No. 179 at 24) (citing Checkpoint Sys., 104 F. Supp. 2d at 460).  Plaintiff asserts that it is "undisputed that Defendants' customers comprise ordinary purchasers who need not have any prior experience owning or operating an RV . . . and thus, should be held to a low standard of care and attention."  (Id.)  Plaintiff argues that "[t]o the extent Defendants contend that the standard of care is elevated by the price point of their rentals, that contention is belied by the undisputed record evidence" because "[a]s Defendants testify, much of Defendants' RV rental business is conducted by word of mouth, and the rental process can be completed in a matter of minutes over the phone."  (Id. at 25.)

In response, Defendants argue that they "put up a disclaimer on their website immediately after receiving Plaintiff's cease and desist letter to mitigate any potential confusion" and that "Plaintiff has presented no evidence of actual consumer confusion, much less the substantial evidence required for a showing under the third factor."  (Id. at 14.)  Defendants assert that "[a]t a minimum, a reasonable jury could conclude that these consumers are unlikely to be confused."  (Id. at 14–15.)

The Court agrees with Plaintiff that here, the undisputed evidence of record, even viewed in the light most favorable to Defendants, suggests that consumers are unlikely to exercise a high degree of care when renting Defendants' RVs under the <goPSUrv.com> mark.  Defendants admit that: their "target customers for their RV-related goods and services include people attending Penn State football games"; they "market their goods and services specifically at Penn State sports fans"; and the "customers generally comprise ordinary purchasers who do not need

73

to have any prior experience owning or operating RVs." See (Doc. No. 178 ¶¶ 128–30; Doc. No. 189 ¶¶ 128–30). In addition, Defendants admit that "[t]he rental process can be completed in a matter of minutes over the phone" because "[c]ustomers can simply call to request for an RV with a certain number of beds and any other desired accommodations." See (Doc. No. 178 ¶ 130; Doc. No. 189 ¶ 130). Accordingly, consumers renting Defendants' RVs should be held to a low standard of care and attention. See McNeill Nutritionals, LLC v. Heartland Sweeteners, LLC, 511 F.3d 350, 363–64 (3d Cir. 2007) (concluding that "the standard of care to be exercised by the reasonably prudent purchaser will be equal to that of the least sophisticated consumer in the class").[63] Therefore, viewed in the light most favorable to Defendants, the undisputed evidence of record relevant to this factor weighs in favor of a likelihood of confusion.

### d.   Length of Use Without Actual Confusion and Any Evidence of Actual Confusion – Lapp Factors 4 and 6

Factors four and six significantly overlap and therefore courts routinely assess them together in an effort to determine "whether a 'pattern of confusion' has emerged in the relevant product or service market." See UHS of Delaware, Inc., 227 F. Supp. 3d at 395 (citation omitted). "This inquiry is not concerned with 'isolated and idiosyncratic' examples of confusion between products or services," id. (quoting A&H Sportswear, 237 F.3d at 227), which may be "dismissed as inconsequential or de minimis," see id. (quoting 4 McCarthy, supra, at § 23:14). Factor four recognizes that when similar marks have coexisted without confusion for many years, there is a strong inference that the marks are not likely to cause customer confusion in the future. See Versa Prods., 50 F.3d at 205. As to factor six and evidence of actual confusion,

---

[63]   As to Defendants' reliance on the use of a disclaimer beginning in 2017, the Court agrees with Plaintiff that this disclaimer fails to address Defendants' use of the "PSU" mark during the period of time prior to 2017.

although proof of actual confusion is not required for a Lanham Act claim, "the more evidence of actual confusion that a plaintiff can muster, the stronger the likelihood of confusion in the future."  See id.  However, "evidence of actual confusion . . . is not essential."  See Fisons, 30 F.3d at 476.

Plaintiff argues that Lapp factors four and six also weigh in favor of likelihood of confusion.  (Doc. No. 179 at 25.)  Plaintiff maintains that the evidence of record "shows that confusion has actually occurred," referencing an instance when "Penn State fielded a phone call from a season ticket holder arising out of confusion after the individual received Defendants' marketing that used the goPSUrv Mark."  (Id. at 26.)  Plaintiff asserts that "[s]pecifically, the marketing material Defendants were handing out in Penn State's RV lot 'confused [Penn State's] customers because they saw the GOPSU in the name and thought it was [Penn State's] website.'"  (Id.) (citing Doc. No. 178 ¶¶ 144–47).  Accordingly, Plaintiff maintains that this "evidence of actual confusion strongly weighs in favor of likelihood of confusion."  (Id.)

In response, Defendants state that "Plaintiff can put forth no admissible evidence that confusion occurred or has even existed since 2010" and "[f]urthermore, given that no actual confusion existed here, the Defendants have testified that they never had any reason to believe any consumer was being confused" and therefore "summary judgment is improper."  (Doc. No. 190 at 15.)  Defendants challenge the admissibility of the evidence of the incident Plaintiff relies on in support of a finding of actual confusion, stating:

> Plaintiff has not included testimony from alleged the [sic] season ticket holder, nor from the alleged Penn State employee who spoke to the season ticket holder, but rather from a third party who heard from [the Penn State employee] that he had heard from a season ticket holder that there was an error on one of Defendants' football schedules.

(Doc. No. 189 ¶ 144.)  In its reply brief, Plaintiff relies on Third Circuit authority in support of

its position that "[t]he statements of the consumers indicating their (false) belief that Penn State is affiliated with Defendants are admissible 'because they are not submitted for their truth; indeed it is their falsity that show's the speaker's confusion.'" (Doc. No. 199 at 13) (citing Kos Pharms., Inc. v. Andrx Corp., 369 F.3d 700, 719–20 (3d Cir. 2004)).

