## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

THE PENNSYLVANIA STATE :
UNIVERSITY, :
  **Plaintiff**  :  **No. 1:19-cv-02039**
    :
  **v.**  :  **(Judge Kane)**
    :
KEYSTONE ALTERNATIVES LLC d/b/a :
GOPSURV.COM and MARK LAUER, :
  **Defendants**  :

### <u>MEMORANDUM</u>

This is a trademark infringement action arising out of Defendants Keystone Alternatives,

LLC d/b/a GoPSUrv.com ("Keystone") and Mark Lauer (collectively, "Defendants")' alleged

use of Plaintiff The Pennsylvania State University ("Plaintiff or "Penn State")'s registered

trademark "PSU" as well as the "PENN STATE" mark and the "Nittany Lion Logo."  (Doc. No.

1 ¶¶ 1–4, 18–21, 26–31.)  Before the Court are cross-motions for summary judgment filed by

Plaintiff and Defendants (Doc. Nos. 176, 173), which the Court will resolve by separate opinions

on the respective motions.[1]  The Court addresses Defendants' motion by way of this

---

[1] "Concurrent resolution of cross-motions for summary judgment can present a formidable task." <u>Interbusiness Bank, N.A. v. First Nat'l Bank of Mifflintown</u>, 318 F. Supp. 2d 230, 235 (M.D. Pa. 2004) (Conner, J.) (citing 10A Charles Alan Wright <u>et al.</u>, <u>Federal Practice and Procedure</u> § 2720 (3d ed. 1998)).  Federal Rule of Civil Procedure 56 requires that the court view all facts in the light most favorable to the non-moving party, drawing all reasonable inferences in favor of the non-moving party.  <u>See</u> Fed. R. Civ. P. 56.  However, in the circumstances of cross-motions for summary judgment, where both parties are moving and non-moving parties, "[i]nferences to which a party is entitled with respect to the opponent's motion may not be granted with respect to its own" and accordingly, "[i]n such circumstances, Rule 56 requires two statements of the 'facts' of the same case, a proposition that may counsel separate opinions on the respective motions."  <u>See</u> <u>Interbusiness Bank, N.A.</u>, 318 F. Supp. 2d at 235–36 (first citing <u>United States v. Hall</u>, 730 F. Supp. 646, 648 (M.D. Pa. 1990) and then citing <u>Rains v. Cascade Indus., Inc.</u>, 402 F. 2d 241, 245 (3d Cir. 1968)).  Given the voluminous record in this case, the lengthy statements of facts filed by the parties, the factual disputes reflected in those statements of facts and responses thereto, and mindful of the Court's obligation to view the evidence in the light most favorable to the non-moving party with respect to each motion, the Court concludes that separate opinions on

Memorandum and accompanying Order and, for the following reasons, the Court will deny Defendants' motion in its entirety.

## I. PROCEDURAL HISTORY AND FACTUAL BACKGROUND

The Court first describes the extensive procedural history of this case before setting forth the factual background relevant to Defendants' motion.

### A. Procedural History

In connection with the resolution of discovery disputes between the parties, then-Magistrate Judge Saporito in a May 3, 2021 Memorandum succinctly summarized the facts giving rise to Plaintiff's complaint in the instant action:

> [Plaintiff] has alleged that the defendants have infringed its trademarks by incorporating the PSU mark into their internet domain registered as <goPSUrv.com> (the "Disputed Domain") and almost exclusively use the brand GoPSUrv.com rather than Keystone Alternatives to promote their goods and services. ([Doc. No. 1] ¶ 43.) Plaintiff alleges that the defendants attempt to suggest a connection, sponsorship, or affiliation with it where no such affiliation exists. (Id. ¶ 45.) It has further alleged that the defendants advertise in other media using the PSU mark, and they use other [Plaintiff] owned trademarks on their webpage and in advertising which has caused or is likely to cause irreparable injury to [Plaintiff]. (Id. ¶¶ 49, 52, 54–58, 66.) The defendants contend that they have used the Disputed Domain for ten years with [Plaintiff's] knowledge and acquiescence.

(Doc. No. 99 at 2–3.)

Plaintiff's complaint asserts the following claims against Defendants: trademark infringement (Count I), unfair competition (Count II), cybersquatting (Count III), and trademark dilution (Count IV), all in violation of the Lanham Act, 15 U.S.C. § 1051 et seq. (Doc. No. 1.) Plaintiff also asserts a claim for trademark dilution (Count V) under Pennsylvania law and a claim for common law trademark infringement and unfair competition (Count VI). (Id.) Defendants filed a motion to dismiss the complaint (Doc. No. 14), which the Court denied (Doc.

---

the respective motions are appropriate.

Nos. 28–29), and Defendants subsequently filed an answer to the complaint (Doc. No. 32), asserting counterclaims for cyberpiracy (Counterclaim Count I), reverse domain name hijacking (Counterclaim Count II) and tortious interference with contractual relations (Counterclaim Count IV), and seeking a declaratory judgment that Defendants' domain name GoPSUrv.com does not violate the Lanham Act (Counterclaim Count III).  Plaintiff filed a motion to dismiss Counterclaim Count IV (Doc. No. 33), which the Court granted (Doc. Nos. 39–40).

The Court conducted a case management conference and set a close of fact discovery date of December 31, 2020. (Doc. No. 46.)  Thereafter, the case was referred to then-Magistrate Judge Saporito for purposes of conducting a settlement conference (Doc. Nos. 47, 49), and, by agreement of the parties, the fact discovery deadline was extended to March 31, 2021 (Doc. No. 77).  After the undersigned initially handled a discovery-related motion (Doc. Nos. 54–56, 64–64, 67–68), the Court referred additional discovery-related disputes to then-Magistrate Judge Saporito for resolution given his familiarity with the case (Doc. Nos. 85, 102).  The Court then extended the fact discovery deadline again—to April 30, 2021—upon the parties' joint request. (Doc. No. 90.)

On May 4, 2021, Defendants filed another motion (Doc. No. 101), which Plaintiff opposed (Doc. No. 103), requesting an extension of the discovery deadline.  On June 7, 2021, acknowledging the May 2021 Orders of then-Magistrate Judge Saporito (Doc. Nos. 100, 107), which resolved the discovery disputes referred to him, the Court granted Defendants' motion only insofar as necessary to comply with then-Magistrate Judge Saporito's Orders (Doc. No. 109).  The Court conducted a post-discovery status conference with the parties on July 15, 2021, and issued a case management order setting a potential trial date for March 2022.  (Doc. No. 112.)  Defendants subsequently filed a motion to compel deposition testimony and supporting

3

memorandum (Doc. Nos. 114–15), and the Court, noting that the motion to compel related to one of the discovery disputes previously resolved by then-Magistrate Judge Saporito,[2] referred the dispute to him for resolution by Order dated September 29, 2021 (Doc. No. 118).  After the motion to compel was briefed, Defendants filed a motion to stay case deadlines based on Defendants' counsel's COVID-19 illness (Doc. No. 125), and the Court thereafter granted the motion to stay and continued all case management deadlines (Doc. No. 128).

The Court held a status conference with the parties on December 1, 2021,[3] after which the Court issued an Order lifting the stay of case deadlines and ordering that any Daubert motions or motions to dismiss be filed by December 13, 2021.  (Doc. No. 131.)  Plaintiff thereafter filed two Daubert motions (Doc. Nos. 135, 140) with supporting briefs (Doc. Nos. 136, 141), and Defendants filed a motion to dismiss for failure to join an indispensable party (Doc. No. 142), along with a supporting brief (Doc. No. 143).  Three days before the parties filed those motions, then-Magistrate Judge Saporito issued a Memorandum and Order (Doc. Nos. 133–34) denying Defendants' motion to compel the deposition testimony of Coach Franklin.  On December 20, 2021, Defendants filed an appeal of then-Magistrate Judge Saporito's Memorandum and Order denying their motion to compel (Doc. No. 148), along with a brief in support of the appeal (Doc. No. 149).  Plaintiff filed a brief in opposition to Defendants' appeal. (Doc. No. 152.)  The parties agreed to extend the deadlines to oppose the pending motions (Doc. No. 144), and, after briefs in opposition to the Daubert motions and the motion to dismiss were filed (Doc. Nos. 153–55), the parties filed reply briefs in opposition to the pending motions

---

[2]  The motion to compel sought to compel the deposition testimony of James Franklin ("Coach Franklin"), the head coach of Plaintiff's football team.

[3]  At the status conference, Defendants' counsel indicated his plan to file a motion to dismiss for failure to join an indispensable party, and the parties agreed that Daubert motions must be resolved prior to the Court's issuance of a dispositive motion deadline.

4

(Doc. Nos. 156–58).

In September 2022, the Court denied Defendants' appeal of then-Magistrate Judge Saporito's Order and Defendants' motion to dismiss for failure to join an indispensable party. (Doc. Nos. 161–64.)  In March 2023, the Court issued a Memorandum and Order granting Plaintiff's <u>Daubert</u> motion to exclude the opinions of Jeffrey J. Neuman in its entirety (Doc. Nos. 165–66) and an Order denying Plaintiff's <u>Daubert</u> motion to partially exclude the opinions of Steven B. Boyles without prejudice to Plaintiff's right to refile the motion after the Court's resolution of any dispositive motions (Doc. No. 167).  The Court's Order also set a dispositive motions deadline of April 14, 2023.  (<u>Id.</u>)

On April 14, 2023, both Plaintiff and Defendants filed motions for summary judgment (Doc. Nos. 173, 176), briefs in support of those motions (Doc. Nos. 175, 179), and respective statements of facts in support of those motions (Doc. Nos. 174, 178).  Both statements of facts attached numerous exhibits.  (<u>Id.</u>)  After the Court granted the parties an extension of time (Doc. No. 183), on May 12, 2023, Defendants filed five sealed documents on the docket of this matter in connection with their response to Plaintiff's motion for summary judgment.  (Doc. Nos. 184-88.)  On that date, Defendants also filed their answer to Plaintiff's statement of material facts (Doc. No. 189), with numerous attached exhibits (Doc. Nos. 189-1 through 189-13), several of which Defendants also sought to file under seal,[4] as well as a brief in opposition to Plaintiff's motion for summary judgment (Doc. No. 190).

Also on May 12, 2023, Plaintiff filed its "Unopposed Motion for Leave to File Under Seal Exhibits in Support of Plaintiff's Opposition to Defendants' Motion for Summary

---

[4]  The exhibits sought to be sealed by Defendants—Docket Numbers 189-1 through 189-5, 189-7 through 189-9, and 189-11 through 189-12—were transmitted to the Court by way of a letter filed June 7, 2023 (Doc. No. 204) and subsequently filed provisionally under seal on the Court's docket at Docket Numbers 209-1 through 209-10.

Judgment" (Doc. No. 191), with a proposed order (Doc. No. 191-1) and supporting brief (Doc. No. 192). By way of that motion, Plaintiff originally sought to file under seal Exhibits 45, 54, 56, 58, and 60 (Doc. Nos. 194-14, 194-25, 194-27, 194-29, and 194-31) to its response in opposition to Defendants' statement of undisputed material facts in support of their summary judgment motion. On that date, Plaintiff filed its brief in opposition to Defendants' motion for summary judgment (Doc. No. 193), as well as an answer to statement of facts (Doc. No. 194), with numerous attached exhibits (Doc. Nos. 194-1 through 194-34). Subsequently, on May 17, 2023, Plaintiff filed the exhibits to Docket Number 194 sought to be filed under seal (Doc. Nos. 194-14, 194-25, 194-27, 194-29, and 194-31) provisionally under seal on the Court's docket at Docket Numbers 196-1 through 196-5. On May 26, 2023, both parties filed reply briefs in further support of their motions for summary judgment. (Doc. Nos. 198–99.)

Also on May 26, 2023, the Court issued an Order (Doc. No. 197) directing the parties to show cause why the exhibits submitted provisionally under seal should not be made a part of the publicly available docket in this matter under the standards applicable to judicial records articulated by the United States Court of Appeals for the Third Circuit in In re Avandia Marketing, Sales Practices and Products Liability Litigation, 924 F.3d 662 (3d Cir. 2019) ("Avandia"). (Id.) In its May 26 2023 Order, the Court referenced Avandia's discussion of the common law right of access to judicial records as well as the First Amendment right of access, which "requires a much higher showing than the common law right of access before a judicial proceeding can be sealed." See Avandia, 924 F.3d at 673 (quoting In re Cendant Corp., 260 F.3d 183, 198 n.13 (3d Cir. 2001)). That Order directed the Clerk of Court to maintain the documents filed by Defendants (Doc. Nos. 184–88, representing exhibits contained at Doc. Nos. 174-2; 174-4 through 174-9; 174-11; and 174-12) and documents filed by Plaintiff (Doc. Nos. 196-1 through

6

196-5, representing exhibits contained at Doc. Nos. 194-14; 194-25; 194-27; 194-29; and 194-31) provisionally under seal until further Order of Court.  (Doc. No. 197 at 6–7.)  On June 5, 2023, Plaintiff and Defendants filed their respective responses to the Court's May 26 2023 Order.  (Doc. Nos. 201–02.)[5]

On October 27, 2023, the Court issued a Memorandum (Doc. No. 212) and corresponding Order (Doc. No. 213) largely denying Plaintiff's motion for leave to file exhibits under seal but granting the motion insofar as it permitted Plaintiff to file a redacted version of its Exhibit 60.  In addition, the Court's Order temporarily retained under seal Defendants' Exhibit E pending the parties' clarification of the nature of the exhibit.  The Court's Order also permitted Plaintiff to file appropriately excerpted (but unredacted) versions of two of Defendants' exhibits (Exhibit B and Exhibit D), afforded third-party Christopher Longo the opportunity to be heard before unsealing his deposition and its exhibits, and directed the Clerk of Court to unseal certain exhibits provisionally filed under seal by both parties and to strike certain exhibits from the docket of this matter.

On November 9, 2023, Plaintiff filed a "Notice of Filing Exhibits and Response to the Court's Request for Clarification" (Doc. No. 214) which attached a redacted version of Plaintiff's Exhibit 60 (Doc. No. 214-1) and excerpted versions of Defendants' Exhibit B (Doc. No. 214-2) and Exhibit D (Doc. No. 214-3).  Although the Court's Order directed Plaintiff to provide the Order to third-party Christopher Longo or his counsel and permitted Christopher

---

[5] As noted supra at note 4, on June 7, 2023, Defendants filed under seal on the Court's docket a letter (Doc. No. 204) which resubmitted certain documents originally intended to be filed under seal by way of its May 12, 2023 letter (Doc. Nos. 174-8, 174-11, and 174-12), filed provisionally under seal on the Court's docket at Docket Numbers 204-1 and 205 through 208, in addition to submitting the exhibits located at Docket Numbers 189-1 through 189-5, 189-7 through 189-9, 189-11, and 189-12, for filing under seal on the Court's docket.  As noted above, the exhibits to Docket Number 189 sought to be filed under seal were filed provisionally under seal on the Court's docket at Docket Numbers 209-1 through 209-10.

Longo time within which to show cause why his deposition and accompanying exhibits (located at Docket Numbers 207 and parts of Docket Numbers 186 and 209-8) should remain sealed, Christopher Longo did not respond to the Court's Order.  As to Defendants' Exhibit E (Doc. Nos. 189-5 and 209-5), Plaintiff's filing stated that "[t]he parties have conferred regarding this document" and "Defendants indicated that the document filed with the Court was corrupted, and that the filed document is not the exhibit Defendants intended to submit"; accordingly, Plaintiff stated its understanding that "Defendants will be requesting that this document be withdrawn from the record, rendering the issue of sealing the document moot."  (Doc. No. 214 at 2.)

The next day, Defendants submitted a letter to the Court (Doc. No. 215) requesting to withdraw Docket Numbers 209-5 and 189-5 from the Court's docket and "replace those filings with the redacted version of the Contract attached hereto as Exhibit A."  (Doc. No. 215-1.) Defendants stated that "[b]ecause Plaintiff concurs that the redactions in this replacement attachment obviate the need for confidentiality, Defendants submit that the question of whether Docks. 209-5 and 189-5 should remain sealed is rendered moot by this replacement."  (Doc. No. 215.)

In an Order dated April 1, 2024, the Court, in accordance with its October 27, 2023 Order, and in light of the parties' filings: (1) directed the Clerk of Court to strike from the docket Plaintiff's original Exhibit 60 (Doc. No. 196-5), given Plaintiff's filing of a redacted version of its Exhibit 60 (Doc. No. 214-1); (2) directed the Clerk of Court to strike from the docket the original versions of Defendants' Exhibit B (Doc. Nos. 288 and 209-3) and Defendants' Exhibit D (Doc. Nos. 187 and 209-3), given Plaintiff's filing of appropriately excerpted versions of Defendants' Exhibit B (Doc. No. 214-2) and Defendants' Exhibit D (Doc. No. 214-3); and (3) directed the Clerk of Court to unseal Christopher Longo's deposition (Doc. No. 207) and

documents containing exhibits to his deposition (Doc. Nos. 186 and 209-8), given his lack of response to the Court's October 27, 2023 Order.  (Doc. No. 218 at 2.)  In addition, noting Defendants' clarification that they previously filed the wrong Exhibit E and request that Exhibit E (Doc. Nos. 189-5 and 209-5) be removed from the Court's docket, the Court directed the Clerk of Court to strike from the docket Docket Numbers 189-5 and 209-5.  (Id.)  However, noting the Court's prior statement to the effect that it would address whether Plaintiff met its burden to demonstrate that its interest in secrecy in Defendants' Exhibit E outweighed the presumption of public access under Avandia after the parties clarified whether the Exhibit E filed on the Court's docket was the "SideARM Sports" contract referenced by the parties in their summary judgment briefing, and the fact that the replacement Exhibit E (Doc. No. 215-1) was heavily redacted, with minimal text visible, and the fact that, absent an ability to review an unredacted copy of the SideARM Sports contract, as well as a statement from Plaintiff justifying the redactions made to that contract under the Avandia standard, the Court could not address whether Plaintiff met its Avandia burden as to the entirety of Exhibit E such that filing a redacted version is permissible, the Court directed the parties to file an unredacted version of Exhibit E (Doc. No. 215-1) provisionally under seal along with a statement from Plaintiff justifying the redactions under Avandia.  (Doc. No. 218 at 1–3.)

On April 11, 2024, Plaintiff filed a "Statement Concerning Docket No. 215-1 in Response to the Court's April 1, 2024 Order" (Doc. No. 219), in which Plaintiff stated that "the redactions here [in Doc. No. 215-1] are part of the Exhibit itself, and do not denote material that either party is requesting the Court to review under seal."  (Doc. No. 219 at 1.)  Plaintiff further stated as follows:

> By way of background, prior to the Defendants' submission of this Exhibit on November 10, 2023, counsel for the parties conferred on this Exhibit with the goal of

avoiding complications related to sealing.  Because the parties' relevant summary judgment briefing referenced only a few provisions of the SideARM Sports contract, the parties agreed to jointly create a redacted exhibit, essentially paring down the exhibit to show only the portions of the contract that are relevant to the pending motions.  With those redactions in place, the final exhibit—which Defendants submitted at Docket Number 215-1—obviated the need for the Court to consider any portions of this contract under seal.

(Doc. No. 219 at 2.)  Plaintiff also stated that "[b]ecause the parties are not requesting that the Court consider any portions of this contract under seal, the Court need not apply Avandia here or consider whether the redactions included in Docket Number 215-1 should remain in place."

(Doc. No. 219 at 2.)  Finally, Plaintiff concluded:

> Accordingly, in response to the Court's directive that the parties "file an unredacted version of Defendants' Exhibit E (Doc. No. 215-1) provisionally under seal on the Court's docket", Penn State respectfully submits that the document filed at Docket Number 215-1 is the full and complete copy of Defendants' Exhibit E.  There is not an alternate version of this Exhibit to be filed here, as the redactions are part of the Exhibit itself.

(Doc. No. 219 at 3.)  Upon consideration of Plaintiff's April 11 filing, the Court will accept the filing of Docket Number 215-1 (Defendants' Exhibit E) in its current form.

Defendants' motion for summary judgment is ripe for disposition.  The Court turns to a recitation of the relevant facts of record.

### B.   Factual Background[6]

Prior to this litigation, Plaintiff initiated an arbitration in June 2019 under the Uniform Domain Name Dispute Policy ("UDRP"), a trademark dispute policy contractually incident to registration of internet domain names requiring the participation in arbitration, against Defendants arising out of their use of the <goPSUrv.com> domain name and seeking an order

---

[6]  The following relevant facts of record are taken from Defendants' Statement of Undisputed Material Facts ("DSUMF") (Doc. No. 174) and Plaintiff's Response to Defendants' Statement of Undisputed Material Facts ("PRSUMF") (Doc. No. 194) and are undisputed unless otherwise noted. In general, both the DSUMF and PRSUMF contain citations to the record at each numbered paragraph.

10

requiring GoDaddy LLC to transfer the domain <goPSUrv.com> to Plaintiff (the "UDRP

Proceeding").  (Doc. No. 174 ¶¶ 1–2.)  As stated by Defendants, in a decision dated July 29,

2019 (the "UDRP Decision"), the Hon. Neil Anthony Brown "denied all of [Plaintiff's] claims

on the basis of the equitable doctrine of acquiescence, ruling that [Plaintiff] 'authorized the

Respondent [GoPSURV.com] to offer its services at PSU athletic events using the domain name

[<gopsurv.com>] that incorporates the Complainant's PSU trademark and acquiesced in the

Respondent doing so.'"  (Id.) (quoting Doc. No. 174-1 (Exh. A to Rinehart Declaration) at 19).

The parties dispute the import of that decision, with Defendants relying on various portions of it

in support of their defenses to Plaintiff's claims of trademark infringement and unfair

competition and Plaintiff maintaining that the decision is not material to the resolution of

Defendants' motion and further noting, as to Defendants' specific quotes from the decision,[7] that

---

[7] Defendants quote the following provisions of the UDRP Decision:

> In total, the Panel concludes that the evidence adduced has made out a case to the
> satisfaction of the Panel that the Complainant on the balance of probabilities, and
> including via the agency of PSSP, authorized Respondent to offer the hire of RV
> vehicles while using the domain name and the Complainant's PSU trademark, at and
> in association with PSU sporting events.

> The Panel therefore accepts the principal submission of the Respondent that the
> Complainant by its conduct, including via the agency of PSSP, authorized the
> Respondent to offer its services at PSU athletic events using the domain name that
> incorporates the Complainant's PSU trademark and acquiesced in the Respondent
> doing so.
> . . .
> In the present case, the Complainant must be presumed from the evidence to have
> been aware of the Respondent's activities, acquiesced in them and by that means
> consented to the use of the domain name, giving rise to a right or legitimate interest
> in the domain name and negating the notion of registration and use of the domain
> name [in] bad faith.
> . . .
> [T]he Panel finds that the Respondent has a right and legitimate interest in the
> disputed domain name that arises from the consent and acquiescence of the
> Complainant to the Respondent's use of the PSU mark in its domain name and using

"the Arbitration Decision speaks for itself."  (Doc. No. 194 at 6–7.)

Specifically, Plaintiff disputes Defendants' statements as to the UDRP Proceeding in part, clarifying that the instant case "involves claims and issues beyond those that were raised in the UDRP arbitration" and noting that "UDRP proceedings are limited to domain names and are a mechanism by which domains can be ordered to be transferred but do not involve damages or injunctive relief"; however "Plaintiff's claims here are for infringement beyond just the use of GoPSUrv.com and seeks damages and injunctive relief."  (Doc. No. 194 at 3.)  In addition, Plaintiff asserts that the UDRP Proceeding involved a different legal standard whereby it "bore the burden of establishing that (1) Defendants' domain name is identical or confusingly similar to a trademark or service mark in which [Plaintiff] has rights; (2) Defendants have no rights or legitimate interests in respect of the domain name; and (3) Defendants' domain name has been registered and is being used in bad faith."  (Doc. No. 194 at 4–5.)  Plaintiff asserts that its trademark infringement claims in this litigation require only proof of (1) a valid and legally protectable mark, (2) ownership of the mark, and (3) defendant's use of the mark to identify goods and services that causes a likelihood of confusion and that "[t]he UDRP Panel found [it] satisfied each of these elements."  (Doc. No. 194 at 5.)  Plaintiff also disputes "that Neil Anthony Brown denied [its] claims based on the equitable doctrine of acquiescence as it is alleged by Defendants in this case; Neil Anthony Brown is an Australian attorney and therefore not

---

the domain name in its business in the manner described.
. . .
[T]he Panel finds that the Respondent did not register or use the domain name in bad faith . . . The Panel also finds that Respondent has not registered or used the <gopsurv.com> domain name in bad faith for the additional reason that it has not violated any of the factors listed in Policy ¶ 4(b) or engaged in any other conduct that would constitute bad faith registration.

(Doc. No. 174 ¶¶ 3–4) (quoting Doc. No. 174-1 (Exh. A to Rinehart Declaration) at 19–20).

qualified to decide acquiescence under U.S. law." (Doc. No. 194 at 5.)

With regard to the UDRP Proceeding, Defendants assert that "[n]o evidence that James Franklin or [former Penn State Athletic Director] Sandy Barbour authorized Defendants' action was adduced by either side" as "[t]he case was decided without proffer of this supporting evidence below." (Doc. No. 174 ¶ 5.)[8]

The parties dispute the implications of Plaintiff's filing of the UDRP Proceeding on Defendants' control of the domain <goPSUrv.com>. Compare (Doc. No. 174 ¶ 6 with Doc. No. 194 at 8).[9] Defendant Keystone Alternatives registered the disputed domain <gopsurv.com> on April 17, 2010. (Doc. No. 174 ¶ 7.) The parties dispute when Keystone Alternatives began using the disputed domain, with Defendants asserting that they have used it since April 19, 2010 (Doc. No. 174 ¶ 7) (citing Doc. No. 189-9 (Lauer Declaration) ¶¶ 2 and 11), and Plaintiff stating that "[t]he evidence cited by Defendants indicates that the domain was not used until October 3,

---

[8] In support of their assertion, Defendants cite to the Rinehart Declaration. (Doc. No. 174-1 ¶ 6.) Although it contends that this fact is not material to Defendants' motion for summary judgment, Plaintiff disputes this assertion "to the extent Defendants contend that they have adduced in the instant case supporting evidence that James Franklin or Sandy Barbour authorized Defendants' infringing conduct, because no such evidence exists." (Doc. No. 194 at 7.)

[9] Defendants cite Mark Lauer's Declaration in support of their statement that "[a]s a result of the UDRP complaint, GoDaddy LLC disabled Defendants' access to and control of the Disputed Domain. Within approximately 48 hours of filing the UDRP case, Defendant[s] lost the ability to control the Disputed Domain, including redirecting the nameservers and emails, as well as eliminating Defendant's [sic] ability to sell, transfer, or license the website." (Doc. No. 174 ¶ 6) (citing Doc. No. 189-9 ¶ 10).

Plaintiff disputes this assertion, stating that "[t]he evidence shows that Defendants own and control the <goPSUrv.com> Domain and have updated the contents to that website"; the Lauer Declaration "is directly contradicted by his sworn deposition testimony" in this regard; "Defendants may not use a self-serving declaration that contradicts other evidence to create a dispute of fact"; and "[t]here is no admissible evidence that Defendants have ever lost the ability to control the Domain <goPSUrv.com>, or that any restrictions were ever imposed by GoDaddy." (Doc. No. 194 at 8) (citing Doc. No. 178-19 (discovery responses) at 9, 12; Doc. No. 178-41 (2023 screenshot of website at domain); and Doc. No. 178-23 (Lauer deposition testimony) at 48–49).

2010" (Doc. No. 194 at 9) (citing Doc. No. 209-8 (Exh. A to Lauer Declaration) at 3). The parties also dispute who registered the disputed domain, with Defendants asserting that Defendant Keystone Alternatives, and not Defendant Mark Lauer personally, registered the domain name and "has always been the owner" (Doc. No. 174 ¶ 8) (citing Doc. No. 174-3 (Lauer deposition testimony) at 146–47), while Plaintiff maintains that "Mark Lauer is listed as the registrant of the goPSUrv.com domain" (Doc. No. 194 at 9) (citing Doc. No. 209-8 (Exh. A to Lauer Declaration) at 10).[10]

Since 2010 Defendants have used the disputed domain to rent RVs to Penn State fans who want to attend Penn State football games. (Doc. No. 174 ¶ 9.) These fans would typically park the RVs at Penn State's overnight RV lot ("ORV lot") adjacent to Beaver Stadium and camp there through the weekends for home football games. (Id.) Since April 19, 2010, Defendant Keystone Alternatives has maintained a website at <goPSUrv.com> which has been used to rent Defendant Keystone's RVs, as shown below:



(Doc. No. 174 ¶ 10.) Plaintiff disputes this statement to the extent that the image above is a

---

[10] The Court notes that the referenced evidence reflects that the "Registrant Name" is Mark Lauer and the "Registrant Organization" is Keystone Alternatives. (Doc. No. 209-8 (Exh. A to Lauer Declaration) at 10).

former version of the website which has since been edited, and asserts that a current (as of March 2023) screenshot is shown below:







PSU0002482

(Doc. No. 194 at 10–12.)  Defendants maintain that, from 2010 to 2015, the Nittany Lion, Penn

State's mascot, was shown in the header of Defendants' website stepping out of Defendants' RV,

as shown below:



(Doc. No. 174 ¶ 10.)  Plaintiff asserts that this fact is not material to Defendants' motion for

summary judgment "because the photograph in question does [not] show any use of 'GOPSUrv'

or any other Penn State trademarks."  (Doc. No. 194 at 12–13.)  The parties dispute who took the

photo of the Nittany Lion and for what purpose.  <u>Compare</u> (Doc. No. 174 ¶ 11 with Doc. No. 194

at 13).[11]

---

[11]  Defendants state that the photo "was taken by a photography team of the Penn State Athletics
Department in 2010.  The mascot was instructed by the photography team to enter Defendants'
RV on Penn State property at a home football game, then exit for the photograph, then the
photograph was given to Defendants by Penn State for marketing purposes."  (Doc. No. 174 ¶
11) (citing Doc. No. 189-9 (Lauer Declaration) ¶¶ 12–14).

Plaintiff disputes that the photo was taken by the Penn State Athletics Department in 2010 or that
it was given to Defendants for marketing purposes.  (Doc. No. 194 at 13) (citing Doc. No. 178-
37 (Defendants' discovery responses which fail to identify any involvement by anyone from
Penn State in Defendants' marketing)).  In addition, Plaintiff disputes this assertion "to the extent
this statement implies that officials from the University with the capacity to make decisions
regarding Penn State's intellectual property provided the Defendants with a photograph and gave
Defendants permission to use that photograph, or otherwise purported to authorize, assist, or
contribute to Defendants' advertising" because "Penn State has never authorized Defendants' use
of goPSUrv, goPSUrv.com, or any of the Infringing Marks."  (Doc. No. 194 at 13) (citing Doc.
No. 178-24 (Plaintiff 30(b)(6) deposition testimony) at 12–13, 19; Doc. No. 178-2 (McGrath
Declaration) ¶¶ 8, 62, 68; Doc. No. 178-25 (McGrath deposition testimony) at 3; Doc. No. 178-
28 (Bordner deposition testimony) at 4).  Finally, Plaintiff disputes the statement to the extent it
"suggests personnel at Penn State responsible for enforcing Penn State's trademarks were aware

Defendants attended Penn State football games in an RV and parked in spaces in the ORV lot, helping customers throughout the weekend manage RVs while also hosting breakfasts, speaking events and tailgating parties at the ORV lot, which certain Penn State employees attended, including Joe Paterno in 2010, James Franklin in 2017, Mark Bodenschatz (associate director of Penn State Intercollegiate Athletics), and Dave Baker (associate director of Penn State Intercollegiate Athletics).  (Doc. No. 174 ¶ 12.)  The parties dispute whether Defendants parked RVs in "spaces reserved for GOPSURV by Penn State in the ORV lot" and whether Penn State employees Mark Bodenschatz and Dave Baker attended such events.  Compare (Doc. No. 174 ¶ 12 with Doc. No. 194 at 14–15).[12]

Mark Lauer is a 50% owner of Defendant Keystone Alternatives.  (Doc. No. 174 ¶ 13.)  The parties dispute whether Mark Lauer and co-owner Tim Lauer divide responsibilities for the Keystone Alternative business "pretty equal[ly]."  Compare (Doc. No. 174 ¶ 13 with Doc. No.

_____

of Defendants' infringing use of the GoPSUrv Mark and Domain prior to April 2015, when those personnel first became aware of the infringement."  (Doc. No. 194 at 14) (citing Doc. No. 178-24 (Plaintiff 30(b)(6) deposition testimony) at 16–17; Doc. No. 178-2 (McGrath Declaration) ¶¶ 59–60; Doc. No. 178-20 (Riedel deposition testimony) at 6–8).

[12]  Defendants cite Mark Lauer's Declaration in support of their assertions.  (Doc. No. 174 ¶ 12) (citing Doc. No. 189-9 ¶ 15).  Plaintiff disputes that "any spaces in the ORV lot were 'reserved for GOPSURV' by Penn State," or that Penn State personnel knew in 2010 that Defendants were using the goPSUrv mark and domain, maintaining that "Defendants used the name Keystone Alternatives when discussing the ORV lot with Dave Baker and Mark Bodenschatz"; further, Plaintiff disputes "that 'numerous Penn State employees' including Dave Baker and Mark Bodenschatz attended Defendants' events."  (Doc. No. 194 at 14–15) (citing Doc. No. 194-5 (Bodenschatz deposition testimony) at 11; Doc. No. 194-6 (Bodenschatz Declaration) ¶¶ 14–19; Doc. No. 194-33 (Defendants' emails with Penn State referring to "Keystone Alternatives"); Doc. No. 194-9 (Baker deposition testimony) at 6–7; Doc. No. 194-8 (Baker Declaration) ¶¶ 11–15; Doc. No. 194-10 (Mark Lauer deposition testimony) at 39–41; Doc. No. 194-30 (Longo deposition testimony) at 15–16).  Plaintiff asserts that Mark Lauer's cited Declaration contradicts the evidence cited above, and "Defendants cannot rely on this unsupported affidavit to create a dispute of fact."  (Doc. No. 194 at 15.)

194 at 16–17).[13]

The parties dispute the reason why Defendants chose the <goPSUrv.com> domain name. Compare (Doc. No. 174 ¶ 14 with Doc. No. 194 at 17–18).  Defendants maintain that they registered the domain name <goPSUrv.com> because "it was recommended by their marketing consultant and [they] did not select the name themselves"; they "recognized that 'go' was a common prefix in domains in 2010 to indicate a 'call to action'"; they "incorporated 'PSU' into the domain because '[i]t's where we were offering our services'"; and they "liked the name because it was reminiscent of two other domain names having the prefix go relating to RVs, <gorving.com> and <gooutdoors.com>."  (Doc. No. 174 ¶ 14) (citing Doc. No. 174-3 (Mark Lauer deposition testimony) at 77–78 and Doc. No. 189-9 (Mark Lauer Declaration) ¶¶ 17–18). Plaintiff disputes these stated reasons, maintaining that: "Defendants adopted and use 'PSU' in goPSUrv and goPSUrv.com in order to create an association in the minds of consumers between their company and Penn State"; "Defendants chose the domain <goPSUrv.com> because of the similarities between this domain and the Penn State Athletics website domain <goPSUsports.com>"; and "Defendants use the name goPSUrv even when it [sic] is offering services that are not connected with Penn State."  (Doc. No. 194 at 17–18) (citing Doc. No. 178-23 (Mark Lauer deposition testimony) at 3–4, 15–17, 20–21, 24–25; Doc. No. 178-26 (Tim

---

[13]  Defendants cite Mark Lauer's deposition testimony for the proposition that he and his brother divide the labor of running the Keystone Alternatives business equally.  (Doc. No. 174 ¶ 13) (citing Doc. No. 174-3 at 47, 53).  Plaintiff disputes that Mark and Tim Lauer are "equally responsible" for marketing-related decisions pertaining to Keystone Alternatives, stating that "[t]he evidence shows that Mark Lauer made the decisions relevant to Defendants' infringing use of Penn State's Marks, including choosing the infringing domain name, determining the appearance of Defendants' infringing website, organizing Defendants' advertising at events, and handling the purchasing and stenciling of Defendants' RVs with the goPSUrv Mark."  (Doc. No. 194 at 16–17) (citing Doc. No. 178-19 (Defendants' discovery responses) at 5, 13–14; Doc. No. 178-37 (Defendants' supplemental discovery responses) at 3; Doc. No. 194-10 (Mark Lauer deposition testimony) at 14–15, 18–20; Doc. No. 194-11 (Tim Lauer deposition testimony) at 3).

Lauer deposition testimony) at 7–10; Doc. No. 178-19 (Defendants' discovery responses) at 14).

The name of Defendant Keystone's internet hosting company (where Keystone registered the <goPSUrv.com> domain) was GoDaddy and used the domain <godaddy.com>.  (Doc. No. 174 ¶ 15.)  The domain <goPSUrv.com> is the only domain owned by Defendants incorporating the character string "psu" and Defendants have not marked references to GOPSURV as a tradename or <gopsurv.com> with any trademark identifiers.  (Doc. No. 174 ¶ 16.)[14]  The parties agree that Defendants hired a web designer to assist with creating and putting content on the goPSUrv.com website, but dispute Mark Lauer's involvement in that process.  Compare (Doc. No. 174 ¶ 17 with Doc. No. 194 at 19–20).[15]  The parties also dispute Tim Lauer's involvement

---

[14]  Plaintiff disputes this statement to the extent it "is intended to imply that Defendants did not use goPSUrv as a tradename or trademark in order to create an association in the minds of consumers between Defendants' services and the University," stating that "Defendants consistently used GoPSUrv and GoPSUrv.com as their primary logo and brand."  (Doc. No. 194 at 18–19) (citing Doc. Nos. 178-23 (Mark Lauer deposition testimony) at 4–5, 24–25; Doc. No. 178-41 (March 2023 screenshot of goPSUrv.com); Doc. No. 178-42 (screenshot of goPSUrv Facebook page); and Doc. No. 178-19 (Defendants' discovery responses) at 14).  Plaintiff also maintains that this fact is not material to the resolution of Defendants' motion for summary judgment.