The exhibit Plaintiff relies on in connection with these interrelated Lapp factors (Exhibit 35 to Plaintiff's motion) consists of an email from one Penn State employee (Lowell Berg) to another Penn State employee (Tom McGrath) forwarding an April 18, 2016 email from Penn State employee James Grecco to Lowell Berg, which stated as follows: "I don't know how much of an issue this is.  I just fielded a call from a season ticket holder that GOPSURV.com was handing out schedules in our RV lot this weekend and had the wrong date for Michigan.  It confused our customers because they saw the GOPSU in the name and thought it was our website."  See (Doc. No. 178-36 at 2).

The Court is persuaded that, in relying on Kos Pharmaceuticals in support of the admissibility of the email contained at Exhibit 35 to Plaintiff's motion, Plaintiff has misread the scope of that decision.  As this Court stated in UHS of Delaware, Inc. in discussing the import of Kos Pharmaceuticals:

> [t]he circuit panel observed that the first level of hearsay—customer statements to employees evincing confusion—are not hearsay because they are submitted for their falsity rather than their truth.  It is the second level of hearsay—statements by employees to the deponent describing telephone calls—that must satisfy an exception to the hearsay rule.  Even if the second-level statement fails to meet an exception, a witness may acknowledge receipt of subordinate reports of confusion.

See UHS of Delaware, Inc., 227 F. Supp. 3d at 396 (citations omitted).  Accordingly, pursuant to Kos Pharmaceuticals, "[a]bsent an exception authorizing admission of the second-level statements, testimony concerning the content of subordinate conversations with customers is inadmissible hearsay."  See UHS of Delaware, Inc., 227 F. Supp. 3d at 396 (citing Kos Pharms.,

76

369 F.3d at 719).  As Plaintiff offers no exception authorizing admission of the second (and perhaps third) level of hearsay contained in the email submitted as Exhibit 35 to its motion, the contents of that email is inadmissible.  Although "the hearsay rule prohibits any substantive recount of underlying conversations," Mr. McGrath as ultimate recipient of the email may permissibly testify "to the fact that [he] received [a] report[] of confusion from [Penn State] employees."  See id.  Viewing the evidence of record in that limited regard, and construing all inferences in the light most favorable to Defendants, the non-moving parties, the Court concludes that a report of a single instance of customer confusion during of period of seven years—from 2010 (when Defendants began using the <goPSUrv> mark) until 2017 (when Plaintiff sent a cease-and-desist letter to Defendants regarding their use of the mark)—consists of an "isolated and idiosyncratic" example of confusion, see A & H Sportswear, 237 F.3d at 227, and fails to demonstrate a pattern of confusion over the relevant time period or to support a likelihood of confusion in the future.  Accordingly, the undisputed evidence of record as to these two interrelated factors weighs against a finding of likelihood of confusion.

> **e.** **Intent of Defendant in Adopting the Mark – <u>Lapp</u> Factor 5**

This factor examines whether the defendant intended to confuse consumers by adopting a mark resembling the plaintiff's mark.  See A&H Sportswear, 237 F.3d at 225–26 (citing Versa Prods., 50 F.3d at 205–06).  "[C]ourts have recognized that evidence of 'intentional, willful and admitted adoption of a mark closely similar to the existing marks' weighs strongly in favor of finding the likelihood of confusion."  Checkpoint Sys., 269 F.3d at 286 (citation omitted).

Plaintiff maintains that the evidence of record weighs in favor of a likelihood of confusion, asserting that "[c]ourts in this Circuit have found that [] bad faith, on its own, raises a presumption of a likelihood of confusion" and that "[t]he undisputed evidence and Defendants'

own admissions show their bad faith in adopting the goPSUrv Mark and domain name" because "[t]he record shows that Defendants intentionally and purposely selected the goPSUrvMark and related domain name to capitalize on Penn State's goodwill." (Doc. No. 178 at 26–27.) Plaintiff argues that "Defendants sought to capitalize on Penn State's goodwill in the PSU Mark by adopting branding that would lead consumers to connect their company with the University," including by actively marketing their products and services on Plaintiff's property and by referring to themselves as the "OFFICIAL PSU RV RENTAL & TAILGATES," all of which was "designed to suggest authorization by the University." (Id. at 28.) Plaintiff points to Mark Lauer's testimony that "PSU is PSU" and states that, "by choosing the goPSUrv Mark, he believed that consumers 'would assume we offered RV rentals at Penn State'" asserting that the testimony demonstrates that "Defendants specifically wanted consumers to associate their brand with the University." (Id.) Plaintiff also points to the testimony of Tim Lauer, who said "[w]e definitely wanted—Penn State fans are going to be drawn to Penn State—and that's going to get them to think." (Id. at 29.) Finally, Plaintiff also points to Defendants' selection of the goPSUrv Mark and related domain <goPSUrv.com> due to its similarity to Penn State's athletic domain, <gopsusports.com, noting Defendants' admission that "Lauer chose the domain <gopsurv.com>—at least in part—because of its similarities to the domain <gopsusports.com>." (Id.) (citing Doc. No. 174 ¶ 104). Based on the above facts, Plaintiff argues that "there is no reasonable dispute that Defendants' intent in selecting the goPSUrv Mark was to capitalize on Penn State's goodwill and confuse potential consumers" and therefore, factor five weighs in favor of a likelihood of confusion. (Id.)

In response, Defendants state that they "have testified that they liked the Disputed Domain because it was reminiscent of two other RV-related domains having 'go' prefixes used

in the RV world: <gorving.com> and <gooutdooring.com>, as well as numerous domain names using the 'go' prefix as a call to action."  (Doc. No. 190 at 15.)  Defendants also maintain that "[t]he domain name <gopsurv.com> was recommended by Defendants' marketing consultant and was registered by Defendants because '[i]t's where we were offering our services.'"  (Id.) Defendants also assert that: "when adopting its mark, the Defendants did not know what the USPTO was . . . nor how to search for trademarks there"; and "Defendants did not know Plaintiff had a trademark for PSU, but believed it was simply the name of Plaintiff."  (Id. at 15–16.)