[15]  Defendants maintain that the website designer "put the content up on the website at <gopsurv.com> in 2010 and thereafter" and "created the logo on the website," asserting that "Mark Lauer personally did not know how to change 'one thing' on the website and never did access it."  (Doc. No. 178 ¶ 17) (citing Doc. No. 174-3 (Lauer deposition testimony) at 62–63, 74–76 and Doc. No. 189-9 (Lauer Declaration) ¶ 20).

Plaintiff disputes the statement to the extent it "suggests Mark Lauer did not maintain and exercise control over the content of the website" and to the extent it "implies that Mark Lauer did not select or approve Defendants' website and logo."  (Doc. No. 194 at 19–20) (citing Doc. No. 178-37 (Defendants' discovery responses) at 3 (stating Mark Lauer "ultimately made the final decisions in all marketing & advertising" for Keystone Alternative); Doc. No. 178-19 (Defendants' discovery responses) at 13 (admitting that "Lauer makes all branding and marketing decisions acting on behalf of Keystone Alternative"); Doc. No. 194-10 (Mark Lauer deposition testimony) at 18–22; 178-23 (Mark Lauer deposition testimony) at 13–17).  Plaintiff also asserts that this fact is not material to the resolution of Defendants' motion for summary judgment.

with the website designer. <u>Compare</u> (Doc. No. 174 ¶ 18 with Doc. No. 194 at 20–21).[16]  The

parties dispute Mark Lauer's awareness of social media accounts involving Keystone. <u>Compare</u>

(Doc. No. 174 ¶ 19 with Doc. No. 194 at 21).[17]  The parties dispute the purpose of the use of

"go" in Defendants' <goPSUrv.com> domain, with Defendants asserting that it is a generic word

that is a "call to action" and Plaintiff maintaining that Defendants adopted the domain because of

the similarities between it and the Penn State Athletics website domain <gopsusports.com>.

<u>Compare</u> (Doc. No. 174 ¶ 20 with Doc. No. 194 at 21–23).[18]

---

[16]  Defendants maintain that "Lauer's brother Tim handled communications with the web designer, ordering business cards, and updates to the website at <gopsurv.com>, but not Lauer (who is named personally)" and "[t]he football schedules on the website at <gopsurv.com> were not updated annually either by Lauer or his brother Tim, but by the web designer." (Doc. No. 174 ¶ 18) (citing Doc. No. 174-3 (Mark Lauer deposition testimony) at 70–73).

Plaintiff disputes this assertion, stating that "Tim Lauer testified that the web designer was 'somebody that Mark had met or was dealing with' and that Tim 'never met them' and '[n]ever talked to them.'"  In addition, Plaintiff asserts that "Mark Lauer maintained ownership and control over the content of the website and updates thereto" and that "Tim Lauer further testified that Mark Lauer was involved in ordering and printing Defendants' business cards." (Doc. No. 194 at 20–21) (citing Doc. No. 194-11 (Tim Lauer deposition testimony) at 3; Doc. No. 178-37 (Defendants' discovery responses) at 3; Doc. No. 178-19 (Defendants' discovery responses) at 13).  Plaintiff also maintains that this fact is not material to the resolution of Defendants' motion for summary judgment.

[17]  Defendants assert that "Mark Lauer did not know if Keystone Alternatives has a Twitter social media page, but knew it had a Facebook page.  His kids started and managed the social media because Mark Lauer is not tech savvy." (Doc. No. 174 ¶ 19) (citing Doc. No. 174-3 (Mark Lauer deposition testimony) at 149–50).  Plaintiff disputes this statement, maintaining that "Mark Lauer testified in his deposition that he was aware of both a Twitter social media page and a Facebook social media page, and knew that Defendants have hired a company to manage social media" and "Defendants have admitted that Mr. Lauer has the final decisions in all marketing & advertising, including social media." (Doc. No. 194 at 21) (citing Doc. No. 178-23 (Mark Lauer deposition testimony) at 51–53 and Doc. No. 178-37 (Defendants' discovery responses) at 3).  Plaintiff also maintains that this fact is not material to the resolution of Defendants' motion for summary judgment.

[18]  Defendants characterize "go" as "a generic action word in domain names, used to prompt a call to action.  Examples from public records of other domain names incorporating the 'go' prefix was very commonly registered in domains from 1995-2012 include: <gotomypc.com>, <godaddy.com>, <gopro.com>, <go.com>, <goto.com>, <go.co>, <gosports.com>,

Mark Lauer testified that: he is not aware of ever having a "license agreement" with anyone; he is not clear exactly what a "license agreement" or "coexistence agreement" is; he was unaware of the USPTO or how to search for a trademark; and he did not know that Plaintiff had a trademark for "PSU," believing it was simply the name of Plaintiff.  (Doc. No. 174 ¶ 21) (citing Doc. No. 174-3 (Mark Lauer deposition testimony) at 14, 77, 125, 226–27).[19]

---

<gofloats.com>, <gopong.com>, <goprocamera.com>, <gopsusports.com>, <playgosports.com>, <gorv.com>, <go-rv.com>, <gorving.com>, <gorv.com.au>, <gorvrentals.com>, and <justgorv.com>."  (Doc. No. 174 ¶ 20) (citing Doc. No. 189-9 (Lauer Declaration) ¶ 18).

Plaintiff largely disputes this assertion, first disputing "whether those names are all actual domain names that Mr. Lauer was familiar with at the time that he selected the infringing domain <goPSUrv.com> in 2010," stating that the only support for this assertion comes from his Declaration which "provides no references to underlying evidentiary support."  Plaintiff also disputes that: "'go' is a generic action word in domain names, generally, and that it is a generic word as used in the domains identified above"; "the use of 'go' in the disputed domain name is merely a call to action" because "Defendants adopted and use 'PSU' in goPSUrv and goPSUrv.com in order to create an association in the minds of consumers between their company and Penn State" and "because of the similarities between this domain and the Penn State Athletics website domain <goPSUsports.com>" given that "Defendants use the name goPSUrv even when it [sic] is offering services that are not connected with Penn State."  (Doc. No. 194 at 22–23) (citing Doc. No. 178-23 (Mark Lauer deposition testimony) at 3–4, 15–17, 20–21, 24–25; Doc. No. 178-26 (Tim Lauer deposition testimony) at 7–10; Doc. No. 178-19 (Defendants' discovery responses) at 14, 16).

[19]  Plaintiff acknowledges that Mark Lauer so testified but disputes the statement as follows: "Defendants have conceded that the PSU Mark is associated with Penn State and that this Mark is instantly recognizable to the consuming public"; and notes that it disputes the statement "to the extent that Defendants imply that this Statement is evidence of good faith" because "Defendants adopted and use 'PSU' in goPSUrv and goPSUrv.com in order to create an association in the minds of consumers between their company and Penn State" and "chose the domain <goPSUrv.com> because of the similarities between this domain and the Penn State Athletics website domain <goPSUsports.com>," stating that "Defendants use the name goPSUrv even when it is offering services that are not connected with Penn State."  (Doc. No. 194 at 23) (citing Doc. No. 178-19 (Defendants' discovery responses) at 14, 16; Doc. No. 178-26 (Tim Lauer deposition testimony) at 7–10; Doc. No. 178-23 (Mark Lauer deposition testimony) at 3–4, 15–17, 20–21, 24–25).  Plaintiff also disputes that "Defendants did not understand that rights to use trademarks could be governed by agreements, regardless of whether Mark Lauer is familiar with the specific term 'license' or 'coexistence agreement,'" because "Defendants had negotiated with Penn State over the <goPSUrv.com> domain and demanded that the University include in the

The parties dispute whether Penn State's ticketing department sold passes to GOPSURV each year between 2010 and 2017.  Defendants assert that it did and sent mail to Defendants identifying them as GOPSURV (Doc. No. 174 ¶ 22) (citing Doc. No. 189-9 (Lauer Declaration) ¶ 25), but Plaintiff asserts that the ticketing department account history indicates that from 2011 through 2015, Defendants purchased passes using Mark Lauer's personal name and personal email address, and that Defendants first purchased passes from the ticket department under the name GoPSUrv in 2016 (Doc. No. 194 at 25) (citing Doc. No. 194-13 (ticket department records).[20]

The parties dispute various aspects relating to Defendants' sponsorship of Penn State athletics by way of a Marketing and Sports Contract with Penn State Sports Properties ("PSSP"), a third-party handling the sale of Penn State sports sponsorships.  <u>Compare</u> (Doc. No. 174 ¶ 23 with Doc. No. 194 at 27–28).[21]  Defendants quote the following provision of the PSSP contracts

---

agreement rights permitting Defendants to use this domain"; further, Plaintiff disputes Defendants' lack of awareness of Penn State's trademark rights in PSU because "Penn State first contacted Lauer regarding the infringing conduct in 2015."  (Doc. No. 194 at 24–25) (citing Doc. No. 194-12 (emails between Defendants' representatives and Plaintiff personnel) and Doc. No. 194-15 (phone records)).

[20]  Plaintiff also asserts that the cited paragraph from Mark Lauer's Declaration is unsupported by any citation to record evidence.  (Doc. No. 194 at 27).

[21]  Defendants assert that they signed a contract with PSSP each year from 2010 to 2017.  (Doc. No. 174 ¶ 23) (citing Doc. No. 189-9 (Lauer Declaration) ¶¶ 8, 26 and Doc. No. 209-8 (Exh. C to Mark Lauer Declaration) at 13–27 (marketing and sponsorship contracts).  Plaintiff asserts that the cited evidence includes executed contracts for only 2010 -2013, and disputes the statement to the extent that it "purports to suggest that Penn State had knowledge of Defendants' use of the goPSUrv Mark, or in any way authorized Defendants to use that Mark and Domain," noting that the contracts "are between [PSSP] and Keystone Alternatives, do not reference goPSUrv and do not include any license to use any Penn State trademarks."  (Doc. No. 194 at 27) (citing Doc. No. 209-8 (Exh. C to Mark Lauer Declaration) at 13–27).  Plaintiff also maintains that this is not a fact material to the resolution of Defendants' motion for summary judgment "as it does not evidence any fact relating to the use of, or Penn State's knowledge of the use of, GoPSUrv or GoPSUrv.com."  (Doc. No. 194 at 27–28).

purportedly relating to use of Penn State trademarks:

> University Marks.  To the extent that any of the Sponsor's Benefits described in Exhibit A hereto include the right to make use of University's athletic logos or trademarks ("School Marks"), Sponsor agrees that its use of School Marks is nonexclusive, limited and non-transferable and must be approved by the Provider and/or the University prior to its use.  Sponsor further agrees that it may not make use of School Marks in any retail promotion, premium item production/distribution or sale of a product without the approval of the University or its authorized agent and the payment of any required license fee.

(Doc. No. 174 ¶ 24) (citing Doc. No. 209-8 (Exh. C to Lauer Declaration) at 20).  Defendants assert that "[t]he provision contemplates prospective use of Penn State's marks by the Sponsor (Defendant).  Notably, this provision does not require that the approval to use Penn State's mark be in writing.  It further provides that this approval (explicit or implicit) may be granted by Penn State or its 'authorized agent' (who presumably is PSSP)."  (Id.)[22]  Defendants assert that the Marketing and Sponsorship Contracts expressly provide that Defendants are authorized to set up displays, "including tables, chairs, tents, staffing . . . and other materials."  (Doc. No. 174 ¶ 25)

---

[22]  In response, Plaintiff states that "[t]o the extent that fact purports to quote from the Marketing and Sponsorship Contract, the Marketing and Sponsorship Contract speaks for itself.  Aside from the Language quoting the sponsorship agreements, this Statement is disputed," because "[t]he provision referenced does not contemplate that Defendants would be permitted to use Penn State's trademarks, and the agreements are clear that Defendants were not being granted any permission to use Penn State trademarks."  (Doc. No. 194 at 28) (citing Doc. No. 209-8 (Exh. C to Mark Lauer deposition) at 14–27).  In addition, Plaintiff states that "[t]he provision quoted is, on its face, conditional and applies only if the sponsorship agreement includes a trademark license," but "[t]hese contracts do not include any such rights" and "[f]urther, this language is also explicit that any use of Penn State's trademarks must be authorized and is subject to the payment of any required license fees," and that "Penn State has never authorized Defendants' use of goPSUrv, goPSUrv.com, or any of the other Infringing Marks, and therefore also has not contracted for (or received) any licensing revenues."  (Doc. No. 194 at 28–29) (citing Doc. No. 178-24 (Plaintiff 30(b)(6) deposition testimony) at 12–13; Doc. No. 178-2 (McGrath Declaration) ¶¶ 8, 68; Doc. No. 178-25 (McGrath deposition testimony) at 3).  Plaintiff also maintains that this statement is not material to the outcome of Defendants' motion because "the contracts in question do not authorize the use of University Intellectual Property, therefore making it irrelevant to any claim that Defendants were authorized to use the PSU Mark."  (Doc. No. 194 at 29.)

(citing Doc. No. 209-8 (Exh. C to Mark Lauer Declaration) at 17).  In response, Plaintiff notes

that the contracts speak for themselves and disputes this fact to the extent the statement "purports

to imply that Penn State authorized the use of displays involving the goPSUrv Mark, the

Domain, or any other of the Infringing Marks" because "Penn State has never authorized

Defendants' use of goPSUrv, goPSUrv.com, or any of the other Infringing Marks."  (Doc. No.

194 at 29–30) (citing Doc. No. 194-10 (Mark Lauer deposition testimony) at 36–37, 43–44; Doc.

No. 178-24 (Plaintiff 30(b)(6) deposition testimony) at 12–13); Doc. No. 178-2 (McGrath

Declaration) ¶¶ 8, 68; Doc. No. 178-25 (McGrath deposition testimony) at 3).  Plaintiff also

maintains that this fact is not material to the resolution of Defendants' motion, because

Defendants' right to set up tables, chairs, etc. does not bear on Defendants' right to use Penn

State's intellectual property.  (Doc. No. 194 at 30.)

The parties dispute at least in part Defendants' assertion that the referenced contracts

required Defendants to send insurance certificates annually to Penn State's Risk Management

Department in order to be permitted to set up displays and advertising on campus, which they did

from 2010 to 2017.  Compare (Doc. No. 174 ¶ 26 with Doc. No. 194 at 30–31).[23]  The parties

---

[23]  In support of their assertion, Defendants cite Mark Lauer's Declaration.  (Doc. No. 174 ¶ 26)
(citing Doc. No. 189-9 (Mark Lauer Declaration) ¶¶ 28–30).  Plaintiff does not dispute that
Defendants submitted insurance certificates from 2010 to 2014 in which they referred to their
business as Keystone Alternatives but Plaintiff disputes that Defendants submitted insurance
certificates for any year after 2014, stating that the cited evidence does not show any certificates
post-2014, and noting that the insurance certificates contain the name "Keystone Alternatives"
and not "goPSUrv."  (Doc. No. 194 at 30–31) (citing Doc. No. 209-8 (Exh. D to Mark Lauer
Declaration) at 28–38).  Plaintiff also disputes the statement to the extent it "suggests personnel
at Penn State responsible for enforcing Penn State's trademarks were aware of Defendants'
infringing use of the GoPSUrv Mark and Domain prior to April 2015, when those personnel first
became aware of the infringement."  (Doc. No. 194 at 31) (citing Doc. No. 178-24 (Plaintiff
30(b)(6) deposition testimony) at 16–17; Doc. No. 178-2 (McGrath Declaration) ¶¶ 59–60; Doc.
No. 178-20 (Riedel deposition testimony) at 6–8; Doc. No. 196-1 (4/24/15 email from Tom
McGrath to Maureen Riedel regarding goPSUrv)).  Finally, Plaintiff asserts that this statement is
not material to the issues in Defendants' motion.

dispute additional aspects of the referenced insurance certificates.  <u>Compare</u> (Doc. No. 174 ¶ 27 with Doc. No. 194 at 32–35).[24]  The parties dispute at least in part Defendants' statement that

---

[24] Defendants assert that "Penn State testified these certificates were required and vendors who did not provide the insurance certificates would not be allowed to set up the displays PSSP authorized" and that "[t]he Penn State Risk Management Department is listed by the insurance company as the certificate holder on these certificates."  (Doc. No. 174 ¶ 27) (citing Doc. No. 203-7 (Plaintiff 30(b)(6) deposition testimony) at 28).  Plaintiff does not dispute that "Defendants submitted insurance certificates from 2010 to 2014 wherein they referred to their business as Keystone Alternatives and made no mention of goPSUrv" or that "Penn State requires vendors on campus property at football games to have provide[d] evidence of insurance coverage, and that failure to provide that evidence of coverage generally results in the vendor not being allowed to operate."  (Doc. No. 194 at 32.)  However, Plaintiff disputes that the referenced insurance certificates "contain any information that Defendants were using the goPSUrv Mark and Domain" because "[e]ach of those contracts are under the name 'Keystone Alternatives LLC' (not 'GoPSUrv'), and there is nothing on those certificates that make reference to goPSUrv."  Plaintiff submits excerpts of these certificates in demonstration:

**ACORD** CERTIFICATE OF LIABILITY INSURANCE

**PRODUCER**
Keller-Brown Ins. Services
P. O. Box 215
9 South Main Street
Shrewsbury PA 17361
Phone: 717-235-6891  Fax: 717-235-3511

THIS CERTIFICATE IS ISSUED AS A MAT
ONLY AND CONFERS NO RIGHTS UPON
HOLDER. THIS CERTIFICATE DOES NO
ALTER THE COVERAGE AFFORDED BY

**INSURERS AFFORDING COVERAGE**

| | |
|---|---|
| INSURER A: | Erie Insurance Exc |
| INSURER B: | |
| INSURER C: | |
| INSURER D: | |
| INSURER E: | |

**INSURED**
Keystone Alternatives LLC
PO Box 173
Red Lion PA 17356

**COVERAGES**

THE POLICIES OF INSURANCE LISTED BELOW HAVE BEEN ISSUED TO THE INSURED NAMED ABOVE FOR THE POLICY PERIOD INDICATED. NOTWITHSTAND
ANY REQUIREMENT, TERM OR CONDITION OF ANY CONTRACT OR OTHER DOCUMENT WITH RESPECT TO WHICH THIS CERTIFICATE MAY BE ISSUED OR
MAY PERTAIN, THE INSURANCE AFFORDED BY THE POLICIES DESCRIBED HEREIN IS SUBJECT TO ALL THE TERMS, EXCLUSIONS AND CONDITIONS OF SUC
POLICIES. AGGREGATE LIMITS SHOWN MAY HAVE BEEN REDUCED BY PAID CLAIMS.

| INSR LTR | ADD'L INSRD | TYPE OF INSURANCE | POLICY NUMBER | POLICY EFFECTIVE DATE (MM/DD/YYYY) | POLICY EXPIRATION DATE (MM/DD/YYYY) | |
|---|---|---|---|---|---|---|
| A | X X | GENERAL LIABILITY COMMERCIAL GENERAL LIABILITY CLAIMS MADE [X] OCCUR | Q400950659 | 04/09/10 | 04/09/11 | EACH OCCUR DAMAGE TO PREMISES (E MED EXP (An PERSONAL & |

---

**ACORD** CERTIFICATE OF LIABILITY INSURANCE **DEF**

THIS CERTIFICATE IS ISSUED AS A MATTER OF INFORMATION ONLY AND CONFERS NO RIGHTS UPON THE CE
CERTIFICATE DOES NOT AFFIRMATIVELY OR NEGATIVELY AMEND, EXTEND OR ALTER THE COVERAGE AFFO
BELOW. THIS CERTIFICATE OF INSURANCE DOES NOT CONSTITUTE A CONTRACT BETWEEN THE ISSUING IN
REPRESENTATIVE OR PRODUCER, AND THE CERTIFICATE HOLDER.

IMPORTANT: If the certificate holder is an ADDITIONAL INSURED, the policy(ies) must be endorsed. If SUBROGATI
the terms and conditions of the policy, certain policies may require an endorsement. A statement on this certificate do
certificate holder in lieu of such endorsement(s).

**PRODUCER**
Keller-Brown Ins. Services
P. O. Box 215
9 South Main Street
Shrewsbury PA 17361
Phone: 717-235-6891  Fax: 717-235-3511

| CONTACT NAME: | |
|---|---|
| PHONE (A/C, No, Ext): | |
| E-MAIL ADDRESS: | |
| PRODUCER CUSTOMER ID #: | KEYST-2 |

**INSURER(S) AFFORDING CC**

**INSURED**
Keystone Alternatives LLC
PO Box 173
Red Lion PA 17356

| | |
|---|---|
| INSURER A: | Erie Insurance |
| INSURER B: | |
| INSURER C: | |
| INSURER D: | |
| INSURER E: | |
| INSURER F: | |

**COVERAGES**   **CERTIFICATE NUMBER:**   **REVISI**

THIS IS TO CERTIFY THAT THE POLICIES OF INSURANCE LISTED BELOW HAVE BEEN ISSUED TO THE INSURED NAMED ABOVE FOR THE POLICY PERIO
INDICATED. NOTWITHSTANDING ANY REQUIREMENT, TERM OR CONDITION OF ANY CONTRACT OR OTHER DOCUMENT WITH RESPECT TO WHICH THIS
CERTIFICATE MAY BE ISSUED OR MAY PERTAIN, THE INSURANCE AFFORDED BY THE POLICIES DESCRIBED HEREIN IS SUBJECT TO ALL THE TERMS,
EXCLUSIONS AND CONDITIONS OF SUCH POLICIES. LIMITS SHOWN MAY HAVE BEEN REDUCED BY PAID CLAIMS.

| INSR LTR | TYPE OF INSURANCE | ADDL INSR | SUBR WVD | POLICY NUMBER | POLICY EFF (MM/DD/YYYY) | POLICY EXP (MM/DD/YYYY) | |
|---|---|---|---|---|---|---|---|
| A | GENERAL LIABILITY [X] COMMERCIAL GENERAL LIABILITY CLAIMS MADE [X] OCCUR | | X | Q400950659 | 04/09/11 | 04/09/12 | EACH O DAMAGE PREMIS MED EX PERSON GENERA |

**ACORD** CERTIFICATE OF LIABILITY INSURAN

THIS CERTIFICATE IS ISSUED AS A MATTER OF INFORMATION ONLY AND CONFERS NO RIGHTS UPO CERTIFICATE DOES NOT AFFIRMATIVELY OR NEGATIVELY AMEND, EXTEND OR ALTER THE COVER BELOW.   THIS CERTIFICATE OF INSURANCE DOES NOT CONSTITUTE A CONTRACT BETWEEN THE REPRESENTATIVE OR PRODUCER, AND THE CERTIFICATE HOLDER.

IMPORTANT: If the certificate holder is an ADDITIONAL INSURED, the policy(ies) must be endorsed.   If S the terms and conditions of the policy, certain policies may require an endorsement.  A statement on this c certificate holder in lieu of such endorsement(s).

| PRODUCER | CONTACT NAME: Traci D. Nadolny |
| Keller-Brown Ins. Services | PHONE (A/C, No, Ext): 717-235-6891 |
| P. O. Box 215 | 717-235-3511 |
| 9 South Main Street | E-MAIL ADDRESS: tracin@keller-brown.co |
| Shrewsbury, PA 17361 | |
| Traci D. Nadolny | INSURER(S) AFFORDING |
| | INSURER A : Erie Insurance Excha |
| INSURED   Keystone Alternatives LLC | INSURER B : |
| PO Box 173 | INSURER C : |
| Red Lion, PA 17356 | INSURER D : |
| | INSURER E : |
| | INSURER F : |

717-235-6891

COVERAGES          CERTIFICATE NUMBER:                                    REV

THIS IS TO CERTIFY THAT THE POLICIES OF INSURANCE  LISTED BELOW HAVE BEEN ISSUED TO THE INSURED N INDICATED.  NOTWITHSTANDING  ANY REQUIREMENT, TERM OR CONDITION OF ANY CONTRACT OR OTHER DOC CERTIFICATE  MAY BE  ISSUED OR MAY PERTAIN, THE INSURANCE  AFFORDED BY THE POLICIES DESCRIBED HE EXCLUSIONS AND CONDITIONS OF SUCH POLICIES. LIMITS SHOWN MAY HAVE BEEN REDUCED BY PAID CLAIMS.

| INSR LTR | TYPE OF INSURANCE | ADDL INSR | SUBR WVD | POLICY NUMBER | POLICY EFF (MM/DD/YYYY) | POLICY EXP (MM/DD/YYYY) | |
| A | GENERAL LIABILITY  X  COMMERCIAL GENERAL LIABILITY  CLAIMS-MADE  X  OCCUR | X | | Q40-0950659 | 04/09/12 | 04/09/13 | |

**ACORD** CERTIFICATE OF LIABILITY INSURA

THIS CERTIFICATE IS ISSUED AS A MATTER OF INFORMATION ONLY AND CONFERS NO RIGHTS UPO CERTIFICATE DOES NOT AFFIRMATIVELY OR NEGATIVELY AMEND, EXTEND OR ALTER THE COVE BELOW.   THIS CERTIFICATE OF INSURANCE DOES NOT CONSTITUTE A CONTRACT BETWEEN THE REPRESENTATIVE OR PRODUCER, AND THE CERTIFICATE HOLDER.

IMPORTANT: If the certificate holder is an ADDITIONAL INSURED, the policy(ies) must be endorsed.  If the terms and conditions of the policy, certain policies may require an endorsement.  A statement on this c certificate holder in lieu of such endorsement(s).

| PRODUCER | CONTACT NAME: Traci D. Nadolny |
| Keller-Brown Ins. Services | PHONE (A/C, No, Ext): 717-235-6891 |
| P. O. Box 215 | 717-235-3511 |
| 9 South Main Street | E-MAIL ADDRESS: tracin@keller-brown. |
| Shrewsbury, PA 17361 | |
| Traci D. Nadolny | INSURER(S) AFFORDI |
| | INSURER A : Erie Insurance Exch |
| INSURED   Keystone Alternatives LLC | INSURER B : |
| PO Box 173 | INSURER C : |
| Red Lion, PA 17356 | INSURER D : |
| | INSURER E : |
| | INSURER F : |

717-235-6891

COVERAGES          CERTIFICATE NUMBER:                                    RI

THIS IS TO CERTIFY THAT THE POLICIES OF INSURANCE LISTED BELOW HAVE BEEN ISSUED TO THE INSURED INDICATED.  NOTWITHSTANDING ANY REQUIREMENT, TERM OR CONDITION OF ANY CONTRACT OR OTHER OC CERTIFICATE MAY BE ISSUED OR MAY PERTAIN, THE INSURANCE AFFORDED BY THE POLICIES DESCRIBED I EXCLUSIONS AND CONDITIONS OF SUCH POLICIES. LIMITS SHOWN MAY HAVE BEEN REDUCED BY PAID CLAIMS.

| INSR LTR | TYPE OF INSURANCE | ADDL INSR | SUBR WVD | POLICY NUMBER | POLICY EFF (MM/DD/YYYY) | POLICY EXP (MM/DD/YYYY) | |
| A | GENERAL LIABILITY  X  COMMERCIAL GENERAL LIABILITY  CLAIMS-MADE  X  OCCUR | X | | Q40-0950659 | 04/09/13 | 04/09/14 | |

(Doc. No. 194 at 32–34) (citing Doc. No. 209-8 (Exh. D to Lauer Declaration) at 28–38). Plaintiff  also disputes the statement to the extent it "indicates that Defendants submitted insurance certificates after 2014, as the cited evidence does not show any certificates post-2014"

"the Indemnification Agreement, which Defendants signed each year and requires the insurance certificates be sent to Penn State, specifies, not that PSSP, but that 'The Pennsylvania State University (hereinafter referred to as "University"), hereby agrees to permit . . . [Defendants] to use University premises . . . ' and that Defendants signed this agreement most years beginning in 2010 through 2017."  (Doc. No. 174 ¶ 28) (citing Doc. No. 189-9 (Lauer Declaration) ¶¶ 29–30).

 Defendants' statement references the following image:



Plaintiff does not dispute that vendors who signed sponsorship agreements were required to indemnify the University for any liabilities and claims caused while the vendor was on University property and were required to send proof of insurance coverage to the University, but otherwise disputes the statement, stating as follows:

> The Indemnification Agreement is between Penn State Sports Properties and Keystone Alternatives, not goPSUrv.  The evidence cited does not include a single executed contract or prove that Defendants ever submitted one of these agreements to Penn State Sports Properties.  Disputed to the extent this Statement purports to suggest that Penn State had knowledge of Defendants' use of goPSUrv prior to 2015 or that Defendants were authorized to use the Infringing Marks.

---

and to the extent it "suggests that Defendants were authorized to set up displays containing the Infringing Marks, or that personnel at Penn State responsible for enforcing Penn State's trademarks were aware of Defendants' infringing use of the GoPSUrv Mark and Domain prior to April 2015."  (Doc. No. 194 at 34–35) (citing Doc. No. 178-24 (Plaintiff 30(b)(6) deposition testeimony) at 16–17; Doc. No. 178-2 (McGrath Declaration) ¶¶ 59–60, 62); Doc. No. 178-20 (Riedel deposition testimony) at 6–8; Doc. No. 196-1 (4/24/15 email from Tom McGrath to Maureen Riedel regarding goPSUrv).   Finally, Plaintiff maintains that this statement is not material to Defendants' motion.

(Doc. No. 194 at 35–36) (citing Doc. No. 209-8 (Exh. M to Mark Lauer Declaration) at 72–75; Doc. No. 178-24 (Plaintiff 30(b)(6) deposition testimony) at 16–17; Doc. No. 178-2 (McGrath Declaration) ¶¶ 59–60, 62; Doc. No. 178-20 (Riedel deposition testimony) at 6–8; Doc. No. 196-1 (4/24/15 email from Tom McGrath to Maureen Riedel regarding goPSUrv)).  The parties dispute Defendants' statement that "[a]fter paying sponsorship fees each year, Defendants were allowed to park RVs covered with references to GOPSURV in highly trafficked grassy areas on campus and in front of Beaver Stadium as shown below":





Compare (Doc. No. 174 ¶ 29 with Doc. No. 194 at 38–39).[25]  With regard to the implications of

the insurance certificates, Defendants quote at length from the UDRP Decision in support of

their position that the insurance certificates demonstrate Plaintiff's knowledge and consent to

Defendants' use of the <goPSUrv.com> domain during the 2010 to 2017 time period.  (Doc. No.

174 ¶ 30) (quoting Doc. No. 174-1 (UDRP Decision) at 13–14).  In response, Plaintiff asserts

that the UDRP Decision is not a fact material to the resolution of Defendants' motion for

summary judgment, but in any event, the decision speaks for itself; Plaintiff also disputes

Defendants' statement to the extent it "suggests that Neil Anthony Brown's weighing of the

evidence is relevant to the outcome of this case," noting that he is "an Australian attorney and

therefore not qualified to decide Penn State's legal claims in this action."  (Doc. No. 194 at 41)

(citing Doc. No. 194-2 (Wheatley Declaration) ¶¶ 5–10; Doc. No. 194-3 (CV of Neil Anthony

---

[25]  Defendants maintain that they were permitted to park "RVs covered with references to
GOPSURV in highly trafficked grassy areas on campus."  (Doc. No. 174 ¶ 29) (citing Doc. No.
209-8 (Exh. N to Lauer Declaration) at 76–80).  Plaintiff does not dispute that "Defendants were
permitted to park a single RV on campus in front of the Bryce Jordan Center for Fan Fest during
Penn State's Blue White Weekend in 2013," but otherwise challenges Defendants' statement as
follows:

> Disputed that Penn State allowed Defendants to use an RV "covered in references to
> GOPSURV."  Penn State never authorized Defendants to use the goPSUrv Mark or
> other Infringing Marks, and Penn State was not aware of Defendants' infringing uses
> prior to 2015. [Doc. No. 178-24 (Plaintiff 30(b)(6) deposition testimony) at 12–13,
> 16–17, 19; Doc. No. 178-2 (McGrath Declaration) ¶¶ 8, 59–60, 62, 68; Doc. No.
> 178-25 (McGrath deposition testimony) at 3; Doc. No. 178-20 (Riedel deposition
> testimony) at 6–8; Doc. No. 196-1 (4/24/15 email from Tom McGrath to Maureen
> Riedel regarding goPSUrv; Doc. No. 178-28 (Bordner deposition testimony) at 4.]
> Disputed that Defendants' RVs were "covered with references to GOPSURV" or that
> anyone in the vicinity would have necessarily noticed any such references.  The
> evidence that Defendants cite shows that the references to the goPSUrv Mark were
> small and difficult to see from the ground; and the images each show Defendants'
> RV parked on a road next to a sidewalk, not "in highly trafficked grassy areas."
> [Doc. No. 209-8 (Exh. N to Mark Lauer Declaration) at 76–80.]

(Doc. No. 194 at 38–39.)

Brown)).

The parties dispute various aspects of Defendants' use of a disclaimer on its website to clarify that GOPSURV was not affiliated with Penn State.  Compare (Doc. No. 174 ¶ 31 with Doc. No. 194 at 41–42).  Defendants assert that "after being accused of infringing Plaintiff's IP, Defendants instructed their web designer to add a disclaimer to every page of their website clarifying GOPSURV was not affiliated with Penn State."  (Doc. No. 174 ¶ 31) (citing Doc. No. 174-3 (Lauer deposition testimony) at 63; Doc. No. 189-9 (Lauer Declaration) ¶ 32).  In response, Plaintiff states that it does not dispute that "in 2018, Defendants added a disclaimer to the bottom of their website that states: 'This website not affiliated with the Pennsylvania State University'" and that "Mark Lauer provides instructions to web designers regarding what content appears to the >goPSUrv.com> website."  (Doc. No. 194 at 41–42.)  However, Plaintiff disputes that:

> Defendants added the disclaimer after they were first told by Penn State to stop infringing on Penn State's intellectual property.  The evidence shows that members of the Penn State Licensing Committee (including Tom McGrath and Maureen Riedel) first learned about Defendants' infringing use of the goPSUrv Mark and Domain in April 2015.  [Doc. No. 196-1 (4/24/15 email from Tom McGrath to Maureen Riedel regarding goPSUrv); Doc. No. 178-24 (Plaintiff 30(b)(6) deposition testimony) at 16–17; Doc. No. 178-2 (McGrath Declaration) ¶¶ 59–60, 62; Doc. No. 178-20 (Riedel deposition testimony) at 6–8].  Phone records obtained from Mr. Lauer's wireless carrier further show that on May 12, 2015, Penn State's Licensing Office called Mr. Lauer.  [Doc. No. 194-15 (phone records)].  Mark Lauer's own testimony confirms that this is the date that Penn State called him, as he described getting a phone call on his cell phone in "the spring" from the phone number 814-865-3905, which he saved to his phone.  [Doc. No. 194-10 (Mark Lauer deposition testimony) at 3–13].  Mr. Lauer also testified that after receiving this call from Penn State, during which he was told he must stop using the goPSUrv Mark and Domain, he called Blair Thomas.  [Doc. No. 194-10 (Mark Lauer deposition testimony) at 11–13] (testifying that he called Blair Thomas at 610-563-0782 on the day he received the call from Penn State's Licensing Office0; [Doc. No. 214-2 (Riedel deposition testimony) at 14] (testifying that the office number is 814-865-3905).  The phone records from Verizon show this series of calls taking place on May 12, 2015, including phone calls with those specific phone numbers:

| 5/12 | 10:52A | 814—865—3905 | Peak | PlanAllow | | Loganville PA | Incoming CL | 10 |
|---|---|---|---|---|---|---|---|---|
| 5/12 | 11:02A | 814—330—6734 | Peak | M2MAllow | | Loganville PA | Altoona PA | 5 |
| 5/12 | 11:46A | 717—315—6183 | Peak | PlanAllow | | Red Lion PA | Incoming CL | 4 |
| 5/12 | 12:06P | 814—280—1452 | Peak | M2MAllow | | Felton PA | Statecollg PA | 3 |
| 5/12 | 12:10P | 610—563—0782 | Peak | PlanAllow | | Felton PA | Avondale PA | 9 |
| 5/12 | 2:06P | 814  330  6734 | Peak | M2MAllow | | Loganville PA | Incoming CL | 6 |

See [Doc. No. 194-15 (phone records)].  Penn State again demanded that Defendants stop any infringing use of Penn State's Marks in 2017, in a letter that reviewed Penn State's intellectual property policies and specifically stated: "the use of University intellectual property, including the University name, its trademark and associated imagery, and promotional use of tickets to University Intercollegiate Athletics events is also restricted" and that "[s]uch use may not occur without a grant of specific rights by the University or its license designated, Penn State Sports Properties". [Doc. No. 178-15 (5/12/17 letter from Tom McGrath to Keystone Alternatives)]. Defendants did not add the disclaimer to the <goPSUrv.com> website until 2018, after receiving yet another cease and desist letter, that was sent on June 19, 2018. See [Doc. No. 178-2 (McGrath Declaration) ¶ 66; Doc. No. 178-16 (6/19/18 letter from Michael Brignati, Associate General Counsel, to Keystone Alternatives)].  The disclaimer was added sometime between July 2 and August 22, 2018.  Screen captures of <goPSUrv.com> from July 2, 2018, obtained through the archival site Internet Archive, shows that the bottom of the Domain appeared as follows in July 2, 2018:



A month later, on August 22, 2018, the disclaimer had been added stating that the company is not associated with Penn State:



<u>See</u> [Doc. No. 194-16 (Wayback Machine capture of <goPSUrv.com> from July 2, 2018); Doc. No. 194-17 (Wayback Machine capture of <goPSUrv.com> from August 22, 2018)].

(Doc. No. 194 at 42–44.)