As an initial matter, the Court notes that Defendants' argument regarding their lack of knowledge of the USPTO or of Plaintiff's possession of a trademark for PSU is inapposite.  The relevant question addressed by this factor is whether Defendants intended to imply an affiliation with Plaintiff in adopting the goPSUrv mark.  See National Football League Props. Inc. v. New Jersey Giants, Inc., 637 F. Supp. 507, 518 (D.N.J. 1986) (finding bad faith intent based "the admitted intention of [the defendant] to have consumers associate its mark with the football Giants").

Plaintiff has pointed to evidence of record indicating that Defendants' adoption of goPSUrv was based at least in part on the association of "PSU" with Plaintiff.  See (Doc. No. 178 ¶ 100; Doc. No. 189 ¶ 100 ("The term 'PSU' in goPSUrv and goPSUrv.com refers to Penn State")); (Doc. No. 178 ¶ 105; Doc. No. 189 ¶ 105 ("Mark Lauer testified in his deposition that when Defendants were selecting their branding and domain name, the 'PSU' portion was meant to refer to Penn State, noting that: 'PSU is PSU'")); (Doc. No. 178 ¶ 106; Doc. No. 189 ¶ 106 ("Mark Lauer admitted that by using this mark, he 'took it that [consumers] would assume we offered RV rentals at Penn State'")); (Doc. No. 178 ¶ 107; Doc. No. 189 ¶ 107 ("Timothy Lauer similarly testified that in choosing the brand name: 'We definitely wanted—Penn State fans are

79

going to be drawn to Penn State—and that's going to get them to think'"")).

However, the Court recognizes that Defendants dispute the record evidence in this regard inasmuch as they maintain that Lauer did not testify that Defendants chose <goPSUrv.com> to create an association between <goPSUrv.com> and PSU but rather because PSU "refers to the name of the University and location where Defendants' services were being offered." (Doc. No. 189 ¶ 102) (citing Doc. No. 178-23 at 15–16). The Court also notes that, while Defendants acknowledge that they admitted that they chose the <goPSUrv.com> domain in part because of the similarities between it and <goPSUsports.com>, they point to evidence that they also chose it upon the recommendation of their marketing consultant and in recognition of the fact that "go" was a common prefix in domains in 2010, particularly two domains relating to RVs— <goRVing.com> and <gooutdoors.com>. (Doc. No. 189 ¶ 104) (citing Doc. No. 189-9 (Lauer Declaration) at 7–8; Doc. No. 209-1 (Lauer deposition testimony) at 77–78, 80).

Viewing the cited evidence in the light most favorable to Defendants as the non-moving parties, the Court concludes that the evidence of record relevant to this <u>Lapp</u> factor—intent of Defendants in adopting the mark—does not definitively weigh in favor of or against a likelihood of confusion.

### f.   Shared Marketing and Advertising Channels and Target Customers – <u>Lapp</u> Factors 7 and 8

These two factors assess the existence of overlap between the parties' target markets and sales channels, recognizing that the likelihood of confusion increases when "parties target their sales efforts to the same consumer base" and there exists "significant overlap between marketing and advertising channels." See <u>UHS of Delaware, Inc.</u>, 227 F. Supp. 3d at 397 (citing <u>Checkpoint Sys.</u>, 269 F.3d at 288–89). In conducting these "intensely factual" inquiries, the court considers "the class of customers to whom goods and services are marketed, the manner in

80

which those products are advertised, and the channels through which they are sold." See id. at 398–99 (citing Checkpoint Sys., 269 F.3d at 288–89).

Plaintiff argues that the seventh and eighth Lapp factors—whether the goods are marketed through the same channels and the extent to which the target markets are the same— also weigh in favor of a finding of likelihood of confusion.  (Doc. No. 178 at 30.)  Plaintiff maintains that Plaintiff and Defendants "directly compete in the same channels and target the same audience—people to want to attend Penn State football games and who are looking to arrange lodging and transportation" and use "much of the same media to reach this customer base, particularly with respect to online and social media advertising."  (Id.)  Plaintiff argues that "because Defendants have purposely adopted a domain that mimics Penn State's athletics domain . . . the similarity in marketing channels and target customers is particularly likely to lead to confusion."  (Id.)

Pertaining to the seventh and eighth Lapp factors, Defendants do not challenge Plaintiff's position that it targets the same audience as Defendants but, as to overlap between advertising and marketing channels, state that:

> [they] have testified that their main form of advertising is stenciling on their RVs referencing the domain <gopsurv.com> and word-of-mouth. These channels are not the same.  Plaintiff does not market its products or services through stenciling on the side of RVs.  Plaintiff does not make use of any domain names referencing RVs.  All stickers and memorabilia in Defendants' RVs were purchased from Plaintiff or an authorized merchandiser.  Whether these factors weigh in favor of Plaintiff or Defendant is "intensely factual."

(Doc. No. 190 at 16) (citations omitted).