Iona Conlon is employed by Penn State as an alumni relationship and stewardship coordinator and has a professional profile at <psu.edu> put up by Penn State and a psu.edu email.  (Doc. No. 174 ¶ 72.)  Ms. Conlon testified on April 14, 2021, that she had known "Mark Lauer and GoPSUrv" for approximately ten years.  (<u>Id.</u> ¶ 73.)  The parties dispute the circumstances surrounding Ms. Conlon's first contact with Defendants.  <u>Compare</u> (Doc. No. 174 ¶¶ 74, 32 with Doc. No. 194 at 82–83, 45).  Defendants state that "Ms. Conlon introduced herself to Defendants after she 'saw Penn State things on his RV' (i.e., Penn State trademarks) working for Penn State at the fairgrounds"; "Lauer has testified this contact took place in early 2010"; and "[a]n email referenced above from Ms. Conlon to Lauer is indeed dated 2010."  (Doc. No. 174 ¶ 74 (citing Doc. No. 209-9 (Conlon deposition testimony) at 11; Doc. No. 189-9 (Lauer Declaration) ¶ 33); <u>see also</u> (Doc. No. 174 ¶ 32).  Plaintiff does not dispute that Ms. Conlon introduced herself to Mark Lauer in 2010 or that she sent him an email in 2010; however, Plaintiff disputes this statement to the extent it:

suggests or implies that Ms. Conlon approached Mr. Lauer because he was using the goPSUrv Mark, or that they discussed intellectual property issues. [Doc. No. 194-19 (Conlon Declaration) ¶¶ 11, 18, 20]. Ms. Conlon has no authority or responsibilities for Penn State's trademarks. [Id. ¶ 17]. Disputed to the extent this statement suggests personnel at Penn State responsible for enforcing Penn State's trademarks were aware of Defendants' infringing use of the GoPSUrv Mark and Domain prior to April 2015, when those personnel first became aware of the infringement. [Doc. No. 178-24 (Plaintiff 30(b)(6) deposition testimony) at 16–17, 19; Doc. No. 178-2 (McGrath Declaration) ¶¶ 59–60; Doc. No. 178-20 (Riedel deposition testimony) at 6–8; Doc. No. 196-1 (4/24/15 email from Tom McGrath to Maureen Riedel regarding goPSUrv)].

(Doc. No. 194 at 82–83; see also (id. at 45).   Ms. Conlon testified that her relationship with Lauer has been "friendly and cooperative" and that Mark Lauer was easy to work with.  (Doc. No. 174 ¶ 75.)

The parties dispute the nature and implications of Defendants' interactions with Ms. Conlon.  Compare (Doc. No. 174 ¶¶ 76, 33, 35 with Doc. No. 194 at 83–84, 45–48).  Defendants state that "Ms. Conlon testified that, over the years, Defendants have repeatedly brought their RVs to Penn State events Ms. Conlon has organized and did so at Ms. Conlon's invitation, including clay pigeon shoots at which events Penn State used Defendants' RVs as scoring stations" and "[t]he scoring stations in Defendants' RVs were then manned by Penn State employees."  (Doc. No. 174 ¶ 76) (citing Doc. No. 209-9 (Conlon deposition testimony) at 11–12; see also (Doc. No. 174 ¶¶ 33, 35).  Plaintiff does not dispute that Defendants brought their RVs to events organized by Penn State York, including sporting clays events.  However, Plaintiff:

Dispute[s] to the extent this Statement implies Ms. Conlon ever represented to Defendants that they were permitted to use the goPSUrv Mark, or that she has authority or responsibilities for Penn State's trademarks. [Doc. No. 194-19 (Conlon Declaration) ¶¶ 17–20; Doc. No. 194-18 (Conlon deposition testimony) at 3)] (testifying that she her [sic] are "help[ing] with the development office, which is fundraising"; "do[ing] gift entry sometimes"; and serving as a "liaison to two alumni groups and a student group on campus").  Disputed to the extent this statement implies that Penn State was put on notice of Defendants' infringing use

36

of the goPSUrv Mark simply because they brought their RVs to these events, or that the University authorized or licensed their trademarks to Defendants through the events described in this Statement.  The personnel at Penn State with authority to oversee trademark and intellectual property matters were not aware that Defendants were using the goPSUrv Mark or the domain <goPSUrv.com> until 2015.  [Doc. No. 178-2 (McGrath Declaration) ¶ 62; Doc. No. 178-24 (Plaintiff 30(b)(6) deposition testimony) at 16—17, 19; Doc. No. 178-20 (Riedel deposition testimony) at 6–8].  Penn State has never authorized or permitted Defendants to use the goPSUrv Mark in any manner, including as a domain name.  Penn State has never authorized Defendants' use of goPSUrv, goPSUrv.com, or any of the other Infringing Marks.  [Doc. No. 178-24 (Plaintiff 30(b)(6) deposition testimony) at 12–13, 19; Doc. No. 178-2 (McGrath Declaration) ¶¶ 8, 62, 68; Doc. No. 178-25 (McGrath deposition testimony) at 3; Doc. No. 178-28 (Bordner deposition testimony) at 4].

(Doc. No. 194 at 83–84); see also (id. at 45, 47–48).  Ms. Conlon's supervisor at Penn State, Diana Hershey, attended the clay shooting events organized by Ms. Conlon.  (Doc. No. 174 ¶ 77.)

The parties dispute aspects of Defendants' interactions with Ms. Conlon at these events.

Compare (Doc. No. 174 ¶ 78 with Doc. No. 194 at 85).[26]  In particular, the parties dispute

---

[26]  Defendants state that "[d]uring these events, Ms. Conlon encouraged Defendants to place marketing materials for GOPSURV outside on tables for marketing to participants of the events" and "[t]he funds generated from these events would be used by Penn State to purchase uniforms for Penn State athletes."  (Doc. No. 174 ¶ 78) (citing Doc. No. 209-9 (Conlon deposition testimony) at 11; Doc. No. 189-9 (Lauer Declaration) ¶ 38).  Plaintiff does not dispute that funds from these events purchased uniforms for Penn State York athletes but otherwise disputes Defendants' statement, as follows:

> Defendants were allowed to leave out business cards or brochures at events where they submitted donations or assisted in putting on the event, just as any other business or person who donates to the York County Alumni Chapter is permitted to do.  [Doc. No. 194-19 (Conlon Declaration) ¶ 16].  Disputed that Ms. Conlon authorized Defendants to use the goPSUrv Mark, or that she made any representations to them that she was granting such permission or had authority to do so.  [Id. ¶¶ 17–20].  Further, the cited testimony of Ms. Conlon states only that Defendants placed business cards on a table at the York County Chapter pigeon shoot, not that Ms. Conlon encouraged Defendants to place marketing materials at these events.  See [Doc. No. 194-18 (Conlon deposition testimony) at 4].  The cited declaration testimony of Mark Lauer is unsupported by any citation to record evidence.

whether Ms. Conlon actively participated in marketing Defendants' services as a Penn State

employee.  Compare (Doc. No. 174 ¶¶ 79, 37 with Doc. No. 194 at 86–87, 52–53).[27]   The

parties also dispute various details regarding Ms. Conlon's involvement with Defendants as to

these events.  Compare (Doc. No. 174 ¶ 37 with Doc. No. 194 at 52–53).  Defendants assert that

Ms. Conlon:

> ran advertisements for Defendants in Penn State Alumni Association newsletters and

_____

(Doc. No. 194 at 85.)

[27]  Defendants state that "[i]n addition to allowing Defendants to place marketing materials at Penn State events on Penn State property, Ms. Conlon actively participated in marketing Defendants' services as a Penn State employee, informing Defendants via her psu.edu email that she had distributed their business cards, that alumni were seeking to contact Defendants, and inviting Defendants to distribute marketing materials at upcoming Penn State events."  (Doc. No. 174 ¶ 79) (citing Doc. No. 209-9 (Conlon deposition testimony) at 73).  Lauer printed as many as 40,000 business cards per year for distribution.  (Doc. No. 174 ¶ 38.)

Plaintiff does not dispute that Ms. Conlon provided one of Defendants' business cards to an individual at one of the Penn State York clay shoots who had asked Ms. Conlon about renting one of Defendants' RVs; however, Plaintiff:

> Dispute[s] that Ms. Conlon "actively participated" in Defendants' marketing endeavors.  [Doc. No. 194-19 (Conlon Declaration) ¶ 15; Doc. No. 178-37 (Defendants' second supplemental interrogatory responses) at 3].  Mr. Lauer was permitted to display business cards and brochures on instances where he had made donations to fundraising events or other programming, just as any other donor would be allowed to leave out some marketing information at an event they helped sponsor. [Doc. No. 194-19 (Conlon Declaration) ¶ 16].  Moreover, Penn State disputes this statement to the extent it purports to evidence that Penn State had knowledge of Defendants' infringing use of the PSU Mark prior to 2015.  Ms. Conlon has no responsibilities for Penn State's trademark enforcement. [Doc. No. 194-19 (Conlon Declaration) ¶ 17].  The personnel at Penn State with authority to oversee trademark and intellectual property matters were not aware that Defendants were using the goPSUrv Mark or the domain <goPSUrv.com> until 2015.  [Doc. No. 194-19 (Conlon Declaration) ¶ 17; Doc. No. 178-2 (McGrath Declaration) ¶ 62; Doc. No. 178-24 (Plaintiff 30(b)(6) deposition testimony) at 16–17, 19; Doc. No. 178-20 (Riedel deposition testimony) at 6–8].

(Doc. No. 194 at 86–87.)

invited Defendants to distribute marketing materials at Penn State events.  Ms. Conlon actively participated in marketing Defendants' services at these events, distributing business cards for Defendants, notifying Defendants of potential customers, and allowing Defendants to park RVs bearing the GOPSURV name on campus—as well as notifying other departments that Defendants were authorized to do so.

(Doc. No. 174 ¶ 37) (citing Doc. No. 189-9 (Lauer Declaration) ¶ 38; Doc. No. 209-8 (Exh. R. to Lauer Declaration) at 87–89).  Defendants offer the following examples:

**Football Weekend RV Raffle**
*What do RV's and Scholarship Fundraising have in Common?*

**COMING SOON!**  More fun than a hotel and closer to the stadium too!  Spend the **ENTIRE FOOTBALL WEEKEND** in Happy Valley, *AND* have exclusive use of an **AWESOME RV**, from **GO PSU RV.com**!

Take a chance, while supporting the Penn State Alumni Association – York County Chapter, as they raise money for student scholarships!  Raffle tickets are included in this newsletter, so plan on buying a few and tell other family members and friends!  Tickets will also be available at the annual tailgate/meeting on August 22.



PSU RV OVERNIGHT Lot RV RENTALS

1-800-519-8467

**GO PSU RV .com** has generously donated the use of an RV for the Penn State vs. Nebraska football game in Happy Valley!  The RV, which can sleep up to six guests, will be set up at the PSU RV Overnight Lot on Friday, November 22 (and ready for arrival after noon).  Departure is by 10:00 a.m. on Sunday, November 24.

ALSO:  RV's are available to rent, from the York area!

Check out **www.goPSUrv.com** or contact them at 1-800-519-8467 to reserve a weekend now!



**Please support our business sponsors!**

Glen Rock Mill Inn
175 Years
1837 – 2012
www.glenrockmillinn.com

Built in 1837 as a woolen mill by the founder of Glen Rock, William Heathcote, the historic Glen Rock Mill Inn features rough-hewn 14" beams, original stone and brick work, and a collection of antiques, many from the 19th century. The Inn presents a spectacular dining atmosphere including the Fountain Room, a dramatic space with high ceilings, stone walls and floors, and a fountain fed from a natural spring. We look forward to serving you outstanding cuisine in one of southern Pennsylvania's most attractive historic landmarks.  We are committed to great food and quality service presented in a beautiful and historic setting. Our seasonal menu features upscale American regional cuisine with an emphasis on fresh local products. Our menu changes frequently and features unique entrees sure to please the most discriminating diner.  This year marks the 175th anniversary of the Mill building and we have featured events and specials to celebrate this historic occasion.  Stop by to see our collection of memorabilia, record your memory of the Inn in our oral history project or later on this year to purchase a copy of the book recording the 175 years of Mill history.

~ Contact Terry Steyer and Cindy Duzan  717.235.5918

**July's Penn State Happy Hour Social:**

(Doc. No. 174 ¶ 37.)

Plaintiff does not dispute that Defendants advertised in newsletters of the York County Chapter of the Penn State Alumni Association and distributed marketing materials at Penn State events without permission from Penn State or that Ms. Conlon provided one of Defendants' business cards to an individual at one of the clay shoots who asked about renting one of

Defendants' RVs.  (Doc. No. 194 at 52.)  Plaintiff also does not dispute that Ms. Conlon notified

Penn State York campus security that Defendants' RV would be parked on campus.  (Doc. No.

194 at 53.)  Plaintiff otherwise disputes that "Ms. Conlon 'actively participated' in Defendants'

marketing endeavors," stating that "Mr. Lauer was permitted to display business cards and

brochures on instances where he had made donations to fundraising events or other

programming, just as any other donor would be allowed to leave out some marketing information

at an event they helped sponsor."  (Doc. No. 194 at 53) (citing [Doc. No. 194-19 (Conlon

Declaration) ¶¶ 13–16; Doc. No. 178-37 (Defendants' supplemental discovery responses) at 3]).

In addition, as to Ms. Conlon's notification of Penn State York security regarding the parking of

RVs on campus, Plaintiff disputes that "this contact in any way provided notice to Penn State

about Defendants' infringement, or that this communication concerning where an RV is allowed

to park somehow authorized Defendants to use Penn State's trademarks" because "[t]he

personnel with authority to oversee trademark and intellectual property matters were not aware

that Defendants were using the goPSUrv Mark or the domain <goPSUrv.com> until 2015."

(Doc. No. 194 at 53) (citing Doc. No. 178-2 (McGrath Declaration) ¶ 62; Doc. No. 178-24

(Plaintiff 30(b)(6) deposition testimony) at 16–17, 19; Doc. No. 178-20 (Riedel deposition

testimony) at 6–8). Plaintiff also maintains that this fact is immaterial to the resolution of

Defendants' motion.

The parties dispute the circumstances surrounding the inclusion of advertisements for

Defendants in a Penn State Alumni Association newsletter in the summer of 2013.  Compare

(Doc. No. 174 ¶ 80 with Doc. No. 194 at 87–88).  Defendants state that "[i]n the summer of

2013, advertisements for Defendants were included by Ms. Conlon in the Penn State Alumni

Association newsletters, which newsletters were prepared by Ms. Conlon, a Penn State

employee" and "[t]he newsletters were sent to individuals, including some with psu.edu email addresses, hundreds of whom may have been Penn State employees."  (Doc. No. 174 ¶ 80) (citing Doc. No. 209-9 (Conlon deposition testimony) at 13; Doc. No. 189-9 (Lauer Declaration) ¶ 38; Doc. No. 174-3 (Lauer deposition testimony) at 51, 53).  Defendants include the following image with this statement:



(Doc. No. 174 ¶ 80.)

In response, Plaintiff does not dispute that Defendants advertised in a newsletter for the York County Chapter of the Penn State Alumni Association and that the newsletter is sent to hundreds of Penn State alumni located in York County.  (Doc. No. 194 at 87.)  However, Plaintiff:

> Dispute[s] that this advertisement ran in "the Penn State Alumni Association newsletters" because this implies that the newsletter was put out by the broader Alumni Association, rather than just the York Chapter.  [Doc. No. 194-19 (Conlon Declaration) ¶ 14].  Disputed that this newsletter was sent to individuals "with psu.edu email addresses" because this newsletter is distributed by postal mail.  [Id.] Disputed that hundreds of recipients "may have been Penn State employees" because there is no evidence in the record to support this assertion, and the cited deposition transcript specifically does not support this statement.  See [Doc. No. 194-10 (Mark Lauer deposition testimony) at 16–17].  Disputed that Ms. Conlon made any content-based decision to include Defendants' advertisements in any of the York County Chapter's newsletters.  Ms. Conlon testified that she was given the material and merely helped organize and format it for printing.  [Doc. No. 194-18 (Conlon

deposition testimony) at 5; Doc. No. 194-19 (Conlon Declaration) ¶ 14]. Disputed that the referenced newsletters are sent to Penn State administrators responsible for the University's trademarks, or that the publication of these alumni newsletters put Penn State on notice of Defendants' infringing conduct. See [Doc. No. 194-19 (Conlon Declaration) ¶ 14]. The personnel at Penn State with authority to oversee trademark and intellectual property matters were not aware that Defendants were using the goPSUrv Mark or the domain <goPSUrv.com> until 2015. See [Doc. No. 178-2 (McGrath Declaration) ¶ 62; Doc. No. 178-24 (Plaintiff 30(b)(6) deposition testimony) at 16–17, 19; Doc. No. 178-20 (Riedel deposition testimony) at 6–8].

(Doc. No. 194 at 87–88.)

The parties also dispute the circumstances surrounding the location of Defendants' RVs during various events. Compare (Doc. No. 174 ¶ 81 with Doc. No. 194 at 89). Defendants state that "Ms. Conlon allowed Defendants to park an RV at Penn State Alumni Association (PSAA) events 'where people were walking into the event so they would see his RV'" and "[a]t one of these events, Defendants were permitted to park their RV was [sic] 'on campus'" which was allowed by Mr. Conlon "because 'showing off the RV helped us because Mark was gracious enough to donate' to Penn State." (Doc. No. 174 ¶ 81) (citing Doc. No. 209-9 (Conlon deposition testimony) at 17–18). In response, Plaintiff does not dispute that Defendants brought their RVs to various events staged by the York County Chapter of the Penn State Alumni Association or that Mr. Lauer donated RV services to support fundraising efforts by the Chapter. (Doc. No. 194 at 89.) However, Plaintiff:

> Dispute[s] to the extent that this Statement implies that Ms. Conlon ever authorized, or purported to authorize, Defendants to use the goPSUrv Mark, or to promote that mark. Ms. Conlon never represented to Defendants that they are allowed to use Penn State's marks. [Doc. No. 194-19 (Conlon Declaration) ¶¶ 17–20]. Further disputed to the extent this Statement implies that Penn State knew about Defendants' infringement prior to 2015, or ever authorized Defendants to use Penn State's trademarks. [Doc. No. 194-19 (Conlon Declaration) ¶ 19; Doc. No. 178-24 (Plaintiff 30(b)(6) deposition testimony) at 12–13, 16–17, 19; Doc. No. 178-2 (McGrath Declaration) ¶¶ 8, 59–60, 62, 68; Doc. No. 178-25 (McGrath deposition testimony) at 3; Doc. No. 178-20 (Riedel deposition testimony) at 6–8; Doc. No. 196-1 (4/24/15 email from Tom McGrath to Maureen Riedel regarding goPSUrv); Doc. No. 178-28 (Bordner deposition testimony) at 4].

42

(Doc. No. 194 at 89–90.)  Ms. Conlon informed Campus Security that Defendants' RV was authorized to be on display on campus on April 7, 2017, as it had been the year before.  (Doc. No. 174 ¶ 87) (citing Doc. No. 209-9 (Conlon deposition testimony) at 73).[28]

The parties also dispute Defendants' representations about Ms. Conlon's request for donations.  Compare (Doc. No. 174 ¶ 82 with Doc. No. 194 at 90).  Defendants state that they "were asked by Ms. Conlon to donate free RV rentals 'for a few years in a row'" and "[i]n January of 2013, Ms. Conlon sent Defendants an email asking them to donate again 'in the same sport as last year' (indicating Defendants had donated in 2012)."  (Doc. No. 174 ¶ 82) (citing Doc. No. 209-9 (Conlon deposition testimony) at 18, 33).  Plaintiff disputes this statement, as follows:

> Disputed to the extent this Statement implies that Ms. Conlon was authorizing Defendants to use the goPSUrv Mark or representing to Defendants that they are allowed to use Penn State's marks.  [Doc. No. 194-19 (Conlon Declaration) ¶¶ 17–20].  Further disputed to the extent this Statement mischaracterizes Ms. Conlon's testimony.  In the cited testimony, Ms. Conlon testifies only that Defendant Mark Lauer donated a free RV weekend rental at a football game for a few years, not that Ms. Conlon asked Defendants to donate free RV rentals.  [Doc. No. 194-18 (Conlon deposition testimony) at 7].  Disputed to the extent this Statement implies that Penn State knew about Defendants' infringement prior to 2015, or ever authorized Defendants to use Penn State's trademarks.  [Doc. No. 194-19 (Conlon Declaration) ¶¶ 17, 19; Doc. No. 178-24 (Plaintiff 30(b)(6) deposition testimony) at 12–13, 16–17, 19; Doc. No. 178-2 (McGrath Declaration) ¶¶ 8, 59–60, 62, 68; Doc. No. 178-25 (McGrath deposition testimony) at 3; Doc. No. 178-20 (Riedel deposition testimony) at 6–8; Doc. No. 196-1 (4/24/15 email from Tom McGrath to Maureen Riedel regarding goPSUrv); Doc. No. 178-28 (Bordner deposition testimony) at 4].

(Doc. No. 194 at 90.)  Penn State acknowledges accepting free RV rental services donated by

---

[28]  Plaintiff does not dispute that Ms. Conlon notified campus security that Defendants' RV would be parked on the Penn State York campus but otherwise disputes that "this contact would have in any way authorized Defendants to use the goPSUrv Mark."  (Doc. No. 194 at 93–94) (citing Doc. No. 178-24 (Plaintiff 30(b)(6) deposition testimony) at 12–13, 19; Doc. No. 178-2 (McGrath Declaration) ¶¶ 8, 62, 68; Doc. No. 178-25 (McGrath deposition testimony) at 3; Doc. No. 178-28 (Bordner deposition testimony) at 4).

Defendants to fundraising events for Plaintiff twice in 2011 and twice in 2017 and admits that there could have been additional gifts in 2010.  (Doc. No. 174 ¶ 83.)[29]

The parties dispute the circumstances surrounding Defendants' involvement with guest speakers at alumni association events.  Compare (Doc. No. 174 ¶¶ 84, 39 with Doc. No. 194 at 92, 54).  Defendants state that "Ms. Conlon testified that, in addition to asking Lauer to donate free GOPSURV rentals to Penn State, Penn State also asked Lauer to arrange for guest speakers to speak at these events," and "Lauer chose former Penn State athletes associated with GOPSURV"; further, "Ms. Conlon testified she 'was aware' of this association."  (Doc. No. 174 ¶ 84) (citing Doc. No. 209-9 (Conlon deposition testimony) at 17–18).  Defendants assert that the speakers "includ[ed] former Penn State athletes working for Defendants (e.g., Blair Thomas and Quinton McDonald)" and "Coach James Franklin spoke at events where Defendants' marketing materials were being distributed."  (Doc. No. 174 ¶ 39) (citing Doc. No. 189-9 (Lauer Declaration) ¶ 40).  Plaintiff does not dispute that "former Penn State athletes Blair Thomas and Quintus McDonald spoke at Penn State York chapter events and that Ms. Conlon was aware these individuals worked with Defendants" but otherwise disputes Defendants' statement 39, as follows:

> Specifically disputed that Ms. Conlon asked for "free GOPSURV rentals to Penn State" as this implies that Ms. Conlon was communicating with Defendants regarding their branding, or that she made representations about the name goPSUrv. Ms. Conlon did not have any such contact with Defendants. See [Doc. No. 194-19 (Conlon Declaration) ¶¶ 18, 20]. Disputed that Ms. Conlon asked Defendant Mark Lauer to arrange for guest speakers and that Defendant Mark Lauer did arrange for speakers at these events. See [Doc. No. 194-18 (Conlon deposition testimony) at 8

---

[29]  Plaintiff admits that Penn State testified that Keystone Alternatives donated RV rentals for various fundraising events in 2011 and 2017, and possibly in other years.  (Doc. No. 194 at 91.) However, Plaintiff disputes this statement to the extent it "implies that Penn State knew about Defendants' infringement prior to 2015, or ever authorized Defendants to use Penn State's trademarks."  (Id.)

("Q. Did Mark Lauer arrange those speaking engagements for you? A. I don't remember. I don't believe so.")].

(Doc. No. 194 at 92.)  Although Plaintiff does not dispute that Coach Franklin spoke at one Penn State Alumni Association Coaches Caravan Event, Plaintiff disputes this statement "to the extent this implies that Ms. Conlon or other Penn State personnel were 'distribut[ing]' Defendants' marketing materials" maintaining that "Defendants simply had an opportunity to leave out business cards on a table in the corner."  (Doc. No. 194 at 54) (citing Doc. No. 194-18 (Conlon deposition testimony) at 9–10).  Finally, Plaintiff maintains that this statement is not a fact that is material to the resolution of Defendants' motion.

In June 2013, Ms. Conlon sent emails twice referring to Defendants as "GoPSUrv" and a reference to GoPSUrv was again included in the 2017 PSAA newsletter.  (Doc. No. 174 ¶ 85) (citing Doc. No. 209-9 (Conlon deposition testimony) at 24, 72).[30]  Ms. Conlon testified that coach James Franklin spoke at events where Defendants' marketing materials were being distributed.  (Doc. No. 174 ¶ 86) (citing Doc. No. 209-9 (Conlon deposition testimony) at 73).[31]

Defendants assert that an "email from Iona Conlon dated August 24, 2010, was sent using a psu.edu email address, evidencing Defendants and their domain name were known to Penn State by August 24, 2010":

---

[30]  Plaintiff disputes this statement to the extent it "implies that Penn State knew about Defendants' infringement prior to 2015, or ever authorized Defendants to use Penn State's trademarks."  (Doc. No. 194 at 92–93) (citing Doc. No. 194-19 (Conlon Declaration) ¶¶ 17–19; Doc. No. 178-24 (Plaintiff 30(b)(6) deposition testimony) at 12–13, 16–17, 19; Doc. No. 178-2 (McGrath Declaration) ¶¶ 8, 59–60, 62, 68; Doc. No. 178-25 (McGrath deposition testimony) at 3; Doc. No. 178-20 (Riedel deposition testimony) at 6–8; Doc. No. 196-1 (4/24/15 email from Tom McGrath to Maureen Riedel regarding goPSUrv); Doc. No. 178-28 (Bordner deposition testimony) at 4).

[31]  Plaintiff disputes this statement in the same manner set forth in response to Defendants' statement in paragraph 85.

(Doc. No. 174 ¶ 34.)  Plaintiff responds to this statement as follows:

> To the extent this statement purports to characterize the email, the email speaks for itself.  Disputed that "Defendants and their domain name were known to Penn State by August 24, 2010."  Ms. Conlon has no responsibilities for Penn State's trademark enforcement.  [Doc. No. 194-19 (Conlon Declaration) ¶ 17].  Ms. Conlon's contact with Mr. Lauer was simply to facilitate contact between him and the member who won his donated prize, and Ms. Conlon contacted Mr. Lauer with the business information he had provided. Id. ¶ 20.  This evidence submitted by Defendants does not support their assertion that "Defendants and their domain name were known to Penn State by August 24, 2010", given that Ms. Conlon has never had duties related to Penn State's trademark and intellectual property matters, and she never informed Penn State that Defendants had submitted the domain <gopsurv.com> as part of the contact information they provided along with a fundraising donation. Id. ¶¶ 17–20.  The personnel at Penn State with authority to oversee trademark and intellectual property matters were not aware that Defendants were using the goPSUrv Mark or the domain <goPSUrv.com> until 2015.  See [Doc. No. 178-2 (McGrath Declaration) ¶ 62; Doc. No. 178-24 (Plaintiff 30(b)(6) deposition testimony) at 16–17, 19; Doc. No. 178-20 (Riedel deposition testimony) at 6–8]. Statement 34 is not a fact that is material to the outcome of Defendants' motion for summary judgment.

(Doc. No. 194 at 46–47.)

Defendants assert that they donated to events "including College of Agricultural Science and Ag Alumni Society events" and that "[a] Live Auction and Silent Auction Donation form from 2013 shows Defendants were identified not as 'Keystone Alternatives' but as 'GoPSUrv.com' by the College of Agricultural Sciences," noting that "[t]he form was signed by

46

'Jennifer Biedel,' a licensed attorney and Penn State graduate who appeared to be acting for Penn State" and that "Defendants believed she was handling legal matters involving donations for Penn State," noting that "her email identifies her as being an attorney with 'saul.com' (the law firm of Saul Ewing which represents Penn State) and the form itself shows her undertaking representation of Penn State in managing these donations."  (Doc. No. 174 ¶ 36) (citing Doc. No. 189-9 (Lauer Declaration) ¶ 36; Doc. No. 209-8 (Exh. P to Lauer Declaration) at 83–84). Defendants include the following representation of the referenced form:

**Donor Information**: Please list donor name as it should appear in print. This is the individual or organization that will receive a tax receipt for the amount of the donation from University Development as applicable.

| | |
|---|---|
| Donor Name: | GoPSURV.com |
| Address: | P. O. Box #173 |
| City: | Red Lion    State:  PA    Zip Code:  17536 |
| Phone Number: | (800) 519-8467    Email:  mlauer@zoominternet.net |

(Doc. No. 174 ¶ 36.)

In response, Plaintiff does not dispute that Defendants donated RV rentals to be used at some of the indicated events.  Plaintiff also states that "[t]o the extent this statement purports to characterize the Live Auction and Silent Auction Donation Form, the form speaks for itself" and does not dispute that: the form was signed by Jennifer Beidel, a Penn State graduate and attorney who no longer works for Saul Ewing; and Saul Ewing represents Penn State in non-trademark matters.  (Doc. No. 194 at 49) (citing Doc. No. 194-22 (Beidel Declaration) ¶ 3).  However, Plaintiff otherwise disputes Defendants' statement, as follows:

> Disputed that "Defendants were identified . . . as 'GoPSUrv.com' by the College of Agricultural Sciences" on the referenced form.  The form appears to have been filled out by Defendants, not Penn State.  See [Doc. No. 209-8 (Exh. P to Lauer Declaration) at 83–84].  Further disputed to the extent that the purported excerpt of the form included in Statement 36 does not match the form attached as Exhibit P to Mark Lauer's Declaration.  See [id.]  Disputed that Ms. Beidel was acting for Penn State or that she gave Mr. Lauer any reason to believe that she was performing legal work on Penn State's behalf through the silent auction form.  See [Doc. No. 194-22

(Beidel Declaration) ¶¶ 4–5, 7–8].  Disputed to the extent this statement purports to evidence that Penn State had knowledge of Defendants' infringing use of the goPSUrv Mark prior to 2015.  Ms. Beidel has no responsibilities for Penn State's trademark enforcement and so Ms. Beidel's familiarity with Mark Lauer's business cannot be imputed to the University.  See [id. at ¶¶ 5–7 (Ms. Beidel has never represented Penn State on intellectual property matters, and never discussed legal matters with Mark Lauer)]. The personnel at Penn State with authority to oversee trademark and intellectual property matters were not aware that Defendants were using the goPSUrv Mark or the domain <goPSUrv.com> until 2015.  See [Doc. No. 178-2 (McGrath Declaration) ¶ 62; Doc. No. 178-24 (Plaintiff 30(b)(6) deposition testimony) at 16–17, 19; Doc. No. 178-20 (Riedel deposition testimony) at 6–8]. Moreover, Statement 36 is not a fact that is material to the outcome of Defendants' Motion for Summary Judgment.

(Doc. No. 194 at 49–50.)

The parties dispute Defendants' assertion that "[f]rom 2010 to 2018, Defendants would park caravans of RVs, sometimes as many as 20, at the ORV lot on Thursdays then remove these RVs on Sunday" and that "Defendants paid Penn State for entry of each RV into the ORV lot and rented the RVs to Penn State fans for the weekends of Penn State home football games." Compare (Doc. No. 174 ¶ 40 with Doc. No. 194 at 54–55).[32]  The parties also dispute

---

[32]  In support of their assertion, Defendants cite the Lauer Declaration.  (Doc. No. 174 ¶ 40) (citing Doc. No. 189-9 ¶ 42).  In response, Plaintiff does not dispute that: "Defendants RVs were brought into the ORV lot for Penn State football games"; "Defendants never had more than 20 of the spaces in the ORV lot for any one football game"; and "Defendants were renting their RVs and providing services to Penn State fans."  (Doc. No. 194 at 55.)  However, Plaintiff disputes Defendants' assertion as follows:

Disputed to the extent that the cited paragraph of M. Lauer's declaration is unsupported by any citation to record evidence.  Penn State further disputes this statement to the extent it purports to evidence that Penn State had knowledge of Defendants' infringing use of the PSU Mark prior to 2015.  Disputed to the extent this statement suggests personnel at Penn State responsible for enforcing Penn State's trademarks were aware of Defendants' infringing use of the GoPSUrv Mark and Domain prior to April 2015, when those personnel first became aware of the infringement.

(Doc. No. 194 at 55) (citing Doc. No. 178-24 (Plaintiff 30(b)(6) deposition testimony) at 16–17; Doc. No. 178-2 (McGrath Declaration) ¶¶ 59–60, 62; Doc. No. 178-20 (Riedel deposition testimony) at 6–8; Doc. No. 196-1 (4/24/15 email from Tom McGrath to Maureen Riedel

Defendants' assertion that "Penn State began reserving approximately a dozen spaces for GOPSURV's use in the ORV lot during each home football game weekend, permitting only Defendants to use these spaces and excluding all others."  (Doc. No. 174 ¶ 41) (citing Doc. No. 189-9 (Lauer Declaration) ¶ 43).  Plaintiff disputes that "Penn State has ever reserved any spaces in the ORV lot 'for GOPSURV'" because "Defendants used the name Keystone Alternatives when discussing the ORV lot with Dave Baker and Mark Bodenschatz."  (Doc. No. 194 at 55–56) (citing Doc. No. 194-5 (Bodenschatz deposition testimony) at 11; Doc. No. 194-6 (Bodenschatz Declaration) ¶¶ 14–19; Doc. No. 194-33 (Defendants' emails with Penn State); Doc. No. 194-7 (Baker Declaration) ¶¶ 11–15).  Plaintiff also disputes "that Penn State 'exclude[ed] all others' from the ORV lot" because "Penn State's ORV lot accommodates up to 1,200 RVs for typical games, and Penn State has hosted more than 2,000 RVs on its lots for particularly popular games."  (Doc. No. 194 at 56) (citing Doc. No. 194-5 (Bodenschatz deposition testimony) at 21).   Plaintiff further disputes Defendants' statement to the extent it "suggests that Penn State permitted Defendants' infringing use of the PSU Mark" or "implies that Penn State knew about Defendants' infringements prior to 2015."  (Doc. No. 194 at 56) (citing Doc. No. 178-24 (Plaintiff 30(b)(6) deposition testimony) at 12–13, 16–17, 19; Doc. No. 178-2 (McGrath Declaration) ¶¶ 8, 59–60, 62, 68; Doc. No. 178-25 (McGrath deposition testimony) at 3; Doc. No. 178-28 (Bordner deposition testimony) at 4; Doc. No. 178-20 (Riedel deposition testimony) at 6–8).

The parties dispute Defendants' statement that:

Beginning in April of 2010, these RVs were openly and notoriously marked with banners, stenciling, flags, tablecloths, signage, advertising and even pumpkins displaying GOPSURV and references to the domain name <gopsurv.com>. Additionally, Defendants would erect temporary enclosures, tables and even

regarding goPSUrv)).

concession stands covered with GOPSURV signage in the ORV lot.  Examples are shown below:





 

19

Compare (Doc. No. 174 ¶ 42 with Doc. No. 194 at 59).[33]

The parties also dispute Defendants' statement that:

> After registering the Disputed Domain <goPSUrv.com> in 2010, Defendants

---

[33] In support of their assertion, Defendants cite the Lauer Declaration (Doc. No. 189-9 ¶ 44) and Lauer's deposition testimony (Doc. No. 174-3 at 55–56). Plaintiff disputes Defendants' assertion, stating as follows:

> Disputed that Defendants' use of the goPSUrv Mark or other infringing Marks [was] "open[] and notorious[]", such that anyone in the vicinity of the ORV lot would necessarily notice Defendants' advertising. The evidence shows that people such as Dave Baker and Mark Bodenschatz—both of whom have been present in the ORV lot when Defendants' RVs were present—do not recall specifically seeing Defendants' RVs and did not recall seeing marketing materials from Defendants that used the goPSUrv Mark. See [Doc. No. 194-9 (Baker deposition testimony) at 6–8, 14, 28; Doc. No. 194-5 (Bodenschatz deposition testimony) at 11–12, 21–22]. Penn State further disputes this Statement to the extent it is [sic] lacks any citation to record evidence indicating when or where the images were taken, and therefore does not provide any support that the displays shown appeared in 2010 or in any year prior to 2015. Plaintiff disputes this statement to the extent it purports to evidence that Penn State had knowledge of Defendants' infringing use of the PSU Mark prior to 2015. [Doc. No. 178-24 (Plaintiff 30(b)(6) deposition testimony) at 16–17; Doc. No. 178-2 (McGrath Declaration) ¶¶ 59–60, 62; Doc. No. 178-20 (Riedel deposition testimony) at 6–8; Doc. No. 196-1 (4/24/15 email from Tom McGrath to Maureen Riedel)].

(Doc. No. 194 at 59.)

> expended substantial resources developing a company around the Disputed Domain. Over the ten years prior to the above-captioned action being commenced, Defendants invested hundreds of thousands of dollars in purchasing RVs, maintaining RVs, advertising GOPSURV in stenciling, signage, banners, canopies, on Defendants' website at <gopsurv.com>, and through other mediums.   During this time, Defendants have paid nearly $200,000 to Penn State itself in RV parking fees, donations, and sponsorships.

(Doc. No. 174 ¶ 43) (citing Doc. No. 189-9 (Lauer Declaration) ¶ 46).  Plaintiff first disputes that

Defendants have paid nearly $200,000 to Penn State in RV parking fees, donations, and

sponsorships, asserting that "that number is an estimate from Mark Lauer unsupported by any

record evidence."  (Doc. No. 194 at 60) (citing Doc. No. 189-9 (Lauer Declaration) ¶ 46).

Plaintiff also disputes Defendants' assertion that they invested "substantial resources" related to

"advertising GOPSURV in stenciling, signage, banners, canopies, on Defendants' website at

<gopsurv.com>, and through other mediums," contending that the assertion is "contradicted by

Defendants' interrogatory responses, wherein Defendants did not identify any costs or expenses

related to advertising or promoting the goPSUrv Mark."  (Doc. No. 194 at 60) (citing Doc. No.

194-23 (Defendants' supplemental responses to first interrogatories) at 7–8).  Plaintiff maintains

that "it is further contradicted by Mark Lauer's testimony that switching domain names would

cost 'a few dollars' and that having RVs re-stenciled would cost 'several hundred dollars'" and

contends that "Defendants may not use an unsupported declaration to create an issue of fact."