The Court acknowledges Defendants' testimony that their main forms of advertising consist of stenciling the domain <gopsurv.com> on RVs and word-of-mouth.  However, the undisputed facts of record reflect that:  Keystone Alternatives owns and maintains a website at

the domain <goPSUrv.com> advertising RV rentals and services; Defendants' advertising includes social media advertisements published through two different Facebook pages; and Defendants also operate a social media page on Twitter (or X) under the handle @goPSUrv. (Doc. No. 178 ¶¶ 88, 111, 114; Doc. No. 189 ¶¶ 88, 111, 114.)  It is also undisputed that Plaintiff utilizes online and social media advertising to promote its PSU brand.  See (Doc. No. 178 ¶¶ 26–27, 55; Doc. No. 189 ¶¶ 26–27, 55).  Accordingly, even viewed in the light most favorable to Defendants, the undisputed facts suggest that there is significant overlap in the target audience and marketing channels utilized by Plaintiff and Defendants and therefore this factor weighs in favor of a likelihood of confusion.

g.      **Relationship of Goods in Minds of Consumers – Lapp Factor 9**

Under this factor, the court examines "whether the services provided under [the parties'] marks are so similar that a consumer 'might . . . reasonably conclude that one company would offer both.'"  See UHS of Delaware, Inc., 227 F. Supp. 3d at 399 (citations omitted).

As to this factor—similarity of goods and services—Plaintiff asserts that it weighs in favor of a finding of confusion.  (Doc. No. 178 at 31.)  Plaintiff points to evidence of record that it "has used the PSU Mark on a wide variety of merchandise and services, including transportation, hospitality, athletics events, tailgating merchandise, and other goods and services related to athletics," including "provid[ing] myriad services for college football gameday activities, such as transportation and parking, including in the University's overnight RV lot." (Id.) (citing Doc. No. 178 ¶¶ 34, 62–64, 68–82).  Plaintiff argues that "Defendants' RV rentals on Penn State property for Penn State football games are exactly the types of goods and services that consumers would expect Penn State to license under the PSU Marks, or to be sponsored through Penn State's affiliates" and accordingly, Plaintiff asserts that "[t]he similarities between

the goods and services at issue strongly weighs in favor of a likelihood of confusion." (Id. at

32.)

     As to this factor—the perceived relationship of the goods, whether because of their near-

identity, similarity of function, or other factors—Defendants state as follows:

> Plaintiff has admitted it does not rent RVs, and there is no evidence it rents any other
> vehicles either . . . . Plaintiff's registered PSU Mark is not registered in any classes
> for any hospitality- or transportation-related services.  Plaintiff has failed to assert
> any common law trademark rights in any class, much less hospitality- or
> transportation-related industries.  Defendants rent only RVs.  There is no overlap is
> [sic] the services offered by Plaintiff and Defendants.  A reasonable jury could find
> that this factor weighs in favor of Defendants.

(Doc. No. 190 at 17.)  Defendants further argue that "the Plaintiff operates a university";

"Defendant operates a simple RV rental business"; and "[t]hese industries are sufficiently

different as to obviate confusing similarities." (Id.)  Defendants dispute many of the facts relied

on by Plaintiff in relation to this factor, including: whether Plaintiff rents or has rented RVs

(Doc. No. 189 ¶ 68); whether Plaintiff offered parking in the overnight RV lot using the PSU

mark during the relevant time period (id. ¶ 72); whether Plaintiff offered tables, chairs, tents and

catering through the <goPSUsports.com> website during the relevant time period (id. ¶ 75);

whether Plaintiff offered or offers reserved, preferred, and general parking spaces under the PSU

mark (id. ¶ 76); and whether Plaintiff offers vehicles for rent under the PSU mark (id. ¶ 82).

     Viewing the evidence of record as to this factor in the light most favorable to Defendants,

the Court concludes that the undisputed facts of record weigh in favor of a likelihood of

confusion.  Although Defendants cite disputes of fact related to whether Plaintiff engages in (or

has engaged in) potentially competing services during the relevant time period, that is not the

pertinent question as to this Lapp factor.  Rather, the question is whether the similarity in goods

or services might cause a consumer to "reasonably conclude that one company would offer

both." <u>See</u> <u>UHS of Delaware, Inc.</u>, 227 F. Supp. 3d at 399.  Because Defendants do not dispute

that Plaintiff offers goods and services related to hospitality and transportation, <u>see</u> (Doc. No.

178 ¶¶ 69–71, 78; Doc. No. 189 ¶¶ 69–71, 78), the Court concludes that the undisputed evidence

of record supports a reasonable customer's conclusion that Penn State would offer or license RV

services under the PSU mark, weighing in favor of a likelihood of confusion.

### h.    Likelihood of expansion – <u>Lapp</u> Factor 10

The tenth <u>Lapp</u> factor asks the court to "consider[] other facts from which a consumer

might expect that the trademark owner, through expansion or otherwise, is affiliated with the

alleged infringer."  <u>See</u> <u>UHS of Delaware, Inc.</u>, 227 F. Supp. 3d at 399 (citing <u>Fisons</u>, 30 F.3d at

480).  This "inquiry is 'highly context-dependent,'" requiring a court to "consider 'the nature of

the products or the relevant market' and 'the practices of other companies in the relevant fields.'"

 <u>See</u> <u>id.</u> (quoting <u>Kos Pharms.</u>, 369 F.3d at 724).

Plaintiff does not address the likelihood of expansion factor in its principal brief.

Defendants maintain that "Plaintiff has filed no intent-to-use trademark applications for

hospitality- or transportation-related services and there is no evidence before the Court that

Plaintiff intends to ever rent RVs" and therefore "a reasonable jury could find this factor favors

Defendants."  (Doc. No. 190 at 18.)  In Plaintiff's reply brief, it states that "Penn State's use of

the PSU Mark with [hospitality or transportation services], which Defendants do not dispute,

alone establishes trademark rights in those areas," and that "Defendants do not dispute that Penn

State's presence in hospitality and transportation makes it likely that Penn State could enter the

RV rental market."  (Doc. No. 199 at 17.)  Further, Plaintiff asserts that "[n]or could Defendants

dispute this, as Penn State recently did just that."  (<u>Id.</u>) In connection with this statement,

Plaintiff cites its responsive statement of facts submitted in opposition to Defendants' motion for

summary judgment.  (Id.) (citing Doc. No. 194 ¶ 146.)[64]  However, given the absence of evidence of record challenging the fact that Plaintiff's use of the PSU mark in connection with hospitality and transportation services makes it likely it could enter the RV rental market, the Court need not consider this evidence in order to conclude that, viewed in the light most favorable to Defendants, the undisputed evidence of record as to this factor weighs in favor of a likelihood of confusion.