(Doc. No. 194 at 60) (citing Doc. No. 178-23 (Lauer deposition testimony) at 3–4).  Finally,

Plaintiff disputes that "Defendants' donations over a decade would have put Penn State as an

institution on notice of Defendants' use of the goPSUrv Mark," because "Penn State receives

hundreds of thousands of in-kind and monetary donations each year, generating upwards of $300

million."  (Doc. No. 914 at 61) (citing Doc. No. 194-34

(https://www.psu.edu/news/administration/story/penn-state-breaks-fundraising-record-second-

year-row/)).

Plaintiff also largely disputes Defendants' statement that "Lauer testified that by 2012, he had 'upwards of twelve or 15, if not more, probably closer to 20 RVs that were lettered with GoPSUrv.com on it that [he] paid, you know, several hundred dollars an RV to have lettered.'" (Doc. No. 174 ¶ 44) (citing Doc. No. 174-3 (Lauer deposition testimony) at 38–39).  In doing so, Plaintiff disputes that as of 2012, Defendants had "twelve or 15" or "closer to 20" RVs stenciled with the goPSUrv Mark, maintaining that "[t]he testimony cited from Mark Lauer refers to how many RVs with stenciling Defendants owned at the time that Mr. Lauer received a call from Penn State Licensing demanding that he stop using the GoPSUrv Mark" and "[t]he evidence shows that this call occurred in May 2015, not in 2012" and "Mark Lauer also testified that in 2012, the company probably owned only 8-10 RVs total."  (Doc. No. 194 at 61–62) (citing Doc. No. 194-10 (Lauer deposition testimony) at 3–13; Doc. No. 194-15 (phone records); Doc. No. 178-23 (Lauer deposition testimony) at 7–9).  The parties also dispute Defendants' assertion that "[i]n hiring a company to letter his RVs, Lauer testified, '[i]t's because I'm the president of the company [Keystone] that I'm calling someone to tell them to put a domain name on an RV . . . That's why I'm doing it.  I'm not acting independently I guess is what I'm trying to say.'" Compare (Doc. No. 174 ¶ 44 with Doc. No. 194 at 62).[34]  Lauer purchased about four RVs in

---

[34]  Defendants cite Mark Lauer's testimony in support of this assertion.  (Doc. No. 174 ¶ 45) (citing Doc. No. 174-3 (Lauer deposition testimony) at 42).  In response, Plaintiff states that:

> [t]o the extent this statement purports to quote the deposition testimony of Defendant Mark Lauer, the testimony speaks for itself.  Disputed that Mark Lauer does not act independently when making decisions regarding the use of GoPSUrv branding. [Doc. No. 178-19 (Defendants' RFA responses) at 13–14 (admitting specifically that "[Mark] Lauer makes all branding and marketing decisions acting on behalf of Keystone Alternatives" and that Mark Lauer chose domain name); Doc. No. 178-37 (Defendants' second supplemental interrogatory responses) at 3 (stating that Mark Lauer "ultimately made the final decisions in all marketing and advertising"); Doc.

2011 and 2012.  (Doc. No. 174 ¶ 46) (citing Doc. No. 174-3 (Lauer deposition testimony) at 48–

49).[35]

The parties dispute the circumstances surrounding James Franklin's involvement with

GoPSUrv.  Defendants assert that:

> In 2017 (as detailed below), head football coach James Franklin was given a free
> RV rental in exchange for endorsing GOPSURV and authorizing GOPSURV to
> advertise that [sic] it as the "Official PSU RV Rental of Coach Franklin."
> According to James Franklin's agent, both James Franklin and Athletic Director
> Sandy Barbour then authorized Defendants to distribute marketing materials
> saying GOPSURV was the "Official PSU RV Rental of Coach Franklin" at
> official Penn State events in Beaver stadium in 2017, including dinners with large
> Penn State benefactors.

(Doc. No. 174 ¶ 47) (citing Doc. No. 189-9 (Lauer Declaration) ¶¶ 47–50).  Although Plaintiff

admits that Defendants provided James Franklin with a free RV rental in 2017, Plaintiff disputes

that:

> James Franklin or Sandy Barbour endorsed "goPSUrv" or otherwise authorized
> Defendants to distribute marketing materials saying goPSUrv was the "Official PSU
> RV Rental of Coach Franklin."   The evidence submitted with Mark Lauer's
> declaration does not support that approval was ever given by James Franklin or
> Sandy Barbour to use this wording.  See [Doc. No. 209-8 (Exhs. W, Y to Lauer
> Declaration) at 102–99, 205–07].  Further, Mark Lauer's declaration is directly
> contradicted by other evidence in the record—including Mr. Lauer's own deposition
> testimony—which makes clear that Defendants never asked for or received
> permission to use the goPSUrv Mark.  [Doc. No. 194-10 (Mark Lauer deposition
> testimony) at 36–37, 43–44; Doc. No. 178-24 (Plaintiff 30(b)(6) deposition
> testimony) at 12–13, 19; Doc. No. 178-2 (McGrath Declaration) ¶¶ 8, 62, 68; Doc.
> No. 178-25 (McGrath deposition testimony) at 3].

---

> No. 194-10 (Mark Lauer deposition testimony) at 14–15, 18–20; Doc. No. 194-11
> (Tim Lauer deposition testimony) at 14].

(Doc. No. 194 at 62.)

[35]  Plaintiff does not dispute that Defendants purchased 2-3 RVs in 2011, but otherwise disputes
this statement "because the cited evidence states only that Defendants purchased 'two or three'
RVs in 2011 and gives no information about RVs purchased in 2012."  (Doc. No. 194 at 63)
(citing Doc. No. 178-23 (Lauer deposition testimony) at 48–49).  Plaintiff also maintains that this
is not a fact material to the resolution of Defendants' motion.

(Doc. No. 194 at 63–64.)

Defendants have never been the target of a "cybersquatting" case and have never registered any other domain name containing "psu" or any other of Plaintiff's trademarks; in addition, Defendants have never tried to sell the Disputed Domain.  (Doc. No. 174 ¶ 48.)[36]

The parties dispute the involvement of Mark Bodenschatz, associate athletic director for Penn State Intercollegiate Athletics from 2007 to 2017, with the ORV lot at Beaver Stadium. Compare (Doc. No. 174 ¶ 49 with Doc. No. 194 at 64–65).  Defendants assert that Bodenschatz was in charge of as many as 150 employees and director of the ORV lot where RVs are parked during Penn State home football games in 2010.  (Doc. No. 174 ¶ 49) (citing Doc. No. 209-6 (Bodenschatz deposition testimony) at 13–14).  Plaintiff does not dispute that Bodenschatz was in charge of as many as 150 employees and indirectly managed the ORV lot, where RVs were parked during Penn State football games in 2010.  However, Plaintiff "otherwise" disputes the statement, saying:

> Penn State disputes this statement to the extent it purports to evidence that Penn State had knowledge of Defendants' infringing use of the goPSUrv Mark prior to 2015. [Doc. No. 194-5 (Bodenschatz deposition testimony) at 22; Doc. No. 194-6 (Bodenschatz Declaration) ¶¶ 7–10].  Disputed to the extent this statement suggests personnel at Penn State responsible for enforcing Penn State's trademarks were aware of Defendants' infringing use of the GoPSUrv Mark and Domain prior to April 2015, when those personnel first became aware of the infringement. [Doc. No. 178-24 (Plaintiff 30(b)(6) deposition testimony) at 16–17; Doc. No. 178-2 (McGrath Declaration) ¶¶ 59–60, 62; Doc. No. 178-20 (Riedel deposition testimony) at 6; Doc. No. 196-1 (4/24/15 email from Tom McGrath to Maureen Riedel regarding goPSUrv)].

(Doc. No. 194 at 65.)

The parties dispute whether "Bodenschatz admitted he was aware of Defendants' activities

---

[36]  Plaintiff disputes this fact as immaterial to the resolution of Defendants' motion.  (Doc. No. 194 at 64.)

'before 2012' and exchanged emails with Defendants before 2012." <u>Compare</u> (Doc. No. 174 ¶

50 with Doc. No. 194 at 65–66).[37]   The parties also dispute Defendants' statement that

"Bodenschatz was charged with policing the ORV lot during home games, including reporting

violations of the law <u>and university policies</u> to the Office of General Counsel and campus police,

and the Risk Management Department." <u>Compare</u> (Doc. No. 174 ¶ 51 with Doc. No. 194 at 66–

67).[38]   Along those same lines, Plaintiff disputes Defendants' statement that "[e]xamples of

---

[37]  In support of their assertion, Defendants cite Bodenschatz's deposition testimony.  (Doc. No.
174 ¶ 50) (citing Doc. No. 209-6 (Bodenschatz deposition testimony) at 17–18 ("Q. So you're
aware that you had interactions with goPSUrv and Mark Lauer before 2012? A. Yes. . . . Q.
Okay.  Did you see emails in 2012, Mark, between yourself and the defendants in this case? A.
Yes. Q. Okay.  And did you review those emails before this deposition? A. Yes.")).

Plaintiff does not dispute that "Mr. Bodenschatz exchanged an email with Defendants who were
using the name Keystone Alternatives (and not goPSUrv) in 2012" but otherwise disputes this
statement:

> to the extent it mischaracterizes Mr. Bodenschatz's testimony.  Mr. Bodenschatz did
> not testify that he was aware of Defendants' activities at all, much less before 2012.
> Mr. Bodenschatz testified only that he had seen an email between himself and
> Defendant Mark Lauer in 2012.  [Doc. No. 194-5 (Bodenschatz deposition
> testimony) at 3–4].  Moreover, Penn State disputes this statement to the extent it
> purports to evidence that Penn State had knowledge of Defendants' infringing use of
> the PSU Mark prior to 2015.  Mr. Bodenschatz has no responsibilities for Penn
> State's trademark enforcement. [Doc. No. 194-5 (Bodenschatz deposition testimony)
> at 22; Doc. No. 194-6 (Bodenschatz Declaration) ¶¶ 7–10].  Disputed to the extent
> this statement suggests personnel at Penn State responsible for enforcing Penn
> State's trademarks were aware of Defendants' infringing use of the GoPSUrv Mark
> and Domain prior to April 2015, when those personnel first became aware of the
> infringement.  [Doc. No. 178-24 (Plaintiff 30(b)(6) deposition testimony) at 16–17;
> Doc. No. 178-2 (McGrath Declaration) ¶¶ 59–60, 62; Doc. No. 178-20 (Riedel
> deposition testimony) at 10–12; Doc. No. 196-1 (4/24/15 email from Tom McGrath
> to Maureen Riedel)].

(Doc. No. 194 at 65–66.)

[38]  In support of their statement, Defendants cite Bodenschatz's deposition testimony.  (Doc. No.
174 ¶ 51) (citing Doc. No. 209-6 (Bodenschatz deposition testimony) at 21–23, 25.)  In disputing
this assertion, Plaintiff states:

misconduct with Bodenschatz was charged with reporting include proselyting [sic] using megaphones, a noose tied to a monkey hanging from a flagpole with a confederate flag; tailgaters setting up improper 'canopy-type structures'; and fans scalping football tickets." (Doc. No. 174 ¶ 52) (citing Doc. No. 209-6 (Bodenschatz deposition testimony) at 24–25). Plaintiff "[d]ispute[s] that Mr. Bodenschatz was 'charged with reporting' misconduct," stating that "[t]he evidence cited here does not support the statement, as Mr. Bodenschatz was simply responding to a series of hypothetical questions from counsel about what actions he might take to various events if he were to encounter them." (Doc. No. 194 at 67–68) (citing Doc. No. 194-5 (Bodenschatz deposition testimony) at 5–9; Doc. No. 194-6 (Bodenschatz Declaration) ¶¶ 7–10).

Plaintiff also disputes Defendants' statement that "[d]espite being tasked with enforcing Plaintiff's alleged ban on 'canopy-like structures', Bodenschatz never asked Defendants to take down their canopies." (Doc. No. 174 ¶ 53) (citing Doc. No. 189-9 (Lauer Declaration) ¶ 44). Plaintiff maintains that "[t]he evidence cited herein does not support this assertion because the cited declaration paragraph does not refer to canopies or canopy-like structures." (Doc. No. 194

---

Bodenschatz was not responsible for policing the ORV lot during home games. [Doc. No. 194-6 (Bodenschatz Declaration) ¶¶ 7–10]. The evidence to which Defendants cite in support of this Statement does not support this Statement. Mr. Bodenschatz testified that during athletic events he attended it was "very unlikely" he would ever speak with vendors. [Doc. No. 194-5 (Bodenschatz deposition testimony) at 5]. He stated that he would sometimes walk around during athletic events, including on the lots. [Id.] Counsel for Defendants then posed a series of hypotheticals, asking what various Penn State personnel might do if they encountered violence, illegal activities, drug use, or medical emergencies in the ORV lot. [Id. at 5–9]. This is the testimony that Defendants cite to support Statement 51, which clearly distorts Mr. Bodenschatz's actual testimony. This testimony does not support the statement that Mr. Bodenschatz was "charged with policing the ORV lot during home games" or that he was charged with "reporting violations of the law and university policies". This testimony only gives information about how Mr. Bodenschatz might hypothetically respond to various urgent situations if he happened to encounter them.

(Doc. No. 194 at 66–67.)

at 68) (citing Doc. No. 189-9 (Lauer Declaration) ¶ 44) (stating "We would erect temporary enclosures, tables and even concession stands covered with GOPSURV signage in the ORV lot . . .")). In addition, Plaintiff disputes that Mr. Bodenschatz was tasked with enforcing a ban on "canopy-like structures," stating that he testified "only that he would report if 'canopy-like structures' had been kicked up by the wind and were being blown across vehicles or cars." (Doc. No. 194 at 68) (citing Doc. No. 194-5 (Bodenschatz deposition testimony) at 9–10). Plaintiff also maintains that this statement is not a fact that is material to Defendants' motion for summary judgment.

The parties dispute several other aspects of Mr. Bodenschatz's testimony. Specifically, Defendants state that "Bodenschatz admitted the 2015 football schedule distributed and bearing Defendants' GOPSURV ads on the reverse side (including reference to the domain <gopsurv.com> and Defendants' phone number) was produced by Plaintiff's Intercollegiate Athletics Department" and also that "Identical football schedules bearing Defendants' ads were produced by Plaintiff in 2011, 2013, 2014, 2016, and 2017." (Doc. No. 174 ¶ 54) (citing Doc. No. 209-6 (Bodenschatz deposition testimony) at 39, 52–53; Doc. No. 189-9 (Lauer Declaration) ¶ 8(d); and Doc. No. 209-8 (Exh. E to Lauer Declaration) at 39–42).



(Doc. No. 174 ¶ 54.)

Although Plaintiff does not dispute that Defendants distributed advertising materials including those shown in Statement 54 showing the goPSUrv Mark and offering RV rental services, Plaintiff otherwise disputes that Penn State's Intercollegiate Athletics Department produced any marketing materials for Defendants, stating that "Mr. Bodenschatz testified expressly that the athletics department produced football schedules similar to those that Defendants included in their marketing materials, but that the football schedules Defendants used were not produced by the athletic department."  (Doc. No. 194 at 69) (citing Doc. No. 194-5 (Bodenschatz deposition testimony) at 15–16; Doc. No. 194-6 (Bodenschatz Declaration) ¶ 12).

The parties dispute various aspects of Defendants' assertion that "Bodenschatz acknowledged receiving a 'fan zone map' from PSSP bearing a date of April 13, 2010, the fan zone map showing Defendants were a vendor or corporate partner at an upcoming Penn State football game in 2010" and also acknowledged "he would 'be aware of' the fan map, as would 'everybody who works on game day'"; further, Defendants assert that "[t]hese fan maps were distributed to Penn State for every home football game" and "Penn State later testified as many

as 60 to 100 employees at Penn State would see the fan maps each week." (Doc. No. 174 ¶ 55)

(citing Doc. No. 209-6 (Bodenschatz deposition testimony) at 79–81 and then citing [Doc. No.

203-7] (Plaintiff 30(b)(6) deposition testimony) at 63:1-13 – cited page not included in portion of

transcript located at Docket Number 203-7). Plaintiff does not dispute that Penn State created

fan zone maps and would distribute them to as many as 60 to 100 Penn State employees for

coordination purposes and that Keystone Alternatives was listed as a vendor on a 2010 map.

(Doc. No. 194 at 70.) However, Plaintiff otherwise disputes the statement, as follows:

> Specifically, Penn State disputes that Mr. Bodenschatz received any fan zone map
> in 2010 showing Defendants were a vendor or corporate partner at an upcoming
> Penn State football game in 2010, as this assertion is unsupported by the cited
> testimony. [Doc. No. 194-5 (Bodenschatz deposition testimony) at 19–20]
> (testifying only that he was aware of fan zone maps generally, but that he was not
> responsible for this function). Further disputed to the extent this Statement is
> meant to imply that the fan zone maps give any notice that Defendants were using
> the goPSUrv Mark, because Defendants are listed on the map as "Keystone
> Alternatives." [Id. at 23]. Penn State further disputes this statement to the extent
> it purports to evidence that Penn State had knowledge of Defendants' infringing
> use of the PSU Mark prior to 2015. Mr. Bodenschatz has no responsibilities for
> Penn State's trademark enforcement. [Id. at 22; Doc. No. 194-6 (Bodenschatz
> Declaration) ¶¶ 7–11]. The personnel at Penn State with authority to oversee
> trademark and intellectual property matters were not aware that Defendants were
> using the goPSUrvMark or the domain <goPSUrv.com> until 2015. [Doc. No.
> 178-24 (Plaintiff 30(b)(6) deposition testimony) at 16–17; Doc. No. 178-2
> (McGrath Declaration) ¶¶ 59–60, 62; Doc. No. 178-20 (Riedel deposition
> testimony) at 6–8].

(Doc. No. 194 at 70–71.)

Dave Baker ("Baker"), who has been employed by Penn State for 50 years, is on the Penn

State management team, a group of about 25 people who meet with Plaintiff's Athletic Director

every week. (Doc. No. 174 ¶ 56.)[39] Like Mark Bodenschatz, Baker is an associate athletic

---

[39] Plaintiff does not dispute that Dave Baker works in the athletic department and has been
employed by Penn State for 50 years but disputes that he "is on the Penn State management
team," stating that:

director.  (Doc. No. 174 ¶ 57.)  The parties dispute the circumstances under which Baker first

encountered goPSUrv.  <u>Compare</u> (Doc. No. 174 ¶ 58 with Doc. No. 194 at 72).[40]  The parties

dispute Defendants' assertion that:

> Baker testified that Penn State "made a provision" reserving "ten RVs in a lot in a
> specific area" for Defendants. [Doc. No. 209-7 (Baker deposition testimony) at 22]
> (agreeing with Lauer that Penn State reserved about a dozen RV spaces for the
> exclusive use of GOPSURV at each home game in the ORV lot).  He did this so
> Defendants' customers could be parked together.  [<u>Id.</u> at 23].  He later testified it
> could have been "more than" ten spaces.  [<u>Id.</u> at 26].  He later explained these spaces

---

> This reference to "the Penn State management team" suggests that Mr. Baker has
> primary duties to manage the entire University, which is not the case.  Mr. Baker is a
> member of a management team within the athletics department.  [Doc. No. 194-9
> (Baker deposition testimony) at 3–4].This group, which includes other sports
> administrators, people in finance, and events staff, reports up to the athletic director
> and the leadership team within the athletics department.  <u>Id.</u>  Mr. Baker's
> responsibilities do not include enforcing, overseeing, or otherwise handling Penn
> State's trademarks. [Doc. No. 194-8 (Baker Declaration) ¶¶ 5–10.]

 (Doc. No. 194 at 71.)

[40] Defendant asserts that "Baker testified 'the first time [he] ever met anybody at the goPSUrv
operation' was in 2010 at the ORV lot."  (Doc. No. 174 ¶ 58) (citing Doc. No. 209-7 (Baker
deposition testimony) at 17.  In disputing this statement, Plaintiff asserts:

> This statement quotes a question posed by counsel and misstates the record in order
> to indicate that Mr. Baker was aware, in 2010, that Defendants were using the mark
> GoPSUrv.  The actual exchange quote in this referenced excerpt of the deposition is:
> Q. When was the first time you ever met anybody at the goPSUrv operation?
> A. I would – I can't tell you the exact year.  I would say maybe around 2010 met
> Mark Lauer.
> Q. You met Mark Lauer? And how did you meet him?
> A. I believe we may have talked a couple times at the RV lot.
> <u>See</u> [Doc. No. 194-9 (Baker deposition testimony) at 17].  Mr. Baker made clear that
> he did not know Mark Lauer was using the GoPSUrv Mark or Domain when he met
> Mr. Lauer in 2010.  <u>See id.</u> at [18–20] (testimony that "I knew him as Mark Lauer, I
> mean, for many years.  I didn't even know the name of the company. . . . I said I met
> him in 2010, but I didn't know – didn't realize what the name of the company was.
> And as I said, looking back over my notes, that was never referred to early on.  I
> knew him by Mark Lauer, and that's all I knew, that he had a business he was
> running renting RVs.").  <u>See also</u> [Doc. No. 194-8 (Baker Declaration) ¶¶ 11–15].

(Doc. No. 194 at 72.)

were "in a nice location" and that "the staff of the [ORV] lot was aware of this arrangement and that it needed to be enforced." [Id. at 63].

(Doc. No. 174 ¶ 59.)  Plaintiff does not dispute that Mr. Baker testified that Defendants rented spaces in the ORV lot and that in certain years, Penn State coordinated so that Defendants' RV spaces would be next to each other.  (Doc. No. 194 at 73.)  However, Plaintiff:

> [d]ispute[s] that Mr. Baker or anyone at Penn State reserved spaces in the ORV lot for "GOPSURV." The evidence here shows only that when Defendants interacted with personnel at Penn State regarding the ORV lot, they consistently used the name Keystone Alternatives, or Mark Lauer just used his own personal name.  [(Doc. No. 194-9 (Baker deposition testimony) at 18–20; Doc. No. 194-8 (Baker Declaration) ¶¶ 11–15; Doc. No. 196-4 (email from Mark Lauer requesting reserved spaces under the name "Keystone Alternatives RV Rentals"); Doc. No. 194-5 (Bodenschatz deposition testimony) at 11 ("I believe that every correspondence that I had with Mark Lauer was represented as Keystone Alternatives"); Doc. No. 194-6 (Bodenschatz Declaration) ¶¶ 14–19].

(Doc. No. 194 at 73.)  The parties also dispute Defendants' statement that Baker was tasked with enforcing Penn State trademark violations in the ORV lot.  Compare (Doc. No. 174 ¶ 60 with Doc. No. 194 at 74).[41]  The parties similarly dispute Defendants' statement that "[d]espite being

---

[41]  Defendants assert that "Baker was tasked with enforcing Penn State trademark violations in the ORV lot, including preventing the sale of unauthorized Penn State jerseys having Penn State logos on them"; "[h]e later testified he was familiar with which entities had license to use Penn State trademarks and which did not, and that vendors using Penn State marks without a seal of Collegiate Licensing Corporation would be reported for trademark violations"; and "Baker testified he was tasked with asking companies advertising with signage on the ORV lot to take down the signage."  (Doc. No. 174 ¶ 60) (citing Doc. No. 209-7 (Baker deposition testimony) at 31–33, 41).

In disputing this statement, Plaintiff states that "Mr. Baker has no responsibilities for Penn State's trademark enforcement, or for monitoring signage used in the ORV lot for intellectual property violations."  (Doc. No. 194 at 74) (citing Doc. No. 194-8 (Baker Declaration) ¶¶ 5–10).  Plaintiff further states that "Mr. Baker testified only that he is aware that Penn State works with Collegiate Licensing Corporation to license and enforce trademarks, but he did not testify that he was familiar with all entities had [sic] licenses to use Penn State trademarks and which did not" and "[s]imilarly, Mr. Baker testified as to a single instance that he asked a company to remove a banner, but he did not testify that he was tasked with enforcing a ban on advertising."  (Doc. No. 194 at 74) (citing Doc. No. 194-9 (Baker deposition testimony) at 31–33, 41).

tasked with enforcing Plaintiff's trademark usage in the ORV lot, Baker never asked Defendants

to take down their signage." Compare (Doc. No. 174 ¶ 61 with Doc. No. 194 at 74).[42]   The

parties also dispute Defendants' statement that "Baker testified that he recognized photographs

of Defendants' vehicles stenciled with the GOPSURV name parked on campus at the Jordan

Center, and that he would not have had any objection to GOPSURV being printed and used on

the RVs." (Doc. No. 174 ¶ 62) (citing Doc. No. 209-7 (Baker deposition testimony) at 44–50).

Plaintiff asserts that:

> Mr. Baker did not testify that he recognized the photographs of Defendants' vehicles
> stenciled with the goPSUrv name; he testified only that Defendants stenciling a name
> on their RV would not have violated Penn State's prohibition of advertising signage
> on campus. [Doc. No. 194-9 (Baker deposition testimony) at 15–20]; see also [Doc.
> No. 194-8 (Baker Declaration) ¶ 10]. Mr. Baker did not testify that Defendants' use
> of goPSUrv in any capacity was an authorized use of Penn State's PSU Mark. [Doc.
> No. 194-9 (Baker deposition testimony) at 19–25] (transcript testimony cited by
> Defendants in support of alleged fact).   Further, this Statement is immaterial to
> Defendants' Motion for Summary Judgment because Mr. Baker has no
> responsibilities for Penn State's trademark enforcement. [Doc. No. 194-8 (Baker
> Declaration) ¶¶ 5–10].

(Doc. No. 194 at 75.)

Baker indicated in writing he knew Keystone Alternatives was using the name

---

[42] Defendants cite Baker's deposition testimony in support of this statement.  (Doc. No. 174 ¶
61) (citing Doc. No. 209-7 (Baker deposition testimony) at 42).  Plaintiff disputes this statement,
maintaining that "Statement 61 is not material to the outcome of this Motion" because "[f]irst,
this Statement refers to issues 'enforcing Plaintiff's trademark usage in the ORV lot,' but this
case does not concern what trademarks Plaintiff Penn State was using in the ORV lot" and so
"[a]nything related to Penn State's 'trademark usage in the ORV lot' is immaterial." (Doc. No.
194 at 74.)  In addition, Plaintiff states that "Mr. Baker has no responsibilities for Penn State's
trademark enforcement," citing Mr. Baker's Declaration.  (Doc. No. 194 at 74) (citing Doc. No.
194-8 (Baker Declaration) ¶¶ 5–10).  Plaintiff also states that "Mr. Baker further testified that he
does not recall specifically seeing Defendants' vehicles in the ORV lot or what they might look
like."  (Doc. No. 194 at 74–75) (citing Doc. No. 194-9 (Baker deposition testimony) at 14–16,
28).  Finally, "Penn State further disputes this statement because it is not supported by the cited
evidence" given that "Mr. Baker testified that he recalls having asked people to take down
signage in the ORV lot, and that he cannot recall whether it was Defendants."  (Doc. No. 194 at
75) (citing Doc. No. 194-9 (Baker deposition testimony) at 15–18.

GOPSURV, referring to Keystone Alternatives by the name GoPSUrv in an email dated May 12, 2017.  (Doc. No. 174 ¶ 63.)  Baker testified that he knew Defendants['] operation went back to "2010, 2011" and later that he became aware of Defendants "about the time, 2011, 2012, somewhere in that period."  (Doc. No. 174 ¶ 64) (citing Doc. No. 209-7 (Baker deposition testimony) at 76).  Although Plaintiff does not dispute that Mr. Baker was aware that Mark Lauer was operating an RV business as of 2010, Plaintiff disputes that he knew in 2010-2012 that Mark Lauer's company "was using the goPSUrv Mark or doing business under that name."  (Doc. No. 194 at 76) (citing Doc. No. 194-8 (Baker Declaration) ¶¶ 11–15; Doc. No. 194-9 (Baker deposition testimony) at 6–9, 26–27).  Plaintiff also disputes this statement to the extent it "purports to evidence that Penn State had knowledge of Defendants' infringing use of the PSU mark prior to 2015" because "Mr. Baker has no responsibilities for Penn State's trademark enforcement" and "[t]he personnel at Penn State with authority to oversee trademark and intellectual property matters were not aware that Defendants were using the goPSUrv Mark or the domain <goPSUrv.com> until 2015."  (Doc. No. 194 at 76–77) (citing Doc. No. 194-8 (Baker Declaration) ¶¶ 5–10; Doc. No. 178-24 (Plaintiff 30(b)(6) deposition testimony) at 16–17; Doc. No. 178-2 (McGrath Declaration) ¶¶ 59–60, 62; Doc. No. 178-20 (Riedel deposition testimony) at 6–8).

Maureen Riedel ("Ms. Riedel" or "Riedel") was hired by Penn State in 2004 after previously working as the licensing administrator at Syracuse University.  (Doc. No. 174 ¶ 65.)  She worked as Penn State's licensing director prior to her current employment at the University of Colorado.  (Id.; Doc. No. 194 at 77.)  During her employment as Penn State's licensing director, Ms. Riedel's responsibilities included ensuring that Penn State's trademarks were properly used on officially licensed merchandise.  (Doc. No. 174 ¶ 66; Doc. No. 194 at 77.)  The

parties dispute Defendants' statement regarding Ms. Riedel's testimony about Penn State legal

department activity in 2011.  Compare (Doc. No. 174 ¶ 67 with Doc. No. 194 at 77–78).[43]

The parties dispute Defendants' statement regarding Ms. Riedel's responsibility for

domain names.  Compare (Doc. No. 174 ¶ 68 with Doc. No. 194 at 78–79).  Defendants state

that "Ms. Riedel testified she was not in charge of enforcing anything to do with domain names,

saying '[d]omain names, I don't know how that's handled.  That's handled by our legal folks'"

and also state that she "testified Penn State started protecting domain names in 2011" and that

domain names were "not part of my position."  (Doc. No. 174 ¶ 68) (citing Doc. No. 214-2

(Riedel deposition testimony) at 14, 10, 19, 24).  Plaintiff does not dispute that it enforces its

trademarks, including the PSU mark, against infringing domains; however, Plaintiff disputes:

> that Ms. Riedel "was not in charge of enforcing anything to do with domain names."
> She testified that she was a member of Penn State's Licensing Committee, and that
> the Licensing Committee worked together with the legal team on enforcement.  See
> [Doc. No. 196-2 (Riedel deposition testimony) at 6–7].  Disputed that Penn State did
> not enforce trademark rights in domain names prior to 2011.  Ms. Riedel similarly
> testified that Penn State started protecting domain names to a great degree in 2011,
> not that Penn State had not protected against infringing domain names before this
> time.  [Id.]  Disputed that domain names were "not part of" Ms. Riedel's "position."
> The evidence cited does not support this assertion, because in this section of the

---

[43]  Defendants state that "Ms. Riedel testified that 'back in 2011 the legal [department] started protecting domain names to a great degree including the use of PSU'" and that, "[d]espite this testimony, legal action was not taken against Defendants for registering <gopsurv.com> until 2019."  (Doc. No. 174 ¶ 67) (citing Doc. No. 214-2 (Riedel deposition testimony) at 19). Although Plaintiff does not dispute that "Penn State enforces its trademarks, including the PSU Mark"; "Penn State enforces its trademark rights against infringing domains"; and "Penn State filed this lawsuit in 2019," Plaintiff disputes that "Penn State did not earlier take action against Defendants, or that Penn State did not take action soon after learning about Defendants' infringement," stating that "Penn State became aware of Defendants' infringing use of the domain <goPSUrv.com> in April 2015, and the Office of Licensing called Mr. Lauer and demanded that he stop using this domain in May 2015."  (Doc. No. 194 at 77–78) (citing Doc. No. 196-1 (4/24/15 email from Tom McGrath to Maureen Riedel regarding goPSUrv); Doc. No. 178-24 (Plaintiff 30(b)(6) deposition testimony) at 16–17; Doc. No. 178-2 (McGrath Declaration) ¶¶ 59–60, 62; Doc. No. 178-20 (Riedel deposition testimony) at 6–8; Doc. No. 194-10 (Lauer deposition testimony) at 3–13; Doc. No. 194-15 (phone records)).

deposition transcript, Defendants' counsel was asking Ms. Riedel about branding decisions on Penn State's website.  Ms. Riedel testified that her role related to branding on physical merchandise, not the Penn State website. [Doc. No. 19602 at 15–16].

(Doc. No. 194 at 78–79.)

Plaintiff disputes various aspects of Defendants' statement that "[a]lthough associate athletic director McGrath later alleged Riedel was charged with ensuring Penn State's marks are used properly, Riedel testified that:

(a) She would take any use of the word 'sculpture' in a domain name to the legal department for potential trademark infringement of PSU because the word sculpture has the letters 'p', 's' and 'u' in it.

(b) She might take the domain name 'popsugar' to the legal department for potential trademark infringement of PSU for having the character string 'psu.'

(c) Ms. Riedel asserted that McGrath 'came to me' about use of PSU in the Disputed Domain.

(d) Ms. Riedel testified that her office number may have changed over the years but that she does 'most of [her] work through her cell phone.'"

(Doc. No. 174 ¶ 69) (citing Doc. No. 214-2 (Riedel deposition testimony) at 11–13, 15–18, 23, 25).  Plaintiff does not dispute that Ms. Riedel testified that Penn State enforces its trademark rights against infringing domains or that Tom McGrath "raised the infringing <goPSUrv.com> domain to Ms. Riedel's attention."  (Doc. No. 194 at 80.)  However, Plaintiff states:

Disputed to the extent that this Statement purports to make statements about Tom McGrath, but provides no citation to any evidence supporting that asserted fact.  [ ] Dispute that Ms. Riedel testified that "she would take any use of the word 'sculpture' to the legal department for potential trademark infringement" or that "she might take the domain name 'popsugar' to the legal department for potential trademark infringement."  Those statements distort Ms. Riedel's testimony.  In the referenced testimony, counsel for Defendants posed repeated hypotheticals to Ms. Riedel about whether she would refer domain names that contained the letters PSU to the legal department.  [Doc. No. 196-2 (Riedel deposition testimony) at 9–10].  Ms. Riedel clearly testified that "if someone brought something to me and they thought it was infringing, I certainly would raise it to make sure that it was not confusingly similar to the use of our marks." [Id.]  In the examples of "sculpture" and "popsugar", Ms.

Riedel responded that the hypotheticals were confusing, and opposing counsel appeared to narrow the questions to ask just about domains that used "PSU". [Id.] (Ms. Riedel saying "I got a little lost on that one." And opposing counsel rephrasing a question to say, "Well, I'm just—I'm just wondering, if someone were using 'PSU' in an industry that was entirely unrelated to your trademarks, would that be trademark infringement?"). Further, Ms. Riedel testified that she does not have any legal training and therefore, would consult legal any time someone brought something to her attention that they believed was infringing Penn State's Marks. [Doc. No. 196-2 (Riedel deposition testimony) at 9–10). Disputed to the extent that this Statement implies that Ms. Riedel did not use her office phone, or that she primarily used her cell phone in 2015. She testified that her office phone number had remained the same since at least 2012, and that at the present time, she was primarily using her cell phone. She gave no testimony about the proportion of work she conducted on her cell phone versus office phone in 2015. [Doc. No. 196-2 (Riedel deposition testimony) at 11–12)].

(Doc. No. 194 at 80–81.)

The parties dispute when Riedel first learned of Defendants' use of GOPSURV.

Compare (Doc. No. 174 ¶ 70 with Doc. No. 194 at 81). Defendants state that "Riedel does not remember when she first learned of Defendants' use of GOPSURV, saying 'it is possible' it was 2012 or before." (Doc. No. 174 ¶ 70) (citing Doc. No. 214-2 (Riedel deposition testimony) at 7–8). Plaintiff disputes this statement, asserting that "Maureen Riedel testified that she learned about the domain <goPSUrv.com> in April 2015, upon receiving an email from Tom McGrath raising the issue." (Doc. No. 194 at 81) (citing Doc. No. 178-20 (Riedel deposition testimony) at 4–8). Plaintiff further states that "[s]he otherwise testified that she had 'no recollection' of any conversation with Lauer prior to April 2015, stating only that she could have spoken with him because she 'talk[s] to a lot of people.'" (Doc. No. 194 at 81) (citing Doc. No. 178-20 (Riedel deposition testimony) at 4–6). Riedel had personal knowledge that in 2015 Tom McGrath "was trying to figure out operationally what was going on in the lots around – you know, who was operating RVs in the lots." (Doc. No. 174 ¶ 71.)

Thomas McGrath was the associate athletic director for business relations at Penn State

beginning in 2014 until February 2023.  (Doc. No. 174 ¶ 88; Doc. No. 194 at 94.)  The parties

dispute Mr. McGrath's description of his job duties.  <u>Compare</u> (Doc. No. 174 ¶ 89 with Doc. No.

94 at 94).[44]  Mr. McGrath was not familiar with who was using the ORV lot before he was hired

in April of 2014 and remained "in the dark" about who was using the ORV lot until April of

2015.  (Doc. No. 174 ¶ 90) (citing Doc. No. 214-3 (McGrath deposition testimony) at 9).[45]

McGrath testified that the Intercollegiate Athletics Department is a part of Penn State.  (Doc. No.

174 ¶ 91) (citing Doc. No. 214-3 (McGrath deposition testimony) at 6–7).[46]  In an email from

McGrath to Ms. Riedel dated April 23, 2015, McGrath refers to Defendants' use of GOPSURV.

(Doc. No. 174 ¶ 92) (citing (Doc. No. 214-3 (McGrath deposition testimony) at 15).  The parties

---

[44]  Defendants state that "McGrath testified that he does not know what his official job
responsibilities are as listed in his job responsibilities worksheet (JRW) which he reviews each
year, but that that [sic] he intuitively believes his job responsibilities involved business relations,
marketing, production[] services and sponsorship."  (Doc. No. 174 ¶ 89) (citing Doc. No. 214-3
(McGrath deposition testimony) at 8).  Plaintiff does not dispute that Mr. McGrath testified as to
his job responsibilities in the area of business relations that involve marketing, production,
services, sponsorship, and creative services but "[o]therwise, dispute[s]" this statement because
"Mr. McGrath testified to his job duties and that these responsibilities were provided by his
supervisors."  (Doc. No. 194 at 94) (citing Doc. No. 214-3 (McGrath deposition testimony) at 8).