### i.      Balancing of Factors

Upon careful consideration of the evidence of record, the parties' arguments, and the relevant authority, and mindful that likelihood of confusion is a "decidedly fact-intensive issue" rendering summary judgment unlikely "absent a particularly one-sided factual record," see UHS of Delaware, Inc., 227 F. Supp. 3d at 391, the Court concludes that Plaintiff has failed to demonstrate an entitlement to judgment as a matter of law as to its trademark infringement and unfair competition claims (counts one, two and six) based on the PSU mark.  While the undisputed evidence of record relevant to Lapp factors one, two, three, seven, eight, nine, and ten weighs in favor of a likelihood of confusion, the undisputed evidence of record relevant to Lapp factors four and six weighs against a likelihood of confusion, and the parties dispute facts relevant to Lapp factor five.  Upon weighing and balancing all of the factors, the Court concludes that the trier of fact must ultimately resolve the issue of likelihood of confusion between the PSU mark and <goPSUrv.com>.  As noted supra, only if "the record clearly shows no viable evidence rebutting a showing of a likelihood of confusion and no viable evidence of an affirmative defense" is summary judgment for a trademark owner appropriate.  See 6 McCarthy, supra, at § 32:121.  Accordingly, the Court will deny Plaintiff's motion for summary judgment as to its

---

[64]   It appears to the Court that Plaintiff inadvertently refers to paragraph 146 when it intends to refer to paragraph 145 of Docket Number 194.

trademark infringement and unfair competition claims as to the PSU mark (counts one, two and six of its complaint).[65]  The Court turns to Plaintiff's motion as to its cybersquatting claim (Plaintiff's count three).

### B.     Cybersquatting Under the Lanham Act (Plaintiff's count three)

Plaintiff also moves for summary judgment on its claim for cybersquatting (count three) and Defendants' counterclaim for No Bad Faith/Cyberpiracy (counterclaim count one) and for declaratory judgment as to no violation of the Lanham Act (counterclaim count three).[66]

To succeed on a claim under the Anti Cybersquatting Protection Act ("ACPA"), a plaintiff must prove that (1) plaintiff's mark is distinctive or famous; (2) the defendant's domain name is "identical or confusingly similar to" plaintiff's mark; and (3) the defendant registered the domain name with the bad faith intent to profit from it.  See Shields v. Zuccarini, 254 F.3d 476, 482 (3d Cir. 2001) (quoting 15 U.S.C. § 1125(d)).

To determine whether a defendant acted with bad faith intent to profit from the use of a mark, a court considers the following non-exhaustive list of nine factors:

(I) the trademark or other intellectual property rights of the person, if any, in the

---

[65]  After articulating their view that a reasonable jury could find in their favor as to the Lapp factors, and therefore Plaintiff's motion for summary judgment on its trademark infringement and unfair competition claims should be denied, Defendants also argue that those claims based on the PSU mark are barred by laches, acquiescence, and/or fair use defenses.  (Doc. No. 190 at 18–30.)  The Court's conclusion that a trier of fact must ultimately resolve the issue of likelihood of confusion between the PSU mark and <goPSUrv.com> obviates the necessity of addressing Defendants' affirmative defenses to Plaintiff's trademark infringement and unfair competition claims in connection with Plaintiff's motion for summary judgment.  However, the Court addresses Defendants' affirmative defenses in its opinion resolving Defendants' motion for summary judgment (issued concurrently with the instant opinion) because those defenses are the central focus of Defendants' motion.

[66]  Plaintiff links its cybersquatting claim to Defendants' counterclaim counts one and three, arguing that "the undisputed facts establish that Defendants' [] registration and use of the domain <goPSUrv.com> constitute cybersquatting.  Consequently, judgment as a matter of law should be granted to Penn State on its cybersquatting claim (Count III) and on Defendants' declaratory judgment claims (Counterclaim Counts I, III)."  (Doc. No. 179 at 32.)

domain name; (II) the extent to which the domain name consists of the legal name of the person or a name that is otherwise commonly used to identify that person, (III) the person's prior use, if any, of the domain name in connection with the bona fide offering of any goods or services; (IV) the person's bona fide noncommercial or fair use of the mark in a site accessible under the domain name; (V) the person's intent to divert consumers from the mark owner's online location to a site accessible under the domain name that could harm the goodwill represented by the mark, either for commercial gain or with the intent to tarnish or disparage the mark, by creating a likelihood of confusion as to the source, sponsorship, affiliation, or endorsement of the site; (VI) the person's offer to transfer, sell, or otherwise assign the domain name to the mark owner or any third party for financial gain without having used, or having an intent to use, the domain name in the bona fide offering of any goods or services, or the person's prior conduct indicating a pattern of such conduct; (VII) the person's provision of material and misleading false contact information when applying for the registration of the domain name, the person's intentional failure to maintain accurate contact information, or the person's prior conduct indicating a pattern of such conduct; (VIII) the person's registration or acquisition of multiple domain names which the person knows are identical or confusingly similar to marks of others that are distinctive at the time of registration of such domain names, or dilutive of famous marks of others that are famous at the time of registration of such domain names, without regard to the goods or services of the parties; and (IX) the extent to which the mark incorporated in the person's domain name registration is or is not distinctive and famous within the meaning of subsection (c)(1) of this section.