[45]  Plaintiff responds to this statement as follows:

> [u]ndisputed that Mr. McGrath was aware of some of the vendors present at the ORV
> lot in April 2015.  Undisputed that Mr. McGrath was not familiar with the vendors at
> the ORV lot prior to 2015 because he was not employed by Penn State then.
> Otherwise disputed to the extent that this Statement's use of "in the dark" implies
> that Mr. McGrath should have been aware of the vendors at the ORV lot prior to the
> time he first started working at Penn State and is argumentative.

(Doc. No. 194 at 95.)

[46]  Plaintiff responds to this statement as follows: "[u]ndisputed that Intercollegiate Athletics is a
department within the University" but "[d]isputed to the extent that this Statement is meant to
imply or suggest that the Intercollegiate Athletics Department, or each person working therein,
has the authority to license or enforce Penn State's trademarks."  (Doc. No. 194 at 95) (citing
Doc. No. 178-2 (McGrath Declaration) ¶¶ 59–60, 62).

dispute the circumstances surrounding Mr. McGrath's submission of a sworn declaration in the

UDRP Proceeding.  Compare (Doc. No. 174 ¶ 93 with Doc. No. 194 at 96).[47]

   The parties dispute Mr. McGrath's testimony regarding potential permission given to

Defendants for use of the <gopsurv.com> domain name.  Compare (Doc. No. 174 ¶ 94 with Doc.

No. 194 at 96–97).  Defendants state that "McGrath testified that it is possible other individuals

at Penn State before he was hired in 2014 may have given permission to Defendants to use the

<gopsurv.com> domain name."  (Doc. No. 174 ¶ 94) (citing Doc. No. 214-3 (McGrath

deposition testimony) at 13–14).  Plaintiff responds to this statement as follows:

> Undisputed that Mr. McGrath testified that he is not aware of anyone giving
> Defendants permission to use the <gopsurv.com> domain name before he was hired.
> [Doc. No. 214-3 (McGrath deposition testimony) at 13].  Otherwise disputed.  The
> cited testimony does not support the assertion that "it is possible other individuals at
> Penn State . . . may have given permission to Defendants to use the <gopsurv.com>
> domain name."  Mr. McGrath testified that Penn State has never given permission to

---

[47]  Defendants state that "McGrath testified that he did not write some of the sworn declaration
he submitted in arbitration, but that some of it was written for him by someone at the General
Counsel's Office.  McGrath then admitted that his statement in his sworn declaration that PSSP
only had an agreement with Defendants for sponsorship during the 2013-2014 football season
was false."  (Doc. No. 174 ¶ 93) (citing Doc. No. 214-3 (McGrath deposition testimony) at 10–
12).  Plaintiff disputes this statement, as follows:

> Mr. McGrath testified that the phrasing "upon information and belief" may have
> been drafted by counsel.  See [Doc. No. 214-3 (McGrath deposition testimony) at
> 10].  Disputed that Mr. McGrath made any false statements in the declaration
> referenced.  This Statement 93 does not correctly set out the paragraph of the
> declaration being discussed because the actual paragraph provides the statement
> "upon information and belief" and is clear that "I am not aware of any contracts
> between Penn State Sports Properties LLC and [Defendants]."  See [Doc. No. 194-26
> (McGrath declaration submitted in UDRP Proceeding and marked as exhibit 1 in
> McGrath deposition)].  As Mr. McGrath explained in his deposition, at the time that
> he submitted the declaration referenced, he was only aware of one sponsorship
> agreement between Penn State Sports Properties and Defendants.  See [Doc. No.
> 214-3 (McGrath deposition testimony) at 10].  This statement was made on
> information and belief, and when Mr. McGrath submitted this declaration, he
> believed that it was true.  [Id. at 10–11.]

(Doc. No. 194 at 96.)

use Penn State's marks in the domain <goPSUrv.com> or with its business.   See
[Doc. No. 214-3 (McGrath deposition testimony) at 13].   The citation used by
Defendants here appears to rely on statements made by counsel for Defendants
saying that permission could in theory have been granted by other people at Penn
State.   See [id. at 14].   Further, disputed because this statement has no relevance.   Mr.
Lauer has testified that he never sought permission to use Penn State's marks.   See
[Doc. No. 178-23 (Mark Lauer deposition testimony) at 31–32].

(Doc. No. 194 at 96–97.)

The parties dispute the nature of a potential discrepancy between McGrath's testimony in

the UDRP Proceeding and his testimony in this case.   Compare (Doc. No. 174 ¶ 95 with Doc.

No. 194 at 97–97).[48]   McGrath submitted sworn testimony in the [UDRP Proceeding] that:

I am aware that Doug Nelson at PSSP received an unsolicited text message from
Respondent approximately one to two months ago, followed by an email from
Respondent sent to another PSSP employee on July 12th, 2019.   In each of these
communications, Respondent submitted an initial inquiry for advertising during the
2019 football season.   Other than the initial text message and subsequent email by
Respondent expressing interest in pricing, I am not aware of any further
communications, and no agreement has been discussed, negotiated or executed.

---

[48]  Defendants state: "[w]hen asked why he falsely represented in his testimony in arbitration that
he had knowledge that no permission had been given by Penn State to Defendants to use the
Disputed Domain—despite acknowledging in the deposition he did not have knowledge—
McGrath simply responded, 'I don't have an answer.'"   (Doc. No. 174 ¶ 95) (citing Doc. No.
214-3 (McGrath deposition testimony) at 14).   Plaintiff responds as follows:

To the extent this statement purports to quote Mr. McGrath's testimony, that
testimony speaks for itself.   Otherwise, disputed.   Specifically, Penn State disputes
that Mr. McGrath made any false representations in his testimony in arbitration.   He
testified "to the best of [his] knowledge, information, and belief" that Penn State "has
never given [Defendants] any permission to use [Penn State's] trademarks in the
domain gopsurv.com, or in connection with [Defendants'] regular business
activities."   See [Doc. No. 194-26 (McGrath UDRP Declaration) ¶¶ 1, 7].   Disputed
that this statement was false.   See [Doc. No. 178-23 (Lauer deposition testimony) at
31–32; Doc. No. 178-24 (Plaintiff deposition testimony) at 12–13, 19; Doc. No. 178-
2 (McGrath Declaration) ¶¶ 8, 62, 68; Doc. No. 178-25 (McGrath deposition
testimony) at 3; Doc. No. 178-28 (Bordner deposition testimony) at 4].

(Doc. No. 194 at 97–98.)

(Doc. No. 174 ¶ 96) (citing Doc. No. 214-3 (McGrath deposition testimony) at 16).[49]  The parties

dispute Mr. McGrath's testimony regarding his sworn representation made in the UDRP

Proceeding.  Compare (Doc. No. 174 ¶ 97 with Doc. No. 194 at 99–100).[50]

Mr. McGrath was Plaintiff's corporate designee for all topics in Defendants' 30(b)(6)

deposition of Penn State.  (Doc. No. 174 ¶ 98.)  During Plaintiff's deposition, Plaintiff was

shown historical screenshots of Plaintiff's own website at <gopsusports.com>, including the

following:

---

[49]  Plaintiff responds: "[t]o the extent this statement purports to quote from Mr. McGrath's
arbitration declaration, the declaration speaks for itself.  Otherwise, Statement 96 is not a fact
that is material to the outcome of Defendants' Motion for Summary Judgment."  (Doc. No. 194
at 98.)

[50]  Defendants state that "[a]fter attempting to evade the question repeatedly, McGrath finally
admitted this sworn representation in his testimony in [the UDRP Proceeding] was false."  (Doc.
No. 174 ¶ 97) (citing Doc. No. 214-3 (McGrath deposition testimony) at 17–18).  Plaintiff
disputes this statement as follows:

> Mr. McGrath did not make any false representations in his arbitration declaration.
> Mr. McGrath testified in his arbitration declaration that other than an initial text
> message and subsequent email by Defendants expressing interest in pricing
> concerning advertising during the 2019 football season, he was not aware of any
> further communications between Defendants and PSSP concerning advertising
> during the 2019 football season.  Mr. McGrath testified during his deposition in this
> case that the statement he made in his arbitration declaration was and is correct.  See
> [Doc. No. 214-3 (McGrath deposition testimony) at 17].  Defendants' assertions in
> Statement 97 that Mr. McGrath's declaration was incorrect are not supported by the
> record.  The cited evidence appears to rely on a point that counsel for Defendants
> tried to make during Mr. McGrath's deposition, wherein counsel repeatedly asked
> Mr. McGrath whether he was aware of other communication—unrelated to the 2019
> football season—between PSSP and Defendants.  [Id.].  The testimony also does not
> support this Statement because Mr. McGrath was clear and consistent that his
> declaration was correct: he was not aware of other communications between those
> parties relate[d] to the 2019 football season.  [Id.]. Otherwise, Statement 97 is not a
> fact that is material to the outcome of Defendants' Motion for Summary Judgment.

(Doc. No. 194 at 99–100.)





(Doc. No. 174 ¶ 99.)  The parties dispute Plaintiff's testimony regarding its failure to mark the

website <goPSUsports.com> with trademark identifiers.  <u>Compare</u> (Doc. No. 174 ¶ 100 with

Doc. No. 194 at 101).[51]  The parties dispute Plaintiff's testimony regarding its actions toward

---

[51]  Defendants state that:

> Penn State admitted it has not marked references to its own website goPSUsports nor
> gopsurv.com with any trademark identifiers, either the ® or ™ symbols.  [Doc. No.
> 203-7 (Plaintiff 30(b)(6) deposition testimony) at 5–15].  Plaintiff offered various
> contradictory explanations for this, including that references to URLs should not be
> marked with trademark indicators because they are "associated with a web page."
> [<u>Id.</u> at 15].  Penn State also testified it was not necessary to mark goPSUsports as a
> trademark because any person who has come to the website has already gotten there
> and because any person who has come to the website has already gotten there and
> knows what it is.  [<u>Id.</u> at 14].  When presented with evidence that Penn State is
> marking references to the domain name of their credit union PSECU with trademark
> identifiers, Penn State simply said testified [sic] that "some people use it [trademark
> identifiers], some people do not." [<u>Id.</u> at 20].

(Doc. No. 174 ¶ 100.)  Plaintiff disputes this statement as follows:

other RV rental companies.  Defendants state that "Penn State admitted knowing other RV companies were also using variations of their trademarks to offer RV rental services but has not litigated against them, including Nittany RV."  (Doc. No. 174 ¶ 101) (citing Doc. No. 203-7 at 39–40).[52]  Plaintiff responds as follows:

> Undisputed that Penn State has not instituted legal action against Nittany RV.  Otherwise disputed.  The cited testimony does not reflect that Nittany RV is "using variations of [Penn State's] trademarks" or that this company is infringing on Penn State's trademarks.  Rather, the testimony only states that Nittany RV is a company and that Penn State has not litigated against it or accused that company of trademark infringement.  Statement 101 is not a fact that is material to the outcome of Defendants' Motion.

(Doc. No. 194 at 102.)  The parties also dispute Plaintiff's testimony regarding the fact that Plaintiff does not rent RVs.  Compare (Doc. No. 174 ¶ 102 with Doc. No. 194 at 102).[53]

---

> The cited testimony covers information that was outside the scope of Penn State's 30(b)(6) notice.  See [Doc. No. 194-28 (Plaintiff 30(b)(6) deposition testimony) at 3–13].  Further, Penn State did not offer contradictory explanations about its use of trademark notices.  Mr. McGrath testified about different considerations that might go into play with whether to use trademark notices together with domain names.  [Id. at 3–15].  Otherwise, Statement 100 is not a fact that is material to the outcome of Defendants' Motion for Summary Judgment.

(Doc. No. 194 at 101.)

[52] [DEFENDANTS' FOOTNOTE REPRODUCED HERE] – Lauer testified that he believed a member of Penn State's Board of Trustees was a silent partner in his competitor Nittany RV, which competitor never faced litigation from Plaintiff for use of NITTANY.  [Doc. No. 174-3 (Lauer deposition testimony) at 109].

[53] Defendants state that: "Penn State admitted that it has never rented RVs.  [Doc. No. 203-7 (Plaintiff deposition testimony) at 15–16].  Penn State testified it does not rent vehicles either.  [Id. at 18].  Penn State testified it owns a trolley and some shuttles which are not rented as vehicles, but which Penn State uses to offer transportation services.  [Id. at 19]."  (Doc. No. 174 ¶ 102.)  Plaintiff responds to this statement as follows:

> Undisputed that Penn State does not directly rent RVs.  Undisputed that Penn State offers transportation including through a trolley and shuttles.  Disputed to the extent that this Statement purports to suggest that Penn State does not offer goods and services related to Defendants RVs, or does not enter into sponsorship agreements with companies that offer RV services.  Penn State, through its exclusive sponsorship

The parties hotly dispute the facts surrounding when Plaintiff knew of Defendants' use of

<goPSUrv.com>.  Given the length of Defendants' statement 103 and Plaintiff's response, the

Court sets them forth in full in the text.  Defendants state:

> Penn State repeatedly testified that it only came to know Defendants were using <gopsurv.com> in April of 2015.  See [Doc. No. 174-10 (Plaintiff's discovery responses)].[54]  When presented with evidence showing internal Penn State emails referring to Defendants by the domain <gopsurv.com> beginning in 2010, Penn State simply represented that it had acquired this knowledge only in 2015 because this is when a single individual hired in 2014 (Tom McGrath, one of several assistant athletic directors) saw the Defendants in 2015.  [Doc. No. 203-7 (Plaintiff 30(b)(6) deposition testimony) at 21].  Penn State conducted no investigation in representing the 2015 date was accurate, despite basing both the lost arbitration and the current action entirely on that date.  Plaintiff's corporate designee reviewed no documents and spoke with nobody in making and maintaining this representation.  [Doc. No. 203-7 (Plaintiff 30(b)(6) deposition testimony) at 21–22].  Penn State then litigated this case for five years without correcting the representation that this 2015 date was accurate with the Court.  (Judicial Notice.)  The relevant portion of the transcript follows:
>
> Q.      Then on what basis do you say that Penn State had knowledge only in 2015 of the use of the URL?
>
> A.      Because that is when it came to my attention, and I forwarded it to the appropriate individuals at Penn State.
>
> Q.      So the investigation that you conducted to prepare for this deposition as to when Penn State had knowledge that goPSUrv.com was being used was looking at your own knowledge; is that right?
>
> Ms. Wheatley: Objection; misstates testimony.  As you are well aware, Steven, the

---

> agent Penn State Sports Properties, recently entered into a marketing and sponsorship agreement with a third party operating in the RV business, and under this agreement that company may use the designations "Official RV Dealer Sponsor of Penn State Football" and "Official RV Dealer Sponsor of Penn State Athletics," among other promotional uses.  See [Doc. No. 214-1 (sponsorship agreement)].  Further, Penn State has been using the PSU Mark for decades in connection with a wide variety of goods and services that are related to Defendants' RV products and services, including lodging and hospitality, an RV lot, tailgating equipment and services, and transportation services.  See, e.g., [Doc. No. 178-2 (McGrath Declaration) ¶ 49; Doc. No. 178-5 (Exh. B to McGrath Declaration) at 12–31; Doc. No. 178-24 (Plaintiff 30(b)(6) deposition testimony) at 4–9; Doc. No. 178-31; Doc. No. 178-16; Doc. No. 178-17; Doc. No. 178-18; Doc. No. 178-19].

(Doc. No. 194 at 102–03.)

[54]  [DEFENDANTS' FOOTNOTE REPRODUCED HERE] – Excerpts provided to eliminate reference to Confidential statements.

relevant standard is when people at Penn State with responsibility for trademark infringement had knowledge.

Mr. Rinehart: I'm asking him what preparation he did to answer this question.

By Mr. Rinehart:

Q.     Who else did you speak with? Was it only your own personal knowledge?

A.     I reported it.  And it was new to the people that I reported it to.

Q.     So when you say that Penn State acquired knowledge in 2015 that defendants were using goPSUrv.com, your basis for that statement is that that's because when—that's when you learned about it?

A.     And that's when I referred it to the appropriate individuals at Penn State in licensing and then it went to general counsel for review.  Yes.

Q.     But you admit that there were other Penn State employees who knew about it before that time?

Ms. Wheatley: Objection: form and foundation.

The witness: You have shared that an employee used it in 2010.

By Mr. Rinehart:

Q.     You spoke with this employee, you said, in preparation for this deposition.

A.     Yes.

Q.     Were you aware that that employee had knowledge of goPSUrv.com before 2015?

A.     No. It didn't come up.

Q.     Did you speak with anybody else or review any other documents in preparing to answer the question of when Penn State acquired knowledge of goPSUrv.com?

A.     No.

Id.

(Doc. No. 174 ¶ 103.)  In response, Plaintiff states:

Undisputed that Penn State did not have knowledge of Defendants' infringing use of the PSU Mark prior to April 2015.  To the extent this statement purports to quote from the deposition transcript of Mr. McGrath, that transcript speaks for itself. Otherwise, disputed.

Specifically, Penn State disputes this Statement to the extent that it implies that Penn State had knowledge of Defendants' infringing use of the PSU Mark prior to 2015. The record is clear that Penn State personnel responsible for enforcing trademarks first learned about Defendants' use of the goPSUrv Mark and Domain in April 2015. [Doc. No. 178-24 (Plaintiff deposition testimony) at 16–17; Doc. No. 178-2 (McGrath Declaration) ¶¶ 59–60, 62; Doc. No. 178-20 (Riedel deposition testimony) at 6–8; Doc. No. 196-1 (4/24/15 email from Tom McGrath to Maureen Riedel regarding goPSUrv)].  Disputed that Penn State's corporate representative, Tom McGrath, failed to adequately investigate whether Penn State had been placed on notice of the infringement prior to 2015.  The cited deposition transcript (including that testimony that Defendants excerpt) refers to questions that Defendants' counsel asked about whether Mr. McGrath had investigated that Iona Conlon had an email in

75

2010 with Mark Lauer that referenced goPSUrv.  The implication that Mr. McGrath was required to "investigate" Ms. Conlon's knowledge based on that email is disputed.  Ms. Conlon works at the York County campus for Penn State, and she does not have authority over or responsibility for Penn State's trademarks.  See [Doc. No. 194-19 (Conlon Declaration) ¶¶ 4, 8, 17].  Mr. McGrath was a member of the University Licensing Committee, which is the body responsible for overseeing the University's trademarks.  [Doc. No. 178-2 (McGrath Declaration) ¶ 62; Doc. No. 178-24 (Plaintiff 30(b)(6) deposition testimony) at 19].  Mr. McGrath therefore has knowledge about who has responsibilities for Penn State's trademarks, and similarly would know that Ms. Conlon does not have those responsibilities.  Id.

Disputed that Penn State "litigated this case for five years without correcting the representation this 2015 was accurate with the Court."  This case was filed in November 2019, and has not been in litigation for five years.  Further, there is no evidence that persons responsible for Penn State's trademarks (who are, by law, the people whose knowledge can be imputed to Penn State), knew about Defendants' infringing conduct before April 2015.  The evidence on the record is clear that April 2015 is when Penn State learned of the infringement through Tom McGrath receiving a piece of Defendants' marketing at the Blue-White game, and then referring this issue to Maureen Riedel for the Licensing Committee's Review.  See [Doc. No. 178-24 (Plaintiff 30(b)(6) deposition testimony) at 16–17; Doc. No. 178-20 (Riedel deposition testimony) at 6–8; Doc. No. 178-2 (McGrath Declaration) ¶¶ 59–60].  Mr. Lauer's own cell phone records confirm this date, as they show that Penn State's Licensing Department called him within weeks of that discovery, and demanded that he stop using the GoPSUrv Mark.  See [Doc. No. 194-15 (phone records); Doc. No. 194-10 (Mark Lauer deposition testimony) at 3–13].  Defendants have not produced any evidence that personnel responsible for Penn State's trademarks learned about their infringement before this time.  Rather, the evidence shows that Defendants took efforts to represent themselves as "Keystone Alternatives" or simply use Mark Lauer's name in many of their contacts with Penn State.  See [Doc. No. 194-13 (Ticketing Department records) at 2–4; Doc. No. 209-8 (Exh. C. to Mark Lauer Declaration) at 14–27 (marketing and sponsorship contracts); Doc. No. 209-8 (Exh. D to Mark Lauer Declaration) at 28–38 (insurance certificates); Doc. No. 194-8 (Baker Declaration) ¶¶ 11–15; Doc. No. 196-4; Doc. No. 194-6 (Bodenschatz Declaration) ¶¶ 14–19].

(Doc. No. 194 at 105–08.)  The parties also dispute Defendants' statement that "[d]espite

representing that Penn State became aware of Defendant's use of GOPSURV only in 2015,

McGrath testified for Penn State that he was aware of Defendants' RVs bearing GOPSURV

stenciling being parked on campus in front of the Bryce Jordan Center 'going back several years

before' 2015."  (Doc. No. 174 ¶ 104) (citing Doc. No. 203-7 (Plaintiff 30(b)(6) deposition

testimony) at 42).  Plaintiff disputes this statement as follows:

> This Statement distorts Mr. McGrath's testimony as the corporate representative for
> Penn State in saying that he was aware of Defendants' using the goPSUrv Mark on
> campus for years before 2015.  This quoted testimony was provided after
> Defendants' attorney showed Mr. McGrath photographs that were dated April 2013
> and appeared to show Defendants' advertising on campus.  See [Doc. No. 194-28
> (Plaintiff 30(b)(6) deposition testimony) at 29–30].  Mr. McGrath testified that he had
> present knowledge (that is, at the time of the deposition in 2021) that Defendants had
> entered contracts with Penn State Sports Properties going back to 2010, pursuant to
> which Defendants were allowed to park their RV on Penn State property for Blue-
> White games in April of each year, through 2015.  See [Doc. No. 194-28 (Plaintiff
> 30(b)(6) deposition testimony) at 30]; see also (Doc. No. 209-8 (Exh. C to Mark
> Lauer Declaration) at 14–27].  Mr. McGrath did not testify that Penn State knew,
> prior to 2015, that Penn State was using the goPSUrv.Mark.

(Doc. No. 194 at 108.)  The parties dispute Plaintiff's testimony regarding social media postings

about GOPSURV by the Penn State Alumni Association York Chapter.  Compare (Doc. No. 174

¶ 105 with Doc. No. 194 at 109).[55]  The parties also dispute Plaintiff's testimony regarding a

business called PSU Home Inspections.  Compare (Doc. No. 174 ¶ 106 with Doc. No. 194 at

109–10).[56]

---

[55] Defendants state that "Penn State's corporate designee, McGrath, refused to answer, after
being asked 26 times, whether Penn State employees had made social media postings about
GOPSURV on social media pages of the Penn State Alumni Association York Chapter years
before (despite this being a topic for which McGrath was designated to respond)."  (Doc. No.
174 ¶ 105) (citing Doc. No. 203-7 (Plaintiff 30(b)(6) deposition testimony) at 29–38).

Plaintiff disputes this statement, asserting that it "is not supported by the record" because "[t]he
cited deposition transcript shows Defendants' attorney asking Mr. McGrath various questions
about whether 'Penn State' made certain social media posts, and Mr. McGrath repeatedly
answered that those posts were made by the York County Chapter of the Alumni Association."
(Doc. No. 194 at 109) (citing Doc. No. 194-28 (Plaintiff 30(b)(6) deposition testimony) at 29–
38).  Plaintiff further states that "[t]he questioning focused on one specific post, with
Defendants' attorney asking repeatedly for the name of the person who had made the post, and
Mr. McGrath stating that his only knowledge was that the post would have been made by
someone from the York County Chapter, not by Penn State."  (Id.)

[56] Defendants state that "McGrath, acting for Penn State, repeatedly refused to answer the
question of whether a business called PSU Home Inspections was committing trademark
infringement, despite offering a service which Penn State did not" and later "testified any use of

The parties dispute Mr. McGrath's efforts to prepare for his 30(b)(6) deposition. Compare (Doc. No. 174 ¶ 107 with Doc. No. 194 at 110). Defendants state "McGrath repeatedly admitted undertaking no effort to investigate topics in the 30(b)(6) deposition notice for which he was appointed Penn State's corporate designee, depriving Defendants of valuable information in this case in discovery." (Doc. No. 174 ¶ 107) (citing Doc. No. 203-7 (Plaintiff 30(b)(6) deposition testimony) at 41). Plaintiff disputes this statement, asserting that "[t]he cited evidence does not support this assertion" because "[t]he evidence cited here consists solely of testimony from Tom McGrath as corporate representative for Penn State, saying that in preparation for the deposition he did not speak [to] anyone in Penn State's ticketing office or search their records" but "[t]he record shows, however, that Defendants were given the records from Penn State's Ticketing Department related to Defendants' business" and so "[t]here is no support for Defendants' assertion that they were deprived of valuable information in discovery." (Doc. No. 194 at 110) (citing Doc. No. 194-28 (Plaintiff 30(b)(6) deposition testimony) at 28; Doc. No. 194-13).

On July 19, 2021, Defendants deposed Chris Longo ("Longo") with Athletes First following authorization to do so by the Court. (Doc. No. 174 ¶ 108.) The parties dispute aspects of Longo's employment with Athletes First. Defendants assert that "Longo was an employee of

---

PSU for any service is objectionable, not matter how PSU is being used." (Doc. No. 174 ¶ 106) (citing Doc. No. 203-7 (Plaintiff 30(b)(6) deposition testimony) at 47–50).

Plaintiff disputes this statement, asserting that "Mr. McGrath testified that the use of Penn State's PSU Mark would be a factor considered among others that go to whether there would be likely confusion or whether this hypothetical company would be associated in consumers' minds with Penn State" and "Mr. McGrath further testified that he does not have legal training"; moreover, Plaintiff asserts that "[t]he questions calling for legal conclusions to hypothetical questions are not material here." (Doc. No. 194 at 109–10) (citing Doc. No. 194-28 (Plaintiff 30(b)(6) deposition testimony) at 47–50).

Athletes First—the sports agency of Coach James Franklin—who communicated on behalf of Franklin with Defendants,[57] who admits he was an agent of Franklin." (Doc. No. 174 ¶ 109) (citing Doc. No. 207 (Longo deposition testimony) at 94:2-5 – page not contained in portion of transcript filed at Docket Number 207). Plaintiff does not dispute that "Mr. Longo was an employee of Athletes First, the sports agency that represents Coach James Franklin" and that "Mr. Longo communicated with Defendants on behalf of Coach Franklin" but otherwise disputes Defendants' statement, as follows: "Penn State disputes that Mr. Longo provided inconsistent testimony" because "[t]he portions of Mr. Longo's deposition transcript cited in Defendants' footnote are not internally inconsistent and do not show contradictions" and "Mr. Longo testified clearly that he first worked for Athletes First as an intern, was then hired full-time around 2017." (Doc. No. 194 at 111) (citing Doc. No. 194-30 (Longo deposition testimony) at 3–4, 14, 25).

The parties dispute the representations made by Longo regarding James Franklin and Sandy Barbour's authorization for Defendants to distribute a voucher containing <gopsurv.com> at Penn State events. Compare (Doc. No. 174 ¶ 110 with Doc. No. 194 at 112–13.)[58] The

---

[57] [DEFENDANTS' FOOTNOTE REPRODUCED HERE] With respect to what position of employment Longo had at Athletes First when communicating with Defendants, Longo contradicted himself repeatedly in an attempt to trivialize his position of authority with Athletes First during the period of his communications with Defendants. Cf. [Doc. No. 207 at 14:3-18 – referenced page not contained in portion of Longo deposition transcript filed at Docket Number 207] (in which Longo affirms he is a "marketing manager" and confirms that his social media pages say he has been so since 2016); id. [7:18-21 – referenced page not contained in portion of Longo deposition transcript filed at Docket Number 207] (Longo says he interned for Athletes First in 2015 or 2016) See id. [98:7-10 – referenced page not contained in portion of Longo deposition transcript filed at Docket Number 207] (Longo represents he doesn't know if he was an intern in 2017). But see id. [64:6-8 – referenced page not contained in portion of Longo deposition transcript filed at Docket Number 207] (Longo claims he was an intern in 2017). See also id., [Doc. No. 207 (Ex. A to Longo deposition) at 53–54] (showing that Longo was not an intern, but a 'marketing associate' from October 2016 to May 2018).

[58] Defendants state that:

parties' dispute Longo's identification of the voucher at issue.  <u>Compare</u> (Doc. No. 174 ¶ 111

with Doc. No. 194 at 113–14).[59]  Plaintiff disputes Defendants' statement that "Longo

---

> [i]n the 97-page Text Message Chain between Longo and Defendants, covering a six-
> month period of time in early-2017, Longo expressly represented that <u>both James
> Franklin and the AD [Athletic Director of Penn State Sandy Barbour]</u> knew of,
> and/or authorized, Defendants to distribute a voucher bearing the Disputed Domain
> <gopsurv.com> at official Penn State events on campus as compensation for RV
> rentals provided to Franklin without charge (and/or to be provided without charge to
> Franklin, for professional purposes).

(Doc. No. 174 ¶ 110) (citing Doc. No. 207 (Longo deposition testimony) at 20–22).

Plaintiff disputes this statement, as follows:

> The evidence cited by Defendants does not support this asserted statement of fact.  In
> the cited transcript, Mr. Longo stated only that the Franklins were "talking with the
> [Athletic Director] and needed to know the size and dimensions [of the RV], so they
> can figure out where to park it" for their personal use during tailgates.  <u>See</u> [Doc. No.
> 194-30 (Longo deposition testimony) at 17–22].  Disputed to the extent this
> Statement implies that Coach Frankl[i]n authorized Defendants to use the PSU Mark,
> or that Defendants could have reasonably interpreted Coach Frankl[i]n as providing
> any such authorization.  <u>See</u> [Doc. No. 178-2 (McGrath Declaration) ¶ 40]; <u>see also</u>
> [Doc. No. 178-25 (McGrath deposition testimony) at 4] (testimony from Tom
> McGrath that Penn State's athletics head coaches do not have permission or authority
> to endorse vendors, as such action would be contrary to the sponsorship relationship
> that the athletic department has to solicit sponsors); [Doc. No. 178-27 (Longo
> deposition testimony) at 3–5] (testimony from Chris Longo of Athletes First, who
> previously worked for the agency representing Penn State's football coach James
> Franklin, that Coach Franklin does not have authority to allow others to use Penn
> State's trademarks, and that he never suggested that the has authority to license Penn
> State's trademarks). Similarly disputed that Sandy Barbour authorized Defendants'
> marketing.  In the cited deposition testimony—in a materials [sic] Mr. Longo read
> off at the instruction of Defendants' attorney—Ms. Barbour is purported to have
> indicated that she needed to know the dimensions of Defendants' RV in order to
> determine where it could be parked for the Franklins' personal use during tailgates.
> <u>See</u> [Doc. No. 194-30 (Longo deposition testimony) at 17–20].  Ms. Barbour did not
> authorize Defendants to distribute these flyers.  <u>See</u> [Doc. No. 194-38 (Plaintiff
> 30(b)(6) deposition testimony) at 16–17].

(Doc. No. 194 at 112–13.)

[59] Defendants state that "Longo identified the voucher he claimed Franklin authorized
Defendants to distribute at official Penn State events" and "[t]his voucher/flyer bears the
Disputed Domain <gopsurv.com> and an endorsement referencing PSU", as follows:

represented in [the] Text Message Chain that Defendants were authorized by Franklin and Barbour to distribute the following voucher at official Penn State athletic events as consideration for free RV services of Defendants to Franklin."[60]  (Doc. No. 174 ¶ 112) (citing [Doc. No. 194–30 (Longo deposition testimony) at 20–22]).  Plaintiff disputes this statement as follows:

> This Statement is not supported by the evidence cited.  Mr. Longo testified only that Defendants were seeking authorization to change information on a flyer.  He did not testify that Coach Franklin or Mr. Barbour authorized the distribution of any flyers.



(Doc. No. 174 ¶ 111) (citing Doc. No. 194-30 (Longo deposition testimony) at 11).

Plaintiff disputes this assertion, stating:

> Mr. Longo testified that he was not sure whether the flyer shown here and shown in his deposition is the same flyer that Mark Lauer had requested James Frankl[i]n approve. See [Doc. No. 194-30 (Longo deposition testimony) at 11–12]. Further disputed that Mr. Longo testified that Franklin authorized Defendants to distribute this flyer at official Penn State events. The cited record shows only that Mark Lauer was seeking permission to disseminate a flyer that was similar to the one shown. [Id. at 11]. Mr. Longo testified that he could not recall whether he or James Franklin had authorized any flyers to be distributed wherein Mr. Franklin was endorsing Defendants' services.  [Id. at 11–13]. Disputed to the extent this Statement implies that Coach Frankl[i]n authorized Defendants to use the PSU Mark, or that Defendants could have reasonably interpreted Coach Frankl[i]n as providing any such authorization.  See [Doc. No. 178-2 (McGrath Declaration) ¶ 40]; see also [Doc. No. 178-25 (McGrath deposition testimony) at 4; Doc. No. 178-27 (Longo deposition testimony) at 3–5].

(Doc. No. 194 at 113–14.)

[60] [DEFENDANTS' FOOTNOTE REPRODUCED HERE] This voucher was authorized with the wording shown changed from "OFFICIAL PSU RV RENTAL & TAILGATINGS" to "OFFICIAL PSU RV RENTAL OF COACH FRANKLIN."

To the contrary, he testified that he was not aware of any authorization to change or distribute a flyer containing the Disputed Domain. See [Doc. No. 194-30 (Longo deposition testimony) at 20]. Disputed that any authorization was provided (as Defendants assert here in a footnote) that Defendants could use a voucher saying "OFFICIAL PSU RV RENTAL OF COACH FRANKLIN." Defendants provide no citation to evidence showing such authorization being granted, and so this statement must be disregarded.

Disputed to the extent this Statement implies that Coach Frankl[i]n authorized Defendants to use the PSU Mark, or that Defendants could have reasonably interpreted Coach Frankl[i]n as providing any such authorization. See [Doc. No. 178-2 (McGrath Declaration) ¶ 40]; see also [Doc. No. 178-25 (McGrath deposition testimony) at 4; Doc. No. 178-27 (Longo deposition testimony) at 3–5]. Similarly disputed that this evidence could be reasonably interpreted as Ms. Barbour granting permission for any trademark use, as the only references to Ms. Barbour (as Athletic Director) in the cited evidence refer to where Defendants' RVs could be parked on campus—not about any marketing materials or endorsements. See [Doc. No. 194-30 (Longo deposition testimony) at 20]. Ms. Barbour did not authorize Defendants to distribute these flyers. See [Doc. No. 194-28 (Plaintiff 30(b)(6) deposition testimony) at 16–17].

(Doc. No. 194 at 114–115.)

Further, the parties dispute Plaintiff's testimony regarding James Franklin's authorization to Defendants to distribute the flyer. Compare (Doc. No. 174 ¶ 113 with Doc. No. 194 at 115–16). Defendants assert that "Penn State later testified it does not know if James Franklin gave authorization to defendants to distribute this flyer." (Doc. No. 174 ¶ 113) (citing Doc. No. 194-28 (Plaintiff 30(b)(6) deposition testimony) at 17). Plaintiff disputes this statement, as follows:

The cited evidence does not support the Statement asserted. Mr. McGrath as Penn State's 30(b)(6) representative, testified that James Franklin did not have authority to authorize Defendants' use of the goPSUrv Mark on the flyer in question. See [Doc. No. 194-28 (Plaintiff 30(b)(6) deposition testimony) at 16–17]. In the question Defendants cite specifically, counsel asked Mr. McGrath whether Mr. Franklin might have given "false authorization," and Mr. McGrath responded "I don't know." [Id. at 17.] That testimony does not support this Statement, however, because Statement 113 refers to authorization generally—not "false authorization." The testimony is clear that Mr. Franklin did not give authorization to Defendants to distribute flyers using Penn State's Marks because Mr. Franklin does not have the authority to grant any such authorization. [Doc. No. 178-25 (McGrath deposition testimony) at 4].

(Doc. No. 194 at 116.)

In the text messages with Defendants, Longo also attempts to arrange RV

accommodations for Franklin at away Penn State football games, including the Maryland game

in 2017.[61]  (Doc. No. 174 ¶ 114.)  The parties dispute the following statement of Defendants:

> Defendants were unable to depose James Franklin directly on this matter, but it is
> undisputed that Longo was acting with actual authority of Franklin. [Doc. No. 194-
> 30 (Longo deposition testimony) at 24]. This Court was very careful to hold in its
> decision reviewing de novo Magistrate Judge Saporito's denial of Defendants'
> Motion to Compel Testimony of James Franklin that Longo was acting as an agent of
> Franklin. [Doc. No. 161 (Order) at 9 and 12].

(Doc. No. 174 ¶ 115.)  Plaintiff disputes this statement as follows:

> The Statement is not supported by the evidence cited.  The cited testimony from Mr.
> Longo states only that Mr. Longo told Mark Lauer that he was acting on behalf of
> James Franklin.  See [Doc. No. 194-30 (Longo deposition testimony) at 24]. Whether
> or not Mr. Longo told Mark Lauer that he was acting on Mr. Franklin's behalf is
> distinct from whether Mr. Longo was acting with Mr. Franklin's authority.
> Defendants have not cited to evidence that shows Mr. Longo had actual authority
> here.  The Statement is further unsupported in saying that this Court "was very
> careful to hold in its decision reviewing de novo Magistrate Saporito's denial of
> Defendants' Motion to Compel Testimony of James Franklin that Long was acting as
> an agent of Franklin".  This assertion is unsupported, as the Court's ruling in the
> cited pages simply reviews the position that the Defendants were submitting to the
> Court.  See [Doc. No. 161 at 9, 12]. The Court did not make any finding that Mr.
> Longo was acting as Mr. Franklin's agent—the Court's ruling was limited to finding
> that Magistrate Judge Saporito had made a typographical error in writing up a
> summary of Defendants' view that Mr. Longo was acting as Mr. Franklin's agent.
> [Id.] The Court addressed this error; but clarifying what position Defendants took
> does not amount to the Court finding that Mr. Longo was acting as Mr. Franklin's
> agent.  This Statement is unsupported.

(Doc. No. 194 at 117.)

The parties dispute whether Longo admitted telling Defendants the Athletic Director

authorized Defendants to distribute the voucher.  Compare (Doc. No. 174 ¶ 116 with Doc. No.