See 15 U.S.C. § 1125(d)(1)(B)(i); Shields, 254 F.3d at 484–85. The ACPA includes a safe harbor provision that excludes a finding of bad faith intent for persons who "believed and had reasonable grounds to believe that the use of the domain name was a fair use or otherwise lawful." See 15 U.S.C. § 1125(d)(1)(B)(ii). This defense focuses on a "good faith intention and motivation that existed at the time the challenged domain name was obtained." See 5 McCarthy, supra, § 25A:63.

Plaintiff maintains that it is entitled to summary judgment on its ACPA claim. As to the first required element, Plaintiff asserts that, based on its discussion of the second Lapp factor, supra, "the PSU Mark is distinctive and entitled to protection." (Doc. No. 179 at 33.) Plaintiff maintains that the second element of "confusing similarity" is satisfied by its showing of a "likelihood of confusion" supra as to its trademark infringement claim. (Id.) Plaintiff also

87

maintains that the third element of an ACPA claim—registering the domain with a bad faith intent—is met here because Defendants use the PSU mark to attract customers, and use of Plaintiff's PSU mark for commercial gain shows bad faith.  (Id. at 34.)  Plaintiff argues that "Defendants' bad faith is further highlighted by the undisputed facts that Defendants adopted and use 'PSU' in the goPSUrv.com Domain because that [sic] consumers associate the PSU mark with Penn State."  (Id.)  Plaintiff asserts that there is no "genuine dispute that Penn State fans are Defendants' target customers" and that "Defendants chose the domain goPSUrv.com to divert Penn State customers—which is shown by the Defendants' admission that rather than select a domain using 'Keystone Alternatives,' they chose a domain that plays directly off of and mimics Penn State's Athletics' domain."  (Id. at 35.)  Accordingly, Plaintiff argues that "based on the evidence that is not reasonably in dispute," it is entitled to summary judgment on its cybersquatting claim.  (Id.)

In response, Defendants argue that a "reasonable jury could conclude that Defendants' acts have been conducted in good faith with respect to the PSU mark within the corresponding domain name <gopsurv.com> and tradename."  (Doc. No. 190 at 32.)  Defendants point to evidence of record that the Disputed Domain was selected by a marketing consultant and that "Defendants were not familiar with trademarks nor the USPTO, testifying they believed PSU was simply the name of the Plaintiff and were using PSU within the domain to identify the place where Defendants' RV services were being offered—all showing a lack of bad faith intent in registering the Domain name."  (Id.)  Defendants also point to evidence of record showing that they "liked the Disputed Domain because it was reminiscent of two other RV-related domains having 'go' prefixes used in the RV world: <gorving.com> and <gooutdooring.com>, as well as numerous domains using the 'go' prefix as a call to action."  (Id. at 33.)

As to the relevant factors in determining bad faith intent, Defendants assert that: "Defendants have always offered legitimate services using the Disputed Domain, obviating factor III"; "[u]nder factor IV, Defendants have always made fair use of the Disputed Domain to simply identify the location Defendants' services were being offered" and "[u]nder factor V, Defendants offered only services wholly unrelated to those of Plaintiff and there was never any customer confusion" because "Defendants' action did not 'divert consumers' of the Plaintiff 'to a site accessible under the domain name that could harm the goodwill represented by the mark, either for commercial gain or with the intent to tarnish or disparage the mark.'" (Id. at 33–34.) Defendants also argue that "[u]nder factor VII, Plaintiff has submitted no evidence that Defendants ever registered the Disputed Domain using an alias or any false information, nor any evidence that Defendants have ever offered to sell or transfer the Disputed Domain" and that "factor VIII favors Defendants" because "the Disputed Domain <gopsurv.com> is the only domain name which Defendants own which contains the character string 'psu.'" (Id.) Defendants also argue that a reasonable jury could conclude that they are entitled to protection under the ACPA's safe harbor provision. (Id. at 34.)

Viewing the evidence of record in the light most favorable to Defendants as non-moving parties, and given the Court's conclusion supra that the issue of likelihood of confusion between the PSU mark and Defendants' <goPSUrv.com> domain is an issue for resolution by the factfinder, the Court concludes that Plaintiff has failed to demonstrate an entitlement to judgment as a matter of law as to the second element of its cybersquatting claim—that Defendants' domain is "confusingly similar" to Plaintiff's PSU mark. Further, the Court notes that the record reflects material disputes of fact as to the third element of its claim—the issue of Defendants' "bad faith" intent. See supra at III.A.2.e. Accordingly, the Court will deny Plaintiff's motion for summary

judgment as to its cybersquatting claim (count three).   For the same reasons, and acknowledging Plaintiff's linkage of its cybersquatting claim to its entitlement to summary judgment on Defendants' counterclaim counts one and three, the Court will also deny Plaintiff's motion as to Defendants' counterclaim counts one and three.  The Court turns to Plaintiff's motion as to its trademark dilution claims (counts four and five).

### C.      Trademark Dilution Under the Lanham Act and Pennsylvania Law (Plaintiff's counts four and five)

The trademark dilution cause of action "grants extra protection to strong, well-recognized marks even in the absence of a likelihood of consumer confusion—the classic test for trademark infringement—if the defendant's use diminishes or dilutes the strong identification value associated with the plaintiff's famous mark."  See Times Mirror Magazine, Inc. v. Las Vegas Sports News, LLC, 212 F.3d 157, 163 (3d Cir. 2000) (citing 4 McCarthy, supra, § 24:70)).  The standards for Lanham Act and Pennsylvania dilution claims are almost identical, with the only difference being that the Lanham Act covers instances where dilution is likely, but the Pennsylvania statute affords relief only where the defendant's use has actually caused dilution. See 54 Pa. C.S.A. § 1124; see also Dille Family Trust v. Nowlan Family Trust, 207 F. Supp. 3d 535, 546 & n.7 (E.D. Pa. 2016).