194 at 118).  Defendants state that "Longo admits telling Defendants the AD [Athletic Director

---

[61]  [DEFENDANTS' FOOTNOTE REPRODUCED HERE] Longo testified that he does not
know why he requested that Defendants drive an RV to the Maryland football game for Franklin
in 2017.  [Doc. No. 207 (Longo deposition testimony) at 41:24-43:16 – pages not contained in
deposition transcript submitted as Docket Number 207].

Sandy Barbour] had authorized Defendants to distribute the voucher, but says he was doing so at the instruction of his supervisor."  (Doc. No. 174 ¶ 116) (citing Doc. No. 207 (Longo deposition testimony) at 22).  Plaintiff disputes this statement because "Mr. Longo stated only that the Franklins were 'talking with the [Athletic Director] and needed to know the size and dimensions [of the RV] so they can figure out where to park it'" see [Doc. No. 194-30 (Longo deposition testimony) at 21] and "Ms. Barbour never authorized Defendants to distribute the vouchers in question."  (Doc. No. 194 at 118) (citing Doc. No. 194-28 (Plaintiff 30(b)(6) deposition testimony) at 16–17).[62]

The parties dispute whether Penn State objected to Defendants' distribution of the vouchers at Penn State events.  Compare (Doc. No. 174 ¶ 117 with Doc. No. 194 at 118).  Defendants state that "[t]hereafter, Defendants distributed the vouchers at numerous official Penn State events without objection from Penn State."  (Doc. No. 174 ¶ 117) (citing Doc. No. 189-9 (Lauer Declaration) ¶ 47).  Plaintiff does not dispute that Defendants distributed vouchers using the goPSUrv Mark at numerous Penn State events, but disputes the statement as follows:

> Disputed to the extent this Statement states that Penn State did not object to Defendants' infringing use of the PSU Mark.  Once personnel at Penn State with authority to oversee trademark and intellectual property matters became aware that Defendants were using the goPSUrv Mark or the domain <goPSUrv.com> in April 2015, Penn State diligently took action to enforce its legal rights in the PSU Mark, including by calling Mark Lauer and telling him that he was not permitted to use the goPSUrv Mark in his domain or in his business.  [Doc. No. 178-24 (Plaintiff 30(b)(6) deposition testimony) at 16–17; Doc. No. 178-20 (Riedel deposition testimony) at 4–

---

[62] Plaintiff also disputes Defendants' statement that "Longo also admitted telling Defendants that Franklin would do a promotional video for Defendants."  (Doc. No. 174 ¶ 117) (citing [Doc. No. 194-30] (Longo deposition testimony) at 23).  Plaintiff asserts that "[t]he cited testimony does not support this assertion," because "[i]n this portion of the transcript, Mr. Longo testified that Mr. Franklin may have been willing to consider doing a promotional video" but "[t]his evidence does not say that Mr. Longo told Defendants that Mr. Franklin had agreed to do a promotional video."  (Doc. No. 194 at 118) (citing Doc. No. 194-30 (Longo deposition testimony) at 23).

5; Doc. No. 178-2 (McGrath Declaration) ¶¶ 59–60; Doc. No. 194-10 (Mark Lauer deposition testimony) at 3–13].  Penn State sent Defendants a Cease and Desist Letter[] in 2017 and 2018.  [Doc. No. 178-2 (McGrath Declaration) ¶¶ 65–66; Doc. No. 178-15; Doc. No. 178-16.  Penn State had in fact demanded that Defendants cease Penn State's trademarks prior to Defendants' communications with James Franklin's sports agency.  [Doc. No. 178-24 (Plaintiff 30(b)(6) deposition testimony) at 16–17; Doc. No. 178-20 (Riedel deposition testimony) at 4–5; Doc. No. 178-2 (McGrath Declaration) ¶¶ 59–60; Doc. No. 194-10 (Mark Lauer deposition testimony) at 3–13].

(Doc. No. 194 at 118–19.)

The parties dispute whether Defendants reasonably believed that they were communicating with Franklin through Longo.  Compare (Doc. No. 174 ¶ 119 with Doc. No. 194 at 119–20).  Defendants state that "[i]n communicating with Longo, Defendants reasonably believed they were communicating with Franklin as Longo repeatedly represented, he was acting for, and communicating with, Franklin in the Text Message Chain—and that he had authority to be doing so" and further, that they "also reasonably believed Franklin had authority to act for Penn State and that Longo was acting for Athletic Director Sandy Barbour and Penn State, as Longo represented that she had authorized the voucher."  (Doc. No. 174 ¶ 119) (citing Doc. No. 189-9 (Lauer Declaration) ¶ 47; Doc. No. 174-3 (Lauer deposition testimony) at 116).  Plaintiff disputes this statement, asserting that:

> Defendants could not have reasonably believed that through the referenced text messages, they were being given authorization from Mr. Franklin or Ms. Barbour to use Penn State's trademarks.  The Statement is contradicted by Mr. Lauer's own testimony, which is clear that he never asked for or received permission from Penn State to use its marks. [Doc. No. 194-10 (Mark Lauer deposition testimony) at 3–13; Doc. No. 178-2 (McGrath Declaration) ¶¶ 65–66; Doc. No. 178-15; Doc. No. 178-16].  The cited paragraph from Defendant Mark Lauer's declaration contradicts the evidence cited above, and Defendants cannot rely on this unsupported affidavit to create a dispute of fact about whether authorization was given, or whether Mr. Lauer believed such authorization had been given.

(Doc. No. 194 at 120.)

Plaintiff disputes Defendants' statement that:

Emails sent in 2017 among Athletes First employees, originating with Longo, contain reference to a request from Franklin that Athletes First arrange RV services with Defendant (calling Defendant by the name "gopsurv"). Cf. [Doc. No. 207 (Longo deposition testimony) at 9] (Longo admits that the Athletes First email of January 23, 2017, shows requests from "coaching clients" and this list includes a request from Franklin that gopsurv.com be contacted). Cf. [Doc. No. 194-30 (Longo deposition testimony) at 6] (Longo doesn't recall if Franklin made this request). [Id. at 7] (Longo recalls reaching out to GoPSUrv.com for Franklin about the request in January of 2017).

(Doc. No. 174 ¶ 120.)  Plaintiff disputes this statement "because the Statement does not cite to evidence supporting the asserted fact" given that "[t]he only evidence cited in this Statement includes excerpts from Mr. Longo's deposition that are partial answers from Mr. Longo, none of which include testimony or evidence to support the asserted fact here (that Athletes First sent emails in 2017 referencing a request to arrange RV services for Mr. Franklin, or referencing 'gopsurv')." (Doc. No. 194 at 121) (citing Doc. No. 194-30 (Longo deposition testimony) at 5–7).  The parties also dispute whether Longo admitted arranging RV services for Coach Franklin in connection with Franklin's professional (as opposed to personal) needs.  Compare (Doc. No. 174 ¶ 121 with Doc. No. 194 at 121).[63]

---

[63]   Defendants state that "Longo admits he was arranging RV services for Franklin as part of Franklin's professional needs and that Longo wouldn't have been charged with tending to personal errands for Franklin, supporting the assertion of Defendants that Franklin's purpose in seeking Defendants' services was professional."  (Doc. No. 174 ¶ 121) (citing [Doc. No. 194-30 (Longo deposition testimony) at 9–10]).

Plaintiff disputes this statement, asserting that:

> Longo testified that he was never told the purpose of the RV services that he was coordinating for Mr. Franklin. See [Doc. No. 194-30 (Longo deposition testimony) at 49:9-16 – referenced page not included in Longo deposition transcript filed at Docket Number 194-30].  Mr. Longo further testified that in his work, "you'll do anything for the client." [Id. at 9–10].  Mr. Longo testified that his representation of Coach Franklin was not limited to matters within Coach Franklin's professional capacity. [Id. at 10]. Mr. Longo testified that he was arranging RV services for Coach Franklin for a family vacation, which is not part of Coach Franklin's professional responsibilities as the head football coach of Penn State. See [id. at 8].

The parties dispute Defendants' statement that "[i]n reliance on Athlete's First representations, and those of Franklin, that Defendants could distribute the voucher and had permission to do so from Penn State, Defendants gave free RV rental services to James Franklin in 2017" and that "Lauer also had many phone calls with Franklin's wife." (Doc. No. 174 ¶ 123) (citing Doc. No. 189-9 (Lauer Declaration) ¶ 48; Doc. No. 174-3 (Lauer deposition testimony) at 162–63). Although Plaintiff does not dispute that Defendants provided a free RV rental to Coach James Franklin in 2017 and that Defendant Mark Lauer spoke on the phone with Franklin's wife, Plaintiff disputes the remainder of the statement, as follows:

> Disputed that Mr. Lauer could have reasonably believed that Mr. Franklin had authorized Defendants to use the goPSUrv Mark. The Statement is contradicted by Mr. Lauer's own testimony, which is clear that he never asked for or received permission from Penn State to use its marks. [Doc. No. 194-10 (Lauer deposition testimony) at 36–37, 43–44.] Further, Mr. Lauer had been told on multiple occasions by Penn State that he was not permitted to use the goPSUrv Mark in running his business or in his domain. [Doc. No. 194-10 (Lauer deposition testimony) at 3–13; Doc. No. 178-2 (McGrath Declaration) ¶¶ 65–66; Doc. No. 178-15 (Exh. L to McGrath Declaration); Doc. No. 178-16 (Exh. M. to McGrath Declaration).] The cited paragraph from Defendant Mark Lauer's declaration contradicts the evidence cited above, and Defendants cannot rely on this unsupported affidavit to create a dispute of fact about whether authorization was given, or whether Mr. Lauer believed such authorization had been given.

(Doc. No. 194 at 123–24.)

The parties dispute the circumstances surrounding and implications of Coach Franklin's visit to Defendants' RV in April of 2017. Compare (Doc. No. 174 ¶ 122 with Doc. No. 194 at 122.) Defendants state that:

> Longo confirmed representing that he would try and send Franklin by Defendants' RV in April of 2017. [Doc. No. 207 (Longo deposition testimony) at 61:9–11 – referenced page not included in Longo deposition transcript filed at Docket Number 207]. Franklin did come by Defendants' RV, as Longo said he would, and was

(Doc. No. 194 at 121.)

87

photographed and videotaped signing his name with the trademarked catch phrase of Penn State University, "We Are".  The photographs shown below were used as evidence in the Logo [sic] deposition:



 (Doc. No. 174 ¶ 122) (citing Doc. No. 207) (Exh. G and I to Longo deposition testimony) at 246–47).  Plaintiff does not dispute that James Franklin was photographed and videotaped signing his name and the phrase "We Are" on Defendants' RV or that similar photographs were used in Longo's deposition.  However, Plaintiff disputes the statement to the extent it "implies that Mr. Franklin authorized Defendants to use the PSU Mark, or that Defendants could have reasonably interpreted Mr. Franklin as providing any such authorization."  (Doc. No. 194 at 122) (citing Doc. No. 178-2 (McGrath Declaration) ¶ 40; Doc. No. 178-25 (McGrath deposition testimony) at 4; Doc. No. 178-27 (Longo deposition testimony) at 3–5).  Plaintiff also asserts that this statement is not material to Defendants' motion.

The parties dispute the UDRP Decision's conclusions regarding whether PSSP is an agent of Penn State.  Compare (Doc. No. 174 ¶ 124 with Doc. No. 194 at 124–25).[64]  Plaintiff

---

[64]  Defendants state that:

In the UDRP decision, the deciding judge found PSSP is an agent of Penn State and stated the following:

The Panel therefore accepts the principal submission of the Respondent that the Complainant by its conduct, including via the agency of PSSP, authorized the Respondent to offer its services at PSU athletic events using the domain name that incorporates the Complainant's PSU trademark and acquiesced in the Respondent

disputes Defendants' statement that "Penn States [sic] Associate Athletic Director Mark Bodenschatz admitted in his deposition that PSSP was officed on campus in the White Building and may have been using Penn State phone lines to communicate with Defendants" and that "Bodenschatz calls PSSP a part of Intercollegiate Athletics and 'contracted extension of our staff.'" (Doc. No. 174 ¶ 125) (citing Doc. No. 209-6 (Bodenschatz deposition testimony) at 76–77). Although Plaintiff does not dispute that PSSP had an office on Penn State's campus, Plaintiff otherwise disputes this statement, asserting "Mr. Bodenschatz testified that he did not have knowledge of communications between PSSP and Defendants" and "testified that Penn State Sports Properties contracts with Penn State's Intercollegiate Athletics Department, but was clear that it is a separate company." (Doc. No. 194 at 125) (citing Doc. No. 194-5 (Bodenschatz deposition testimony) at 17–18; Doc. No. 194-6 (Bodenschatz Declaration) ¶ 13). Plaintiff disputes the implications of Defendants' statement that "Dave Baker testified that sponsors such

---

doing so.

(Doc. No. 174 ¶ 124) (citing Doc. No. 174-1 (UDRP Decision) at 15).

In response, Plaintiff states as follows:

> To the extent this statement purports to quote from the Arbitration Decision, the Arbitration Decision speaks for itself. Disputed that this Statement correctly interprets the UDRP decision. The text quoted refers to Penn State Sports Properties as an "agency" in an apparent reference to PSSP being an entity or business—it is not a finding that PSSP is Penn State's legal agent. Further disputed because the UDRP decision has no precedential value and is not entitled to any deference in this Court. Dluhos v. Strasberg, 321 F.3d 365, 372–74 (3d Cir. 2003) (UDRP proceedings are reviewed de novo); Barcelona.com, Inc. v. Excelentisimo Ayuntamiento, 330 F.3d 617, 626 (4th Cir. 2003). A UDRP does not involve the full scope of discovery that is available in federal litigation. See [Doc. No. 194-2] (Declaration of Lucy Jewett Wheatley regarding the UDRP standards). Moreover, Statement 124 is not a fact that is material to the outcome of Defendants' Motion for Summary Judgment.

(Doc. No. 194 at 124–25.)

as Defendants, who parked RVs on campus with permission of PSSP, were 'affiliated with Penn

State Athletics.'" (Doc. No. 174 ¶ 126) (citing Doc. No. 209-7 (Baker deposition testimony) at

44). Plaintiff responds:

> Disputed to the extent that this Statement implies or suggests that any sponsorship
> agreement granted Defendants any intellectual property rights. The sponsorship
> agreements are clear that they did not include any license to use Penn State's
> trademarks. See [Doc. No. 209-8 (Exh. C to Lauer Declaration) at 14–27]. Disputed
> to the extent that this Statement attempts to distort Mr. Baker's testimony and ascribe
> a legal meaning to his use of the word "affiliated" to imply that Defendants had a
> formal relationship with Penn State that might have permitted them the right to use
> Penn State's trademarks.

(Doc. No. 194 at 125–26.) The parties also dispute the testimony of Maureen Riedel, Penn

State's trademark licensing director, regarding Penn State Sports Properties. Compare (Doc. No.

174 ¶ 127 with Doc. No. 194 at 126).[65] In the UDRP Proceeding, Plaintiff tendered a letter dated

May 12, 2017 from Thomas McGrath which was sent to Defendants in 2017 and which is

attached to Lauer's declaration. (Doc. No. 174 ¶ 128.) In that letter, McGrath, having identified

the University policies on this matter, said that the Plaintiff's trademark could only be used with

a grant of specific rights "by the University or its licensed designee Penn State Sports

Properties." (Id.) The parties dispute the import of the UDRP Decision's conclusions regarding

Penn State's relationship with PSSP. Compare (Doc. No. 174 ¶ 129 with Doc. No. 194 at 127).[66]

---

[65] Defendants state that "Maureen Riedel, Penn State's trademark licensing director, testified that
PSSP is in the Athletic Department and 'part of athletics'" and that "Maureen Riedel testified
that PSSP would ask her before letting Penn State sponsors use Penn State marks." (Doc. No.
174 ¶ 127) (citing Doc. No. 214-2 (Riedel deposition testimony) at 20–21). Although Plaintiff
does not dispute that Penn State Sports Properties "consults with the University's Licensing
Committee before granting any licenses to use Penn State's trademarks," Plaintiff disputes that
Ms. Riedel testified that PSSP is "in the Athletics Department and 'part of athletics'", asserting
that she testified the PSSP is "a partnership with athletics" and did not provide testimony that
PSSP is part of Penn State. (Doc. No. 194 at 126) (citing Doc. No. 196-2 (Riedel deposition
testimony) at 21).

[66] Defendants state that: "[t]he [UDRP Decision] expressed concern about how Penn State could

Plaintiff disputes in part Defendants' statement that "Tom McGrath testified that Penn State allowed PSSP employees to use psu.edu email addresses and admitted that anyone receiving an email from a PSSP employee using a psu.edu email address would assume that PSSP employee was an employee of Penn State."  (Doc. No. 174 ¶ 130) (citing Doc. No. 214-3 (McGrath deposition testimony) at 21–22).  Plaintiff responds that "Mr. McGrath testified that one PSSP employee was using a psu.edu email address to communicate with Penn State fans and customers" but "[he] testified, however, that using psu.edu emails was uncommon for PSSP employees."  (Doc. No. 194 at 127) (citing Doc. No. 214-3 (McGrath deposition testimony) at 21).  The parties also dispute Tim Bordner's testimony regarding PSSP.  Compare (Doc. No. 174 ¶ 131 with Doc. No. 194 at 128).[67]

---

represent that PSSP was not an agent of the university, saying, 'Indeed, it is difficult to see how the Complainant could submit to the Panel that "PSSP is not an affiliate or agent of Complainant" when its own policies say that it is the University's "licensed designee.""  (Doc. No. 174 ¶ 129) (citing Doc. No. 174-1 (UDRP Decision) at 13).  Plaintiff responds as follows:

> To the extent this fact purports to quote from the [UDRP Decision], the [UDRP Decision] speaks for itself.  Otherwise, disputed.  The UDRP decision has no precedential value and is not entitled to any deference in this Court.  Dluhos v. Strasberg, 321 F.3d 365, 372–74 (3d Cir. 2003) (UDRP proceedings are reviewed de novo); Barcelona.com, Inc. v. Excelentisimo Ayuntamiento, 330 F.3d 617, 626 (4th Cir. 2003).  A UDRP does not involve the full scope of discovery that is available in federal litigation.  See [Doc. No. 194-2 (Wheatley Declaration) ¶ 10].  Moreover Statement 129 is not a fact that is material to the outcome of Defendants' Motion for Summary Judgment.

(Doc. No. 194 at 127.)

[67] Defendants state that "Tim Bordner, an employee with PSSP, testified in his deposition that 'obviously, we're [PSSP] kind of working for them [Penn State]'" and that "[h]e also testified that PSSP needed Penn State's permission before allowing Defendants to set up displays."  (Doc. No. 174 ¶ 131) (citing Doc. No. 209-3 (Bordner deposition testimony) at 26).  Plaintiff does not dispute that "PSSP needed to have permission for where it permitted vendors to set up displays" but disputes the statement as "not material to the Motion for Summary Judgment, including because PSSP never purported to grant authorization to Defendants to use Penn State's trademarks."  (Doc. No. 194 at 128) (citing Doc. No. 194-32 (Bordner deposition testimony) at 3; Doc. No. 178-28 (Bordner deposition testimony) at 4).

Plaintiff disputes Defendants' statement that "PSSP signed contracts with Defendants, representing knowledge by Penn State of Defendants and their activities, beginning in 2010 and running through 2017." (Doc. No. 174 ¶ 132) (citing Doc. No. 189-9 (Lauer Declaration) ¶¶ 7–8(b)). Although Plaintiff does not dispute that PSSP signed contracts with Defendants, Plaintiff "disputes this statement to the extent it purports to suggest that Penn State Sports Properties granted or purported to grant authorization to Defendants to use the goPSUrv Mark" and "dispute[s] that PSSP knew of Defendants' infringement." (Doc. No. 194 at 128) (citing Doc. No. 178-28 (Bordner deposition testimony) at 4; Doc. No. 194-32 (Bordner deposition testimony) at 3–4). The parties dispute whether PSSP was provided copies of marketing materials referencing goPSUrv to be distributed at the ORV lot. Compare (Doc. No. 174 ¶ 133 with Doc. No. 194 at 129).[68] The parties also dispute whether PSSP sent mail to Defendants beginning in 2010 "further evidencing knowledge of Defendants' use of <gopsurv.com>", as depicted below:

---

[68] Defendants state that: "PSSP was given copies each year of marketing materials Defendants would be distributing at the ORV lot bearing reference to GOPSURV and approved of them." (Doc. No. 174 ¶ 133) (citing Doc. No. 174-3 (Lauer deposition testimony) at 195–96, 201). Plaintiff disputes this statement, asserting "[t]he evidence cited does not show that Defendants provided PSSP marketing materials that reference goPSUrv, or that PSSP approved any of Defendants' marketing"; "Defendants may not put forth statements of fact that are not accompanied by citations to supporting evidence in the record"; and "[f]urther disputed to the extent it purports to suggest that Penn State Sports Properties granted or purported to grant authorization to Defendants to use the goPSUrv Mark." (Doc. No. 194 at 129) (citing Doc. No. 194-10 (Lauer deposition testimony) at 45–47; Doc. No. 178-28 (Bordner deposition testimony) at 4).



(Doc. No. 174 ¶ 134) (citing Doc. No. 189-9 (Lauer Declaration) ¶ 27; Doc. No. 209-8 (Exh. L

to Lauer Declaration) at 70–71).  Plaintiff disputes this statement, as follows:

> Defendants have not cited to evidence in the record to support this statement.  The
> cited evidence includes only a photograph of an envelope that appears to be sent
> from PSSP's parent company (Learfield) and is addressed to Keystone Alternatives.
> Then Defendants' business card is placed on top of the letter in a manner designed to
> give the misleading impression that the business card is pictured in the text of the
> letter or was included in the letter, when it is not. See [Doc. No. 194-2 (Wheatley
> Declaration) at ¶¶ 11–12 and Exh. B].  The exhibit does not show any evidence that
> PSSP was sending around Defendants' business card in mailings.

(Doc. No. 194 at 130) (citing Doc. No. 209-8 (Exh. L to Lauer Declaration) at 70–71).

Penn State met, and meets with, PSSP once per week and Tom McGrath is in "consistent

communication" with PSSP via texts, emails, phone calls and in-person meetings.  (Doc. No. 174

¶ 135.)  Penn State told PSSP in 2019 "not to do business with GOPSURV."  (Doc. No. 174 ¶

136.)  McGrath, acting for Penn State, instructed PSSP on July 16, 2019 to "[p]lease have Tim

hold up on any contact [between PSSP and Defendant GOPSURV]."  (Id.)  McGrath testified he

would expect PSSP to obey his "orders" (evidencing the control and agency relationship of PSSP

to Penn State).  (Id.)

The parties dispute Dave Baker's testimony regarding the use of "go" prefixes in domain

names advertised by other companies renting RVs to Penn State fans at the ORV lot.  Compare

(Doc. No. 174 ¶ 137 with Doc. No. 194 at 131).[69]  Plaintiff disputes Defendants' statement that

"Maureen Riedel testified she is aware that Plymouth State University is also using the

trademark PSU, but that this use is non-infringing because of a coexistence agreement" (Doc.

No. 174 ¶ 138) (citing Doc. No. 214-2 (Riedel deposition testimony) at 11), stating as follows:

"[d]isputed to the extent that this Statement attempts to imply that any other entity is infringing

on Penn State's trademarks, as that involves a legal determination" and "[t]his Statement is not

material to Defendants' Motion for Summary Judgment."  (Doc. No. 194 at 131.)  The parties

dispute more generally whether other businesses, against whom Plaintiff has not taken legal

action, use PSU to describe goods sold to PSU fans.  Compare (Doc. No. 174 ¶ 139 with Doc.

No. 194 at 132).[70]  Plaintiff disputes Defendants' statement regarding Ms. Riedel's deposition

---

[69]  Defendants state that "Dave Baker testified that other companies renting RVs to Penn State
fans at the ORV lot were advertising using the domain <gorving.com>, which also incorporates
the 'go' prefix in the domain, as does <gopsurv.com> and <gopsusports.com>."  (Doc. No. 174 ¶
137) (citing Doc. No. 209-7 (Baker deposition testimony) at 4).

Plaintiff does not dispute that "<gorving.com> was advertising RVs for rent for Penn State
football games and that it has 'go' in the domain name," but otherwise disputes this statement, as
follows:

> Penn State disputes that Mr. Baker testified that <gorving.com> was renting RVs for
> use in the ORV lot or that it was advertising on Penn State's campus. To the
> contrary, Mr. Baker testified that he did not know whether they were actually renting.
>  [Doc. No. 194-9 (Baker deposition testimony) at 10].  Disputed to the extent that this
> Statement attempts to imply that any other entity is infringing on Penn State's
> trademarks, as that involves a legal determination.  This Statement is not material to
> Defendants' Motion for Summary Judgment.

(Doc. No. 194 at 131.)

[70]  Defendants state that "[n]umerous other businesses are using PSU to describe goods sold to
PSU fans, and registered with the Pennsylvania Secretary of State, against whom Plaintiff has
not taken action, including PSU Clothing Outlet, PSU Buffet, PSU Homes, PSU Furniture, and
PSU Paint."  (Doc. No. 174 ¶ 139) (citing Doc. No. 203-7 (Plaintiff 30(b)(6) deposition
testimony) at 45–46).

testimony that "[w]hen presented with evidence that there are 436 domain names registered by other parties incorporating the character string 'gopsu', Ms. Riedel did not have an opinion on whether she should take action on those domains and stated she doesn't 'handle the domain names for the institution'" testifying "that the person at Penn State in charge of domain name infringement retired and she presumes somebody at legal is dealing with it."  (Doc. No. 174 ¶ 140) (citing Doc. No. 214-2 (Riedel deposition testimony) at 15–19).  Plaintiff disputes this statement, as follows:

> Ms. Riedel testified that Penn State enforces its trademarks, including against infringing domains.  [Doc. No. 196-2 (Riedel deposition testimony) at 6–7, 13]. Disputed to the extent that this Statement attempts to imply that any other entity is infringing on Penn State's trademarks, as that involves a legal determination. Disputed that Ms. Riedel was presented with "evidence" as to 436 domain names incorporating "gopsu" and disputed that these domains are active or associated with any websites.  This Statement is not material to Defendants' Motion for Summary Judgment.

(Doc. No. 194 at 132–33.)

Plaintiff possesses no registered trademark in the expression GOPSUSPORTS, nor has Plaintiff asserted such a registered trademark.  (Doc. No. 174 ¶ 141) (citing Doc. No. 174-1 (Rinehart Declaration) ¶ 10).   Plaintiff has never attempted to register GOPSUSPORTS.COM or

---

Plaintiff disputes this statement, as follows:

> The cited evidence does not establish whether or not Penn State has taken action against any of those entities, and/or has any licensing or coexistence arrangements with these entities.  The testimony cited only establishes that Tom McGrath did not know whether Penn State had initiated legal action against the list of companies that was read off by Defendants' attorney.  See [Doc. No. 194-28 (Plaintiff 30(b)(6) deposition testimony) at 31–32]. Disputed that counsel's question listing business names establishes that any of these businesses ever actually used PSU in their branding.  Disputed to the extent that this Statement attempts to imply that any other entity is infringing on Penn State's trademarks, as that involves a legal determination.  This Statement is not material to Defendants' Motion for Summary Judgment.

(Doc. No. 194 at 132.)

GOPSUSPORTS as a trademark.  (Id.)  The parties dispute whether Plaintiff owns the domain

name <gopsusports.com>.  Compare (Doc. No. 174 ¶ 142 with Doc. No. 194 at 133).

Defendants state that "Plaintiff does not even own the domain name <gopsusports.com>, which

is owned and run by Sidearm Sports, a third-party independently contracted by Penn State."

(Doc. No. 174 ¶ 142) (citing Doc. No. 214-2 (Riedel deposition testimony) at 13.  Plaintiff

disputes this statement, as follows:

> This Statement is not supported by the cited evidence, as the testimony from Ms.
> Riedel cited states only that Penn State has been using the domain
> <goPSUsports.com> "for the longest time I can remember." [Doc. No. 196-2 (Riedel
> deposition testimony) at 10].  Further disputed to the extent this Statement seeks to
> imply that Penn State does not control the domain <goPSUsports.com>.  See [Doc.
> No. 178-2 (McGrath Declaration) ¶ 7; Doc. No. 178-24 (Plaintiff 30(b)(6) deposition
> testimony) at 10–11; Doc. No. 178-25 (McGrath deposition testimony) at 5–6].

(Doc. No. 194 at 133.)  The parties dispute Maureen Riedel's testimony regarding Plaintiff's use

of a trademark symbol on its trademarks.  Compare (Doc. No. 174 ¶ 143 with Doc. No. 194 at

133–34).[71]

Plaintiff disputes in part Defendants' statement that "Bodenschatz testified that

Defendants were, in fact, benefiting Penn State by 'providing a service to our clients that they

could not get easily elsewhere'" and "Lauer testified that he was paying $60-$300 per night per

RV to Penn State for spaces at the ORV lot."  (Doc. No. 174 ¶ 144) (citing Doc. No. 209-6

---

[71] Defendants state that "[a]lthough asserting Penn State requires that its marks be designated
with 'an R symbol' or TM symbol because they are 'identifier[s] that the university has rights to
a particular trademark', Maureen Riedel admitted that she is not sure if the TM symbol or R
symbol should be used on references to goPSUsports.com."  (Doc. No. 174 ¶ 143) (citing Doc.
No. 214-2 (Riedel deposition testimony) at 21–24).  Plaintiff does not dispute that Ms. Riedel did
not have knowledge of whether a trademark identifier should be used on websites because that is
not part of her position, but otherwise disputes this statement "because the cited transcript does
not support the Statement asserted," stating that "Ms. Riedel did not testify that a trademark
notice symbol needed to be used with references to <goPSUsports.com> and she explained that
her role primarily involves trademark notices on merchandise"; further, Plaintiff asserts that
"[t]his Statement is not material to Defendants' Motion for Summary Judgment."  (Doc. No. 194
at 133–34) (citing Doc. No. 196-2 (Riedel deposition testimony) at 15–16).

(Bodenschatz deposition testimony) at 47; Doc. No. 174-3 (Lauer deposition testimony) at 103).

Plaintiff does not dispute that Lauer testified that he paid $60-$300 per night per RV to Penn State for spaces at the ORV lot, but otherwise disputes this statement, as follows:

> Specifically, Penn State disputes that Mark Bodenschatz testified that Defendants were benefiting Penn State. In the cited transcript, Mr. Bodenschatz was testifying about the University's policies prohibiting companies from conducting business activities on campus, in the ORV lot. In the course of providing information about issues raised by certain RV caravans, Mr. Bodenschatz described various factors the University considered in developing its approach to the ORV lot—including both positive and negative aspects of companies running businesses on the ORV lot. See [Doc. No. 194-5 (Bodenschatz deposition testimony) at 13–14]. Mr. Bodenschatz also was clear that he was speaking hypothetically and not specifically about Defendants. [Id. at 14] (specifically saying that he did not know whether Defendants were among the "more robust" companies he was speaking about, in describing high-level approaches to the ORV lot).

(Doc. No. 194 at 134–35.)

McGrath testified that Penn State does not offer RV rental services. (Doc. No. 174 ¶ 145.) Although Plaintiff does not dispute that Penn State does not rent RVs, Plaintiff "otherwise dispute[s]" the statement, as follows:

> disputed to the extent that this Statement implies that Penn State does not use the mark PSU with goods or services related to those offered by Defendants, or does not enter into sponsorship agreements with companies that offer RV services. Penn State, through its exclusive sponsorship agent Penn State Sports Properties, recently entered into a marketing and sponsorship agreement with a third party operating in the RV business, and under this agreement that company may use the designations "Official RV Dealer Sponsor of Penn State Football" and "Official RV Dealer Sponsor of Penn State Athletics", among other promotional uses. See [Doc. No. 214-7]. Further, Penn State has been using the PSU Mark for decades in connection with a wide variety of goods and services that are related to Defendants' RV products and services, including lodging and hospitality, an RV lot, tailgating equipment and services, and transportation services. See, e.g., [Doc. No. 178-2 (McGrath Declaration) ¶ 49; Doc. No. 178-5 (Exh. B to McGrath Declaration) at 12-31; Doc. No. 178-24 (Plaintiff 30(b)(6) deposition testimony) at 4–9; Doc. No. 178-30 (Exh. 14); Doc. No. 178-31 (Exh. 15); Doc. No. 178-32 (Exh. 16); Doc. No. 178-33 (Exh. 17); Doc. No. 178-34 (Exh. 18); Doc. No. 178-35 (Exh. 19)].

(Doc. No. 194 at 135–36.)

The parties dispute the amount Defendants have paid Penn State over a ten-year period and the implications of those payments.  Compare (Doc. No. 174 ¶ 146 with Doc. No. 194 at 136–37).[72]   Plaintiff disputes in part Defendants' statement that "Ms. Conlon testified that 'showing off the [Defendants'] RV' on campus was allowed at fundraising events and that this 'helped us because Mark was gracious enough to donate' to Penn State," (Doc. No. 174 ¶ 147)

---

[72]  Defendants state that they "paid nearly $200,000 to Penn State over a ten-year period from revenues generated using GOPSURV, including parking fees, Athletic sponsorships, and donations."  (Doc. No. 174 ¶ 146) (citing Doc. No. 189-9 (Lauer Declaration) ¶ 46).  Plaintiff responds as follows:

> Disputed that Defendants have paid nearly $200,000 to Penn State in RV parking fees, donations, and sponsorships, as that number is an estimate from Mark Lauer unsupported by any record evidence.  See [Doc. No. 174-2 (Lauer Declaration) ¶ 46].  Further, Defendants cannot rely on this estimate now because they did not provide this cost information in response to relevant Interrogatories.  See [Doc. No. 194-23 (Defendants' supplemental responses to interrogatories)].  Statement 146 is not material to Defendants' Summary Judgment Motion because Defendants never had any agreement with Penn State authorizing them to use the PSU Mark.  The sponsorship fees Defendants reference in this Statement provided Defendants with limited rights to set up RVs on campus during the Blue-White game, one day per year.  Those agreements did not give Defendants the right to use the PSU Mark in its domain name or in advertising its business.  See, e.g., ]Doc. No. 209-8 (Exh. C to Lauer Declaration) at 13–27] (Defendants' sponsorship and marketing agreements).  The amount that Defendants paid pursuant to those contracts reflects the limited scope of those agreements.  Compare id. with [Doc. No. 214-1] (sponsorship and marketing agreement with a third party, for substantially higher monetary payments, authorizing that company to promote itself as the "Official RV Dealer Sponsor" of Penn State Football and Penn State Athletics).  Similarly, whether or not Defendants paid money to Penn State for parking passes and donations is not relevant because those payments were not in exchange for the right to use Penn State's intellectual property.  Defendants have not produced any evidence to suggest that they were.  See LR 56.1.  Rather, Defendants purchased the parking passes as part of their RV rental business, meaning that this was an operational expense they used to generate profit.  See [Doc. No. 194-10 (Lauer deposition testimony) at 23–30].  And Defendants made donations to Penn State and local alumni groups to promote their business, but were never told that by simply making donations they would be granted a trademark license.  See [Doc. No. 194-19 (Conlon Declaration) ¶¶ 16, 18, 20; Doc. No. 194-22 (Beidel Declaration) ¶¶ 7–8)].

(Doc. No. 194 at 136–37.)

(citing Doc. No. 209-9 (Conlon deposition testimony) at 18), admitting that Defendants made

donations to the York County Chapter of the Alumni Association and that Mark Lauer was

permitted to "show off his RV to attract potential business because of those donations." (Doc.

No. 194 at 138.)  However, Plaintiff states:

> Disputed to the extent that this Statement implies Ms. Conlon ever represented to
> Defendants that they were permitted to use the goPSUrv Mark, or that she has
> authority or responsibilities for Penn State's trademarks. [Doc. No. 194-19 (Conlon
> Declaration) ¶¶ 17–18].  Disputed to the extent that this Statement implies that Penn
> State was put on notice of Defendants' infringing use of the goPSUrv Mark simply
> because Defendants brought their RVs to these events, or that the University
> authorized or licensed their trademarks to Defendants through the events described in
> this Statement.  The personnel at Penn State with authority to oversee trademark and
> intellectual property matters were not aware that Defendants were using the goPSUrv
> Mark or the domain <goPSUrv.com> until 2015.  [Doc. No. 178-2 (McGrath
> Declaration) ¶ 62; Doc. No. 178-24 (Plaintiff 30(b)(6) deposition testimony) at 16–
> 17, 19; Doc. No. 214-2 (Riedel deposition testimony) at 8–10].  Penn State has never
> authorized or permitted Defendants to use the goPSUrv Mark in any manner,
> including as a domain name.  Penn State has never authorized Defendants' use of
> goPSUrv, goPSUrv.com, or any of the other Infringing Marks.  See [Doc. No. 178-
> 24 (Plaintiff 30(b)(6) deposition testimony) at 12–13, 19; Doc. No. 178-2 (McGrath
> Declaration) ¶¶ 8, 62, 68; Doc. No. 178-25 (McGrath deposition testimony) at 3;
> Doc. No. 209-3 (Bordner deposition testimony) at 73].  This Statement is immaterial
> to Defendants' Motion.

(Doc. No. 194 at 138–39.)

Finally, the parties dispute whether there has been confusion between Penn State and

Defendants.  Defendants state that:

> There has not been confusion between Penn State and Defendants.  Nobody has ever
> asked Defendants if they work for Penn State, are part of Penn State, have a contract
> with Penn State, or are sponsored by Penn State.  [Doc. No. 174-3 (Lauer deposition
> testimony) 202–03]. When questioned in its 30(b)(6), Penn State could not identify
> any instances of actual confusion.  [Doc. No. 203-7 (Plaintiff 30(b)(6) deposition
> testimony) at 43–44].  Hearsay testimony was offered that some customers felt those
> who stayed regularly at the ORV lot were better behaved than "one-time
> participants", but this has nothing to do with the marks or Defendants' individual use
> of PSU.