Accordingly, to obtain relief under both statutes, a plaintiff must prove: (1) plaintiff is the owner of a mark that qualifies as "famous"; (2) defendant is making commercial use in interstate commerce of a mark or trade name; (3) defendant's use began after the plaintiff's mark became famous; and (4) defendant's use causes dilution by lessening the capacity of the plaintiff's mark to identify and distinguish goods or services.  See Times Mirror, 212 F.3d at 163; 15 U.S.C. § 1125(c).  Dilution is assessed by six factors:

(i) [t]he degree of similarity between the mark or trade name and the famous mark.

(ii) [t]he degree of inherent or acquired distinctiveness of the famous mark. (iii) [t]he extent to which the owner of the famous mark is engaging in substantially exclusive use of the mark. (iv) [t]he degree of recognition of the famous mark. (v) [w]hether the use of the mark or trade name intended to create an association with the famous mark. (vi) [a]ny actual association between the mark or trade name and the famous mark.

See 15 U.S.C. § 1125(c)(2)(B)(i)–(vi).

As an initial matter, Plaintiff argues that the first and third elements are established here because there is no genuine dispute that the PSU Mark is famous and "was famous prior to Defendants' first use of goPSUrv in its branding and domain name." (Doc. No. 179 at 37.) As to the second element, Plaintiff asserts that it is satisfied because Defendants admit their use in commerce. (Id. at 38.) As to the fourth element, Plaintiff notes the overlap between the trademark infringement analysis and trademark dilution analysis and references its discussion of the Lapp factors, arguing that "those factors overwhelmingly weigh in favor of trademark dilution." (Id. at 39.) Plaintiff also maintains that "Penn State engages in substantially exclusive use of the PSU Mark," asserting that it "actively polices for infringement of the PSU Mark, monitoring for potential infringements, issuing cease and desist letters, filing lawsuits, taking actions with the USPTO, and instituting domain name resolution proceedings." (Id. at 40.) Plaintiff also asserts that because it "has identified a representative example of actual confusion," evidence regarding actual association between the parties' marks is "one-sided." (Id.) Accordingly, Plaintiff maintains that "[b]ecause each factor indicates that Defendants' use of goPSUrv is diluting the PSU Mark, summary judgment should be granted in Penn State's favor." (Id.) Defendants do not explicitly respond to Plaintiff's arguments regarding its trademark dilution claims.

Viewing the evidence of record in the light most favorable to Defendants as non-moving parties, and acknowledging the Court's conclusion supra regarding the necessity of a factfinder's

resolution of the likelihood of confusion issue and further noting the disputed facts related to

Defendants' intent in using the PSU mark, see supra at III.A.2.e, as well as the de minimis

evidence of actual association between Defendants' mark and Plaintiff's mark, see supra at

III.A.2.d, which relate to two of the factors by which dilution is assessed, see 15 U.S.C. §

1125(c)(2)(B)(v)–(vi), the Court will deny Plaintiff's motion for summary judgment as to its

trademark dilution claims (counts four and five).  The Court turns to Plaintiff's motion as to

Defendants' counterclaim count two for reverse domain name hijacking.

### D.   Reverse Domain Name Hijacking (Defendants' counterclaim count two)

Plaintiff also moves for summary judgment on Defendants counterclaim count two,

which asserts a counterclaim for reverse domain name hijacking pursuant to 15 U.S.C. §§

1114(2)(D)(iv)–(v).  In its counterclaim, Defendants assert that "Plaintiff is well-aware from his

prior unsuccessful UDRP proceedings involving the Defendant(s)' name that the registration and

use of the Disputed Domain is entirely proper"; "Plaintiff's allegations represent a knowing and

material misrepresentation that the Disputed Domain is a bad faith use of a valid trademark"; and

"Plaintiff's allegations represent a knowing and material misrepresentation that the Disputed

Domain is identical to, confusingly similar to, or dilutive of a valid trademark."  (Doc. No. 32 ¶¶

47–49.)

The ACPA "provides a cause of action to a 'domain name registrant who is aggrieved by

an overreaching trademark owner' and allows the registrant to seek a judgment 'to declare that

the domain name registration or use by the registrant is not unlawful under the Lanham Act and

to obtain injunctive relief for return of the domain name.'"  See Am. Diabetes Ass'n v. Friskney

Fam. Tr., LLC, 177 F. Supp. 3d 855, 873 (E.D. Pa. 2016) (quoting Hawes v. Network Solutions,

Inc., 337 F.3d 377, 384 (4th Cir. 2003) (citations omitted)).  "In simple terms, the statute affords

protection to a domain name registrant who is improperly targeted by an overzealous trademark owner claiming the registered domain name infringes on the trademark owner's mark." Am. Diabetes Ass'n, 177 F. Supp. 3d at 873–74.

To prove a claim of reverse domain name hijacking under 15 U.S.C. § 1114(2)(D)(v), a domain name registrant must show that: (1) it is a domain name registrant; (2) its domain name was suspended, disabled or transferred under a policy implemented by a registrar as described in 15 U.S.C. § 1114(2)(D)(ii)(II); (3) the owner of the mark that prompted the domain name to be suspended, disabled or transferred has notice of the action; and (4) its registration or use of the domain name is not unlawful under the Lanham Act.  See Am. Diabetes Ass'n, 177 F. Supp. 3d at 874 (citing Barcelona.com, Inc. v. Excelentisimo Ayuntamiento de Barcelona, 330 F.3d 617, 626–27 (4th Cir. 2003)).[67]

Plaintiff argues that Defendants have "failed to offer any evidence demonstrating that the <goPSUrv.com> domain was suspended, disabled, or transferred, and thus Defendants have failed to satisfy the second element of their prima facie case." (Doc. No. 179 at 44.)  Plaintiff asserts that, in fact, Defendants have admitted that Keystone Alternatives "own[s] and control[s] the website at the Domain <goPSUrv.com>."  (Id.) (citing Doc. No. 178 ¶ 153; Doc. No. 189 ¶

---

[67]   The Court notes that Defendants' counterclaim count two also references 15 U.S.C. § 1114(2)(D)(iv), which provides as follows:

> If a registrar, registry, or other registration authority takes an action described under clause (ii) based on a knowing and material misrepresentation by any other person that a domain name is identical to, confusingly similar to, or dilutive of a mark, the person making the knowing and material misrepresentation shall be liable for any damages, including costs and attorney's fees, incurred by the domain name registrant as a result of such action.