(Doc. No. 174 ¶ 148.)  Plaintiff disputes this statement, maintaining that it has offered evidence

of actual confusion and stating as follows:

> Penn State has offered evidence of actual confusion.  See [Doc. No. 178-36 at 2].
> For example, in or around April 2016, a Penn State season ticketholder contacted
> James Grecco of Penn State's Athletics Department regarding Defendant's business.
> Id.  The individual had received a copy of the Penn State football schedules that
> Defendants were handing out in Penn State's RV lot, which also included the
> goPSUrv.com domain name.  Id.  Upon looking at the football schedule on this card,
> the individual noted that the schedule listed an incorrect date for one of the games.
> Id.  The customer saw the goPSUrv.com domain on the schedule, believed that the
> website was associated with Penn State because of the 'GOPSU-' element, and
> contacted the Athletic Department to discuss the schedule issue.  Id. Defendants'
> self-serving hearsay testimony that they have not been asked if they are affiliated
> with Penn State does not negate this evidence.  See Baer v. Chase, 392 F.3d 609, 624
> (3d Cir. 2004) ("a party may not create a material issue of fact to defeat summary
> judgment by filling [sic] an affidavit disputing his or her own testimony without
> demonstrating a plausible explanation for the conduct").

(Doc. No. 194 at 139–40.)

## II.    LEGAL STANDARD

Rule 56(a) of the Federal Rules of Civil Procedure provides that summary judgment is

warranted "if the movant shows that there is no genuine dispute as to any material fact and the

movant is entitled to judgment as a matter of law."  See Fed. R. Civ. P. 56(a).  A factual dispute

is material if it might affect the outcome of the suit under the applicable law, and it is genuine

only if there is a sufficient evidentiary basis that would allow a reasonable factfinder to return a

verdict for the non-moving party.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248–49

(1986).  At summary judgment, the inquiry is whether the evidence presents a sufficient

disagreement to require submission to the jury or whether it is so one-sided that one party must

prevail as a matter of law.  See id. at 251–52.  In making this determination, the Court must

"consider all evidence in the light most favorable to the party opposing the motion."  See A.W.

v. Jersey City Pub. Schs., 486 F.3d 791, 794 (3d Cir. 2007).

The moving party has the initial burden of identifying evidence that it believes shows an

absence of a genuine issue of material fact.  See Conoshenti v. Pub. Serv. Elec. & Gas Co., 364

F.3d 135, 145–46 (3d Cir. 2004).  Once the moving party has shown that there is an absence of

evidence to support the non-moving party's claims, "the non-moving party must rebut the motion

with facts in the record and cannot rest solely on assertions made in the pleadings, legal

memoranda, or oral argument."  See Berckeley Inv. Grp. Ltd. v. Colkitt, 455 F.3d 195, 201 (3d

Cir. 2006); accord Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986).  If the non-moving party

"fails to make a showing sufficient to establish the existence of an element essential to that

party's case, and on which that party will bear the burden at trial," summary judgment is

warranted.  See Celotex, 477 U.S. at 322.  With respect to the sufficiency of the evidence that the

non-moving party must provide, a court should grant a motion for summary judgment when the

non-movant's evidence is merely colorable, conclusory, or speculative.  See Anderson, 477 U.S.

at 249–50.  There must be more than a scintilla of evidence supporting the non-moving party and

more than some metaphysical doubt as to the material facts.  See id. at 252; see also Matsushita

Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  Further, a party may not

defeat a motion for summary judgment with evidence that would not be admissible at trial.  See

Pamintuan v. Nanticoke Mem'l Hosp., 192 F.3d 378, 387 (3d Cir. 1999).

## III.   DISCUSSION

As noted supra, Plaintiff's complaint asserts the following causes of action: (1) trademark

infringement (Lanham Act); (2) unfair competition (Lanham Act); (3) cybersquatting (Lanham

Act); (4) trademark dilution (Lanham Act); (5) trademark dilution (Pennsylvania law); and (6)

common law trademark infringement and unfair competition.  Defendants' counterclaims for (1)

cyberpiracy; (2) reverse domain name hijacking; and (3) declaratory judgment as to non-

violation of the Lanham Act remain pending.  Defendants have moved for summary judgment on

all six counts of Plaintiff's complaint, as well as Defendants' three counterclaims, arguing that Defendants are entitled to judgment as a matter of law on each of Plaintiff's claims and Defendants' counterclaims.

As an initial matter, the Court notes that, although Plaintiff's complaint purports to assert claims of trademark infringement and unfair competition (counts one, two and six) based on Defendants' use of the "PSU" mark, the "PENN STATE" mark, and the Lionhead Logo, see (Doc. No. 1 at 1, 20, 22, and 26), the focus of Defendants' briefing in support of their motion for summary judgment as to those claims, similar to Plaintiff's briefing on its cross-motion for summary judgment, is on Defendants' use of the "PSU" mark.  See (Doc. No. 175 at 7–9 (referring only to claims relating to the "PSU" mark)).  Accordingly, the Court's discussion infra as to Plaintiff's trademark infringement and unfair competition claims (counts one, two, and six) is limited to the PSU mark.[73]

The focus of Defendants' motion as to Plaintiff's trademark infringement and unfair competition claims is their argument that Plaintiff's claims are barred by the affirmative defenses of laches, acquiescence, and fair use; however, Defendants also argue that Plaintiff cannot prevail on its trademark infringement and unfair competition claims because there is no likelihood of confusion between Plaintiff's "PSU" mark and <goPSUrv.com>.  (Doc. No. 175 at 34–38.)  The Court first considers Defendants' argument as to the likelihood of confusion element common to Plaintiff's trademark infringement and unfair competition claims (counts one, two, and six) before considering Defendants' arguments as to affirmative defenses to those claims.  The Court then addresses Defendants' arguments regarding Plaintiff's cybersquatting claim (count three) and trademark dilution claims (counts four and five).  Finally, the Court

---

[73]  Plaintiff's cybersquatting and trademark dilution claims (counts three, four, and five) are also based on the PSU mark.  See (Doc. No. 1 at 23–25).

addresses Defendants' arguments regarding their reverse domain name hijacking claim[74] and

Mark Lauer's personal liability for Plaintiff's claims.

### A. Trademark Infringement and Unfair Competition Under the Lanham Act and Pennsylvania Law (Plaintiff's counts one, two, and six)

#### 1. Legal Standard

Trademark infringement and unfair competition claims share essentially the same

elements under both the Lanham Act and Pennsylvania law.  See A&H Sportswear, Inc. v.

Victoria's Secret Stores, Inc., 237 F.3d 198, 210 (3d Cir. 2000); UHS of Delaware, Inc. v. United

Health Services, Inc., 227 F. Supp. 3d 381, 390 (M.D. Pa. 2016).[75]  "To prove either form of

Lanham Act violation, a plaintiff must demonstrate that (1) it has a valid and legally protectable

mark; (2) it owns the mark; and (3) the defendant's use of the mark to identify goods or services

causes a likelihood of confusion."  See A&H Sportswear, Inc., 237 F.3d at 210 (citation

omitted); see also Giannone v. Giannone, 429 F. Supp. 3d 34, 39 (E.D. Pa. 2019) (applying the

same standard to Pennsylvania common law trademark infringement and unfair competition

claims).

As to the first two elements, "[a] certificate of registration of a mark upon the principal

register . . . shall be prima facie evidence of the validity of the registered mark and of the

registration of the mark, of the owner's ownership of the mark, and of the owner's exclusive

right to use the registered mark in commerce of in connection with the goods or services

---

[74]  Although Defendants' motion states that they seek summary judgment as to all of their counterclaims in addition to Plaintiff's claims (Doc. No. 173 at 1), in their briefing, Defendants only offer argument as to their reverse domain name hijacking claim (counterclaim count two). Accordingly, the Court views Defendants' motion as relating solely to Plaintiff's claims and Defendants' counterclaim for reverse domain name hijacking.

[75]  The only difference between the Lanham Act and the Pennsylvania claims is that federal unfair competition claims contain an interstate commerce requirement.  See Pennzoil-Quaker State Co. v. Smith, No. 2:05-cv-01505, 2008 WL 4107159, at *9 n.12 (W.D. Pa. Sept. 2, 2008) (noting this sole difference in the infringement inquiry).

specified in the certificate." 15 U.S.C. § 1057(b).   Further, "[i]f the mark at issue is federally

registered and has become incontestable, then validity, legal protectability, and ownership are

proved."   See Commerce Nat. Ins. Services, Inc. v. Commerce Ins. Agency, Inc. 214 F.3d 432,

438 (3d Cir. 2000).   However, "[i]f the owner of an incontestable mark brings an infringement

action, the defendant still has a number of statutorily provided defenses available to it, including

laches, estoppel and acquiescence."   See Keystone Federal Sav. Bank v. First Keystone Mortg.,

Inc., 923 F. Supp. 693, 701 (E.D. Pa. 1996) (citing 15 U.S.C. § 1115(b)).   Further, "[i]f the

defendant prevails on one of the permitted defenses, then the plaintiff loses the presumption of

validity, ownership and right to protection."   See id. (citing Ford Motor Co. v. Summit Motor

Prods., 930 F.2d 277, 291 (3d Cir.), cert. denied, 502 U.S. 939 (1991)).   The Lanham Act

includes the following defenses:

> (1) That the registration or the incontestable right to use the mark was obtained
> fraudulently; or
> (2) That the mark has been abandoned by the registrant; or
> (3) That the registered mark is being used by or with the permission of the registrant
> or a person in privity with the registrant, so as to misrepresent the source of the
> goods or services on or in connection with which the mark is used; or
> (4) That the use of the name, term, or device charged to be an infringement is a use,
> otherwise than as a mark, of the party's individual name in his own business, or of
> the individual name of anyone in privity with such party, or of a term or device
> which is descriptive of and used fairly and in good faith only to describe the goods or
> services of such party, or their geographic origin; or
> (5) That the mark whose use by a party is charged as an infringement was adopted
> without knowledge of the registrant's prior use and has been continuously used by
> such party or those in privity with him from a date prior to (A) the date of
> constructive use of the mark established pursuant to section 1057(c) of this title, (B)
> the registration of the mark under this chapter if the application for registration is
> filed before the effective date of the Trademark Law Review Act of 1988, or (C)
> publication of the registered mark under subsection (c) of section 1062 of this title.
> Provided, however, That this defense or defect shall apply only for the area in which
> such continuous prior use is proved; or
> (6) That the mark whose use is charged as an infringement was registered and used
> prior to the registration under the chapter or publication under subsection (c) of
> section 1062 of this title of the registered mark of the registrant, and not abandoned:
> Provided, however, That this defense or defect shall apply only for the area in which

the mark was used prior to such registration or such publication of the registrant's mark; or

(7) That the mark has been or is being used to violate the antitrust laws of the United States; or

(8) That the mark is functional; or

(9) That equitable principles, including laches, estoppel, and acquiescence, are applicable.

See 15 U.S.C. § 1115(b).

As to the third element of a trademark infringement claim, a plaintiff must prove that a defendant's "use of the mark to identify goods or services causes a likelihood of confusion."  See A&H Sportswear, 237 F.3d at 210.  The Third Circuit has set forth a non-exhaustive list of factors (the "Lapp factors") to be considered by courts when determining whether a likelihood of confusion exists, as follows:

> (1) the degree of similarity between the owner's mark and the alleged infringing mark; (2) the strength of the owner's mark; (3) the price of the goods and other factors indicative of the care and attention expected of consumers when making a purchase; (4) the length of time the defendant has used the mark without evidence of actual confusion; (5) the intent of the defendant in adopting the mark; (6) the evidence of actual confusion; (7) whether the goods, though not competing, are marketed through the same channels of trade and advertised through the same media; (8) the extent to which the targets of the parties' sales efforts are the same; (9) the relationship of the goods in the minds of the consumers because of the similarity of function; (10) other facts suggesting that the consuming public might expect the prior owner to manufacture a product in the defendant's market, or that he is likely to expand into that market.

See Interpace Corp. v. Lapp, 721 F.2d 460, 463 (3d Cir. 1983) (citation omitted).  "None of these factors is determinative in the likelihood of confusion analysis and each factor must be weighed and balanced one against the other."  Checkpoint Systems, Inc. v. Check Point Software Technologies, Inc., 269 F.3d 270, 280 (3d Cir. 2001) (citing Fisons Horticulture, Inc. v. Vigoro Industries, Inc., 30 F.3d 466, 473 (3d Cir. 1994)).

Determining whether a likelihood of confusion exists is a "decidedly fact-intensive issue" and "[c]ourts have thus cautioned that 'summary judgment for either party is unlikely, absent a

particularly one-sided factual record.'"  See UHS of Delaware, Inc., 227 F. Supp.3d at 391

(quoting 800-JR Cigar, Inc. v. GoTo.com, Inc., 437 F. Supp. 2d 273, 285 (D.N.J. 2006)); see also

Country Floors, Inc. v. P'ship Composed of Gepner & Ford, 930 F.2d 1056, 1062–63 (3d Cir.

1991) (noting that "summary judgments are the exception" in a trademark action).  Only if "the

record clearly shows no viable evidence rebutting a showing of a likelihood of confusion and no

viable evidence of an affirmative defense" is summary judgment for a trademark owner

appropriate.  See J. Thomas McCarthy, 6 McCarthy on Trademarks § 32:121 (5th ed. 2023).

### 2.    Analysis

As noted supra, Defendants briefly address the likelihood of confusion element common

to Plaintiff's trademark infringement and unfair competition claims before spending most of their

briefing on affirmative defenses to those claims.  In arguing that Plaintiff has failed to offer

evidence of a likelihood of confusion between Plaintiff's "PSU" mark and Defendants'

<goPSUrv.com> domain name, Defendants address only three of the ten Lapp Factors—4, 6, and

9.  However, in the interest of completeness, the Court sets forth the law applicable to each Lapp

factor infra but discusses the evidence of record only as to the three factors addressed by

Defendants in their motion.

### a.    Similarity of Marks – Lapp Factor 1

The Third Circuit has recognized that similarity of marks is the "single most important

factor" in the likelihood of confusion analysis.  See A&H Sportswear, 237 F.3d at 216 (citing

Fisons, 30 F.3d at 476).  "In applying this test, courts attempt to 'move into the mind of the

roving consumer,' and determine 'whether the labels create the same overall impression when

viewed separately.'"  Checkpoint Sys., 269 F.3d at 281 (first quoting A&H Sportswear, 237 F.3d

at 216, then quoting Fisons, 30 F.3d at 476).  In doing so, "[c]ourts must compare the

appearance, sound and meaning of the marks" so as to "determine whether the average consumer, on encountering one mark in isolated circumstances of marketplace and having only [a] general recollection of the other, would likely confuse or associate the two." See Checkpoint Sys., 269 F.3d at 281 (citations and internal quotation marks omitted). In considering the appearance of the marks, courts look to "visual characteristics such as the layout and format of lettering." See Harp v. Rahme, 984 F. Supp. 2d 398, 411–12 (E.D. Pa. 2013) (citing A&H Sportswear, 237 F.3d at 217). As to the "sound" of the marks, "courts have looked at the number of words and syllables, as well as the use of different words or syllables, in each mark." See Harp, 984 F. Supp. 2d at 412. The "meaning" of the marks requires an assessment of "whether the words included in each mark, viewed as a whole, gave the mark a different denotative or connotative meaning." See id. at 413.

### b.      Strength of the Owner's Mark – **Lapp** Factor 2

As stated by the Third Circuit, "[t]he strength of a mark is determined by (1) the distinctiveness or conceptual strength of the mark and (2) its commercial strength or marketplace recognition." See Checkpoint Sys., 269 F.3d at 282 (citing Fisons, 340 F.3d at 478–79).

As to the first prong of this test—distinctiveness or conceptual strength—courts evaluate the "inherent features of the mark." See id. As stated by the Third Circuit, "[t]rademarks protected under the Lanham Act are divided into four categories," see id., as follows:

> [1] arbitrary or fanciful marks use terms that neither describe nor suggest anything about the product; they "bear no logical or suggestive relation to the actual characteristics of the goods." [2] Suggestive marks require consumer "imagination, thought or perception" to determine what the product is. [3] Descriptive terms "forthwith convey[] an immediate idea of the ingredients, qualities or characteristics of the goods" [and] [4] Generic marks are those that "function as the common descriptive name of a product class."

See A&H Sportswear, 237 F.3d at 221–22 (quoting A.J. Canfield Co.v. Honickman, 808 F.2d

291, 296–97 (3d Cir. 1986)).  Arbitrary or fanciful marks generally do not describe or suggest anything about the product and are "virtually indistinguishable" from suggestive marks except that suggestive marks may "suggest a quality or ingredient of goods."  See Checkpoint Sys., 269 F.3d at 282 (quoting Ford Motor Co., 930 F.2d at 292 n.18).  "A mark is descriptive with a secondary meaning when the mark is interpreted by the consuming public to be not only an identification of the product or services, but also a representation of the origin of those products of services."  Checkpoint Sys., 269 F.3d at 283 n.10 (citations and internal quotation marks omitted).  Generic marks "function as the common descriptive name of a product class."  See A&H Sportswear, 237 F.3d at 221–22 (citation omitted).

As to the second prong of the test—commercial strength—courts measuring commercial strength consider "advertising expenditures, sales volume, and purchasing trends."  See UHS of Delaware, Inc., 227 F. Supp. 3d at 394 (citing Harp, 984 F. Supp. at 415).  "These factual indicators serve as proxies to test the likelihood and extent of marketplace recognition."  Id. (citations omitted).  Therefore, courts consider a registrant's "efforts to promote and fortify the mark's 'commercial presence' through the prism of this evidence."  See id. (citing Checkpoint Sys., 104 F. Supp. 2d at 458).

### c.        Care and Sophistication of Purchasers – Lapp Factor 3

The third Lapp factor assesses the expected care and sophistication of consumers when purchasing a product containing the mark at issue and acknowledges that likelihood of confusion decreases when consumers exercise greater care in purchasing decisions.  See Checkpoint Sys., 269 F.3d at 284.  If the product is expensive, "or the buyer class consists of sophisticated or professional purchasers, courts have generally not found Lanham Act violations."  See id. (citing Versa Prods. Co., Inc. v. Bifold Co. (Mfg.) Ltd., 50 F.3d 189, 204 (3d Cir. 1995)).  However,

"[w]hen the purchasing class is mixed, courts normally do not hold the general class to a high standard of care."  See id. at 285 (citing Ford Motor Co., 930 F.2d at 293).

### d.  Length of Use Without Actual Confusion and Any Evidence of Actual Confusion – Lapp Factors 4 and 6

Factors four and six significantly overlap and therefore courts routinely assess them together in an effort to determine "whether a 'pattern of confusion' has emerged in the relevant product or service market."  See UHS of Delaware, Inc., 227 F. Supp. 3d at 395 (citation omitted).  "This inquiry is not concerned with 'isolated and idiosyncratic' examples of confusion between products or services," id. (quoting A&H Sportswear, 237 F.3d at 227), which may be "dismissed as inconsequential or de minimis," see id. (quoting 4 McCarthy, supra, at § 23:14).  Factor four recognizes that when similar marks have coexisted without confusion for many years, there is a strong inference that the marks are not likely to cause customer confusion in the future.  See Versa Prods., 50 F.3d at 205.  As to factor six and evidence of actual confusion, although proof of actual confusion is not required for a Lanham Act claim, "the more evidence of actual confusion that a plaintiff can muster, the stronger the likelihood of confusion in the future."  See id.  However, "evidence of actual confusion . . . is not essential."  See Fisons, 30 F.3d at 476.

Defendants argue that Plaintiff has failed to produce any evidence of actual confusion. (Doc. No. 175 at 36.)[76]  In response, Plaintiff maintains that, in making this argument, Defendants "ignore the evidence that season ticket holders—consumers targeted by both parties—contacted Penn State on the false assumption that Defendants were affiliated with the University."  (Doc. No. 193 at 39) (citing Doc. No. 178 ¶¶ 144–47).

---

[76]  Defendants cite DSUMF ¶ 149 in support; however, it appears to the Court that Defendants intend to cite to ¶ 148 for this proposition.  See (Doc. No. 174 ¶ 148).

The exhibit Plaintiff relies on in connection with these interrelated Lapp factors (Doc. No. 178-36) consists of an email from one Penn State employee (Lowell Berg) to another Penn State employee (Tom McGrath) forwarding an April 18, 2016 email from Penn State employee James Grecco to Lowell Berg, which stated as follows: "I don't know how much of an issue this is.  I just fielded a call from a season ticket holder that GOPSURV.com was handing out schedules in our RV lot this weekend and had the wrong date for Michigan.  It confused our customers because they saw the GOPSU in the name and thought it was our website."  See (Doc. No. 178-36 at 2).

In Plaintiff's briefing in support of its cross-motion for summary judgment, Plaintiff relies on Kos Pharmaceuticals, Inc. v. Andrx Corp., 369 F.3d 700, 719–20 (3d Cir. 2004), in support of the admissibility of the referenced email allegedly demonstrating actual confusion.  The Court is persuaded that, in relying on Kos Pharmaceuticals in support of the admissibility of the email contained at Docket Number 178-36, Plaintiff has misread the scope of that decision.  As this Court stated in UHS of Delaware, Inc. in discussing the import of Kos Pharmaceuticals:

> [t]he circuit panel observed that the first level of hearsay—customer statements to employees evincing confusion—are not hearsay because they are submitted for their falsity rather than their truth.  It is the second level of hearsay—statements by employees describing telephone calls—that must satisfy an exception to the hearsay rule.  Even if the second-level statement fails to meet an exception, a witness may acknowledge receipt of subordinate reports of confusion.

See UHS of Delaware, Inc., 227 F. Supp. 3d at 396 (citations omitted).  Accordingly, pursuant to Kos Pharmaceuticals, "[a]bsent an exception authorizing admission of the second-level statements, testimony concerning the content of subordinate conversations with customers is inadmissible hearsay."  See UHS of Delaware, Inc., 227 F. Supp. 3d at 396 (citing Kos Pharms., 369 F.3d at 719).  As Plaintiff offers no exception authorizing admission of the second (and perhaps third) level of hearsay contained in the email submitted at Docket Number 178-36, the

contents of that email are inadmissible. Although "the hearsay rule prohibits any substantive recount of underlying conversations," Mr. McGrath as ultimate recipient of the email may permissibly testify "to the fact that [he] received [a] report[] of confusion from [Penn State] employees." See id.

Viewing the evidence of record in that limited regard, and construing all inferences in the light most favorable to Plaintiff, the non-moving party, the Court concludes that a report of a single instance of customer confusion during of period of seven years—from 2010 (when Defendants began using the <goPSUrv> mark) until 2017 (when Plaintiff sent a cease-and-desist letter to Defendants regarding their use of the mark)—consists of an "isolated and idiosyncratic" example of confusion, see A & H Sportswear, 237 F.3d at 227, and fails to demonstrate a pattern of confusion over the relevant time period or to support a likelihood of confusion in the future. Accordingly, the undisputed evidence of record as to these two interrelated factors weighs against a finding of likelihood of confusion.

### e.    Intent of Defendant in Adopting the Mark – Lapp Factor 5

This factor examines whether the defendant intended to confuse consumers by adopting a mark resembling the plaintiff's mark. See A&H Sportswear, 237 F.3d at 225–26 (citing Versa Prods., 50 F.3d at 205–06). "[C]ourts have recognized that evidence of 'intentional, willful and admitted adoption of a mark closely similar to the existing marks' weighs strongly in favor of finding the likelihood of confusion." Checkpoint Sys., 269 F.3d at 286 (citation omitted).

### f.    Shared Marketing and Advertising Channels and Target Customers – Lapp Factors 7 and 8

These two factors assess the existence of overlap between the parties' target markets and sales channels, recognizing that the likelihood of confusion increases when "parties target their sales efforts to the same consumer base" and there exists "significant overlap between marketing

and advertising channels."  See UHS of Delaware, Inc., 227 F. Supp. 3d at 397 (citing

Checkpoint Sys., 269 F.3d at 288–89).  In conducting these "intensely factual" inquiries, the

court considers "the class of customers to whom goods and services are marketed, the manner in

which those products are advertised, and the channels through which they are sold."  See id. at

398–99 (citing Checkpoint Sys., 269 F.3d at 288–89).

> **g.**     **Relationship of Goods in Minds of Consumers – Lapp Factor 9**

Under this factor, the court examines "whether the services provided under [the parties']

marks are so similar that a consumer 'might . . . reasonably conclude that one company would

offer both.'"  See UHS of Delaware, Inc., 227 F. Supp. 3d at 399 (citations omitted).

As to this factor, Defendants argue that they operate in a different industry from

Plaintiff—"[P]laintiff operates a university" and "[D]efendant[s] operate[] a simple RV rental

business" and "[t]hese industries are sufficiently different as to obviate confusing similarities."

(Doc. No. 175 at 37.)   In response, Plaintiff asserts that Defendants' argument is unavailing

because "the question is whether 'the goods, though not competing, are marketed through the

same channels of trade'" (Doc. No. 193 at 39) (quoting Fisons, 30 F.3d at 473) and, "[t]o that

end, the evidence shows that both parties market the same services (lodging) to the same

consumers (Penn State fans) using much of the same media" (id. at 39–40).

Viewing the evidence of record as to this factor in the light most favorable to Plaintiff,

the non-moving party, the Court concludes that the undisputed facts of record weigh in favor of a

likelihood of confusion.  While Defendants argue that the parties engage in different businesses,

that is not the pertinent question as to this Lapp factor.  Rather, the question is whether the

similarity in goods or services might cause a consumer to "reasonably conclude that one

company would offer both."  See UHS of Delaware, Inc., 227 F. Supp. 3d at 399.  Because the

undisputed evidence of record adduced in relation to Plaintiff's cross-motion for summary judgment demonstrates that Plaintiff offers goods and services related to hospitality and transportation, see (Doc. No. 178 ¶¶ 69–71, 78; Doc. No. 189 ¶¶ 69–71, 78), the Court concludes that the undisputed evidence of record supports a reasonable customer's conclusion that Penn State would offer or license RV services under the PSU mark and so this factor weighs in favor of a likelihood of confusion.

### h.     Likelihood of expansion – <u>Lapp</u> Factor 10

The tenth <u>Lapp</u> factor asks the court to "consider[] 'other facts' from which a consumer might expect that the trademark owner, through expansion or otherwise, is affiliated with the alleged infringer."  See <u>UHS of Delaware, Inc.</u>, 227 F. Supp. 3d at 399 (quoting <u>Fisons</u>, 30 F.3d at 480).  This "inquiry is 'highly context-dependent,'" requiring a court to "consider 'the nature of the products or the relevant market' and 'the practices of other companies in the relevant fields.'"  See <u>id.</u> (quoting <u>Kos Pharms.</u>, 369 F.3d at 724).

### i.     Balancing of Factors

Upon careful consideration of the evidence of record, the parties' arguments, and the relevant authority, and mindful that likelihood of confusion is a "decidedly fact-intensive issue" rendering summary judgment unlikely "absent a particularly one-sided factual record," see <u>UHS of Delaware, Inc.</u>, 227 F. Supp. 3d at 391, the Court concludes that Defendants have failed to demonstrate an entitlement to judgment as a matter of law as to the likelihood of confusion element of Plaintiff's trademark infringement and unfair competition claims (counts one, two and six) based on the PSU mark.  As noted <u>supra</u>, Defendants address only <u>Lapp</u> factors four, six, and nine in connection with their motion, and while the undisputed facts of record relevant to <u>Lapp</u> factors four and six weigh against a likelihood of confusion, the undisputed evidence of

record relevant to Lapp factor nine weighs in favor of a likelihood of confusion.  Moreover, the

Court notes that Plaintiff has adduced evidence related to the other seven Lapp factors not

addressed by Defendants in their motion.  See (Doc. No. 190 at 12–18).  Given the state of the

record, the Court cannot find that Defendants have demonstrated "a complete failure of proof

concerning an essential element of [Plaintiff's] case," entitling them to summary judgment on

Plaintiff's trademark infringement and unfair competition claims.  See Celotex, 477 U.S. at 323.

The Court next addresses Defendants' argument that they are entitled to judgment as a matter of

law on Plaintiff's trademark infringement and unfair competition claims (counts one, two, and

six) because Plaintiff's claims are barred by several affirmative defenses.

### 3.    Defenses

After articulating their view that Plaintiff has failed to adduce evidence supporting a

likelihood of confusion, Defendants argue that Plaintiff's trademark infringement and unfair

competition claims based on the PSU mark are barred by laches, acquiescence, and/or fair use

defenses.  (Doc. No. 175 at 18–30.)  The Court addresses each defense in turn.

### a.    Laches

The Court addressed the elements of a laches defense in its Memorandum Opinion

denying Defendants' motion to dismiss Plaintiff's complaint and quotes its previous statement in

full:

> The doctrine of laches applies to bar claims where there is: "(1) inexcusable delay in
> bringing suit, and (2) prejudice to the defendants as a result of the delay."  See
> Santana Prods. v. Bobrick Washroom Equip., Inc., 401 F.3d 123, 138 (3d Cir. 2005)
> (citing Univ. of Pittsburgh v. Champion Prods., 686 F.2d 1040, 1044 (3d Cir. 1982)).
> Once the statute of limitations has run, "the defendant 'enjoys the benefit of a
> presumption of excusable delay and prejudice.'"  See id. (citing EEOC v. A&P, 735
> F.2d 69, 80 (3d Cir. 1984)).  A plaintiff can rebut the presumption of laches "by
> showing that its delay was excusable and that its delay did not prejudice the
> defendant."  See id. at 139–40 (collecting cases).  A plaintiff can also defeat laches
> through a showing that the defendant has unclean hands.  See United States v. One

Toshiba Color Television, 213 F.3d 147, 159 (3d Cir. 2000) (stating that "insofar as it considers the doctrines of equity, the [d]istrict [c]ourt will also have to consider whether the party asserting the defense of laches has clean hands").

In order to determine the most appropriate statute of limitations for laches purposes, a court should look to the "most analogous statute of limitation."  See Santana, 401 F.3d at 135; see also Kaufhold v. Caiafa, 872 F. Supp. 2d 374, 379 (D.N.J. 2012).  As the Lanham Act does not include a specific statute of limitations, the Third Circuit has found that the most analogous state claim for trademark infringement actions in Pennsylvania would be a claim under the Unfair Trade Practices and Consumer Protection Law, which includes a six-year statute of limitations.  See Santana, 401 F.3d at 137 (noting that "[t]he UTPCPL is the most analogous state cause of action that would encompass all claims brought under § 43(a) of the Lanham Act").

(Doc. No. 28 at 7–8.)  In addition, "the correct disposition of the equitable defense of laches can only be made by a close scrutiny of the particular facts and . . . it usually requires the kind of record only created by a full trial on the merits."  See Country Floors, Inc, 930 F.2d at 1066 (citations and internal quotation marks omitted).

Defendants argue that Plaintiff has inexcusably delayed initiating this litigation and that they have been prejudiced by that delay.  Specifically, Defendants argue that Plaintiff had "actual knowledge of Defendants[ '] use of GOPSURV in 2010 and constructive notice of Defendants' use through the domain registration and various other records."  (Doc. No. 175 at 12.) Defendants argue that "[b]efore Penn State filed this action, Defendants spent almost ten (10) years—and now over thirteen (13) years—building valuable services, business, and goodwill around the GOPSURV name" and that "Penn State never sought preliminary injunctive relief in this case nor did Penn State file a suit claiming infringement of its trademarks or cybersquatting until November 27, 2019, in what Defendants believe is a retaliatory action . . . after losing their case in arbitration."  (Id. at 13.)

Defendants maintain that "[e]vidence that Plaintiff had actual knowledge of Defendants' activities many years before filing the present action in November of 2019 is incontrovertible—

as is evidence that Plaintiff took affirmative actions leading Defendants to reasonably believe their use of goPSUrv was explicitly and implicitly authorized." (Doc. No. 185 at 13.) Defendants maintain that the following facts of record support both their defense of laches and their defense of acquiescence:

1. Plaintiff had constructive notice the Disputed Domain was registered in 2010 from public registration records and Defendants' website and social media accounts. Plaintiff admits expressly that it started enforcing the PSU trademark in domain names in 2011. [Doc. No. 174] ¶¶ 8–9, 11 and 68.

2. Plaintiff had actual knowledge of Defendants' use of up to 20 RVs at each home football game on Plaintiff's property. Defendants['] RVs, signage, tables, tents and canopies were all marked with Defendants' tradename and domain name <gopsurv.com> at every home football game from early 2010 through 2017 or 2018. [Doc. No. 174] ¶¶ 30 and 43.

3. Plaintiff specifically reserved space for Defendants in the ORV lot at each home football game. Multiple associate athletic directors have admitted having this knowledge before 2012, including the directors charged with enforcing Penn State intellectual property policies. [Doc. No. 174] ¶¶ 13 and 60.

4. Beginning in 2010, Plaintiff expressly permitted Defendants to set up displays bearing reference to goPSUrv.com on campus directly in front of Beaver Stadium, and collected money from Defendants for authorizing these displays. These displays were set up most years from 2010 to 2017. [Doc. No. 174] ¶¶ 25 and 30.

5. Plaintiff's own photography team instructed the Penn State mascot to enter Defendants' RV for a marketing photo, which Plaintiff then gave to Defendants for marketing purposes in 2010. [Doc. No. 174] ¶¶ 11 and 12.

6. Plaintiff asked Defendants repeatedly to donate at Plaintiff's fundraising events and to arrange speakers at these events. The speakers wore clothing embroidered with Defendants' tradename. Plaintiff used Defendants['] RVs as scoring stations at fundraising events and manned them with Penn State employees. Senior Penn State employees attended. [Doc. No. 174] ¶¶ 36, 40, 77 and 85.

7. Penn State ran advertisements for Defendants in newsletters identifying Defendants as goPSUrv from 2010 – 2016, and authorized Defendants to distribute marketing materials at fundraising events on campus. Plaintiff actually participated in Defendants' marketing efforts, distributing Defendants' business card and emailing and communicating to Defendants the name of prospective customers. [Doc. No. 174] ¶¶ 79–82.

8. Defendants distributed tens of thousands of business cards each year at the ORV lot.  [Doc. No. 174 ]¶ 39.

9. Plaintiff's relationship and stewardship coordinator informed Campus Security that Defendants' displays bearing the goPSUrv tradename were authorized on campus.  [Doc. No. 174] ¶ 88.

10. Plaintiff's relationship and stewardship coordinator became aware of Defendants' business in 2010.  She exchanged emails in 2010 with Defendants recognizing them by the name goPSUrv. [Doc. No. 174] ¶¶ 35, 74, and 86.

11. Penn State's Ticketing Department sold parking passes to Defendants every year from 2010-2017. [Doc. No. 174] ¶ 23.

12. Plaintiff's Risk Management Department received insurance certificates from Defendants every year from 2010-2017 naming Penn State as the certificate holder, and testified Defendants would not have been able to set up displays without receipt of these certificates. [Doc. No. 174] ¶¶ 27–31 and 132.

13. Penn State's head football coach Joe Paterno attended tailgating parties of Defendants at the ORV lot in 2010 and 2011.  [Doc. No. 174] ¶ 13.

14. The College of Agricultural Science accepted donations from Defendants in 2013, putting the name goPSUrv.com on the donation forms.  An attorney at an outside law firm representing Penn State signed these forms. [Doc. No. 174] ¶ 37.

15. Plaintiff's associate athletic director, Mark Bodenschatz, admitted knowing of Defendants and their activities before 2012. [Doc. No. 174 ¶ 51.]

16. Plaintiff's associate athletic director, David Baker, admitted knowing of Defendants' activities in 2010.  Despite being tasked with enforcing Plaintiff's ban on signage, he never enforced the ban against Defendants.  [Doc. No. 174] ¶ 59.

17. Plaintiff admitted it produced football schedules with Defendants['] domain name <goPSUrv.com> printed on them from 2011 to 2017. [Doc. No. 174] ¶ 55.

18. Plaintiff received fan zone maps from PSSP before home football game[s] showing Defendants' business listed as sponsor. [Doc. No. 174] ¶ 56.

19. Plaintiff's head football coach James Franklin authorized Defendants to distribute a voucher at official Penn State events inside Beaver Stadium in 2017 informing Penn State donors that Defendant Keystone Alternatives was the "Official PSU RV Rental of Coach James Franklin." [Doc. No. 174] ¶¶ 110–24.

20. Plaintiff's head football coach James Franklin represented that Sandy Barbour, the Athletic Director of Penn State, had authorized distribution of these vouchers.

[Doc. No. 174] ¶ 117.

21. Plaintiff's head football coach James Franklin used Defendants' RV services in 2017. [Doc. No. 174] ¶¶ 13 and 124.

22. Plaintiff's head football coach James Franklin attempted to use Defendants' RV services at away football games of Penn State.  [Doc. No. 174] ¶ 122.

23. Plaintiff's head football coach James Franklin visited Defendants' RV on Penn State property in 2017 and endorsed the RVs with a variation of a Penn State trademark. [Doc. No. 174] ¶ 123.

24. Penn State admitted PSSP is effectively an agent of Penn State. [Doc. No. 174] ¶¶ 125–37.

25. Plaintiff's agent PSSP signed Marketing and Sponsorship Agreements with Defendants for seven years beginning in 2010. [Doc. No. 174] ¶¶ 24 and 26.

26. Plaintiff admitted benefitting from Defendants' business activities. [Doc. No. 174] ¶ 145.

(Doc. No. 175 at 13–18.)  Defendants also argue that the evidence of record reflects that Athletes First (and Chris Longo) as the agents of James Franklin possessed authority to act on behalf of Plaintiff.  (Id. at 18–20.)  Basically, Defendants argue that because Plaintiff had knowledge of their use of Plaintiff's "PSU" mark as far back as 2010 (outside the six-year statute of limitations period for this lawsuit brought in November 2019), Plaintiff engaged in inexcusable delay.

Defendants also argue that the record reflects evidence supporting the second element of a laches defense—that they have been prejudiced by this delay, pointing to the following facts: "Defendants have paid almost $200,000 to Penn State over a ten-year period from revenues generating [sic] using goPSUrv, including parking fees, Athletic sponsorships, and donations"; Plaintiff "itself testified that it benefitted from Defendants' operation"; "Defendants had additional expenditures running and maintaining their business, including paying for RV maintenance and website upkeep"; and "[a]fter Defendants began using the website at <goPSUrv.com>, Defendants purchased numerous RVs to rent at Penn State football games and

118

paid hundreds of dollars to have one stenciled with advertisements referencing goPSUrv." (Doc. No. 175 at 20) (citing Doc. No. 174 ¶¶ 44–45, 145).