See id.

153).[68]  Plaintiff also asserts that "the undisputed record shows that Defendants continue to

control and update the site, which currently links to the 2023 football schedule."  (Id. at 44–45)

(citing Doc. No. 178 ¶¶ 149, 153–55).  Plaintiff argues that, based on Defendants' discovery

responses, Defendants "contend that they are entitled to relief because the domain name was

allegedly placed on registrar lock" but "there is no evidence aside from Defendants' inadmissible

discovery responses to support its contention that a registrar lock was ever imposed on

Defendants' domain."  (Id. at 45.)  In addition, Plaintiff argues that "even if true, a registrar lock

is insufficient alone to support a claim for reverse domain name hijacking" because "[t]he plain

text of the statute requires that a domain name be 'suspended, disabled, or transferred'."  (Id.)

(citing Am. Diabetes Ass'n, 177 F. Supp. 3d at 874–75 and 15 U.S.C. § 1114(2)(D)(v)).  Plaintiff

maintains that "[t]here is no dispute of material fact that Defendants' domain name has not been

suspended, disabled, or transferred" and instead, "it is undisputed that <goPSUrv.com> is

currently being used to advertise Keystone Alternatives' RV goods and services to the public and

that the registrar of the domain, GoDaddy, has not prevented Keystone Alternatives from

advertising RV rental services through the Domain."  (Id.) (citing Doc. No. 178 ¶¶ 148–49, 152–

53).

      As an initial matter, the Court notes that Defendants do not respond to Plaintiff's

arguments regarding their reverse domain name hijacking claim in their brief in opposition to

Plaintiff's motion.  However, having reviewed the relevant evidence of record, and viewing that

evidence in the light most favorable to Defendants as the non-moving parties, it is indeed

undisputed that Defendants continue using the goPSUrv.com mark to offer and advertise RVs

and related goods and services and Defendants' website at goPSUrv.com remains active.  See

---

[68]  Defendants clarify that Defendant Keystone Alternatives alone owns the website.  (Doc. No.
189 ¶ 153) (citing Doc. No. 189-9 (Lauer Declaration) at 1–2).

(Doc. No. 178 ¶¶ 148–49; Doc. No. 189 ¶¶ 148–49).  In their response to Plaintiff's statement of

facts, Defendants dispute Plaintiff's contention that "[a]t no time has GoDaddy prevented

Keystone Alternatives from advertising RV rental services through the <goPSUrv.com>

Domain" by asserting that "[a]s a result of the UDRP complaint, GoDaddy LLC disabled

Defendants' access to and control of the Disputed Domain" and therefore "[w]ithin

approximately 48 hours of filing the UDRP case, Defendant lost the ability to control the

Disputed Domain, including redirecting the nameservers and emails, as well as eliminating

Defendant's ability to sell, transfer, or license the website."  (Doc. No. 189 ¶ 155) (citing Doc.

No. 189-9 (Lauer Declaration) at 5).  Reviewing the Lauer Declaration upon which Defendants

rely to dispute Plaintiff's assertion, the Court notes that it states that: "[w]hen the UDRP

arbitration was filed, the Disputed Domain was locked and we lost the ability to control the

Disputed Domain, including redirecting nameservers and emails, as well as eliminating our

ability to sell, transfer, or license the website or our business."  (Doc. No. 189-9 ¶ 10.)

     In addressing Plaintiff's motion as to this claim, the Court notes that "the statutory text

makes clear that it is a domain name which must be disabled, transferred, or suspended."  See

Am. Diabetes Ass'n, 117 F. Supp. 3d at 875 (citing 15 U.S.C. § 1114(2)(D)(v)).  Accordingly,

the Court notes that Defendants' citation to evidence that the domain <goPSUrv.com> was

subject to a registrar lock upon Plaintiff's filing of a UDRP action is not the same thing as

evidence that the domain name <goPSUrv.com> was disabled, transferred, or suspended.  See id.

(granting summary judgment to plaintiff on defendants' reverse domain name hijacking

counterclaim for failure to support claim that domain name was "disabled" or "suspended" based

upon a registrar lock, stating that "the limited precedent available involving claims for reverse

domain name hijacking does not support Defendants' arguments that an inability to obtain an

investor, or renew a domain name at a future point in time, constitutes evidence that a domain name itself is presently disabled"); <u>Hawes</u>, 337 F.3d at 384 (noting that congressional reports indicate that the ACPA is intended to provide a cause of action when a domain name has been suspended, cancelled, or transferred).  Because Defendants have failed to create a genuine dispute of fact as to whether the domain name <goPSUrv.com> was disabled, transferred, or suspended, Defendants have failed to offer evidence supporting the second element of their reverse domain name hijacking claim, and therefore, the Court will grant Plaintiff's motion for summary judgment as to Defendants' counterclaim count two.

## IV.   CONCLUSION

For the foregoing reasons, the Court will grant Plaintiff's motion as to Defendants' counterclaim count two but deny the motion in all other respects.  An appropriate Order follows.


 s/ Yvette Kane
Yvette Kane, District Judge
United States District Court
Middle District of Pennsylvania