In response, Plaintiff maintains that Defendants are not entitled to a presumption of laches. First, Plaintiff correctly notes that a defendant is entitled to a rebuttable presumption of laches only if a plaintiff brings claims after the statute of limitations has lapsed, while if a plaintiff asserts claims within the limitations period, a defendant is not entitled to a presumption of laches but must carry the burden to establish inexcusable delay. (Doc. No. 193 at 15) (citing Santana Prods., 401 F.3d at 138). Accordingly, given the applicable six-year statute of limitations period noted by the Court supra, Plaintiff asserts that, given the filing of its complaint in November of 2019, the laches period dates back to at least November 2013. (Id.) Plaintiff further correctly notes that the limitations period begins when the plaintiff knows or should have known about the cause of action. (Id.) (citing Gloster v. Relios, No. 02-cv-07140, 2006 WL 1791306, at *1 (E.D. Pa. June 26, 2006)). Plaintiff frames the relevant issue as to Defendants' summary judgment laches argument as whether there is a genuine dispute of material fact as to whether Plaintiff knew or should have known of Defendants' alleged infringement of its PSU mark before November 2013. (Id.)

Plaintiff insists that "the evidence establishes that Penn State first became aware of Defendants' infringement no earlier than April 2015, when Defendants' infringing website first came to the attention of its trademark licensing team," after which Plaintiff's licensing team called Defendant Lauer to tell him that Defendants were not authorized to use Penn State's marks. (Id. at 16.) Plaintiff maintains that the timeline of its actions since April 2015 demonstrate its diligence in acting on its rights. (Id. at 16–17.) Plaintiff also seeks to discredit that evidence relied on by Defendants as to Plaintiff's potential knowledge of Defendants'

alleged infringement prior to November of 2013.  Along those lines, Plaintiff maintains that "Defendants' [d]omain [r]egistration [d]id [n]ot [p]rovide [n]otice to Penn State" and takes issue with Defendants' position that "their interactions with a handful of Penn State employees and entities with no responsibility for Penn State's trademarks established Penn State's institutional knowledge and approval of their infringement as early as 2010." (Id. at 18–19.)  Plaintiff challenges the testimony relied on by Defendants, asserting that Defendants fail to "establish that any of these individuals or entities had actual knowledge of Defendants' use of the goPSUrv Mark, let alone that such use was infringing" and further challenges whether any knowledge by Penn State employees of Defendants' use of goPSUrv prior to 2015 can be imputed to Plaintiff. (Id. at 20–22.)  Finally, Plaintiff maintains that Defendants' identification of themselves as Keystone Alternatives LLC in connection with a number of their interactions with Plaintiff undercuts their claim that their presence at Penn State football games provided potential notice of any infringement as early as 2010.  (Id. at 23.)  Plaintiff also maintains that Defendants cannot establish laches as a matter of law for the separate reason that they have not shown actual prejudice from Plaintiff's alleged delay.

Upon careful consideration of the arguments of the parties, the relevant authority, and the evidence of record, viewed in the light most favorable to Plaintiff, the non-moving party, and cognizant that the disposition of the defense of laches "can only be made by a close scrutiny of the particular facts and . . . usually requires the kind of record only created by full trial on the merits," see Country Floors, Inc., 939 F.2d at 1066, the Court concludes that the record reflects disputed facts relevant to the issue of Plaintiff's knowledge of Defendants' alleged infringement of Plaintiff's PSU Mark.  For example, Plaintiff points to evidence that some of the Penn State employees who interacted with Defendants prior to 2013 also testified that their communications

with Defendants reflected the tradename of Keystone Alternatives, LLC, not <goPSUrv>, as did

PSSP's contracts with Defendants.  See (Doc. No. 194 at 15, 128).  Plaintiff has also pointed to

evidence challenging the responsibility of any of these Penn State individuals for policing the use

of Plaintiff's trademarks.  See (Doc. No. 194 at 45–54, 66–68, 82–94).   Accordingly, the Court

concludes that Defendants have not demonstrated the applicability of a laches defense as a matter

of law and will therefore deny Defendants' motion on that basis.  The Court turns to Defendants'

defense of acquiescence.

### b.    Acquiescence

Acquiescence is an equitable defense to a trademark infringement claim, distinct from

laches, that applies "'when the trademark owner, by affirmative word or deed, conveys its

implied consent' to the use of a mark."  See Covertech Fabricating, Inc. v. TVM Building

Products, Inc., 855 F.3d 163, 175 (3d Cir. 2017) (quoting Pappan Enters., Inc. v. Hardee's Food

Sys., Inc., 143 F.3d 800, 804 (3d Cir. 1998)).  The Third Circuit has held that the applicability of

the defense is governed by the following factors:

> Relevant considerations, required as elements in a number of our sister Circuits,
> may include whether "(1) the senior user actively represented that it would not
> assert a right or a claim; (2) the [senior user's] delay between the active
> representation and assertion of the right or claim was not excusable; and (3) the
> delay caused the defendant undue prejudice."

See id. (quoting Hyson USA, Inc. v. Hyson 2U, Ltd., 821 F.3d 935, 941 (7th Cir. 2016)).  The

Third Circuit further noted as follows:

> Once use becomes infringing, the relevant date for quantifying the "delay" is when
> the trademark owner either knew or should have known of the existence of a
> provable claim of infringement, and an owner's claim does not ripen until the
> defendant's infringement is sufficiently far-reaching to create a likelihood of
> confusion.

See id. at 175–76.

Defendants note that acquiescence differs from laches in that the defense requires that the trademark owner by affirmative word or deed convey its implied consent to the alleged infringer. (Doc. No. 175 at 21.)  As to this defense, Defendants' brief in support of their motion summarily states that "[t]he facts recited immediately above are sufficient to rule summarily in Defendants' favor on acquiescence."  (Id.)  Defendants also cite the decision in their favor in the UDRP Proceeding initiated by Plaintiff against the <goPSUrv.com> domain, noting that the UDRP Decision denied Penn State's claims on the basis of the doctrine of acquiescence.  (Id. at 20.)

In response, Plaintiff notes that Defendants "claim in one sentence that the facts supporting their laches defense likewise establishes Penn State's acquiescence to their infringement" but that "[t]his falls far short of their burden."  (Doc. No. 193 at 27.)  Plaintiff notes that Defendants' brief does not attempt to establish a right to acquiescence as a matter of law under any of the relevant factors.  (Doc. No. 193 at 28–29.)

Given the minimal nature of Defendants' briefing in this regard, the Court agrees with Plaintiff that Defendants have not met their burden to demonstrate the applicability of the defense of acquiescence as a matter of law and will accordingly deny their motion for summary judgment on that basis.  The Court turns to Defendants' affirmative defense of fair use.

### c.      Fair Use

"Fair use" is an affirmative defense to claims of trademark infringement that can be characterized as "nominative" or "classic" fair use.  See Century 21 Real Estate Corp. v. Lendingtree, Inc., 425 F.3d 211, 214 (3d Cir. 2005).  The Third Circuit has described the distinction between the defenses in the following way:

> "Nominative" fair use is said to occur "when the alleged infringer uses the [trademark holder's] product, even if the alleged infringer's ultimate goal is to describe his own product.  Nominative fair use also occurs if the only practical way to refer to something is to use the trademarked term." KP Permanent Make-Up, Inc.

122

v. Lasting Impression I, Inc., 328 F.3d 1061, 1072 (9th Cir. 2003) (rev'd on other grounds) (quotations omitted).  By contrast, "classic" fair use occurs where the defendant uses the plaintiff's mark to describe the defendant's own product.  New Kids on the Block v. News America Pub., Inc., 971 F.2d 302, 308 (9th Cir. 1992).

See id.[77]

"Classic" fair use "protects from liability anyone who uses a descriptive term, 'fairly and in good faith' and 'otherwise than as a mark,' merely to describe her own goods."  See United States PTO v. Booking.com B.V., 140 S. Ct. 2298, 2307–08 (2020) (quoting 15 U.S.C. § 1115(b)(4)).  "By choosing a descriptive term, the trademark owner must live with the result that everyone else in the marketplace remains free to use the term in its original 'primary' or descriptive sense."  2 McCarthy, supra, § 11:45.

"To prevail on summary judgment with a fair use defense, [Defendants] must demonstrate that: (1) [they] used [PSU] in a non-trademark manner; (2) the use is descriptive of [their] goods or services; and (3) [they] used [PSU] in good faith."  Lontex Corp. v. Nike, Inc., No. 18-cv-05623, 2021 WL 724971, at *13 (E.D. Pa. Feb. 24, 2021) (citing 15 U.S.C. § 1115(b)(4)).  "While summary judgment on the fair use defense in a trademark case is possible,"

---

[77] Within the Third Circuit, courts apply a two-step approach when evaluating a nominative fair use defense.  See Commerce Bancorp, LLC v. Hill, No. 08-cv-05628, 2010 WL 2545166, at *14 (D.N.J. June 18, 2010) (citing Century 21, 425 F.3d at 222).  At the first step, "the primary inquiry is whether the defendant's use of the mark is likely to cause confusion."  See Pierre & Carlo, Inc. v. Premier Salons, Inc., 713 F. Supp. 2d 471, 483 (E.D. Pa. 2010) (citing Century 21, 425 F.3d at 222.  "[T]he burden then shifts to defendant to show that its nominative use of plaintiff's mark is nonetheless fair."  Century 21, 421 F.3d at 222.  At the second step, a court considers:

> (1) Is the use of the plaintiff's mark necessary to describe both plaintiff's product or service and defendant's product or service? (2) Is only so much of the plaintiff's mark used as is necessary to describe plaintiff's product or service? (3) Does the defendant's conduct or language reflect the true and accurate relationship between plaintiff and defendant's products or services?

See id. at 232.  "If each of these questions can be answered in the affirmative, the use will be considered a fair one, regardless of whether likelihood of confusion exists."  Id.

granting summary judgment on this basis "is generally disfavored" because of "the intensely factual nature of trademark disputes."  See Marketquest Group, Inc. v. BIC Corp., 862 F.3d 927, 935 (9th Cir. 2017) (citation omitted).

In connection with their arguments as to their entitlement to a fair use defense as a matter of law, Defendants cite mostly out-of-circuit authority but agree that the elements of the defense are proof that use of a trademark is (1) other than as a mark, (2) in a descriptive sense, and (3) in good faith.  (Doc. No. 175 at 22) (citing Int'l Stamp Art, Inc. v. United States Postal Serv., 456 F.3d 1270, 1274 (11th Cir. 2006)).  Defendants assert that they "have never used the ™ or ® symbol next to 'GOPSURV' to designate that they claimed any trademark rights in and to GOPSURV" and "[t]he expression GOPSURV is the functional equivalent of a call to action—a call to 'go' and rent RVs at PSU events."  (Doc. No. 175 at 22–23.)  Defendants also assert that they have used Plaintiff's PSU mark in a descriptive sense because their "use of PSU within the Disputed Domain merely identifies where RV rentals are offered and for what" and "[i]n this instance, the services are being offered for PSU events on PSU property" and so "<gopsurv.com> and the name GOPSURV are therefore descriptive of Defendants' services and the geographic location where they are rented."  (Id. at 23.)  Defendants contend that "[t]here is no alternative way to describe this characteristic of RV rental services at Penn State without reference to either PENN STATE® or PSU®, both of which are trademarked by Plaintiff, and both of which are themselves geographically descriptive of a location (a university in Pennsylvania)."  (Id. at 23–24.)  As to the issue of good faith, Defendants maintain that prior knowledge of a senior user's trademark does not alone create an inference of bad faith, stating that:

> Here, Defendants' non-trademark use of the PSU mark is not an attempt to confuse consumers as to the source of Defendants' services, but rather a means of identifying

> the "what for and where" of Defendants' services.  Defendants have repeatedly
> testified they did not know Plaintiff had a trademark for PSU and registered the
> domain at the suggestion of a third party because the generic appeal of its elements
> "go" and "rv."

(Id. at 25.)

Defendants also argue that "Plaintiff has never marked any use of GOPSUSPORTS with a trademark indicator (™ or ®)."  (Id. at 27) (citing [Doc. No. 174] ¶¶ 100–01).  Defendants further state that "[t]he failure of a sophisticated organization such as Penn State to mark this expression affirms with the rest of the evidence, that the reasonable basis Defendants had for believing that the use of GOPSURV was legitimate, non-trademark use just as GOPSUSPORTS was . . . ."  (Id.)

 In response, Plaintiff asserts that Defendants' fair use arguments rely on "misconstructions" of the law.  (Doc. No. 193 at 30.)  Plaintiff maintains that "the use must 'describe a characteristic of the goods or services.'"  (Id.) (citing 2 McCarthy, supra, § 11:45).  Plaintiff asserts that "[u]ltimately, 'the scope of the fair use should be related to the degree to which the descriptive meaning is relevant to the goods with which it is associated in the alleged infringement, and whether there are other terms available to describe the pertinent characteristic.'"  (Id. at 31) (citing EMI Catalogue P'ship v. Hill, Holliday, Connors, Cosmopulos Inc., 228 F.3d 56, 65 (2d Cir. 2000)).

Plaintiff maintains that Defendants fail to establish any of the elements of a fair use defense.  First, Plaintiff contends that Defendants have failed to establish that their use of the PSU mark is limited to non-trademark purposes, arguing that "although claiming that it uses PSU in the goPSUrv Mark to 'merely identif[y] where RV rentals are offered and for what,' Defendants in fact concede that they used the goPSUrv [sic] as a source identifier on their RVs, stenciling each RV with the Mark."  (Doc. No. 193 at 32) (citing [Doc. No. 174] ¶ 45).  Plaintiff

also references the image of Defendants' RV contained in paragraph 42 of their Statement of

Undisputed Facts, which contains references to "goPSUrv" but no references to Defendants'

tradename, Keystone Alternatives.  (Id. at 32–33) (citing [Doc. No. 174] ¶ 42).  Accordingly,

Plaintiff maintains that "[o]n Defendants' own facts, therefore, they use PSU in the goPSUrv

Mark explicitly for a trademark purpose (i.e., to identify Defendants as the source)." (Id. at 33.)

Second, Plaintiff argues that Defendants' use of PSU is not descriptive of the goods and

services with which the mark is used.  (Id.)  Plaintiff asserts that, to be geographically descriptive

as Defendants suggest, "PSU must describe the RVs' 'geographic origin.'"  (Id.) (citing 2

McCarthy, supra, § 11:45 and Forschner Grp., Inc. v. Arrow Trading Co. Inc., 30 F.3d 348, 353

(2d Cir. 1994)).  Further, Plaintiff maintains that "the mark must be a place that is generally

known to the public" and "the public must associate the goods with the place described," but

Defendants "offer no evidence that their RVs originate from any Penn State campus, let alone

that consumers associate Penn State's campuses with RVs" and this is "compounded by the fact

that Penn State has multiple campuses across the Commonwealth of Pennsylvania."  (Doc. No.

193 at 33–34.)  Plaintiff also maintains that Defendants can describe the location at which their

RVS are rented without suggesting an affiliation with Penn State, contending that "Defendants

could use their official name 'Keystone Alternatives' as the primary source identifier and simply

advertise that they rent at 'Penn State games'" and that "'HappyValleyRVs' or

'StateCollegeRVs' would similarly avoid consumer confusion" while at the same time indicating

the geographic origins of Defendants' services.  (Id. at 34.)

Finally, Plaintiff argues that Defendants have failed to establish that they adopted the

goPSUrv Mark in good faith, for all of the reasons set forth previously in their briefing.  Plaintiff

also dismisses Defendants' argument regarding Plaintiff's failure to mark "goPSUsports" as a

trademark because Plaintiff is not asserting trademark rights in <goPSUsports>. (Id. at 35.)

Upon careful consideration of the arguments of the parties, the relevant authority, and the evidence of record, viewed in the light most favorable to Plaintiff, the non-moving party, and noting the disputes of fact evident in the record relevant to the elements of a fair use defense, the Court concludes that Defendants have failed to demonstrate an entitlement to a fair use defense as a matter of law and will therefore deny Defendants' motion on that basis.  The Court turns to Defendants' motion as to Plaintiff's cybersquatting claim (Plaintiff's count three).

**B.      Cybersquatting Under the Lanham Act (Plaintiff's count three)**

To succeed on a claim under the Anti Cybersquatting Protection Act ("ACPA"), a plaintiff must prove that (1) plaintiff's mark is distinctive or famous; (2) the defendant's domain name is "identical or confusingly similar to" plaintiff's mark; and (3) the defendant registered the domain name with the bad faith intent to profit from it.  See Shields v. Zuccarini, 254 F.3d 476, 482 (3d Cir. 2001) (quoting 15 U.S.C. § 1125(d)).

To determine whether a defendant acted with bad faith intent to profit from the use of a mark, a court considers the following non-exhaustive list of nine factors:

> (I) the trademark or other intellectual property rights of the person, if any, in the domain name; (II) the extent to which the domain name consists of the legal name of the person or a name that is otherwise commonly used to identify that person, (III) the person's prior use, if any, of the domain name in connection with the bona fide offering of any goods or services; (IV) the person's bona fide noncommercial or fair use of the mark in a site accessible under the domain name; (V) the person's intent to divert consumers from the mark owner's online location to a site accessible under the domain name that could harm the goodwill represented by the mark, either for commercial gain or with the intent to tarnish or disparage the mark, by creating a likelihood of confusion as to the source, sponsorship, affiliation, or endorsement of the site; (VI) the person's offer to transfer, sell, or otherwise assign the domain name to the mark owner or any third party for financial gain without having used, or having an intent to use, the domain name in the bona fide offering of any goods or services, or the person's prior conduct indicating a pattern of such conduct; (VII) the person's provision of material and misleading false contact information when applying for the registration of the domain name, the person's intentional failure to

maintain accurate contact information, or the person's prior conduct indicating a pattern of such conduct; (VIII) the person's registration or acquisition of multiple domain names which the person knows are identical or confusingly similar to marks of others that are distinctive at the time of registration of such domain names, or dilutive of famous marks of others that are famous at the time of registration of such domain names, without regard to the goods or services of the parties; and (IX) the extent to which the mark incorporated in the person's domain name registration is or is not distinctive and famous within the meaning of subsection (c)(1) of this section.

See 15 U.S.C. § 1125(d)(1)(B)(i); Shields, 254 F.3d at 484–85.  The ACPA includes a safe harbor provision that excludes a finding of bad faith intent for persons who "believed and had reasonable grounds to believe that the use of the domain name was a fair use or otherwise lawful."  See 15 U.S.C. § 1125(d)(1)(B)(ii).  This defense focuses on a "good faith intention and motivation that existed at the time the challenged domain name was obtained."  See 5 McCarthy, supra, § 25A:63.

Defendants maintain that they are entitled to summary judgment on Plaintiff's ACPA claim, arguing that Plaintiff has failed to adduce proof of the third element of an ACPA claim— the registration of a domain name with a bad faith intent to profit from it—appearing to argue that, even if the Court assumes that Plaintiff has established the second "confusingly similar" element of its ACPA claim, Defendants are entitled to summary judgment on Plaintiff's ACPA claim because "an analysis of the relevant factors in view of the record leaves no doubt that Defendants' acts have at all times been conducted in good faith with respect to the PSU mark within the corresponding domain name <gopsurv.com> and tradename."  (Doc. No. 175 at 29– 30.)  Defendants maintain that Plaintiff has not produced evidence that their use of <gopsurv.com> was "anything other than a part of an entirely legitimate business renting RVs at PSU football games" and has not produced evidence of "Defendants' 'intent to divert customers' where Plaintiff does not even rent RVs."  (Id. at 30.)

Defendants point to the following evidence of record in support of their argument: "the

name GOPSURV was selected by a marketing consultant"; "Defendants were not familiar with trademarks nor the USPTO, testifying they believed PSU was simply the name of the Plaintiff and were using PSU within the domain to identify the place where Defendants' RV services were being offered"; and "Defendants have testified they liked the Disputed Domain because it was reminiscent of two other RV-related domains having 'go' prefixes used in the RV world: <gorving.com> and <gooutdooring.com>, as well as numerous domain names using the 'go' prefix as a call to action," all of which shows "a lack of bad faith intent in registering the Domain Name." (Id. at 30–31.)  Defendants also point to the fact that they "have never attempted to sell the domain name <gopsurv.com> to anyone" and "have never [] been the target of a 'cybersquatting' case." (Id. at 32.)

As to the relevant statutory factors used to determine bad faith intent, Defendants assert that:  "Defendants have always offered legitimate services using the Disputed Domain, obviating factor III"; "[u]nder factor IV, Defendants have always made fair use of the Disputed Domain to simply identify the location Defendants' services were being offered" and "[u]nder factor V, Defendants offered only services wholly unrelated to those of Plaintiff and there was never any customer confusion" because "Defendants' action did not 'divert consumers' of the Plaintiff 'to a site accessible under the domain name that could harm the goodwill represented by the mark, either for commercial gain or with the intent to tarnish or disparage the mark.'" (Id. at 31–32.) Defendants also argue that "[u]nder factor VII, Defendants never registered the Disputed Domain using an alias or any false information, and have never offered to sell or transfer the Disputed Domain under factor VI" and "because the Disputed Domain <gopsurv.com> is the only domain name which Defendants own which contains the character string 'psu', factor VIII is out." (Id. at 31–32.)  For all the same reasons, Defendants maintain that they are also entitled

to safe harbor protection under the ACPA.  (Id. at 34.)

In response, Plaintiff argues that it "has adduced undisputed evidence of Defendants'
intent to use the PSU Mark to attract customers to its website by capitalizing on the goodwill
associated with the PSU Mark."  (Doc. No. 193 at 37) (citing Doc. No. 178 ¶¶ 100, 102–08).
Plaintiff further maintains that Defendants have "admitted that they selected goPSUrv in their
domain over their actual name, Keystone Alternatives, to target Penn State fans."  (Doc. No. 193
at 37) (citing Doc. No. 178 ¶¶ 83, 96, 104, 128–29).  Accordingly, Plaintiff argues that "[t]his
evidence establishes bad faith under the ACPA and thus precludes judgment for Defendants."
(Doc. No. 193 at 37.)[78]

Viewing the evidence of record in the light most favorable to Plaintiff as the non-moving
party, the Court cannot find that Defendants have demonstrated "a complete failure of proof
concerning an essential element of [Plaintiff's] case" entitling Defendants to summary judgment
on Plaintiff's ACPA claim.  See Celotex, 477 U.S. at 323.  Plaintiff has pointed to evidence of
record indicating that Defendants' adoption of goPSUrv was based at least in part on the
association of "PSU" with Plaintiff.  See (Doc. No. 178 ¶ 100; Doc. No. 189 ¶ 100 ("The term
'PSU' in goPSUrv and goPSUrv.com refers to Penn State")); (Doc. No. 178 ¶ 105; Doc. No. 189
¶ 105 ("Mark Lauer testified in his deposition that when Defendants were selecting their
branding and domain name, the 'PSU' portion was meant to refer to Penn State, noting that:
'PSU is PSU'")); (Doc. No. 178 ¶ 106; Doc. No. 189 ¶ 106 ("Mark Lauer admitted that by using
this mark, he 'took it that [consumers] would assume we offered RV rentals at Penn State'");
(Doc. No. 178 ¶ 107; Doc. No. 189 ¶ 107 ("Timothy Lauer similarly testified that in choosing the

---

[78] Because the parties refer to the evidence reflected in Plaintiff's Statement of Undisputed
Material Facts submitted in connection with its cross-motion for summary judgment (Doc. No.
178), the Court does so as well.

brand name: 'We definitely wanted—Penn State fans are going to be drawn to Penn State—and that's going to get them to think'")).  Although Defendants dispute the record evidence in this regard inasmuch as they maintain that Lauer did not testify that Defendants chose <goPSUrv.com> to create an association between <goPSUrv.com> and PSU but rather because PSU "refers to the name of the University and location where Defendants' services were being offered" (Doc. No. 189 ¶ 102) (citing Doc. No. 178-23 (Lauer deposition testimony) at 15–16), and they also point to evidence that they chose their domain name upon the recommendation of their marketing consultant and in recognition of the fact that "go" was a common prefix in domains in 2010, particularly two domains relating to RVs—<goRVing.com> and <gooutdoors.com> (Doc. No. 189 ¶ 104) (citing Doc. No. 189-9 (Lauer Declaration) at ¶¶ 17–18; Doc. No. 209-1 (Lauer deposition testimony) at 77–78, 80), viewing the evidence in the light most favorable to Plaintiff, the non-moving party, the Court concludes that Plaintiff has adduced sufficient evidence to permit a reasonable factfinder to conclude that Defendants acted with bad faith under the ACPA.  The Court will therefore deny Defendants' motion for summary judgment as to Plaintiff's cybersquatting claim (count three).   The Court turns to Defendants' motion as to Plaintiff's trademark dilution claims (counts four and five).

### C.   Trademark Dilution Under the Lanham Act and Pennsylvania Law (Plaintiff's counts four and five)

The trademark dilution cause of action "grants extra protection to strong, well-recognized marks even in the absence of a likelihood of consumer confusion—the classic test for trademark infringement—if the defendant's use diminishes or dilutes the strong identification value associated with the plaintiff's famous mark."  See Times Mirror Magazine, Inc. v. Las Vegas Sports News, LLC, 212 F.3d 157, 163 (3d Cir. 2000) (citing 4 McCarthy, supra, § 24:70).  The standards for Lanham Act and Pennsylvania dilution claims are almost identical, with the only

difference being that the Lanham Act covers instances where dilution is likely, but the

Pennsylvania statute affords relief only where the defendant's use has actually caused dilution.

See 54 Pa. C.S.A. § 1124; see also Dille Family Trust v. Nowlan Family Trust, 207 F. Supp. 3d

535, 546 & n.7 (E.D. Pa. 2016).

Accordingly, to obtain relief under both statutes, a plaintiff must prove: (1) plaintiff is the

owner of a mark that qualifies as "famous"; (2) defendant is making commercial use in interstate

commerce of a mark or trade name; (3) defendant's use began after the plaintiff's mark became

famous; and (4) defendant's use causes dilution by lessening the capacity of the plaintiff's mark

to identify and distinguish goods or services.  See Times Mirror, 212 F.3d at 163; 15 U.S.C. §

1125(c).  Dilution is assessed by six factors:

> (i) [t]he degree of similarity between the mark or trade name and the famous mark.
> (ii) [t]he degree of inherent or acquired distinctiveness of the famous mark. (iii) [t]he
> extent to which the owner of the famous mark is engaging in substantially exclusive
> use of the mark. (iv) [t]he degree of recognition of the famous mark. (v) [w]hether
> the use of the mark or trade name intended to create an association with the famous
> mark. (vi) [a]ny actual association between the mark or trade name and the famous
> mark.

See 15 U.S.C. § 1125(c)(2)(B)(i)–(vi).

The Court notes that, despite their representation that they are moving for summary

judgment on all counts of Plaintiff's complaint (Doc. No. 173 at 1), Defendants' briefing in

support of their motion does not address Plaintiff's trademark dilution claims (counts four and

five).  For that reason alone, Defendants' motion is subject to denial as to those counts.  In

addition, even if the Court considered the merits of any motion by Defendants as to counts four

and five, the Court would still conclude that Defendants' motion as to those counts is subject to

denial.  Viewing the evidence of record in the light most favorable to Plaintiff as the non-moving

party, and acknowledging the Court's conclusion supra as to the evidence adduced by Plaintiff

regarding the likelihood of confusion issue, see supra at III.A.2, and further noting the evidence adduced by Plaintiff relating to Defendants' intent in using the PSU mark, see supra at III.B, which relate to two of the factors by which dilution is assessed, see 15 U.S.C. § 1125(c)(2)(B)(v)–(vi), the Court concludes that Defendants have failed to demonstrate a failure of proof as to the elements of Plaintiff's trademark dilution claims.  Accordingly, Defendants' motion as to those claims will be denied. The Court turns to Defendants' motion as to their counterclaim for reverse domain name hijacking.

### D.   Reverse Domain Name Hijacking (Defendants' counterclaim count two)

Defendants move for summary judgment on their counterclaim count two, which asserts a claim for reverse domain name hijacking pursuant to 15 U.S.C. §§ 1114(2)(D)(iv)–(v).  In their counterclaim, Defendants assert that "Plaintiff is well-aware from his prior unsuccessful UDRP proceedings involving the Defendant(s)' name that the registration and use of the Disputed Domain is entirely proper"; "Plaintiff allegations represent a knowing and material misrepresentation that the Disputed Domain is a bad faith use of a valid trademark"; and "Plaintiff's allegations represent a knowing and material misrepresentation that the Disputed Domain is identical to, confusingly similar to, or dilutive of a valid trademark."  (Doc. No. 32 ¶¶ 47–49.)

The ACPA "provides a cause of action to a 'domain name registrant who is aggrieved by an overreaching trademark owner' and allows the registrant to seek a judgment 'to declare that the domain name registration or use by the registrant is not unlawful under the Lanham Act and to obtain injunctive relief for return of the domain name.'"  See Am. Diabetes Ass'n v. Friskney Fam. Tr., LLC, 177 F. Supp. 3d 855, 873 (E.D. Pa. 2016) (quoting Hawes v. Network Solutions, Inc., 337 F.3d 377, 384 (4th Cir. 2003) (citations omitted)).  "In simple terms, the statute affords

protection to a domain name registrant who is improperly targeted by an overzealous trademark owner claiming the registered domain name infringes on the trademark owner's mark." <u>Am. Diabetes Ass'n</u>, 177 F. Supp. 3d at 873–74.

To prove a claim of reverse domain name hijacking under 15 U.S.C. § 1114(2)(D)(v), a domain name registrant must show that: (1) it is a domain name registrant; (2) its domain name was suspended, disabled or transferred under a policy implemented by a registrar as described in 15 U.S.C. § 1114(2)(D)(ii)(II); (3) the owner of the mark that prompted the domain name to be suspended, disabled or transferred has notice of the action; and (4) its registration or use of the domain name is not unlawful under the Lanham Act.  <u>See</u> <u>Am. Diabetes Ass'n</u>, 177 F. Supp. 3d at 874 (citing <u>Barcelona.com, Inc. v. Excelentisimo Ayuntamiento de Barcelona</u>, 330 F.3d 617, 626–27 (4th Cir. 2003)).[79]

Defendants offer minimal argument as to their entitlement to summary judgment on this claim beyond their statement that they "are entitled to damages for reverse domain name hijacking."  (Doc. No. 175 at 41.)  In response, Plaintiff asserts that Defendants' motion as to this claim "fails on its face" because Defendants fail to even address the requirement that the domain be "suspended, disabled or transferred under a policy implemented by a registrar" and, as Plaintiff argues, "[n]or can they establish this factor on the undisputed facts, which show that

---

[79]   The Court notes that Defendants' counterclaim count two also references 15 U.S.C. § 1114(2)(D)(iv), which provides as follows:

> If a registrar, registry, or other registration authority takes an action described under clause (ii) based on a knowing and material misrepresentation by any other person that a domain name is identical to, confusingly similar to, or dilutive of a mark, the person making the knowing and material misrepresentation shall be liable for any damages, including costs and attorney's fees, incurred by the domain name registrant as a result of such action.

<u>See</u> <u>id.</u>

Penn State never caused Defendants' domain to be suspended, disabled, or transferred." (Doc. No. 193 at 43) (citing Doc. No. 178 ¶¶ 149, 153–55).[80]

Having reviewed the relevant evidence of record in the light most favorable to Plaintiff as the non-moving party, the Court concludes that it is indeed undisputed that Defendants continue using the goPSUrv.com mark to offer and advertise RVs and related goods and services and that Defendants' website at goPSUrv.com remains active. See (Doc. No. 178 ¶¶ 148–49; Doc. No. 189 ¶¶ 148–49). In their response to Plaintiff's statement of facts, Defendants dispute Plaintiff's contention that "[a]t no time has GoDaddy prevented Keystone Alternatives from advertising RV rental services through the <goPSUrv.com> Domain" by asserting that "[a]s a result of the UDRP complaint, GoDaddy LLC disabled Defendants' access to and control of the Disputed Domain" and therefore "[w]ithin approximately 48 hours of filing the UDRP case, Defendant lost the ability to control the Disputed Domain, including redirecting the nameservers and emails, as well as eliminating Defendant's ability to sell, transfer, or license the website." (Doc. No. 189 ¶ 155) (citing Doc. No. 189-9 (Lauer Declaration) at ¶ 10). Reviewing the Lauer Declaration upon which Defendants rely to dispute Plaintiff's assertion, the Court notes that it states that: "[w]hen the UDRP arbitration was filed, the Disputed Domain was locked and we lost the ability to control the Disputed Domain, including redirecting nameservers and emails, as well as eliminating our ability to sell, transfer, or license the website or our business." (Doc. No. 189-9 ¶ 10.)

In addressing Defendants' motion as to this claim, the Court notes that "the statutory text makes clear that it is a domain name which must be disabled, transferred, or suspended." See

---

[80] Because the parties refer to evidence reflected in Plaintiff's Statement of Undisputed Material Facts submitted in connection with its cross-motion for summary judgment (Doc. No. 178), the Court does so as well.

Am. Diabetes Ass'n, 117 F. Supp. 3d at 875 (citing 15 U.S.C. § 1114(2)(D)(v)).  Accordingly,

the Court notes that Defendants' citation to evidence that the domain <goPSUrv.com> was

subject to a registrar lock upon Plaintiff's filing of a UDRP action is not the same thing as

evidence that the domain name <goPSUrv.com> was disabled, transferred, or suspended.  See id.

(granting summary judgment to plaintiff on defendants' reverse domain name hijacking

counterclaim for failure to support claim that domain name was "disabled" or "suspended" based

upon a registrar lock, stating that "the limited precedent available involving claims for reverse

domain name hijacking does not support Defendants' arguments that an inability to obtain an

investor, or renew a domain name at a future point in time, constitutes evidence that a domain

name itself is presently disabled"); Hawes, 337 F.3d at 384 (noting that congressional reports

indicate that the ACPA is intended to provide a cause of action when a domain name has been

suspended, cancelled, or transferred).  Because Defendants have failed to offer evidence

supporting the second element of their reverse domain name hijacking claim—that the domain

name <goPSUrv.com> was disabled, transferred, or suspended—the Court will deny

Defendants' motion for summary judgment as to their counterclaim count two.  The Court turns

to Defendants' argument that Defendant Mark Lauer is entitled to summary judgment because

Plaintiff has failed to substantiate any claims against him individually.

### E.    Defendant Mark Lauer's Personal Liability

Individual corporate officers are regularly found to be proper defendants in Lanham Act

cases under a participation theory of liability.  See, e.g., Donsco, Inc. v. Casper Corp., 587 F.2d

602, 606 (3d Cir. 1978) (finding corporate officer liable where the officer "authorized and

approved" the actions at issue in the case); Rosenbaum & Assocs., P.C. v. Morgan & Morgan,

No. 17-cv-04250, 2018 WL 327167, at *7–9 (E.D. Pa. Jan. 8, 2018) (declining to dismiss claims

against corporate officers who affirmatively made misleading statements or authorized and approved false advertising); Gentex Corp. v. Abbott, 978 F. Supp. 2d 391, 403–04 (M.D. Pa. 2013) (declining to dismiss claims against corporate officer because a complaint alleging trademark infringement "requires only such allegations that show [the officer] participated in the wrongful acts"); Brown & Brown, Inc. v. Cola, 745 F. Supp. 2d 588, 618 (E.D. Pa. 2010) (declining to dismiss claims against corporate officers alleged to have used the infringing marks).

Defendants argue that Plaintiff has failed to substantiate any claim against Defendant Mark Lauer individually and so they are entitled to summary judgment as to Plaintiff's claims as asserted against him.  (Doc. No. 175 at 40.)  Defendants maintain that: "Lauer has testified he owned only 50% of Keystone Alternatives"; "Lauer has testified he did not personally select the Disputed Domain, but that it was selected by a marketing consultant"; "Lauer did not register the Disputed Domain personally"; "Lauer has testified that he did not personally design or maintain the website at the Disputed Domain, and did not know how, but that this was handled by a web designer contracted with Keystone Alternatives"; and that "Lauer has testified he was not personally aware that PSU was a trademark, but believed it to be simply the name of Penn State."  (Id. at 41) (citing Doc. No. 174 ¶¶ 15, 18, 22, 114).

Plaintiff responds that, under Donsco, "[a] corporate officer is individually liable for the torts he personally commits and cannot shield himself behind a corporation when he is an actual participant in the tort."  (Doc. No. 193 at 41–42) (quoting Donsco, 587 F.2d at 606).  Plaintiff asserts that the evidence of record reflects Defendants' acknowledgement of Lauer's personal participation in the alleged infringement, citing to the following: "Lauer conducts the business of Keystone Alternatives"; "Lauer determined the appearance of Defendants' [alleged] infringing website"; "Lauer printed '40,000 business cards per year for distribution'"; "Lauer organized

Defendants' advertising at events"; and "Lauer handled the purchase and stenciling of Defendants' RVs with the goPSUrv Mark."  (Doc. No. 193 at 42) (citing Doc. No. 174 ¶¶ 13, 31, 38, 44–46).  Plaintiff argues that "[t]his is the precisely the evidence that the Third Circuit has found establishes personal liability."  (Id.) (citing Donsco, 587 F.2d at 606).  In addition, the Court notes that the evidence of record reflects that the "Registrant Name" of the <goPSUrv.com> website is listed as Mark Lauer.  See (Doc. No. 209-8 (Exh. A to Lauer Declaration) at 10).

Upon consideration of the parties' arguments, the relevant authority, and the evidence of record, viewed in the light most favorable to Plaintiff as the non-moving party, the Court concludes that Plaintiff has pointed to evidence supporting a reasonable factfinder's conclusion that Defendant Mark Lauer was a participant in the alleged infringement of Plaintiff's PSU mark.  Accordingly, the Court will deny Defendants' motion for summary judgment as to Defendant Mark Lauer's personal liability.

## IV.  CONCLUSION

For the foregoing reasons, the Court will deny Defendants' motion in its entirety.  An appropriate Order follows.

 s/ Yvette Kane_____
Yvette Kane, District Judge
United States District Court
Middle District of Pennsylvania